# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
MILAGRO HOLDINGS, LLC, et al.,          :   Case No. 15-11520 (____)
                                        :
            Debtors.¹                   :   Joint Administration Requested
                                        :
-------------------------------------------------------------x
```

## DECLARATION OF SCOTT W. WINN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

1.      I, Scott W. Winn, hereby submit this declaration in support of chapter 11 petitions and first day relief (the "Declaration") under penalty of perjury.  I am the Chief Restructuring Officer of each of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").  The Debtors engaged Zolfo Cooper Management, LLC ("Zolfo Cooper"), of which I am a Senior Managing Director in May, 2014 to assist the Debtors in managing their business and evaluating strategic alternatives.  On May 5, 2014, I was appointed as Chief Restructuring Officer of the Debtors.  In that capacity, I am familiar with the Debtors' day-to-day operations, business and financial affairs and books and records.

2.      Under its engagement with the Debtors, Zolfo Cooper has agreed to provide certain temporary personnel to assist the Debtors and to assist me in carrying out my role as an officer of the Debtors.  Zolfo Cooper specializes in providing restructuring advisory and crisis management services to financially distressed companies and their creditors.  Zolfo Cooper is

---

¹       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Milagro Holdings, LLC (7232); Milagro Oil & Gas, Inc. (7173); Milagro Exploration, LLC (9260); Milagro Producing, LLC (9330); Milagro Mid-Continent, LLC (8804); and Milagro Resources, LLC (6134). The Debtors' mailing address is 1301 McKinney Street, Suite 500, Houston, Texas 77010.

one of the world's leading financial advisory, interim management and litigation support firms, with a team of restructuring and litigation specialists.  Zolfo Cooper specializes in advising debtors, creditors, investors and court-appointed officials in bankruptcy proceedings and out-of-court workouts.  Zolfo Cooper has a reputation for quality and breadth of experience, and a proven track record for success, earned by serving clients in numerous nationally prominent bankruptcy proceedings.

3.      This Declaration is submitted pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and I am authorized by the Debtors' Boards of Directors and Members, as applicable, to submit it on behalf of the Debtors.  All facts set forth herein are based upon my personal knowledge of the Debtors' business and finances, information learned from my review of relevant documents, and/or information supplied to me by other members of the Debtors' management and the Debtors' advisors.  If called upon to testify, I would testify to the facts set forth herein on that basis.

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Each Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors have requested that their Chapter 11 Cases be consolidated for procedural purposes only.

5.      To familiarize the Court with the Debtors, their chapter 11 petitions, their restructuring goals, and the relief requested in the First Day Pleadings, this Declaration (a) provides background information with respect to the Debtors' corporate history and their business operations, as well as a summary of the Debtors' prepetition capital structure,

(b) describes the circumstances leading to the commencement of these Chapter 11 Cases, and (c) supports the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings.

## A.    Introduction[2]

6.    The Debtors commenced the Chapter 11 Cases to effectuate a prearranged bankruptcy plan[3] that was negotiated at arms'-length over a period of several months by and among the Debtors and a number of their chief stakeholders, including:  (i) the Prepetition First Lien Agent and Prepetition First Lien Lenders; (ii) the Initial Consenting Noteholders; and (iii) certain of the Debtors' equity holders.  Each of the foregoing, along with the Debtors and White Oak, are parties to that certain Restructuring Support Agreement, dated July 15, 2015 (the "Restructuring Support Agreement").    Under the Restructuring Support Agreement, the executing parties have agreed to, among other things, support and pursue the confirmation of the Plan and effectuate the related transactions.

7.    The Plan is premised on the consummation of the Contribution Agreement, dated July 15, 2015 (the "Contribution Agreement"), by and between the Debtors and White Oak Resources VI, LLC ("White Oak").  Generally, the Contribution Agreement provides that the Debtors will contribute substantially all of their oil and gas assets to White Oak in exchange for $120 million in cash plus equity in White Oak (the "Milagro Interests") with an agreed value of approximately $97 million (as may be adjusted as set forth in Contribution Agreement).

---

[2]    Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Declaration below.

[3]    The Debtors anticipate that they will file the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be amended, modified, and/or supplemented from time to time, the "Plan") and the *Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be amended, modified, and/or supplemented from time to time, the "Disclosure Statement") on or prior to seven (7) days after the Petition Date.

8.      In addition to the consummation of the Contribution Agreement, the Plan contemplates:  (i) payment in full of the Debtor's DIP Facility and the remaining claims of the Prepetition First Lien Lenders and Prepetition First Lien Agent, if any; (ii) the issuance of a certain percentage of the equity interests in reorganized Milagro Oil & Gas, Inc. ("MOG," and as reorganized, the "Reorganized Debtor") to holders of the Prepetition Second Lien Notes (collectively, the "Noteholders"); and (iii) to fund the distributions contemplated pursuant to the Plan, the implementation of a rights offering (the "Rights Offering"), whereby the Debtors will sell a certain portion of the remaining equity interests in the Reorganized Debtor at a discount to eligible Noteholders and the final portion of the remaining equity interests in the Reorganized Debtor shall be issued as a fee to the Noteholders that are backstopping the Rights Offering.  The Noteholders will receive substantially less than payment in full under the Plan.  While the Plan provides that holders of allowed general unsecured claims against the Debtors will receive no distribution on account of such claims, certain holders of general unsecured claims that are Eligible Plan Release Consideration Recipients[4] (as defined in the Plan) may obtain a pro rata share of $1 million of consideration from the Noteholders if they elect to become a "Releasing Party" under the Plan.

9.      Based on the Debtors' efforts over the past several years, it has become clear that the Noteholders, whose claims are secured by second liens on all of the Debtors' assets, are substantially impaired—a fact that has been exacerbated by the declines in global crude oil and natural gas prices.  While the Noteholders will receive less than payment in full in the Chapter 11

---

[4]      The Plan defines "Eligible Plan Release Consideration Recipients" as any Holder of a General Unsecured Claim (only to the extent such Claim is ultimately Allowed) other than any Holder of (i) a Claim that has been assumed by White Oak under the Contribution Agreement, (ii) a Notes Claim with respect to any deficiency, or (iii) a Claim (regardless of type) of an Equity Holder or Insider of the Debtors or any of the Affiliates of any such persons, including, without limitation, any Claims for management, advisory, or similar services (with each capitalized term having the meaning ascribed to it in the Plan).

Cases, the Contribution Agreement Transaction, and the Plan and Rights Offering, provide an avenue that will allow for payment in full of all other secured, administrative expense and priority claims, as required under section 1129 of the Bankruptcy Code, and will also facilitate the payment of a number of other prepetition claims against the Debtors—primarily through the assumption of liabilities under the Contribution Agreement.  In addition, certain of the First Day Pleadings, which are supported by the Noteholders, provide for payment of a number of prepetition claims against the Debtors.  Taken together, these transactions provide recoveries that may not otherwise be available absent the support of the Noteholders (and other stakeholders) for the Plan and Contribution Agreement Transaction.  After extensive efforts on the part of the Debtors and their stakeholders, the Debtors believe that the Plan (and its related transactions) represents the best outcome currently available in the Chapter 11 Cases.

**B.    The Debtors' Organizational Structure**

10.    MOG, a wholly owned subsidiary of Milagro Holdings, LLC ("Milagro Holdings"), owns (either directly or indirectly) 100% of Milagro Exploration, LLC ("Milagro Exploration"), Milagro Resources, LLC ("Milagro Resources"), Milagro Producing, LLC ("Milagro Producing"), and Milagro Mid-Continent, LLC ("Milagro Mid-Continent").  Each Debtor is a Delaware limited liability company, except for MOG, which is a Delaware corporation.  A chart setting forth the Debtors' current organization structure is attached hereto as Exhibit A.

**C.    The Debtors' Assets and Operations**

11.    The Debtors are independent oil and gas companies primarily engaged in the acquisition, exploration, exploitation, development, production and sale of oil and natural gas reserves.  The Debtors' historic geographic focus has been along the onshore Gulf Coast area,

primarily in Texas, Louisiana and Mississippi.  As of March 31, 2015, the book value of the Debtors' total assets and liabilities was approximately $390 million and $468 million, respectively.  The Debtors generated revenues of approximately $153.1 million and $23.5 million during the fiscal year ended December 31, 2014 and the three month period ended March 31, 2015, respectively.

### 1.    Brief Background Regarding the Oil and Gas Production Industry

12.    In most oil and gas producing states, fee owned real property interests consist of the actual surface features, as well as the oil, gas and other minerals located beneath the surface. The mineral estate may be severed from the surface interest in the form of an oil and gas lease. Under the lease, the real property owner transfers all or a portion of the oil and gas leasehold interest to the transferee/lessee and reserves a non-operating "economic interest" in the minerals (such as a royalty) that is expected to continue for the productive life of the property.  The nature of the severed mineral estate is governed by the applicable law of the particular state in which the leasehold interest is located.

13.    The interest conveyed by the typical oil and gas lease is called the working interest, consisting of a share of the gross production burdened by the costs, risks and expenses of exploration and production.  The working interest may be further divided and sold such that multiple parties each own an undivided fractional share in the oil and gas leasehold estate.  Even if a single lessee owns oil and gas leases from all of the oil and gas fee co-owners, that lessee will usually spread the cost and risk of exploration, drilling and development by assigning undivided fractional shares in its oil and gas leases to third parties.

14.    A joint operating agreement (the "JOA") is an agreement among co-owners that outlines the rights and obligations with respect to the exploration and development of oil and gas

in certain described lands, called the "Contract Area."[5]  Among other things, a JOA (i)  identifies the property interests of the parties in identified leases and lands, (ii) commits the parties to participate in operations on the Contract Area and provides a procedure for dealing with disagreements among the parties about what operations will be conducted, (iii) designates one of the co-owners, (most often the co-owner with the largest fractional interest or with the most operating expertise) as the "operator" to " . . . conduct and direct and have full control of all operations on the Contract Area as permitted and required within the limits of this agreement," and sets forth the duties of the operator, (iv) sets forth the sharing of expenses for and the allocation of liability with respect to joint operations and provides remedies for a party's failure to pay its share of expenses, and (v) provides for limits on a party's rights with respect to transfer and acquisition of interests in the oil and gas leases in the Contract Area, as well as set forth the rights of the parties in production from the Contract Area.  Notably, the JOA provides that exploration, development and production expenses incurred under a JOA are borne among the several co-owners that are parties to the JOA, which provision can be implemented through direct payment to the operators and/or deductions from the proceeds of the oil and gas produced in the Contract Area.

15.    As a general matter, the operator is responsible for assuring that the wells covered by the JOA operate and produce, and the operator often markets and sells the hydrocarbons produced for certain non-operating working interest owners and lessees (or distributes such hydrocarbons to the non-operating owners and lessees or their designees).  The operator is responsible for paying or causing to be paid the applicable taxes and other amounts owing with

---

[5]    The JOA typically used by most oil and gas producers in the United States, including the Debtors, is a form document promulgated by the American Association of Professional Landmen, (*e.g.*,  A.A.P.L. Form 610-1977, A.A.P.L. Form 610-1982 and A.A.P.L. Form 610-1989), with certain negotiated deviations from the model form included in the Article 16 "Other Provisions" section of the JOA.

respect to operation of the leases and wells.  The costs of operating the wells and leases are shared among the participants in the JOA according to its terms and may either be paid on a cash basis or through deductions from the proceeds distributable to the non-operating lessees and owners

### 2.      Overview of the Debtors' Assets

16.      The Debtors own and operate a significant portfolio of oil, natural gas liquids ("NGL"), and natural gas producing properties and mineral interests in the Gulf Coast area and have expanded their footprint through the acquisition and development of additional producing or prospective properties in North Texas and Western Oklahoma.  In addition, the Debtors own certain non-operated working interests in leases located on the Outer Continental Shelf in the Gulf of Mexico.  The Debtors operate in four principal areas located in: (a) Wharton, Victoria, Goliad, Lavaca, Harris, Brazoria and Colorado Counties, Texas; (b) St. Martin, Vermilion and Cameron Parishes, Louisiana, Marion and LaFourche Counties, Mississippi and Jefferson, Chambers and Liberty Counties, Texas; (c) Starr, Hidalgo, Live Oak and Bee Counties, Texas; and (d) Jack and Wise Counties, Texas and Beaver, Ellis, Harper and Woodward Counties, Oklahoma.  Collectively, the Debtors' holdings include 183,331 net acres, 1,186 wells, of which 797 are operated by Milagro Exploration, and net proved natural gas reserves of 81,422 MMcf and net proved oil reserves of 14,609 MMBbl.

17.      For the most part, the Debtors' oil and gas leases are owned by Milagro Resources and Milagro Producing.  Milagro Exploration serves as an operator under the Development Agreement (as defined below), but does not itself own any oil and gas leases. Milagro Mid-Continent is a dormant entity with no assets and liabilities, other than the guarantee of the Debtors' funded indebtedness.

### 3.    Overview of the Debtors' Operations

18.    As of the Petition Date, the Debtors' workforce consisted of 97 full-time employees and 2 regular part-time employees; 62 of which are salaried employees and 37 are hourly employees.  The Debtors have a land department staff that includes four landmen, an exploration staff that includes three geologists, one geophysicist and one geological technician and an operations staff that includes five engineers.  The Debtors, through Milagro Exploration, serve as the operator for most of the wells in which they participate—797 of 1,186 wells.  In addition, Milagro Exploration is a party to a Development Services Agreement (the "Development Agreement") with Milagro Producing, whereby Milagro Exploration provides: (a) geological and geophysical services, (b) project marketing services, (c) drilling, completion and operating services (including acting as an operator for oil and gas properties), (d) accounting services, (e) revenue distribution and joint interest billing services, (f) governmental compliance and regulatory filings support, (g) general business services, (h) land services, (i) production handling, marketing and hedging, and (j) such additional services as the parties mutually agree.

19.    As a result of these arrangements, substantially all of the obligations to third parties incurred in the ordinary course of the Debtors' business are the obligation of Milagro Exploration.  As operator, Milagro Exploration is responsible for obtaining a variety of goods and services from third parties.  It is also responsible for marketing for sale the production from the various wells that it operates.

20.    In addition, each of the states in which the Debtors operate provide special protections to participants in the oil and gas industry—including providing that amounts owed to the approximately 6,000 royalty interest and working interest owners for whom the Debtors serve as operator are subject to automatically perfecting security interests and providing that parties to whom the Debtors, as operators, have incurred obligations may assert superpriority

security interests against the subject leasehold and proceeds of the leasehold.  In order to faithfully discharge its duties as an operator, Milagro Exploration (and the other Debtors, where applicable) have remained current on their obligations to pay both the interest owners for whom they serve as an operator and the parties who have rendered goods and services to them as an operator.  Doing so has allowed Milagro Exploration to remain in good stead as an operator and avoid adverse actions against the Debtors, including the encumbrance of the leaseholds they own or for which Milagro Exploration serves as operator and the termination of the JOAs for which Milagro Exploration serves as operator.

**D.      Prepetition Capital Structure**

**1.      The Debtors' Funded Indebtedness**

21.      _Prepetition First Lien Financing_.  In September 2014, the Debtors amended and restated their then existing first lien secured credit facility, pursuant to that certain Second Amended and Restated First Lien Credit Agreement dated as of September 4, 2014 (the "Prepetition First Lien Financing Agreement"),[6] among TPG Specialty Lending, Inc. ("TSL"), as administrative agent (in such capacity, the "Prepetition First Lien Agent"), for certain lenders (in such capacity, the "Prepetition First Lien Lenders"), the Prepetition First Lien Lenders, Milagro Exploration, LLC and Milagro Producing, LLC (the "Borrowers"), as borrowers, and MOG, as a guarantor.  The obligations under the Prepetition First Lien Financing Agreement are further supported by guaranties by MOG's non-Borrower subsidiaries.  The Prepetition First Lien Financing Agreement has a stated maturity date of September 4, 2017.

22.      The Prepetition First Lien Financing Agreement provided for aggregate borrowings of up to $140 million, subject to a Borrowing Base that is subject to quarterly

---

[6]      All capitalized terms used in describing the Prepetition First Lien Financing Agreement shall have the meaning ascribed to them therein.

redeterminations to be effective not later than as of March 1, June 1, September 1, and December 1 of each year (as well as other discretionary redeterminations).  The obligations under the Prepetition First Lien Financing Agreement are secured by first priority liens upon and senior security interests in substantially all of the Borrowers' and Guarantors' property and assets (collectively, the "Prepetition First Lien Collateral").  As of the Petition Date, the outstanding principal indebtedness under the Prepetition First Lien Financing Agreement was $87,625,000. As discussed below, the Debtors are in default under the Prepetition First Lien Financing Agreement, the Obligations have been accelerated, and the obligations thereunder are proposed to be refinanced under the DIP Facility.

23.    *Prepetition Second Lien Notes*.  In May 2011, in connection with the refinancing of their then-existing first lien debt, the Debtors completed an offering, pursuant to that certain Indenture, dated as of May 11, 2011, by and among MOG, as issuer, the guarantors party thereto, and Wells Fargo Bank, N.A. as trustee, of $250.0 million of 10.50% senior secured second lien notes due 2016 (the "Prepetition Second Lien Notes").  The current trustee for the Prepetition Second Lien Notes is Wilmington Trust, N.A. (in such capacity, the "Prepetition Second Lien Trustee").  The Prepetition Second Lien Notes are publicly held and secured by a second priority lien on the Prepetition First Lien Collateral.  The Prepetition Second Lien Notes are due May 11, 2016 and carry a face interest rate of 10.50% payable semi-annually.  Interest on the Prepetition Second Lien Notes was last paid on June 14, 2013.  As of June 30, 2015, the outstanding principal balance of the Prepetition Second Lien Notes was $250 million, accrued but unpaid interest on the Prepetition Second Lien Notes was approximately $56.0 million and accrued but unpaid late fees and penalties was approximately $5.3 million.

24. Pursuant to that certain Intercreditor Agreement, dated as of May 11, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement") by and among Wells Fargo Bank, N.A., (as predecessor to the Prepetition First Lien Agent) and Wells Fargo Bank, N.A. (as predecessor to the Prepetition Second Lien Trustee), the Prepetition Second Liens are junior and subordinate to the Prepetition Senior Liens.

25. The Prepetition Second Lien Notes currently are in default, but the Prepetition Second Lien Trustee has not sought to accelerate. Pursuant to the Intercreditor Agreement, the Prepetition Second Lien Trustee is prohibited from enforcing remedies arising from a default under the Prepetition Second Lien Notes for a "standstill" period of 180 days from the date the Prepetition Second Lien Trustee delivers to the Prepetition First Lien Agent a notice of acceleration of the Prepetition Second Lien Notes, which period shall be tolled for certain specified reasons, including if the Prepetition First Lien Agent is pursuing its own remedies with respect to the Prepetition First Lien Collateral.

### 2. The Debtors' Other Indebtedness

26. The Debtors have remained relatively current on their ordinary course obligations, particularly for the reasons discussed above related to their obligations as lessee and as operator under their various JOAs. The Debtors believe that, as of the Petition Date, the amount of their outstanding liabilities (excluding disputed and unliquidated litigation claims) that are not related to funded indebtedness, total approximately $16 million of operating obligations already incurred and approximately $32 million of asset retirement obligations. The Debtors believe that White Oak has agreed to assume (subject to the purchase price adjustments set forth in the Contribution Agreement) a substantial portion of these amounts through the Contribution Agreement, either directly or indirectly, including "suspense funds" and the long-term asset retirement obligations.

### 3. Equity

27.    In 2007, in connection with an $825 million acquisition of the Gulf Coast Division of Petrohawk Energy Corporation (the "Petrohawk Transaction"), Milagro Holdings was capitalized with a $250 million equity investment made by funds affiliated with ACON Investments (together with its affiliated and managed funds, "ACON"), Guggenheim Capital (together with its affiliated and managed funds, "Guggenheim"), and West Coast Capital (together with its affiliated and managed funds, "West Coast").   The 2007 capitalization transaction resulted in ACON, Guggenheim and West Coast owning a substantial majority of the Debtors' equity interests, and those parties own approximately 44%, 30%, and 14%, respectively, of the equity interest in Holdings as of the Petition Date.

28.    On January 13, 2010, as part of a recapitalization, the Debtors entered into agreements to exchange a portion of their then-existent debt for $205.5 million of MOG's Series A Preferred Stock (the "Preferred Stock").  As of June 30, 2015, there was approximately $148.3 million in accrued dividends under the Preferred Stock.

### E. Events Leading to Debtors' Chapter 11 Filings

### 1. Turmoil in the Oil and Natural Gas Markets

29.    The Petrohawk Transaction closed in November 2007 when oil and natural gas prices were at or near historic highs.  However, after a short uptick, the oil and gas markets did an almost immediate about-face in terms of pricing, attributable primarily to the unforeseen "shale revolution," which unlocked reserves previously considered uneconomic to drill and flooded the energy markets with cheap domestic fuel.  Specifically, oil prices dropped by over 50% from November 2007 through 2008.  Additionally, the price of natural gas began a steep decline, falling approximately 40% by 2009, with current prices at over 45% below 2007 prices. Oil and natural gas prices started to recover from 2009 to the middle of 2014.  It was then, at the

same time that the Debtors began the process of refinancing their first lien debt, that oil and natural gas prices took an abrupt dive in the second half of 2014, which price shock has continued to this day.  Oil prices and natural gas are now approximately 60% and 65%, respectively, of the level they were at just a year ago.  Oil and natural gas price have never returned to the levels expected at the time the Petrohawk Transaction occurred.

30.    As a result of this turmoil, the Debtors' business and financial affairs have been significantly and negatively impacted since late 2007.  Following the Petrohawk Transaction, the Debtors' total asset base was reduced due to an impairment charge of approximately $430 million taken in 2008 and an additional impairment charge of approximately $40 million taken in 2009.  These impairments wiped out the approximately $250 million equity investment made at the time of the Petrohawk Transaction, and the Debtors' balance sheet reported negative equity of $61.2 million by December 31, 2008 with negative equity growing to $78.4 million by March 31, 2015.  Since 2008, the Debtors have not had positive net earnings, and the table below sets forth their net losses (in thousands), starting with the year ended December 31, 2008.

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Q1' 2015 |
|------|------|------|------|------|------|------|----------|
| ($319,757) | ($8,636) | ($70,588) | ($23,574) | ($33,396) | ($55,372) | ($53,541) | ($14,974) |

31.    The Debtors' oil and gas business requires substantial capital expenditures for the exploration, exploitation and development of crude oil and natural gas reserves and as a result, the Debtors depend heavily on the availability of capital and liquidity to finance their operations. The Debtors' operating performance has been negatively affected by a combination of declining commodity prices and unsuccessful drilling programs all of which have led to the inability of the Debtors to service their debt obligations and meet their obligations to the Prepetition First Lien Lenders and the Noteholders.  Contractions in the Debtors' available liquidity have, in turn,

limited the Debtors' ability to further produce oil, NGLs and natural gas, thus further exacerbating the Debtors' liquidity constraints.

32.     Following the refinancing of the Debtors' first lien obligations in September 2014, the Debtors were able to access additional liquidity and believed that they may be on a path to improved financial performance.  Indeed, immediately after the refinancing the Debtors were able to implement new drilling programs, which was simply not possible prior to the refinancing, and began to seek new revenue producing projects.  However, those initiatives were short-lived.  The unforeseen and sharp dive in pricing in the global oil and gas markets that played out through the end of 2014, led to a contraction in the Debtors' borrowing base, which is ultimately tied to commodity-pricing.  By the first quarter of 2015, the Debtors were once again hamstrung by the same commodities pricing issues that had plagued their ability to generate profits since 2008.

**2.      Out of Court Restructuring Efforts and Initiation of the Debtors' Chapter 11 Cases**

33.     In the years prior to the Petition Date, the Debtors explored a range of restructuring alternatives.  First, in 2010, the Debtors engaged in a recapitalization, which reduced the Debtors' funded indebtedness by approximately $195 million.  Second, in the spring of 2013, the Debtors launched a private exchange offer to exchange a portion of the Prepetition Second Lien Notes for equity, cash and/or new notes and a related restructuring.  However, since the minimum principal amount of at least $237.5 million of outstanding principal amount of the Prepetition Second Lien Notes was not tendered in the exchange offer, the conditions to the exchange offer were not satisfied and the Debtors were unable to consummate the proposed de-leveraging transaction.  Third, the Debtors were able to extend the maturities of their debt obligations through various refinancings, most recently through the refinancing of their then-

existing first lien indebtedness in September 2014.  However, the upheaval in oil and natural gas prices that started to develop around the time the Debtors were finalizing entry into the Prepetition First Lien Financing Agreement, and which firmly manifested itself in the beginning of 2015, significantly curtailed the run-way the Debtors otherwise would have obtained from that refinancing.

34.     Finally, since 2012, the Debtors have been exploring transactions to address their liquidity constraints.  Over this period, the Debtors have been engaged in extensive discussions and negotiations with certain Noteholders advised by Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Blackstone Advisory Partners L.P. ("Blackstone") and certain of the Debtors' equity holders.  At times, these discussions centered on a further recapitalization of the Debtors, including the potential for a new equity investment in the Debtors.  In addition, the Debtors have utilized a number of financial advisors and investment banks and have exchanged information with and made presentations to over 20 interested parties in an effort to execute a transformational opportunity.

35.     The Debtors extensive efforts over the last three years have yielded only one suitor—White Oak—that the Debtors believe could credibly execute a transaction that would preserve value for the Debtors' stakeholders.  White Oak's initial contact with the Debtors occurred in September 2013, following an introduction from ACON.  At that time, White Oak performed some initial due diligence to better understand the Debtors' assets and financials.  In July of 2014, White Oak's interest continued as they returned for an update on Milagro's 2013 and 2014 drilling results and mid-year 2014 reserves.  Most recently, ACON again placed White Oak in contact with the Debtors in March of 2015.

36.     Since approximately March of 2015, the Debtors have worked in good-faith and at arms'-length with White Oak, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Noteholders advised by Akin Gump and Blackstone, ACON and Guggenheim to negotiate the Contribution Agreement and the Restructuring Support Agreement.   Upon execution of these various agreements in July of 2015, the Debtors commenced their Chapter 11 Cases to effectuate the Contribution Agreement and their reorganization pursuant to the Plan.

**3.      Recent Events of Default under the Prepetition First Lien Financing Agreement**

37.     At the time of the Debtors' September 2014 refinancing of their first lien obligations, the Prepetition First Lien Lenders and Debtors acknowledged certain existing events of default under their existing credit agreement and entered into a forbearance agreement with respect to those existing defaults in connection with entering into the Prepetition First Lien Financing Agreement.  On May 4, 2015, the Prepetition First Lien Agent advised the Debtors of a new event of default under the Prepetition First Lien Financing Agreement arising from the Debtors' failure to maintain certain hedging agreements. On that same date, the Prepetition First Lien Agent advised the Debtors that the borrowing base under the Prepetition First Lien Financing Agreement had been redetermined and designated to be $95,925,000, and that the Debtors had a Borrowing Base Deficiency of $13,387,500.  On May 22, 2015, the Debtors, the Prepetition First Lien Agent and the Prepetition First Lien Lenders entered into a forbearance agreement, which was amended and restated as of June 10, 2015, and those parties entered into a second forbearance agreement on July 1, 2015, which was amended on July 10, 2015 (collectively, the "Forbearance Agreements").   The Forbearance Agreements provided the Debtors with the necessary time to finalize the negotiation of the Contribution Agreement and to

prepare for the commencement of these Chapter 11 Cases to implement the transaction contemplated therein.

38.    On June 30, 2015, the Prepetition First Lien Agent delivered a notice of acceleration that, in accordance with the Prepetition First Lien Financing Agreement, (x) terminated the Commitments; (y) accelerated the entire unpaid principal amount of the Loans and requires that the Borrowers repay the entire principal amount of the Loans immediately, together with all accrued and unpaid interest (including default interest) thereon, costs, fees, expenses, the Yield Maintenance Premium (as defined in the Fee Letter) and all other Obligations payable under the Prepetition First Lien Financing Agreement and other Loan Documents, and (z) declared that all such amounts are immediately due and payable without presentment, demand, protest or further notice of any kind.   On July 8, 2015, the Debtors monetized certain crude oil and natural gas swap transactions and received proceeds of $21,000,000, which were applied to reduce the outstanding principal indebtedness under the Prepetition First Lien Financing Agreement.

## F.    Support of First Day Pleadings

39.    Concurrently herewith, the Debtors filed a number of "first day" motions and applications (each, a "First Day Pleading" and, collectively, the "First Day Pleadings")[7], seeking relief that the Debtors believe is necessary to enable them to operate in chapter 11 with minimal disruption.   I have reviewed each of the First Day Pleadings discussed below, and the facts set forth in each First Day Pleading are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

---

[7]    Capitalized terms used but not defined in this Section shall have the meaning ascribed to them in the relevant First Day Pleading.

1.      **Administrative Motions**

     i.      **Motion for Joint Administration**

40.      The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code whose operations are largely interrelated, and seek entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only.

41.      Joint administration of the Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources and the resources of all parties in interest.    Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

     ii.      **Application to Retain Prime Clerk as Claims and Noticing Agent**

42.      The Debtors seek entry of an order pursuant to 28 U.S.C. § 156(c) approving the retention of Prime Clerk as claims and noticing agent for the Debtors, effective *nunc pro tunc* to the Petition Date.   This application pertains only to the work to be performed by Prime Clerk under the Clerk of the Court's delegation of duties permitted by section 156(c) of the Judicial Code, Local Rule 2002-1(f) and the Claims Agent Protocol.

43.      The Debtors have thousands of potential parties in interest in the Chapter 11 Cases.   Although the Office of the Clerk of the Court ordinarily would serve notices on the Debtors' creditors and other parties in interest, it may not have the resources to undertake such tasks, especially in light of the size of the Debtors' creditor body and the expedited timelines that frequently arise in chapter 11 cases.   The Debtors selected Prime Clerk because it is one of the country's leading chapter 11 administration, solicitation, and balloting agent, and Prime Clerk has expertise in facilitating other administrative aspects of chapter 11 cases.   Prime Clerk also

provides a competitive rate structure, and the Debtors selected Prime Clerk after reviewing the qualification and pricing proposals of three separate firms.  I believe the employment of Prime Clerk as claims and noticing agent in the Chapter 11 Cases is appropriate and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**2.    Operational Motions**

**i.    Motion to Approve DIP Financing and Cash Collateral Use**

44.    The Debtors seek entry of an order authorizing them to:  (i) obtain secured postpetition financing on a superpriority basis under section 364 of the Bankruptcy Code, as provided in the DIP Credit Agreement; (ii) use Cash Collateral; (iii) provide adequate protection to the Prepetition First Lien Lenders and Noteholders, as described in the proposed interim order approving the motion; and (iv) schedule interim and final hearings pursuant to Bankruptcy Rule 4001 with respect to the relief requested in this First Day Pleading.

45.    To operate during these Chapter 11 Cases and effectuate the terms of the Contribution Agreement and the Plan, the Debtors will need to utilize prepetition collateral (including the Cash Collateral), as well as obtain additional, post-petition financing.  Without the use of the Cash Collateral and the DIP Facility, the Debtors would be unable to pay operating expenses, including, without limitation, vendor and other drilling-related expenses, employee payroll and other benefits, rent, utilities and the various other items reflected in the DIP Budget.

46.    The Debtors are seeking entry of an Interim Order that, among other things, authorizes the Debtors to enter into the DIP Facility and obtain credit and incur debt pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, as follows: (i)   a DIP Revolving Facility in an amount equal to $15,000,000, with $11,000,000 available upon entry of an Interim Order; and (ii)   upon entry of a Final Order, the Prepetition First Lien Obligations will be

converted on a dollar-for-dollar basis to a post-petition Term Loan, <u>provided</u> that with respect to the yield maintenance premium and prepayment premium due and payable under the Prepetition First Lien Agreement, such amount shall be deemed paid and satisfied in full upon the payment of $14,000,000 of yield maintenance premium under the Prepetition First Lien Agreement.

47.     The Debtors and I believe that the entry into the DIP Credit Agreement to obtain the DIP Facility and the Debtors' use of Cash Collateral are necessary to maintain the value of the Debtors' businesses as a going concern, and prevent harm to the Debtors' employees and business operations that would result without access to liquidity to pay such operating expenses, among other items, reflected in the DIP Budget.  Moreover, the interim borrowing provided for under the DIP Facility includes up to $8 million that can be used by the Debtors to fund cash collateral calls for their existing surety bonds, plus the incremental liquidity that will be necessary to fund operations pending a final hearing on the motion to approve the DIP Facility. In my opinion, the DIP Facility is appropriately sized to satisfy the Debtors' cash needs.

48.     I also believe the process which led to entry into the DIP Facility was fair and appropriate.  While the Debtors were negotiating the Contribution Agreement and preparing to file these Chapter 11 Cases, they also began discussions with the Prepetition First Lien Agent and Prepetition First Lien Lenders over the provision by the Prepetition First Lien Lenders of debtor-in-possession financing during these Chapter 11 Cases.  These parties were the logical choice to begin with, and likely the only choice, based on several factors.  First, the Debtors solicited interest in providing similar financing in the summer of 2014, and these parties provided the most attractive pricing at that time.  Given the significant downward movement in the price of crude oil and natural gas, and the resulting effect on the value of the Debtors' assets (which are highly correlated to commodities pricing), the Debtors do not believe that an

alternative lender would provide more favorable pricing than was made available to the Debtors less than 12 months ago.  Second, given the relative values of the Debtors' assets and liabilities, the Debtors believe that any party willing to provide post-petition financing would do so only on a priming basis—which would require the consent of the Prepetition First Lien Agent, at a minimum—and the Debtors do not believe the Prepetition First Lien Lenders would agree to be primed and would require that they be paid-off in full instead.  Third, the Prepetition First Lien Agent and Debtors, in connection with negotiating the DIP Facility, have agreed to fix the amount of the yield maintenance and prepayment premiums (the "Premiums") payable under the Prepetition First Lien Financing Agreement, as discussed in more detail below.

49.     In addition to negotiating with the Prepetition First Lien Lenders, the Debtors also contacted the advisors to the Initial Consenting Noteholders to see if those holders would be willing to provide superior financing than what was offered by the Prepetition First Lien Lenders.  The Debtors did not receive an offer for committed debtor-in-possession financing from the Initial Consenting Noteholders.  However, the Initial Consenting Noteholders are supportive of the proposed financing provided under the DIP Facility (to the extent set forth in the Restructuring Support Agreement).

50.     Having determined that the Prepetition First Lien Lenders were the most likely, if not the only, source to provide the required debtor-in-possession financing, the Debtors proceeded to negotiate the terms of the DIP Facility.  The Debtors engaged in extensive and good-faith negotiation with TSL, in its capacity as proposed agent for the DIP Facility, over a number of weeks.

51.     As a result of these negotiations, the Debtors were able to obtain material concessions.  In particular, the Debtors were able to obtain a lower interest rate under the DIP

Facility than what was in effect under the Prepetition First Lien Financing Agreement as of the Petition Date (even without taking into account the additional 2% default interest applicable), a point of significance since the Prepetition First Lien Lenders would likely be entitled to post-petition interest.  In addition, the Debtors were able to resolve, on a consensual and favorable basis, the amount of the Premiums, which could range from a low of $12.7 million to a high of $16.65 million, depending upon the interest rate under the Prepetition First Lien Credit Agreement and applicable treasury rate utilized to calculate the Premiums.  In exchange for agreeing to a "roll-up" of the Prepetition First Lien Obligations, the Debtors were able to agree that the Premiums would be satisfied through a $14 million term loan under the DIP Facility— resulting in what the Debtors believe is a fair calculation of the Premiums (with savings of up to $2.65 million on the Premiums, plus any interest that might have accrued on that incremental amount) and avoiding any litigation over the amount of the Premiums.  The Debtors negotiated other concessions as well, including making numerous provisions subject to entry of a final order, extending challenge periods, increasing the post-default Carve-Out, and modifying the proposed budgeting procedures.

52.    Based on the foregoing, I believe the terms of the DIP Facility and the Interim Order are fair and reasonable under the circumstances.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit on terms acceptable to the Debtors allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors have been unable to procure the necessary financing on terms more favorable than those contained in the DIP Credit Agreement.

53.     The Debtors have an immediate need for the use of the funds provided by the DIP Credit Agreement on an interim basis, and for the use of the total aggregate amount of the DIP Credit Agreement following entry of a final order.  Because there is simply no viable alternative for the Debtors to maintain the value of their assets while pursuing approval of the proposed Contribution Agreement Transaction, I believe that the advances under the DIP Facility are vital to preserve and maximize the going concern value of the Debtors' estates.  I further believe that without access to the DIP Facility, the Debtor and its estate would suffer immediate and irreparable harm.

### ii.      Motion to Utilize Cash Management System

54.     In the ordinary course of business, the Debtors utilize a Cash Management System involving ten domestic Bank Accounts.  The Cash Management System provides a well-established mechanism for the collection, management and disbursement of funds used in the Debtors' business.  The Cash Management System is essential to the efficient execution and achievement of the Debtors' strategic business objectives, and, ultimately, to maximizing the value of the Debtors' estates.

55.     With the exception of certain escrow accounts, the Debtors believe the requirements of section 345(b) of the Bankruptcy Code are satisfied for each Bank Account because either (i) the Debtors maintain deposit balances within the limits of insurance by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation or (ii) the Bank where such Bank Accounts are maintained has executed a UDA with the U.S. Trustee that brings the bank accounts into compliance.

56.     Finally, the Debtors engage in certain Intercompany Transactions with each other in the ordinary course of business, as more fully described in the motion.  The continuation of

such ordinary course transactions will permit the Debtors to conduct business as usual and avoid any disruption to the detriment of the Debtors and their stakeholders. The Debtors request that, pursuant to section 503(b)(1) of the Bankruptcy Code, the Court accord administrative expense status to all Intercompany Transactions arising after the Petition Date.

57.     The Debtors and I believe that the relief requested above is necessary to maintain the value of the Debtors' businesses as a going concern, and prevent harm to the Debtors' estates and stakeholders.

### iii.     Motion to Pay Employee Wages and Benefits

58.     The continued and uninterrupted support of the Debtors' Employees is essential to the Debtors' business and successful reorganization.   The skills and experience of the Employees, their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' infrastructure and business are essential to the preservation of the value of the Debtors' estates and, thus, the ability of the Debtors to emerge from chapter 11 as a reorganized entity.   Interruptions in payment of prepetition Employee-related obligations will impose hardship on the Employees and is certain to jeopardize their continued performance during this critical time.

59.     For the most part, the Debtors' employee relations are managed through the co-employment relationship which the Debtors have with Insperity and the terms of the Insperity CSA.  The Debtors intend to continue their relationship with Insperity post-petition, including payment of all outstanding amounts owed to Insperity to continue the Debtors' goodwill and positive relationship with Insperity.  Insperity currently holds a security deposit that the Debtors believe is well in excess of the pre-petition amounts owed to Insperity.  Maintaining the Insperity co-employment relationship and, by extension, the Debtors' workforce without any disruption is

critical to the Debtors as they work toward the closing of the Contribution Agreement Transaction.

60.     The Debtors are also seeking authority on a second-day basis, after notice and a hearing, to continue their Severance Program, which is available to all full-time Employees.  The payment and continuation of certain Severance Program benefits is critical to maintaining employee morale at a critical juncture for the Debtors.  The Debtors are not seeking, under the Severance Program, to pay any amounts that would violate section 530(c) of the Bankruptcy Code.

61.     For the foregoing reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

### iv.     Motion to Pay Interest Owners and Lease Operating Expenses

62.     The Debtors are obligated, pursuant to their oil and gas leases, to remit to the lessors who own the mineral rights leased by the Debtors (the "Royalty Interest Owners") their share of production from the producing wells located on their respective leases or leases and lands pooled or unitized therewith, free of expenses of production (the "Royalties").  Further, certain assignments of the oil and gas leases created an interest in a share of the production from the producing wells located on the respective leases or leases and lands pooled or unitized therewith, free of expenses of production, that burden the Debtors' working interest in the leases (the "ORRI").  The Debtors are also obligated to remit to the owners of the ORRI (the "ORRI Owners") the share of the proceeds attributable to the ORRI.  In addition to the Royalties and ORRIs, certain third parties own working interests in the leases and wells operated by the Debtors under the JOAs (the "Working Interest Owners" and collectively with the ORRIs and

Royalty Interest Owners, the "Interest Owners").  As a result, the Debtors are responsible for the timely, proper and efficient operation of the leases and wells for the benefit of the Debtors and the other Interest Owners.

63.     Non-payment of the amounts owed to the Interest Owners could jeopardize the oil and gas leases.  Royalty Interest Owners are paid in arrears and must be paid promptly.  The Interest Owners may be able to make claims that their share of production revenue are not property of the estate or may be able to argue that maintenance of the underlying oil and gas lease may be called into question, leading to a lease termination claim.  Accordingly, the Debtors believe that the payment of the amounts owed to Interest Owners is in the best interests of the Debtors and their estates.

64.     Also, in its capacity as operator under various JOAs, Milagro Exploration, incurs numerous current lease operating expenses and other exploration and production costs from various third parties, including vendors, contractors, subcontractors and suppliers, who provide services, supplies and materials necessary to ensure that operations continue in a timely manner, as well as certain capital expenditures (collectively, the "LOEs").  The Debtors are reimbursed for LOEs incurred in operating these leases and wells from the Working Interest Owners through the payment of joint interest billings or by netting the Working Interests Owners' share of production revenue against their share of the LOEs.  Many of the vendors whose goods and services give rise to the LOEs are entitled to assert statutory liens if they are not paid the LOEs, and the JOAs typically require that, among other things, the operator will keep the oil and gas interests that are subject to the JOA free and clear of liens and encumbrances.

65.     Similarly, the Debtors also own working interests in certain leases and wells operated by third-parties under various JOAs.  The Debtors receive their share of revenue from

the operators of these wells, taking an insignificant amount of such payments in-kind and then reimbursing the applicable operators for their share of the production costs through the payment of joint-interest billings ("JIBs," and together with the Royalties, the ORRI, the LOEs, and the obligations under the JOAs, the "Obligations").  The failure to timely pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtors' interest in a well and the underlying oil and gas lease and, under the provisions of certain JOAs, possibly lead to defaults.

66.    If the Debtors fail to satisfy the Obligations as they come due, the Debtors' operations will be severely impacted and production may completely cease for certain wells. Such occurrences would directly, immediately and negatively impact the Debtors' creditors and other parties in interest.  The Debtors and I believe that satisfaction of the Obligations as they become due is in the best interests of the Debtors, their estates and creditors and the other parties in interest.

### v.        Motion to Pay Prepetition Taxes

67.    The Debtors seek entry of an order authorizing them, in their sole discretion, to pay to the applicable taxing authorities in the ordinary course of business certain taxes and fees, including, without limitation, sales and use taxes, federal, state and local severance and production taxes, franchise and margin tax and other miscellaneous taxes (collectively the "Taxes"), and incur business license, permit and vehicle fees and other similar assessments (collectively, the "Fees"), as they deem necessary, to various federal, state, and local governmental authorities accruing prior to the Petition Date (collectively, the "Taxes and Fees") in an amount not to exceed $250,000.

68.     I believe that many of the Taxes and Fees are entitled to priority under section 507 of the Bankruptcy Code and that all of the Taxes and Fees (to the extent valid) will be paid in full under the Plan.  The Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate their businesses during their stay in chapter 11.  Some of the Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid on time.  Moreover, certain of the outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities, and such funds do not constitute property of the Debtors' estates

69.     If the Debtors do not pay the Taxes and Fees in a timely manner, the Authorities may initiate audits, attempt to file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will materially and immediately harm the estates and distract the Debtors from their goal of an efficient and prompt exit from chapter 11 with a right-sized capital structure.  Such actions would unnecessarily divert the attention of the Debtors' management and employees from the Chapter 11 Cases and their goal of promptly implementing the Plan.  Authorization to pay the Taxes and Fees, which will otherwise be paid in full on the effective date of the Plan, will eliminate these distractions, while affording the Taxes and Fees the same treatment they will ultimately receive under the Plan

70.     I believe payment of the Taxes and Fees is prudent and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

### vi.        Utilities Motion

71.     The Debtors seek entry of interim and final orders:   (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate

assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; and (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

72.    The Debtors incur utility expenses in the ordinary course of business for, among other things, telephone, electric, gas, sewer, waste management, and other services (the "Utility Services").  The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to 50% of the Debtors' estimated monthly costs for Utilities (collectively, the "Utility Deposit"), or approximately $64,000, and, additionally, have proposed procedures to address any request made by the Utility Providers for additional adequate assurance.

73.    If the Utility Providers are permitted to terminate services under section 366, the Debtors may be forced to suspend the affected operations, resulting in a severe disruption, loss of revenue and profits, and potentially the destruction of their businesses.  Such disruption and loss would, at a minimum, cause substantial harm to the Debtors' efforts to expeditiously consummate the Plan and be detrimental to the estates and the Debtors' creditors.  Accordingly, it is essential that the Utility Providers continue to provide their services without interruption.

74.    Prior to their chapter 11 filings, the Debtors timely made monthly payments to the Utility Providers.  Overall, the Debtors have a long and established payment history with most of the Utility Providers indicating consistent payment for utility services with few to no material defaults or arrearages with respect to undisputed Utility Services invoices other than payment interruptions that may be incidental to the commencement of the Chapter 11 Cases.

75.     For the foregoing reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

### vii.        Insurance Motion

76.     The Debtors maintain certain Insurance Programs through several different Insurance Carriers.  The Insurance Programs provide the Debtors with insurance coverage for liabilities relating to, among other things, general liability, directors' and officers' liability (including excess liability), employment practices liability, commercial property liability, control of well, auto liability and various other property-related and general liabilities.  In addition to annual premiums, pursuant to certain of the Insurance Programs, the Debtors may be required to pay various deductibles and retentions for claims asserted under the policies.  Continuation of the Insurance Programs is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic liability.  Furthermore, it is my understanding that, pursuant to the chapter 11 operating guidelines issued by the U.S. Trustee pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage, which coverage is provided by certain of the Insurance Programs.  In connection therewith, the Debtors will request that the order authorize them to pay all prepetition premiums, fees and expenses arising under, or related to, the Insurance Programs.

77.     The Debtors have financed the premiums for certain of the Insurance Programs under a premium financing agreement ("PFA").  If the Debtors are unable to continue making payments under the PFA, the relevant lender may be permitted to terminate the relevant Insurance Programs.  The Debtors would then be required to obtain replacement policies on an

expedited basis and likely at a significantly increased cost.  In connection therewith, the Debtors will request authority to continue making payments under the PFA in the ordinary course.

78.    Finally, in addition to the Insurance Programs, the Debtors' insurance coverage consists of surety bonds with respect to identifiable risks related to the drilling and operation of wells (collectively, the "Insurance Bonds") issued in the aggregate face amount of approximately $7.5 million.  The Insurance Bonds guarantee the Debtors' performance of obligations owing to federal and state government departments and other third-parties.  In many instances, the Insurance Bonds are required by applicable law.  As of the Petition Date, the Debtors estimate that they owe nothing on account of the Insurance Bond Premiums.  By their terms, however, the Insurance Bonds may require the Debtors to provide certain credit support to the issuer in order to maintain the bonds, including fully cash collateralizing the Insurance Bonds.  The Debtors request authority, in their sole discretion, to continue or renew the Insurance Bonds, including to provide any credit support required to maintain the Insurance Bonds, and to pay any pre-petition amounts that may be owed that the Debtors are unaware of on account of the Insurance Bond Premiums.

79.    For the foregoing reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

### viii.    Claims and Equity Trading Motion

80.    The Debtors estimate that their federal income tax net operating losses are approximately $217 million as of the conclusion of the first quarter of 2015 ("NOLs"), and they expect to have incurred additional NOLs since then through the Petition Date, which amounts could be even higher when the Debtors emerge from chapter 11.  These NOLs are valuable tax

attributes, and to preserve the NOLs the Debtors will seek to (a) establish notice and objection procedures regarding certain transfers of beneficial interests in equity securities in Milagro Holdings and (b) establish a record date for notice and potential sell-down procedures for trading in claims against the Debtors.  The relief sought will enable the Debtors to closely monitor certain transfers of equity securities, and thereby preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize the Debtors' use of their NOLs.  In addition, establishing a record date with respect to trading in claims against the Debtors will ensure that claimholders receive sufficient notice that any claims purchased after such date may ultimately be subject to certain sell-down procedures in the event an order approving such procedures is sought by the Debtors and entered by the Court in order to preserve the Debtors' ability to use their NOLs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2015

_____
Scott W. Winn
Chief Restructuring Officer

*[Signature Page to First Day Declaration]*

# Exhibit A

## Corporate Organization Chart

