# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                          :
In re                                     :   Chapter 11
                                          :
MILAGRO HOLDINGS, LLC, et al.,            :   Case No. 15-11520 (____)
                                          :
            Debtors.¹                     :   Jointly Administered
                                          :
-----------------------------------------------------x
```

## MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of interim and final orders: (i) authorizing the Debtors to (a) obtain postpetition financing and (b) use cash collateral; (ii) granting adequate protection; (iii) scheduling a final hearing; and (iv) granting related relief. In support of the Motion, the Debtors rely upon the *Declaration of Scott W. Winn in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference, and respectfully state as follows:

### Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the

---

1     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Milagro Holdings, LLC (7232); Milagro Oil & Gas, Inc. (7173); Milagro Exploration, LLC (9260); Milagro Producing, LLC (9330); Milagro Mid-Continent, LLC (8804); and Milagro Resources, LLC (6134). The Debtors' mailing address is 1301 McKinney Street, Suite 500, Houston, Texas 77010.

District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are sections 105,

361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2 and 9013-1(m) of

the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for

the District of Delaware (the "Local Rules").

**Relief Requested**[2]

3.      By this Motion, the Debtors request entry of an interim order substantially in the

form attached hereto as **Exhibit I** (the "Interim Order") and a final order (the "Final Order", and

together with the Interim Order, the "DIP Orders"):

> a.      Authorizing the Debtors to obtain secured postpetition financing on a
> superpriority basis (the "DIP Facility")[3] pursuant to the terms and
> conditions of that certain "Credit Agreement," in substantially the form
> attached hereto as **Exhibit II** (as the same may be amended,
> supplemented, restated, or otherwise modified from time to time, the "DIP
> Credit Agreement"), by and among Milagro Exploration, LLC and
> Milagro Producing LLC, as borrowers (each a "Borrower" and
> collectively the "Borrowers"), Milagro Oil & Gas, Inc. ("MOG" or the
> "Company"), and each subsidiary of MOG listed as a guarantor on the
> signature pages thereto, as guarantors (collectively, the "Guarantors"), the
> various financial institutions and other Persons from time to time parties
> thereto (the "Lenders"), TPG Specialty Lending, Inc., as administrative

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Loan
Documents and the DIP Orders, as applicable.

[3]    The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational
purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and
should only be relied upon as such.  For a complete description of the terms and conditions of the DIP Facility,
reference should be made to the DIP Loan Documents (as defined below), the Interim Order and, if and when
applicable, the Final Order (collectively, the "DIP Documents").  The summary herein is qualified in its entirety
by reference to the DIP Documents.  Parties are strongly encouraged to read the DIP Documents.  In the event
there is a conflict or inconsistency between this Motion and the operative documents, the DIP Documents shall
control in all respects.

agent (in such capacity, the "<u>DIP Agent</u>") for the Lenders, and as the swing line lender (in such capacity, the "<u>Swing Line Lender</u>" and together with the Lenders, the "<u>DIP Lenders</u>"), pursuant to which the DIP Lenders have agreed to provide:   (i) new money revolving loans of up to $15,000,000 (the "<u>DIP Revolving Facility</u>"), of which $11,000,000 shall be available on an interim basis, and, (ii) subject to entry of a Final Order, a term loan (the "<u>Term Loan</u>") equal to the dollar-for-dollar conversion of the Prepetition First Lien Obligations outstanding under the Prepetition First Lien Loan Documents into DIP Obligations;

b.      Authorizing the Debtors to execute the DIP Credit Agreement and the other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Agent;

c.      Granting to the DIP Agent, for itself and for the benefit of the DIP Lenders first priority security interests in and liens on all of the DIP Collateral  to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>"), subject only to Permitted Priority Liens and prior payment of the Carve-Out;

d.      Granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

e.      Authorizing the Debtors to use Cash Collateral;

f.      Authorizing the Debtors to grant, subject to the Carve-Out, adequate protection to (A) the Prepetition First Lien Agent on behalf of the Prepetition First Lien Lenders and (B) the Prepetition Second Lien Trustee on behalf of the Prepetition Second Lien Noteholders;

g.      Subject only to entry of the Final Order, authorizing the dollar-for-dollar conversion of the Prepetition First Lien Obligations to the Term Loan; and

h.      Scheduling a hearing (the "<u>Final Hearing</u>"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order;

### <u>Local Rule 4001-2 Disclosures</u>

4.      The Debtors submit this concise statement listing certain material terms set forth in the DIP Credit Agreement and the proposed DIP Orders.  Specifically, the Debtors believe that the following financing terms are required to be identified pursuant to Bankruptcy Rules

4001(b) and (c) and Local Rule 4001-2 and, as discussed in detail herein, are necessary and

justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

    a.    <u>Stipulations to Validity, Perfection, and Amount of Pre-Petition Liens; Waiver of Pre-Petition Claims</u>.  Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.  Although the DIP Loan Documents include certain stipulations by the Debtors related to the validity, amount, and perfection of the Prepetition First Lien Obligations and Prepetition Second Lien Obligations, the Interim Order provides for the earlier to occur of (a) the date that is seventy-five (75) days after entry of the Interim Order, and (b) the date that is sixty (60) days after the appointment of the official committee, if any, as the challenge period for such stipulations.  *See* Interim Order ¶¶ F & 15.

    b.    <u>Waiver of Section 506(c) Surcharge</u>.  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  Although the DIP Loan Documents provide for a waiver of rights under section 506(c) with respect to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders, the proposed waiver of the estates' rights will be effective only upon entry of the Final Order granting such relief.  See Interim Order ¶ 19.

    c.    <u>Liens on Avoidance Actions</u>.  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  The DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders are not granted liens on Avoidance Actions or their proceeds in the Interim Order, but they will receive liens on the proceeds of Avoidance Actions upon entry of the Final Order.  *See* Interim Order ¶ 8, 11 & 12.

    d.    <u>Roll-Up of First Lien Obligations</u>. Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans to repay prepetition debt.  The DIP Loan Documents provide for the "roll-up" of the First Lien Obligations upon entry of the Final Order whereby the Term Loan will be issued and used to repay all First Lien Obligations on a permanent basis immediately upon entry of the Final Order, as provided for in the DIP Documents.  *See* Interim Order ¶ 2(b).

    e.    <u>Treatment of Professionals</u>.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors.  The Carve-Out being provided for in the Interim Order is

applicable to both the Debtors' and the official unsecured creditors' committee's professionals, if any. *See* Interim Order ¶ 13. Accordingly, all professionals retained by these estates will be treated equally, subject to the Approved Budget, a copy of which is attached to the Interim Order as Exhibit A. *Id.*

f.   Priming Liens.   Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder. The DIP Liens will prime the existing liens of the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders. *See* Interim Order ¶ 8(a)(i). As discussed more fully herein, those parties have consented to the DIP Liens priming their existing liens.

g.   Equities of the Case.   Local Rule 4001-2(a)(1)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under Section 552(b)(1) of the Bankruptcy Code. The Interim Order provides that upon entry of the Final Order, Prepetition First Lien Agent and the Prepetition First Lien Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Prepetition First Lien Agent or the Prepetition First Lien Lenders with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral. *See* Interim Order ¶ 21.

5.   The provisions of the DIP Loan Documents as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the Chapter 11 Cases because the DIP Lenders would not agree to the DIP Facility and the Prepetition First Lien Lenders and Prepetition Second Lien Noteholders would not agree to the use of Cash Collateral or the priming of their liens by the DIP Lenders without the inclusion of such terms, as well as for all of the other reasons discussed below.

**Background**

I.   **Introduction and Case Background**

6.   On July 15, 2015 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). No trustee, examiner, or creditors' committee has been appointed in the

Chapter 11 Cases.  The Debtors are operating their respective businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The Debtors are independent energy companies based in Houston, Texas engaged in the acquisition, development, exploration, and production of oil and natural gas.  The Debtors' historic geographic focus has been along the onshore Gulf Coast area, primarily in Texas, Louisiana, and Mississippi.  The Debtors operate a significant portfolio of oil and natural gas producing properties and mineral interests in this region and have expanded their footprint through the acquisition and development of additional producing or prospective properties in North Texas and Western Oklahoma.  In addition, the Debtors own certain non-operated working interests in leases located on the Outer Continental Shelf in the Gulf of Mexico.  The Debtors own an interest in approximately 4,690 oil and gas leases, substantially all of which are subject to or burdened by royalty interests, overriding royalty interests, third party working and non-working interests, or a sub-set or combination thereof.

8.      The Debtors commenced the Chapter 11 Cases to effectuate a prearranged bankruptcy plan that was negotiated at arms'-length over a period of several months by and among the Debtors and a number of their chief stakeholders, including:  (i) the Prepetition First Lien Agent; (ii) the Prepetition First Lien Lenders; (iii) and certain Prepetition Second Lien Noteholders (the "Initial Consenting Noteholders"); and (iv) certain of the Debtors' equity holders.  The Plan is premised on the consummation of the Contribution Agreement, dated July 15, 2015 (the "Contribution Agreement"), by and between the Debtors and White Oak Resources VI, LLC ("White Oak").  Generally, the Contribution Agreement provides that the Debtors will contribute substantially all of their oil and gas assets to White Oak in exchange for $120 million

in cash plus equity in White Oak (the "Milagro Interests") with a value of approximately $97 million (plus or minus the amount of total adjustments as set forth in Contribution Agreement).

9.     In addition to the consummation of the Contribution Agreement, the Plan contemplates:  (i) payment in full of the Debtor's DIP Facility and the remaining claims of the Prepetition First Lien Lenders and Prepetition First Lien Agent under the Prepetition First Lien Facility, if any; (ii) the issuance of a certain percentage of the equity interests in reorganized MOG (as reorganized, the "Reorganized Debtor") to holders of the Prepetition Second Lien Notes; and (iv) the implementation of a rights offering (the "Rights Offering"), whereby a certain portion of the remaining equity interests in the Reorganized Debtor shall be offered for purchase at a discount to eligible Prepetition Second Lien Noteholders and the final portion of the remaining equity interests in the Reorganized Debtor shall be provided as a fee to the Prepetition Second Lien Noteholders that are backstopping the Rights Offering.  While the Plan provides that holders of allowed general unsecured claims against the Debtors will receive no distribution on account of such claims, certain holders of general unsecured claims that are Eligible Plan Release Consideration Recipients (as defined in the Debtors' proposed plan) may obtain a pro rata share of $1 million of consideration from the Prepetition Second Lien Noteholders if the relevant general unsecured creditor chooses to be a "Releasing Party" under the Plan.

10.     In connection with the Plan, over a period of several months, the Debtors, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Initial Consenting Noteholders, certain of the Debtors' equity holders, and White Oak also negotiated and executed the Restructuring Support Agreement, dated July 15, 2015 (the "Restructuring Support Agreement"), whereby the executing parties have agreed to, among other things, support and pursue the confirmation of the Plan and the effectuation of the related transactions.

## II.    **The Debtors' Secured Indebtedness**

11.    *Prepetition First Lien Facility*.  In September 2014, the Debtors amended and restated their existing first lien secured credit facility, pursuant to that certain Second Amended and Restated First Lien Credit Agreement dated as of September 4, 2014 (the "Prepetition First Lien Financing Agreement"),[4] among TPG Specialty Lending, Inc., as administrative agent (in such capacity, the "Prepetition First Lien Agent"), for certain lenders (in such capacity, the "Prepetition First Lien Lenders"), the Prepetition First Lien Lenders, the Borrowers, as borrowers, and MOG, as a guarantor.  The obligations under the Prepetition First Lien Financing Agreement are further supported by guaranties by MOG's non-Borrower subsidiaries.  The Prepetition First Lien Financing Agreement has a stated maturity date of September 4, 2017.

12.    The Prepetition First Lien Facility provided for aggregate borrowings of up to $140 million, subject to a Borrowing Base that is subject to quarterly redeterminations to be effective not later than as of March 1, June 1, September 1, and December 1 of each year (as well as other discretionary redeterminations).  The obligations under the Prepetition First Lien Financing Agreement are secured by first priority liens upon and senior security interests in substantially all of the Borrowers' and Guarantors' property and assets (collectively, the "Prepetition First Lien Collateral").  As of the Petition Date, the outstanding principal indebtedness under the Prepetition First Lien Financing Agreement was $87,625,000.  As discussed below, the Debtors are in default under the Prepetition First Lien Financing Agreement, the Obligations have been accelerated, and the obligations thereunder are proposed to be refinanced under the DIP Facility.

---

[4]    All capitalized terms used in describing the Prepetition First Lien Financing Agreement shall have the meaning ascribed to them therein.

13.     *Prepetition Second Lien Notes*.  In May 2011, in connection with the refinancing of their then-existing first lien debt, the Debtors completed an offering, pursuant to that certain Indenture, dated as of May 11, 2011, by and among MOG, as issuer, the guarantors party thereto, and Wells Fargo Bank, N.A. as trustee, of $250.0 million of 10.50% senior secured second lien notes due 2016 (the "Prepetition Second Lien Notes").  The current trustee for the Prepetition Second Lien Notes is Wilmington Trust, N.A. (in such capacity, the "Prepetition Second Lien Trustee").  The Prepetition Second Lien Notes are publicly held and secured by a second priority lien on the Prepetition First Lien Collateral.  The Prepetition Second Lien Notes are due May 11, 2016 and carry a face interest rate of 10.50% payable semi-annually.  Interest on the Prepetition Second Lien Notes was last paid on June 14, 2013.  As of June 30, 2015, the outstanding principal balance of the Prepetition Second Lien Notes was $250 million, accrued but unpaid interest on the Prepetition Second Lien Notes was approximately $56.0 million and accrued but unpaid late fees and penalties was approximately $5.3 million.

14.     Pursuant to that certain Intercreditor Agreement, dated as of May 11, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement") by and among Wells Fargo Bank, N.A., (as predecessor to the Prepetition First Lien Agent) and Wells Fargo Bank, N.A. (as predecessor to the Prepetition Second Lien Trustee), the Prepetition Second Liens are junior and subordinate to the Prepetition Senior Liens.

15.     The Prepetition Second Lien Notes currently are in default, but the Prepetition Second Lien Trustee has not sought to accelerate.  Pursuant to the Intercreditor Agreement, the Prepetition Second Lien Trustee is prohibited from enforcing remedies arising from a default under the Prepetition Second Lien Notes for a "standstill" period of 180 days from the date the Prepetition Second Lien Trustee delivers to the Prepetition First Lien Agent a notice of

acceleration of the Prepetition Second Lien Notes, which period shall be tolled for certain specified reasons, including if the Prepetition First Lien Agent is pursuing its own remedies with respect to the Prepetition First Lien Collateral.

### III.    Recent Events of Default under the Prepetition First Lien Facility

16.    At the time of the Debtors' September 2014 refinancing of their first lien obligations, the Prepetition First Lien Lenders and Debtors acknowledged certain existing events of default under their existing credit agreement and entered into a forbearance agreement with respect to those existing defaults in connection with entering into the Prepetition First Lien Financing Agreement.  On May 4, 2015, the Prepetition First Lien Agent advised the Debtors of a new event of default under the Prepetition First Lien Financing Agreement arising from the Debtors' failure to maintain certain hedging agreements. On that same date, the Prepetition First Lien Agent advised the Debtors that the borrowing base under the Prepetition First Lien Financing Agreement had been redetermined and designated to be $95,925,000, and that the Debtors had a Borrowing Base Deficiency of $13,387,500.  On May 22, 2015, the Debtors, the Prepetition First Lien Agent and the Prepetition First Lien Lenders entered into a forbearance agreement, which was amended and restated as of June 10, 2015, and those parties entered into a second forbearance agreement on July 1, 2015, which was amended on July 10, 2015 (collectively, the "Forbearance Agreements").   The Forbearance Agreements provided the Debtors with the necessary time to finalize the negotiation of the Contribution Agreement and to prepare for the commencement of these Chapter 11 Cases to implement the transaction contemplated therein.

17.    On June 30, 2015, the Prepetition First Lien Agent delivered a notice of acceleration that, in accordance with the Prepetition First Lien Financing Agreement, (x) terminated the Commitments; (y) accelerated the entire unpaid principal amount of the Loans

and requires that the Borrowers repay the entire principal amount of the Loans immediately, together with all accrued and unpaid interest (including default interest) thereon, costs, fees, expenses, the Yield Maintenance Premium (as defined in the Fee Letter) and all other Obligations payable under the Prepetition First Lien Financing Agreement and other Loan Documents, and (z) declared that all such amounts are immediately due and payable without presentment, demand, protest or further notice of any kind.   On July 8, 2015, the Debtors monetized certain crude oil and natural gas swap transaction and received proceeds of $21,000,000, which were applied to reduce the outstanding indebtedness under the Prepetition First Lien Financing Agreement.

## IV.    <u>Negotiation of the DIP Facility</u>

18.    While the Debtors were negotiating the Contribution Agreement and preparing to file these Chapter 11 Cases, they also began discussions with the Prepetition First Lien Agent and Prepetition First Lien Lenders over the provision by the Prepetition First Lien Lenders of debtor-in-possession financing during these Chapter 11 Cases.   These parties were the logical choice to begin with, and likely the only choice, based on several factors.   First, the Debtors solicited interest in providing similar financing in the summer of 2014, and these parties provided the most attractive pricing at that time.   Given the significant downward movement in the price of crude oil and natural gas, and the resulting effect on the value of the Debtors' assets (which are highly tied to commodities pricing), the Debtors do not believe that an alternative lender would provide more favorable pricing than was made available to the Debtors less than 12 months ago.   Second, given the relative values of the Debtors' assets and liabilities, the Debtors believe that any party willing to provide post-petition financing would do so only on a priming basis—which would require the consent of the Prepetition First Lien Agent, at a minimum—and the Debtors do not believe the Prepetition First Lien Lenders would agree to be primed and

01:17328512.9

would require that they be paid-off in full instead.  Third, the Prepetition First Lien Agent and Debtors, in connection with negotiating the DIP Facility, have agreed to fix the amount of the Yield Maintenance Premium that is payable under the Prepetition First Lien Financing Agreement, and also have agreed that the Yield Maintenance Premium will be deemed satisfied by issuance of a $14,000,000 DIP Term Loan.  This resolution results in a payment that is approximately $2.65 million less than the Prepetition First Lien Agent asserts (and the Debtors now stipulate) is owed (plus a reduction to the interest that would otherwise accrue on the incremental amount), and avoids any litigation over the issue.

19.    In addition to negotiating with the Prepetition First Lien Lenders, the Debtors also contacted the advisors to the Initial Consenting Noteholders to see if those holders would be willing to provide superior financing than what was offered by the Prepetition First Lien Lenders.  The Debtors did not receive an offer for committed debtor-in-possession financing from the Initial Consenting Noteholders.  However, the Initial Consenting Noteholders are supportive of the proposed financing provided under the DIP Facility (to the extent set forth in the Restructuring Support Agreement).

20.    Having determined that the Prepetition First Lien Lenders were the most likely, if not only, source to provide the required debtor-in-possession financing, the Debtors proceeded to negotiate the terms of the DIP Facility.  The Debtors engaged in extensive and good-faith negotiation with TSL (as defined herein), in its capacity as proposed agent for the DIP Facility, over a number of weeks.  The Debtors were able to obtain a lower interest rate under the DIP Facility than what was in effect under the Prepetition First Lien Financing Agreement as of the Petition Date (even without taking into account the additional 2% default interest applicable).  In addition, the Debtors were able to resolve, on a consensual and favorable basis, the amount of

the yield maintenance and prepayment premiums with the Prepetition First Lien Agent and Lenders.

**The Proposed DIP Facility**

21.     The significant terms of the DIP Credit Agreement and the other DIP Loan Documents to be executed in connection therewith and to which the DIP Facility refers are as follows:

| OVERVIEW OF THE DIP FACILITY | |
| --- | --- |
| **Borrowers:** | Milagro Exploration, LLC and Milagro Producing, LLC |
| **Guarantors:** | MOG and each of MOG's direct and indirect wholly-owned subsidiaries that are not Borrowers (the "Guarantors"). |
| **DIP Agent:** | TPG Specialty Lending, Inc. ("TSL") |
| **DIP Lenders:** | TSL, the lenders under the Prepetition First Lien Obligations and/or other lending institutions and investment vehicles selected by TSL. |
| **DIP Facility:** | The $15,000,000 DIP Revolving Facility, of which $11 million will be made available upon entry of the Interim Order; provided that, after entry of the Interim Order, $8,000,000 of the DIP Revolving Facility shall only be available to be used to fund cash collateral requirements to secure the Borrowers' surety bond obligations solely to the extent that such surety bond provider requires such cash collateral; and<br><br>The Term Loan, subject to the entry of the Final Order, in an amount equal to the dollar-for-dollar conversion of the Prepetition First Lien Obligations outstanding under the Prepetition First Lien Loan Documents into DIP Obligations.<br><br>*Interim Order ¶ 2 & DIP Credit Agreement § 2.1* |
| **Uses of Proceeds/Roll-Up:** | The DIP Facility will be used to (i) fund working capital and general corporate requirements of the Debtors, bankruptcy-related costs and expenses (including interest, fees, and expenses in accordance with the DIP Orders or the DIP Loan Documents), and any other amounts required or allowed to be paid in accordance with the DIP Orders, but only as and to the extent authorized by the Approved Budget and the DIP Loan Documents and (ii) repay the Prepetition First Lien Obligations in full, subject to entry of the Final Order.<br><br>The initial Approved Budget is attached to the Interim Order as Exhibit A, and is subject to "Permitted Deviations," as set forth in the definition of such term in the DIP Credit Agreement.<br><br>*Interim Order ¶ 2 & DIP Credit Agreement § 1.1 & 7.1.7* |
| **Termination Date:** | The date that is the earliest of:  (i) the 35th day after the date of entry of the Interim Order, if the Final Order has not yet been entered on the |

| | |
|---|---|
| | docket of the Court; (ii) the date of final indefeasible payment and satisfaction in full in cash of the DIP Obligations and the termination of the commitments under the DIP Facility; (iii) the date of substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a confirmed plan of reorganization in the Chapter 11 Cases; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtors, whether done by one or a series of transactions; (v) November 15, 2015; (vi) the filing by any Debtor of a motion with the Bankruptcy Court seeking the conversion of any of the Chapter 11 Cases to a case Chapter 7 case or dismissal of the Chapter 11 Cases; and (vii) any date on which the DIP Loans and DIP Obligations accelerate or otherwise become due and payable following the occurrence of any Event of Default under the DIP Loan Documents or the Interim Order. *Interim Order ¶ 5* |
| **Use of Cash Collateral; Entities with an Interest in Cash Collateral:** | The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Interim Order, the Approved Budget (and permitted variances) and the DIP Loan Documents, without further approval by the Court. <br><br> "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Agent, the Prepetition First Lien Agent or the Prepetition Second Lien Trustee have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to the Interim Order <br><br> *Interim Order ¶¶ G & 2(c)* |
| **Interest Rates/Default Rate:** | <u>LIBO Rate Loans</u>:  Shall bear interest at the LIBO Rate (Reserve Adjusted), which is subject to a floor of 1.00%, plus an Applicable Margin of 9.50%. <br><br> <u>Base Rate Loans</u>:  Shall bear interest at the Alternate Base Rate, which is subject to a floor of 3.50%, plus an Applicable Margin of 8.50%. <br><br> <u>Default Rate</u>:  (a) In the case of principal on any DIP Loan, subject to Applicable Law, the rate of interest that otherwise would be applicable to such DIP Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, subject to Applicable Law, the Base Rate from time to time in effect, plus the Applicable Margin for DIP Loans accruing interest at the Base Rate, plus 2% per annum. <br><br> *DIP Credit Agreement §§ 1.1 & 3.2* |
| **Fees:** | <u>Commitment Fee</u>.  The Debtors agree to pay to the DIP Agent for the account of each DIP Lender a fee of 0.75% per annum for unfunded Revolving Loan Commitments, as calculated in accordance with section 3.3.1 of the DIP Credit Agreement. <br><br> <u>Facility Fee</u>.  The Borrowers agree to pay to the DIP Agent for the account of each DIP Lender with a Revolving Loan Commitment in accordance with its Percentage, a facility fee in an amount equal to |

|  | 3.00% of the aggregate amount of the Revolving Loans Commitments, which facility fee shall be earned in full on the Interim Facility Effective Date and due and payable to the DIP Agent on the Final Maturity Date.<br><br>*DIP Credit Agreement § 3.3*<br><br><u>Professional Fees and Expenses</u>.  Subject to the Fee Review Procedures, the Debtors are obligated to pay the professional fees and expenses of the DIP Agent and DIP Lenders.<br><br>*Interim Order ¶ 6; DIP Credit Agreement § 11.3* |
|---|---|
| **Conditions to Borrowing:** | Certain customary conditions precedent to extensions of credit, including, among other things, (a) execution of loan documents, (b) entry of the DIP Orders, (c) payment of certain fees and expenses required by the DIP Loan Documents, (d) receipt of a Borrowing Request accompanied by required certificates, (e) compliance with the Approved Budget, (f) minimum liquidity of $2.5 million, (g) the continued retention of the Debtors' chief restructuring officer, and (h) no Default shall have occurred or be existing.<br><br>*DIP Credit Agreement Article 5.* |
| **DIP Collateral:** | The "<u>DIP Collateral</u>" is all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to: (x) all Oil and Gas Properties, cash, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, and shall not include avoidance actions under chapter 5 of the Bankruptcy Code but, subject to entry of a Final Order, shall include all proceeds or property recovered in connection with the pursuit of Avoidance Actions; (y) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; and (z) all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above.<br><br>*Interim Order ¶ 8(a) & DIP Credit Agreement § 11.27* |
| **Liens and Priorities of DIP Obligations:** | <u>Liens</u>:  To secure the DIP Obligations, the DIP Agent will be granted for the benefit of itself and the DIP Lenders, pursuant to and in accordance with sections 364(d)(1), 364(c)(2), and 364(c)(3), valid, enforceable and fully perfected (i) first priority priming liens and senior security interests, senior to the Prepetition Liens, (ii) first priority liens and security interests on property that is not otherwise encumbered by a validly perfected lien on the Petition Date, and (iii) junior priority liens and security interests, in each case, in and on all of the DIP Collateral, subject only to (A) the Permitted Priority Liens, and (B) prior payment |

of the Carve-Out.

The DIP Liens shall be effective immediately upon the entry of the Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens; and (ii) prior payment of the Carve-Out.

The DIP Liens shall be deemed fully perfected liens and security interests, effective and perfected upon the date of the Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreement or any other agreements or instruments, such that no additional actions need be taken by the DIP Agent or the DIP Lenders to perfect such interests. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Agent, for the benefit of itself and the DIP Lenders, a security interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof, by any of the Debtors in favor of the DIP Agent, for the benefit of itself and the DIP Lenders, in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents.

*Interim Order ¶ 8*

<u>Superpriority Claim</u>:    DIP Lenders' Superpriority Claim.    The DIP Agent, for the benefit of itself and the DIP Lenders, will be granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtor's Chapter 11 Cases and in any Successor Case(s) for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim granted in paragraph 9 of the Interim Order

| | |
|---|---|
| | shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. Except as set forth in the Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case, and the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets, the Prepetition First Lien Adequate Protection Superpriority Claim and the Prepetition Second Lien Superpriority Claim. |
| | *Interim Order ¶ 9* |
| **Carve-Out:** | The DIP Liens, the DIP Superpriority Claim, the Replacement Liens, the Adequate Protection Claims and the Prepetition Liens shall be subject and subordinate only to prior payment of: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court, (ii) Professional Fees payable to Case Professionals, that are incurred or accrued prior to the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of an Event of Default under the DIP Credit Agreement, but solely if, as and to the extent such Professional Fees are or have been provided for in, and are consistent with, the Approved Budget and are ultimately allowed by the Court pursuant to Section 330 of the Bankruptcy Code, and (iii) unpaid Professional Fees incurred or accrued on or after the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of a Termination Event, in an aggregate amount not to exceed $500,000. |
| | Subject to the immediately preceding sentence, so long as no Termination Event has occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable by order under Bankruptcy Code Sections 330, 331 and 503, as provided in the DIP Loan Documents and the Approved Budget, provided that any such payment shall be subject to entry of a final order of the Court on final application for allowance of fees and expenses to be filed for each Case Professional and any such payment shall not reduce the Carve-Out. Any payment of Carve-Out expenses incurred after the occurrence of a Termination Event, including any payment of Professional Fees, shall permanently reduce the Carve-Out on a dollar-for-dollar basis. The DIP Lenders' obligation to permit the use of their Cash Collateral to fund or to otherwise pay the Carve-Out expenses may be reserved against borrowing availability under the DIP Loan Documents and, once funded and paid, shall be added to and made part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law, as applicable. |
| | Without limiting the generality of the foregoing, (A) no person or entity entitled to payment from the Carve-Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any DIP Collateral or Prepetition Collateral and (B) the Carve-Out shall not include, apply to, or be available for any success fee or similar |

| | |
|---|---|
| | payment to any professionals or other persons, including without limitation any such fee payable in connection with a restructuring or asset disposition with respect to any of the Debtors or otherwise.<br><br>*Interim Order ¶ 9* |
| **Prepetition First Lien Lenders' Adequate Protection:** | As adequate protection in respect of any Prepetition First Lien Diminution Claim, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall be granted (in each case subject to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the adequate protection set forth in Paragraph 11 of the Interim Order, including:<br><br>(a)    Prepetition First Lien Adequate Protection Liens.  To secure the Prepetition First Lien Diminution Claim, the Prepetition First Lien Agent, for itself and for the benefit of the Prepetition First Lien Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests and liens in and on all of the DIP Collateral, provided, however, that the Prepetition First Lien Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, (ii) the Permitted Priority Liens, (iii) prior payment of the Carve-Out and (iv) the Prepetition Senior Liens.  Subject to paragraph 15 of the Interim Order, the Prepetition First Lien Replacement Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.<br><br>(b)    Prepetition First Lien Adequate Protection Superpriority Claims. As further adequate protection for the Prepetition First Lien Diminution Claim, the Prepetition First Lien Agent and the Prepetition First Lien Lenders are hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 552(b) (subject to entry of a Final Order), 726, 1113 and 1114 and any other provision of the Bankruptcy Code, which allowed Prepetition First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any Avoidance Action proceeds.  The Prepetition First Lien Adequate Protection Superpriority Claim shall be subordinate and subject only to the DIP Superpriority Claim, prior payment of the Carve-Out and the Prepetition First Lien Obligations.<br><br>(c)    Fees and Expenses.  As further adequate protection for the |

Prepetition First Lien Diminution Claim, upon the closing of the DIP Facility, the Debtors shall pay in cash to the Prepetition First Lien Agent all accrued or incurred and unpaid fees, costs and expenses in respect of the Prepetition First Lien Obligations and all other accrued or incurred and unpaid fees, costs and disbursements, accrued or incurred (whether before or after the Petition Date including those incurred prior to the Petition Date which remain unpaid as of the Petition Date) under any of the Prepetition First Lien Loan Documents, as applicable, as of such date.  During these Chapter 11 Cases, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall also receive current cash payment of their fees, costs and expenses, including all reasonable fees and disbursements of its counsel, financial advisors and all other professionals or consultants retained by the Prepetition First Lien Agent or the Prepetition First Lien Lenders with services performed prior to and during these Chapter 11 Cases to the extent such fees are payable under the Prepetition First Lien Loan Documents.  The payment of the fees, expenses and disbursements set forth in this paragraph of this Interim Order shall be made subject to the Fee Review Procedures set forth in Paragraph 6(a) and (b) of the Interim Order.

(d)    _Interest_.  As further adequate protection for the Prepetition First Lien Diminution Claim,  the Debtors shall pay interest on the Prepetition First Lien Obligations in cash, as and when such interest is payable under the Prepetition First Lien Loan Documents, at the non-default rate until such time as the Prepetition First Lien Obligations are either (i) indefeasibly paid in full in cash or (ii) converted into a post-petition Term Loan.

(e)    _Right to Credit Bid_.   Subject to the provisions of the Restructuring Support Agreement, the DIP Agent, on behalf of the DIP Lenders, and the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Lenders, shall each have the right to "credit bid" their respective claims against the Debtors up to the full amount of (x) for the Prepetition First Lien Agent, the Prepetition First Lien Obligations and (y) for the DIP Agent, the DIP Obligations, during any sale of all or any portion of the DIP Collateral or Prepetition Collateral, as applicable, or any deposit or liquidated damages in connection with such sale, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  For purposes of any such bid or deposit, the portion of the Prepetition First Lien Obligations or DIP Obligations subject to a credit bid by the Prepetition First Lien Agent or DIP Agent, as applicable, shall be treated for all purposes as the equivalent of  a cash bid, cash deposit or cash payment. The DIP Agent and the Prepetition First Lien Agent shall each have the absolute right to assign, sell, or otherwise dispose of its respective right to credit bid in connection with any credit bid by or on behalf of the DIP Lenders and the Prepetition First Lien Lenders, respectively, or any acquisition entity or joint venture formed in connection with such bid.

_Interim Order ¶ 11_

| | |
|---|---|
| **Prepetition Second Lien Noteholders' Adequate Protection:** | As adequate protection in respect of any Prepetition Second Lien Diminution Claim, the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders shall be granted the following adequate protection:<br><br>(a)    _Prepetition Second Lien Replacement Liens_.  To secure the Prepetition Second Lien Diminution Claim, the Prepetition Second Lien Trustee (on behalf of the Prepetition Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements or instruments) valid, perfected, postpetition security interests in and liens on all of the DIP Collateral, _provided_, _however_, that, notwithstanding anything to the contrary, the Prepetition Second Lien Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) the Permitted Priority Liens, (iii) prior payment of the Carve-Out, (iv) the Prepetition Senior Liens and (v) the Prepetition First Lien Replacement Liens.<br><br>(b)    _Prepetition Second Lien Noteholders Adequate Protection Superpriority Claim_.  As further adequate protection for the Prepetition Second Lien Diminution Claim, the Prepetition Second Lien Noteholders are hereby granted a superpriority claim with priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code.  The Prepetition Second Lien Superpriority Claim shall be subordinate only to (i) the DIP Superpriority Claim, (ii) prior payment of the Carve-Out, (iii) payment of the Prepetition First Lien Obligations (iv) the Prepetition First Lien Adequate Protection Superpriority Claim and (v) payment of any Prepetition First Lien Adequate Protection Obligations.<br><br>_Interim Order ¶ 12_ |
| **Financial, Reporting, and Other Covenants:** | Article 7 of the DIP Credit Agreement contains covenants customary and appropriate for DIP financings of this type and substantially similar to covenants set forth in the Prepetition First Lien Obligations, including, but not limited to, (a) provision of and compliance with the Approved Budget, (b) reporting of financial information, (c) operation and maintenance of properties, and (d) maintenance of liens on properties.<br><br>The covenants will include (x) compliance with case milestones that are substantially similar to the case milestones set forth in the certain Restructuring Support Agreement and (y) seeking confirmation of the plan of reorganization in the Chapter 11 Cases consistent with the milestones set forth in the Restructuring Support Agreement, which shall repay the DIP Facility in full in cash on the plan of reorganization's effective date; _provided_, that if the case milestones set forth in the DIP |

<table>
<tr>
<td></td>
<td>Facility documents or the Restructuring Support Agreement, as applicable, are amended, modified or waived either with the consent of the DIP Agent and the required DIP Lenders or the Requisite Secured Lenders (as defined in the Restructuring Support Agreement), as applicable, then the DIP Agent and the required DIP Lenders or the Requisite Secured Lenders, as applicable, agree to consent to a corresponding amendment, modification or waiver to the case milestones set forth in the DIP Facility documents or the Restructuring Support Agreement, as applicable.

*DIP Credit Agreement Article 7*</td>
</tr>
<tr>
<td>**Events of Default:**</td>
<td>As more fully set forth in Article 9 of the DIP Credit Agreement, "Events of Default" include, without limitation, customary events of default related to non-payment of obligations, breaches of Warranties, non-performance of covenants and obligations, incurrence of judgments, certain actions under ERISA, change in control, impairment of security, dissolution of Obligors, proceedings against Obligors, cessation of business, changes in management, and sales of assets; as well as the following "Events of Default" related to the Chapter 11 Cases:

- <u>Appointment of Trustee</u>. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Obligor shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (a) a trustee under Section 1104, or (b) an examiner or other responsible person or officer with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

- <u>Conversion to Chapter 7</u>. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case.

- <u>Confirmation of Plan of Reorganization</u>. An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases which does not (a) contain a provision for termination of the Commitments and indefeasible payment in full in cash of all Obligations of the Obligors hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (b) provide for the continuation of the Liens and security interests granted to the Administrative Agent for the benefit of the Administrative Agent and the Lenders and priorities until such plan effective date.

- <u>Dismissal of Chapter 11 Cases</u>. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations of the Obligors hereunder and under the other Loan Documents upon entry thereof.</td>
</tr>
</table>

- <u>Certain Court Orders</u>.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the Lenders, (a) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (b) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Obligors equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except for allowed administrative expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", or (c) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien.

- <u>Relief From Automatic Stay</u>.  An order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Obligor with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate.

- <u>Application for Orders</u>.  An application for (a) any of the orders described in Section 9.1.10, Section 9.1.11, and Sections 9.1.17 through Section 9.2.21 of the DIP Credit Agreement shall be made (i) by a Person other than an Obligor and such application is not contested by Obligors in good faith or (ii) by an Obligor, (b) an order for the use of cash collateral without the prior written consent of the Required Lenders is made, or (c) an order for the use of Collateral (or the obtaining of financing or loans, secured by liens that are senior, *pari passu*, or junior to the Administrative Agent's Liens on Collateral) without the prior written consent of the Required Lenders is made.

- <u>Material Adverse Deviation</u>.  A Material Adverse Deviation shall have occurred and, solely in the case of the first Budget Period tested during the Interim Period, the Administrative Agent has provided three Business Days' notice to the Borrowers of the occurrence of such Material Adverse Deviation.

- <u>Loss of CRO</u>.  The CRO shall (a) resign or, except as provided in clause (b) below, otherwise cease to act as the chief restructuring officer of the Obligors and their Subsidiaries in the same capacity and with the same responsibilities as on the Interim Facility Effective Date, and a successor acceptable to Required Lenders is not appointed on terms (including with respect to start date) reasonably acceptable to the Required Lenders within 30 days of such cessation of involvement, or (b) be terminated by the Obligors.

- <u>Contribution Agreement and Restructuring Support Agreement</u>. The Contribution Agreement and/or the Restructuring Support

| | |
|---|---|
| | Agreement shall have been terminated for any reason. |
| | *DIP Credit Agreement § 9.1* |
| **Automatic Stay:** | The automatic stay provisions of section 362 of the Bankruptcy Code will be, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, among other actions: |
| | • Subject to paragraph 18(a)(iv) below, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Agent, for itself and on behalf of the DIP Lenders, or the DIP Lenders, as applicable, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party interest, to (I)(A) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Loan Documents, and (B) declare all DIP Obligations immediate due and payable, and (II) subject to three (3) business days' prior written notice (which may be delivered by electronic mail) to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all other rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) in the case of the DIP Agent, take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) in the case of the DIP Agent, foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (D) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order.  The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents. |
| | • Immediately upon the occurrence of an Event of Default under the DIP Credit Agreement or any of their obligations under this Interim Order, the DIP Agent, for itself and the benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Loan Documents without being subject to the Remedies Notice Period. |
| | • The automatic stay of Section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period. During the Remedies Notice Period, the Debtors shall not be permitted to use any Cash Collateral or any DIP Loan proceeds |

<table>
<tr><td></td><td>except to pay expenses reasonably necessary to preserve the Debtors' going concern value. The Debtors, a Creditors' Committee, if any, and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of Section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the sole issue at any hearing to re-impose the automatic stay or to obtain any other injunctive or other relief shall be limited to whether or not an Event of Default has occurred and is continuing under the DIP Loan Documents.

- If the DIP Agent and/or DIP Lenders are entitled, and have elected in accordance with the provisions hereof, to enforce their respective liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Agent or the DIP Lenders in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent or the DIP Lenders (including any collateral liquidator or consultant), (B) providing the DIP Agent or the DIP Lenders and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Agent or the DIP Lenders or their respective representatives, (C) performing all other obligations set forth in the DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's or the DIP Lenders' enforcement of rights

- Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order, the DIP Agent and the DIP Lenders shall have no further obligation to provide financing under the DIP Loan Documents and the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall have no further obligation to permit the continued use of Cash Collateral.

*Interim Order ¶ 18*</td></tr>
<tr><td>**Indemnification:**</td><td>The DIP Credit Agreement provided for the Debtors to indemnify and hold harmless the Indemnified Parties for the Indemnified Liabilities, as more fully set forth in the DIP Credit Agreement.

*DIP Credit Agreement § 11.4*</td></tr>
<tr><td>**Debtors' Stipulations and Challenge Period:**</td><td>Paragraph F of the Interim Order contains acknowledgements and stipulations by the Debtors regarding the extent, validity, enforceability and other matters related to the DIP Facility, the Prepetition First Lien Financing Agreement, Prepetition First Lien Agent, Prepetition First Lien Lenders, Prepetition First Lien Obligations, Prepetition Second Lien Note Documents, Prepetition Second Lien Trustee, the Prepetition</td></tr>
</table>

| | |
|---|---|
| | Second Lien Noteholders, and the Prepetition Second Lien Obligations.<br><br>These acknowledgements and stipulations are subject to a Challenge by certain parties in interest, subject to paragraph 15 of the Interim DIP Order, which, among other things, establishes the Challenge Deadline of (x) with respect to a Creditors' Committee, sixty (60) calendar days from the formation of a Creditors' Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or a Creditors' Committee, seventy five (75) calendar days following the date of entry of the Interim Order.<br><br>*Interim Order ¶¶ F & 15* |
| **Release:** | Subject only to Paragraph 15 of the Interim Order, entry of the Interim Order shall effectuate the following release: The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Chapter 11 Cases or any Successor Case) forever and irrevocably (a) release, discharge, and acquit the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the DIP Agent, the DIP Lenders, Prepetition First Lien Lenders or the Prepetition First Lien Agent, on the one hand, and the Debtors and their affiliates, on the other hand, including any equitable subordination claims or defenses, with respect to or relating to the Prepetition First Lien Obligations, the Prepetition Senior Liens, the Prepetition First Lien Loan Documents, the DIP Facility, the DIP Liens, the DIP Loan Documents, the Debtors' attempts to restructure the Prepetition First Lien Obligations, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition First Lien Lenders; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Prepetition First Lien Obligations and the Prepetition Senior Liens. |
| **Section 506(c) and 552(b) Waivers; Marshalling:** | The DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall be entitled to (a) subject to entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) subject to entry of the Final Order in the case of the Prepetition First Lien Agent and Prepetition First Lien Lenders, a waiver of the provisions of section 506(c) of the Bankruptcy Code.<br><br>*Interim Order ¶¶ 19 & 21*<br><br>The DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and |

| | the Prepetition First Lien Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of the Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.<br><br>*Interim Order ¶ 20* |
|---|---|
| **Lien on Avoidance Action Proceeds:** | Subject to entry of the Final Order, the DIP Liens and Replacement Liens shall extent to proceeds of Avoidance Actions. No liens are proposed to be granted on the Avoidance Actions themselves.<br><br>*Interim Order ¶ 8, 11, 12* |

## Basis for Relief Requested

22.     As set forth above and in the First Day Declaration, the Debtors believe that the DIP Facility is the best financing available to the Debtors under the circumstances and will enable the Debtors to pursue approval of the Contribution Agreement Transaction without delay. For the reasons stated herein, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code. Importantly, the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders have consented to the terms of the DIP Facility.

23.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to super-priority, administrative-expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both. Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to

authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (i.e., a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.[5]

24.      As further discussed herein, the DIP Facility is secured by substantially all of the assets of the Debtors' estates through super-priority claims, security interests, and secured liens pursuant to section 364.   The circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

## I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code.

25.      Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a super-priority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already encumbered assets.[6]   Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.[7]

26.      Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.   Specifically, courts look to whether:

  a.      The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

  b.      The credit transaction is necessary to preserve the assets of the estate; and

---

[5]     11 U.S.C. §§ 364(c), (d).

[6]     11 U.S.C. § 364(c).

[7]     *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

> c.   The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[8]

27.    The Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, among other things, super-priority claims, security interests, and liens pursuant to sections 364(c)(1)—(3) and section 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

## A.    The Debtors Could Not Obtain Unsecured Financing.

28.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.[9]  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."[10] Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."[11]

29.    As set forth above and in the First Day Declaration, the Debtors do not believe that unsecured financing is available given the Debtors' assets are all subject to the Prepetition Senior Liens held by the Prepetition First Lien Agent as well as the Prepetition Second Liens held by the Prepetition Second Lien Trustee.  The amount of this secured debt substantially

---

[8]    *In re Ames Dep't Stores*, 115 B.R. at 37-39.

[9]    *Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

[10]   *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

[11]   *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Snowshoe Co.*, 789 F.2d 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

exceeds the implied value of their assets as demonstrated by the Contribution Agreement and therefore, there is no value to secure junior financing. This conclusion is also supported by the result of the Debtors' refinancing efforts that took place than one year ago, during which the Debtors received no offers for unsecured financing. Given the downturn in global commodities prices, and the value of the Debtors' assets as a result, the Debtors cannot see how the result would be any different today. Given these factors, obtaining the financing needed by the Debtors as unsecured debt or debt that would be secured by liens junior to the existing Prepetition Liens is simply not a realistic option.

30.    Accordingly, the Debtors have satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**B.    Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.**

31.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.[12] Courts grant a debtor considerable deference in acting in accordance with its sound business judgment.[13] Further, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."[14]

32.    The Debtors' decision to enter into the proposed DIP Credit Agreement is an exercise of their sound judgment that warrants approval by the Court. The Debtors'

---

[12]    *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

[13]    *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

[14]    *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

management, Board of Directors, and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored alternative sources of capital and financing as part of this process, including the DIP Facility.  The Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility.  The Debtors management and the Board of Directors ultimately concluded that the DIP Facility will provide immediate access to capital to pay their ongoing operating expenses while pursuing approval of the Contribution Agreement Transaction, all on more favorable terms than any other reasonably available alternative.

33.    Without postpetition financing, the Debtors would be unable to expeditiously pursue approval of the Contribution Agreement Transaction in accordance with the timeline required under the Restructuring Support Agreement, while satisfying their current and ongoing operating expenses, including postpetition wages and salaries, taxes, and vendor costs.  Absent the requisite financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses, their going concern value, and seriously jeopardizing their ability to achieve the Contribution Agreement Transaction—a course of action that the Debtors, the Prepetition First Lien Lenders, and the Prepetition Second Lien Noteholders believe to be the most effective means of maximizing the value of the Debtors' estates, as demonstrated by the overwhelming stakeholder support of the Restructuring Support Agreement.  By obtaining postpetition financing, the Debtors will be in a position to preserve the value of their assets for the benefit of all creditors.

C.    **The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.**

34.    In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.[15]  Judged from that perspective, the terms of the DIP Facility are fair and reasonable.  The DIP Facility provides the Debtors the liquidity they need to operate their business during the Chapter 11 Cases, thus permitting the Debtors to effectuate the Contribution Agreement Transaction.

35.    Less than a year ago—in a more favorable borrowing environment for the Debtors and other participants in the oil and gas industry—the Debtors went through a refinancing process that resulted in the current Prepetition First Lien Financing Agreement.  The terms offered by the Prepetition First Lien Lenders thereunder were determined to be the best available at that time.  Under the DIP Facility, the Debtor are enjoying substantially the same, albeit slightly improved, borrowing rates as were available to them prepetition.  Informed by their prior refinancing effort last September, and the intervening down-turn in the oil and gas industry, the Debtors do not believe that a third-party lender that has no existing relationship with the Debtors would be willing to lend at rates that are more favorable.

36.    In addition, certain yield maintenance and prepayment premiums under the Prepetition First Lien Financing Agreement (the "Premiums") became due pre-petition.  The Prepetition First Lien Lenders have asserted that the Premiums are as much as approximately $16.65 million.  However, they have agreed to fix the Premium at $14 million if the Debtors enter into the DIP Facility and roll-up the Prepetition First Lien Obligations, including the agreed upon Premium compromise of $14 million, as discussed below.  Thus, entry into the DIP Facility

---

[15]    *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

has the potential to decrease the amount the Debtors owe to the Prepetition First Lien Lenders by up to approximately $2.65 million dollars, while also saving the Debtors' estates from the cost associated with potential litigation regarding the Premiums.

37.     The Debtors also believe that the DIP Facility, along with the coupled consent to use cash collateral, provides them with sufficient liquidity to close the Contribution Agreement Transaction.  Lastly, the Debtors have concluded that the non-economic terms of the DIP Facility are fair and reasonable and are consistent with what can be expected in a debtor-in-possession financing facility. In that regard, the various fees and charges associated with obtaining the DIP Facility are within the range of reasonableness.  Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them.  Notably, the Facility Fee only applies to the $15 million of new money available under the DIP Facility and is not payable until the Final Maturity Date of the DIP Facility.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.

38.     Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve-Out Expenses for certain administrative and professional fees, including (i) the Case Administration Fees, (ii) unpaid Professional Fees payable to any Case Professionals, that are incurred or accrued prior to the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of a Termination Event, but solely if, as and to the extent such Professional Fees are or have been provided for in, and are consistent with, the Approved

Budget and are ultimately allowed by the Court pursuant to Section 330 of the Bankruptcy Code, and (iii) unpaid Professional Fees incurred or accrued on or after the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of a Termination Event, in an aggregate amount not to exceed $500,000.  Carve-Out Expenses for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals.[16]

39.    For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases and the Debtors could not obtain postpetition financing from any other lending source.

### D.    The Roll-Up is Warranted

40.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.[17]    The business judgment rule shields a debtor's management from judicial second-guessing.[18]

41.    The Debtors submit that the roll-up of the Prepetition First Lien Obligations is appropriate in these cases.  First, the valuation in the Contribution Agreement establishes that the Prepetition First Lien Lenders are over-secured by tens of millions of dollars.  Where, as here, a

---

[16]    *See In re Ames*, 115 B.R. at 38.

[17]    *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).

[18]    *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

prepetition secured creditor is oversecured, repaying such creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  Indeed, the Prepetition Second Lien Noteholders, who are impaired and will not be paid in full, have consented to the roll-up in a substantial amount by signing on to the Restructuring Support Agreement and agreeing to support, among other things, the DIP Facility (to the extent set forth in the Restructuring Support Agreement).

42.    Second, the roll-up is one of the conditions to the Debtors' compromise with the Prepetition Frist Lien Agent regarding the amount of the Premiums under the Prepetition First Lien Financing Agreement.  As a result of the DIP Facility, and specifically the roll-up occurring upon entry of the Final Order, the Debtors will pay only $14 million on account of the Premiums, a discount of approximately $2.65 million (plus the interest that would otherwise accrue on that incremental amount) based on what the Prepetition First Lien Agent asserts is owed, resulting in a significant savings to the estates.  Depending upon which interest rate under the Prepetition First Lien Credit Agreement and applicable treasury rate are utilized to calculate the Premiums, the Debtors determined that arguments could be made that the proper Premium amount could range from a low of $12.7 million to a high of $16.65 million  and that the $14 million agreed amount represented a fair calculation and reasonable resolution of the issue. Moreover, the Debtors will be able to avoid a potentially costly and distracting dispute over the amount of these premiums and can focus on closing the Contribution Agreement Transaction.

43.    Third, the Debtors have a lower cost of borrowing under the DIP Facility, a point which has significance here since the Prepetition First Lien Obligations are likely over-secured and would accrue post-petition interest at a higher rate that is provided for under the DIP Facility (even without taking into account additional default interest).    Finally, as a simple matter, the

roll-up is part of the overall package presented to the Debtors by the DIP Agent and DIP Lenders, a package that the Debtors believe is fair and reasonable under the circumstances, as well as the only option that the Debtors believe is available and feasible. As previously mentioned, the roll-up is supported by the vast majority of the Prepetition Second Lien Noteholders, as reflected by their signing of the Restructuring Support Agreement (to the extent set forth therein).

## II.   A Priming Lien Should be Approved under Section 364(d)

44.   If a debtor is unable to obtain credit under the provisions of section 364(c) alone, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."[19]   Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

a.   The trustee is unable to obtain credit otherwise; and

b.   There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.[20]

45.   To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.[21]   The determination of adequate protection is a fact-

---

[19]   11 U.S.C. § 364(d).

[20]   *Id.*

[21]   *See In re Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

specific inquiry to be decided on a case-by-case basis.[22]  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."[23]   However, consent by a secured creditor to priming obviates the need to show adequate protection.[24]

46.    As demonstrated above, the Debtors believe that the DIP Facility is the only likely source of postpetition financing.  In accordance with section 364(d)(1)(B) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition First Lien Lenders and Prepetition Second Lien Noteholders with adequate protection as described above.  In addition, the Prepetition First Lien Lenders have affirmatively consented to the priming of their loans; which otherwise obviates the need to show adequate protection.[25]   Pursuant to section 4.02 of that certain *Intercreditor Agreement* dated May 11, 2011, among the Prepetition First Lien Agent, the Prepetition Second Lien Trustee, the Borrowers, and MOG (the "Intercreditor Agreement"), the Prepetition Second Lien Noteholders have consented to the priming of their liens as provided for in the DIP Facility, similarly obviating the need to show adequate protection.  Finally, pursuant to the Restructuring Support Agreement (but subject to the terms thereof), all of the Prepetition First Lien Lenders and 81% of the Prepetition Second Lien Noteholders have agreed to support, among other things, approval of the DIP Facility, which include priming their existing liens.  Thus, both the Prepetition First Lien Lenders and Prepetition Second Lien Noteholders have consented to the priming of their liens provided that the relief requested herein is granted, including the grant of

---

[22]    *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

[23]    *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

[24]    *See Anchor Savs. Bank FSB v*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

[25]    *Id.*

the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders' adequate

protection as set forth in paragraphs 11 and 12 of the Interim Order.

**III.    <u>Use of Cash Collateral</u>**

47.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the

estates.   Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under
> Section . . . 1108 . . . of this title and unless the court orders
> otherwise, the trustee may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a
> hearing.[26]

Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash

collateral" to the general grant of authority to use property of the estate in the ordinary course set

forth in section 363 of the Bankruptcy Code.   Specifically, a trustee or debtor-in-possession may

not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> a.    Each entity that has an interest in such collateral consents; or
>
> b.    The court, after notice and a hearing, authorizes such use, sale, or lease in
> accordance with the provisions of this section.[27]

48.    During the ordinary course of operations, the Debtors generate cash from the use

of the Prepetition Collateral and DIP Collateral.   As of the Petition Date, the Debtors held no

unrestricted cash.   The Debtors need the proposed DIP Facility and the use of Cash Collateral in

order to pursue the Contribution Agreement Transaction and fund their ordinary course of

business operations and administration in the interim.   As the DIP Facility is contingent upon the

Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain

---

[26]    11 U.S.C. § 363(c)(1).

[27]    11 U.S.C. § 363(c)(2).

authority to use Cash Collateral subject to the terms of this Motion. Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

49.     The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved. The Prepetition First Lien Lenders and the DIP Lenders affirmatively consent, and the Prepetition Second Lien Noteholders consent or are deemed to consent pursuant to the Intercreditor Agreement, to the use of Cash Collateral provided that the relief requested herein is granted. Absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to consummate the Contribution Agreement Transaction. Any delay in consummating the Contribution Agreement Transaction poses grave risk to the Debtors and their ability to implement a strategy that will yield highest recovery for their estates and their creditors. Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

**IV.      Interim Approval Should Be Granted**

50.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.

51.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and

after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Final Hearing

52.    The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon: (i) the United States Trustee for the District of Delaware; (ii) the Debtors' thirty largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent and the Prepetition First Lien Agent; (iv) counsel to the Prepetition Second Lien Trustee; (iii) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (iv) all of the landlords of the Debtors' commercial real properties; (v) all known holders of liens upon the Debtors' assets; (vi) the Debtors' banks; (vii) the United States Attorney for the District of Delaware; (viii) the Internal Revenue Service; (ix) the Securities and Exchange Commission (the "SEC"); and (x) counsel to the Initial Consenting Noteholders.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

### Notice

53.    Notice of this Motion will be provided to:  (i) the United States Trustee for the District of Delaware; (ii) the Debtors' thirty largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent and the Prepetition First Lien Agent; (iv) counsel to the Prepetition Second Lien Trustee; (iii) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (iv) all of the landlords of the Debtors' commercial real properties; (v) all known holders of liens upon the Debtors' assets; (vi) the Debtors' banks;

(vii) the United States Attorney for the District of Delaware; (viii) the Internal Revenue Service; (ix) the Securities and Exchange Commission (the "SEC"); and (x) counsel to the Initial Consenting Noteholders.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter (i) the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order following a Final Hearing, and (iv) grant such other relief as is just and proper.

Dated: July 15, 2015
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ M. Blake Cleary*
M. Blake Cleary (No. 3614)
Joel A. Waite (No. 2925)
Ryan M. Bartley (No. 4985)
Ian J. Bambrick (No. 5455)
1000 N. King Street
Rodney Square
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

John F. Higgins
Eric M. English
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone: (713) 226-6687
Facsimile: (713) 226-6287

*Proposed Counsel for the Debtors and Debtors in Possession*

## EXHIBIT I

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------x
                              :
In re                        :     **Chapter 11**
                              :
**MILAGRO HOLDINGS, LLC,** *et al.,*  :     **Case No. 15-11520 (____)**
                              :
          **Debtors.**[1]         :     **Jointly Administered**
                              :
------------------------------------------------------x

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE
CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING
ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363,
AND 364, AND(III) SCHEDULING FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND (c)**

Upon the *Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A)*

*Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),*

*364(c)(3), 364(d)(1) and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 364, (II)*

*Granting Adequate Protection Pursuant to 11 U.S.C. §§361, 362, 363 and 364, and (III)*

*Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)*, dated as of July 15

2015 (the "Motion")[2] of Milagro Oil & Gas, Inc. ("Milagro") and its affiliated debtors and

debtors-in-possession (collectively with Milagro, the "Debtors") pursuant to 11 U.S.C. §§ 105,

361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), Rules 2002, 4001, 6003, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule

2002-1, 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Milagro Holdings, LLC (7232); Milagro Oil & Gas, Inc. (7173); Milagro Exploration, LLC (9260); Milagro Producing, LLC (9330); Milagro Mid-Continent, LLC (8804); and Milagro Resources, LLC (6134). The Debtors' mailing address is 1301 McKinney Street, Suite 500, Houston, Texas 77010.

[2]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below).

United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), seeking entry of (i) an interim order (this "Interim Order") and (ii) a final order (the "Final Order"); and the Debtors' having requested on the record at the interim hearing on the Motion (the "Interim Hearing") that the Court enter an Interim Order, *inter alia,:*

(a) authorizing the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain "Credit Agreement," in substantially the form attached to the Motion as Exhibit II (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Credit Agreement"), by and among Milagro Exploration, LLC and Milagro Producing LLC, as borrowers (each a "Borrower" and collectively the "Borrowers"), Milagro Oil & Gas, Inc, and each subsidiary of Milagro Oil & Gas, Inc. listed as a guarantor on the signature pages thereto, as guarantors (collectively, the "Guarantors"), the various financial institutions and other Persons from time to time parties thereto (the "Lenders"), TPG Specialty Lending, Inc., as administrative agent (in such capacity, the "DIP Agent") for the Lenders, and as the swing line lender (in such capacity, the "Swing Line Lender" and together with the Lenders, the "DIP Lenders"), pursuant to which the DIP Lenders have agreed to provide on a final basis up to $117,250,857.80 comprised of:  (i) new money revolving loans of up to $15,000,000 (the "DIP Revolving Facility"); and (ii) subject to entry of a Final Order and Paragraph 15 hereof, a term loan (the "Term Loan") equal to the dollar-for-dollar conversion of the Prepetition First Lien Obligations (as defined below) outstanding under the Prepetition First Lien Loan Documents (as defined below) into DIP Obligations (as defined below);

(b) authorizing the Debtors to execute the DIP Credit Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in

connection therewith, all as may be reasonably requested by the DIP Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Credit Agreement, the "DIP Loan Documents");

(c) granting to the DIP Agent, for itself and for the benefit of the DIP Lenders first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, this Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations"), subject only to Permitted Priority Liens (as defined in the DIP Credit Agreement) and prior payment of the Carve-Out (as defined in paragraph 13 below);

(d) granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e) authorizing the Debtors to use Cash Collateral (as defined below);

(f) authorizing the Debtors to grant adequate protection to (A) the Prepetition First Lien Agent (as defined below) on behalf of the Prepetition First Lien Lenders (as defined below) and (B) the Prepetition Second Lien Trustee (as defined below) on behalf of the Prepetition Second Lien Noteholders (as defined below);

(g) subject only to entry of the Final Order, authorizing the dollar-for-dollar conversion of the Prepetition First Lien Obligations to a post-petition Term Loan; and

(h) scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order ((a) through (h) collectively, the "Requested Relief");

and the Interim Hearing having been held on July [__], 2015; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and

the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the Requested Relief is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      <u>Petition Date</u>.  On July 15, 2015 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11 cases (these "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "<u>Creditors' Committee</u>") has been appointed in any of these Chapter 11 Cases.

B.      <u>Jurisdiction; Venue</u>.  The Court has jurisdiction over these Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). The Court is a proper venue of these Chapter 11 Cases and the Requested Relief under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief sought herein are sections 105, 361, 362,363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and the applicable Bankruptcy Local Rules.

---

[3]      Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

C.    <u>Notice</u>.  Notice of the Motion, the relief requested therein and the Interim Hearing (the "<u>Notice</u>") has been served by the Debtors pursuant to Bankruptcy Rules 2002 and 4001; Bankruptcy Local Rules 2002-1, 4001-1(a), and 9013-1(m) on (i) the Debtors' thirty largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Agent and the Prepetition First Lien Agent, (iv) counsel to the Prepetition Second Lien Trustee (iii) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (iv) all of the landlords of the Debtors' commercial real properties, (v) all known holders of liens upon the Debtors' assets, (vi) the United States Attorney for the District of Delaware, (vii) the Internal Revenue Service, (viii) the Securities and Exchange Commission (the "<u>SEC</u>"), and (ix) the United States Trustee for the District of Delaware.   Under the circumstances, the Notice constitutes good and sufficient notice of the relief requested and complies with Bankruptcy Rules 4001(b) and (c) and the Bankruptcy Local Rules, and no further notice of the Requested Relief and the relief granted by this Interim Order is necessary or shall be required.

D.    <u>Prepetition First Lien Obligations and Senior Liens</u>.

(i)    For purposes of this Interim Order, the term "<u>Prepetition First Lien Obligations</u>" shall mean all of the Obligations (as such term is defined in the Prepetition First Lien Loan Documents (as defined below)), as of the Petition Date, owed to TPG Specialty Lending, Inc., in its capacity as administrative agent (in such capacity, the "<u>Prepetition First Lien Agent</u>") for certain lenders (the "<u>Prepetition First Lien Lenders</u>") and the Prepetition First Lien Lenders  under the Second Amended and Restated First Lien Credit Agreement, dated as of September 4, 2014, among Milagro Exploration, LLC and Milagro Producing, LLC, as borrowers, Milagro Oil & Gas, Inc. as a guarantor, the Prepetition First Lien Lenders, and the Prepetition First Lien Agent (as the same has been amended, restated or modified from time to

time, the "Prepetition First Lien Financing Agreement", and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, fee letters and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition First Lien Loan Documents").

(ii)    To secure the Prepetition First Lien Obligations, the Debtors granted to the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Lenders, first priority liens upon and senior security interests in (the "Prepetition Senior Liens") substantially all of the Debtors' property and assets (collectively, the "Prepetition First Lien Collateral") as more particularly set forth in certain security documents and instruments, including but not limited to the (a) Second Amended and Restated First Lien Pledge and Security Agreement and Irrevocable Proxy, dated as of September 4, 2014, by the Debtors and other grantors thereto in favor of the Prepetition First Lien Agent, (b) numerous Mortgages related to Oil and Gas Properties (as defined in the Prepetition First Lien Loan Documents) and (c) Control Agreements (as defined in the Prepetition First Lien Loan Documents).

E.    Prepetition Second Lien Obligations and Prepetition Second Liens.

(i)    For purposes of this Interim Order, the term "Prepetition Second Lien Obligations" shall mean all of the Obligations (as such term is defined in the Prepetition Second Lien Indenture (as defined below)), as of the Petition Date, owing by the Debtors to Wilmington Trust, National Association (as successor to Wells Fargo Bank, N.A.), in its capacity as trustee (in such capacity, the "Prepetition Second Lien Trustee") for certain holders (the "Prepetition Second Lien Noteholders," and together with the Prepetition First Lien Lenders, the "Prepetition Lenders") under the 10½% Senior Secured Second Lien Notes Due 2016 (the "Prepetition Second Lien Notes") under that certain Indenture, dated as of May 11, 2011 by and among

Milagro and the Debtor guarantor parties thereto and Wells Fargo Bank, N.A. (as amended, restated or supplemented from time to time, the "Prepetition Second Lien Indenture," and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, fee letters and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Second Lien Note Documents").  To secure the Prepetition Second Lien Obligations, the Debtors granted the Prepetition Second Lien Trustee, for the benefit of itself and the Prepetition Second Lien Noteholders, certain second priority liens (the "Prepetition Second Liens," and together with the Prepetition Senior Liens, the "Prepetition Liens") on certain collateral (the "Prepetition Second Lien Collateral," and together with the Prepetition First Lien Collateral, the "Prepetition Collateral").

(ii)    Pursuant to that certain Intercreditor Agreement, dated as of May 11, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement") by and among Wells Fargo Bank, N.A., (as predecessor to the Prepetition First Lien Agent) and Wells Fargo Bank, N.A. (as predecessor to the Prepetition Second Lien Trustee), the Prepetition Second Liens are junior and subordinate to the Prepetition Senior Liens.

F.    Debtors' Acknowledgments and Stipulations.  In requesting the DIP Facility, and in exchange for and as a material inducement to (i) the DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition Second Lien Trustee, on behalf of the Prepetition Second Lien Noteholders to permit the priming of the Prepetition Second Liens, the Debtors acknowledge, represent, stipulate, and agree, subject to the terms and provisions of paragraph 15 below, that:

(i)      upon approval of this Interim Order by the Court, the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents and the use of Cash Collateral to which any Debtor is a party;

(ii)      until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens and security interests provided to the DIP Agent and the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (a) the Permitted Priority Liens and (b) prior payment of the Carve-Out;

(iii)      until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses (a) on account of any break-up fee and expense reimbursement authorized to be paid to any person or entity, or (b) of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to prior payment of the Carve-Out;

(iv)      the Debtors have requested that the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders consent to, among other things, (a) the Debtors' use of Cash Collateral and the other Prepetition Collateral, (b) the incurrence of the DIP Loans by the

Borrowers and the Guarantors' guarantees of the DIP Loans under the DIP Loan Documents, and (c) the Debtors' granting of the priming DIP Liens (as defined below) in connection therewith. The Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders are entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral (x) in exchange for their consent to allow the Debtors' use of such Prepetition Collateral, including the Cash Collateral, and (y) for any diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Liens by the DIP Agent and DIP Lenders pursuant to this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise;

(v)      as of the Petition Date, (a) the aggregate principal amount of the Prepetition First Lien Obligations of not less than $87,625,000, together with interest (including default interest) thereon, premiums, Yield Maintenance Premium and Prepayment Premium (each as defined in the Prepetition First Lien Loan Documents), costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and Obligations owed by the Debtors are due and payable under the Prepetition First Lien Loan Documents; (b) all of the Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors and are unconditionally owing by the Debtors to the Prepetition First Lien Lenders, and (c) the Prepetition First Lien Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 15 below;

(vi)    as of the Petition Date, (a) the aggregate principal amount of the Prepetition Second Lien Obligations of not less than $250,000,000, together with interest (including default interest) thereon, and premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations owed by the Debtors are due and payable under the Prepetition Second Lien Note Documents, (b) all of the Prepetition Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors and are unconditionally owing by the Debtors to the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders, and (c) the  Prepetition Second Lien Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 15 below;

(vii)    as of July 1, 2015, the Prepetition First Lien Agent and Prepetition First Lien Lenders have determined and advised the Debtors that the amount of the Yield Maintenance Premium (as defined in the Prepetition First Lien Loan Documents) due and payable is $16,649,787;

(viii)    the  Prepetition First Lien Agent and Prepetition First Lien Lenders and the Debtors have agreed that upon the entry of the Final Order, the Yield Maintenance Premium due and payable shall be reduced and allowed, subject to Paragraph 15, in the amount of $14,000,000 without defense, offset, withholding, counterclaim or deduction of any kind;

(ix)    as of the Petition Date, the Prepetition First Lien Agent and Prepetition First Lien Lenders have determined and advised the Debtors that the amount of accrued and unpaid interest due and payable on the Prepetition First Lien Obligations is $640,376.44;

(x)     the Prepetition First Lien Agent and Prepetition First Lien Lenders and the Debtors have agreed that upon the entry of the Final Order, the amount of accrued and unpaid interest due and payable on the Prepetition First Lien Obligations as of the Petition date shall be set at $625,857.81 without defense, offset, withholding, counterclaim or deduction of any kind;

(xi)     the aggregate value of the Prepetition Collateral exceeds the amount of the Prepetition First Lien Obligations;

(xii)     the Prepetition Liens constitute valid, binding, enforceable, non-avoidable and perfected liens with priority over any and all other liens (other than Permitted Liens, as defined in the Prepetition First Lien Loan Documents) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(xiii)     any payments made on account of the Prepetition First Lien Obligations prior to the Petition Date were (a) on account of amounts in respect of which the Prepetition First Lien Agent and the Prepetition First Lien Lenders were oversecured with respect to the amounts owed on account of the Prepetition First Lien Obligations, (b) payments out of the Prepetition Collateral, and/or (c) made in the ordinary course of business, and did not diminish any property otherwise available for distribution to unsecured creditors;

(xiv)     any payments made on account of the Prepetition Second Lien Obligations prior to the Petition Date were (a) payments out of the Prepetition Collateral, and/or (b) made in the ordinary course of business, and did not diminish any property otherwise available for distribution to unsecured creditors;

(xv)    the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, against the Prepetition First Lien Agent, any of the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, any of the Prepetition Second Lien Noteholders or any affiliates, agents, attorneys, advisors, professionals, officers, directors or employees of the Prepetition First Lien Agent, any of the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, any of the Prepetition Second Lien Noteholders arising out of, based upon or related to the Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations, the Prepetition Second Lien Note Documents or the Prepetition Second Lien Obligations;

(xvi)    all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral constitutes Cash Collateral of the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders;

(xvii)    none of the DIP Agent, DIP Lenders, Prepetition First Lien Agent or Prepetition First Lien Lenders is a control person or insider of the Debtors, nor owes any fiduciary obligation to the Debtors, by virtue of or with respect to any of the actions taken by them in respect of or in connection with the DIP Loans or the Prepetition First Lien Obligations;

(xviii) none of the Prepetition Second Lien Trustee, or Prepetition Second Lien Noteholders is a control person or insider of the Debtors, nor owes any fiduciary obligation to the Debtors, by virtue of or with respect to any of the actions taken by them in respect of or in connection with the Prepetition Second Lien Obligations; and

(xix)    the Prepetition First Lien Agent (on behalf of itself and the Prepetition First Lien Lenders) and the Prepetition Second Lien Trustee (on behalf of itself and the Prepetition Second

Lien Noteholders) are parties to the Intercreditor Agreement, which sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Obligations and the Prepetition Senior Liens, on the one hand, and the Prepetition Second Lien Obligations and the Prepetition Second Liens, on the other hand.  The Debtors admit, stipulate, and agree that the Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto and enforceable in accordance with the terms thereof.

G.    <u>Cash Collateral</u>.  For purposes of this Interim Order, the term "<u>Cash Collateral</u>" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Agent, the Prepetition First Lien Agent or the Prepetition Second Lien Trustee have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

(i)    all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, including insurance policies (including, without limitation, policies for the benefit of directors and officers of the Debtors), in or on which the Prepetition First Lien Agent or Prepetition Second Lien Trustee have a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of this Chapter 11 Case, or arose or was generated thereafter;

(ii)    all of the respective deposits, refund claims and rights in retainers of the Debtors on which the Prepetition Lenders have a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)    the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order.

H.    <u>Adequate Protection</u>.  The Prepetition First Lien Lenders, the Prepetition First Lien Agent, the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders are each entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any diminution in value resulting from (i) the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, (ii) the priming of the Prepetition Liens on and in the Prepetition Collateral by the DIP Agent or the DIP Lenders, (iii) the subordination of the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations to the Carve-Out or  (iv)  the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

I.    <u>Purpose and Necessity of Financing</u>.  The Debtors require the financing described in the Requested Relief to (i) permit the continuation of their businesses and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Loan Documents and the Approved Budget (as defined in paragraph 2 below), and (iii) pay fees and expenses related to the DIP Loan Documents and the Chapter 11 Cases.  If the Debtors do not obtain authorization to borrow under the DIP Credit Agreement, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or

(d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances.  Further, neither the Prepetition First Lien Agent nor the Prepetition First Lien Lenders have consented to the priming of their pre-petition liens by lenders (except to the extent provided herein and under the DIP Loan Documents).  A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Lenders, superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

J.    <u>Willingness to Provide Financing</u>.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to the entry of this Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtors' estates, the DIP Lenders are extending credit to the Debtors as set forth in the DIP Facility in good faith, and that the claims, superpriority claims, security interests, liens, rights, and other protections granted to the DIP Lenders and DIP Agent will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order, the Final Order or any other order.

K.    <u>Good Cause Shown</u>.  Good cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the

ordinary course, preserve the value of the Debtors' assets and pursue a restructuring transaction. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of, the Debtors, their estates and their creditors.

L.      Sections 506(c) And 552(b) Waivers.  In light of (i) the DIP Agent's and the DIP Lenders' agreement to permit their DIP Liens and DIP Superpriority Claim to be subject to prior payment of the Carve-Out, and in exchange for and as a material inducement to the DIP Agent and DIP Lenders to agree to provide the DIP Facility and (ii) the agreement of the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders to permit their Prepetition Liens and Adequate Protection Claims (as defined below) to be subject to prior payment of the Carve-Out, the DIP Liens, and the DIP Superpriority Claim and to permit the use of their Cash Collateral for payments made in accordance with the Approved Budget and the terms of this Interim Order, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders are each entitled to (a) subject to entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) subject to entry of the Final Order in the case of the Prepetition First Lien Agent and Prepetition First Lien Lenders, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.      Good Faith.  The terms of the DIP Loan Documents, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources.  Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders, and the DIP Agent under no duress, and without

undue influence, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Any DIP Loans and other financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereby.

N.     Fair Consideration and Reasonably Equivalent Value.  All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent  judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

O.     Immediate Entry of Interim Order.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Bankruptcy Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors

necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful reorganization or sale of substantially all of their assets.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      <u>Disposition</u>.  The relief requested by the Debtors on the record at the Interim Hearing is granted on the terms set forth in this Interim Order.  Any objection to the interim relief sought by the Debtors that has not previously been withdrawn or resolved is hereby overruled on its merits.  The term of this Interim Order, the DIP Loan Documents, and the use of Cash Collateral authorized hereunder shall expire, and the DIP Loans made pursuant to the this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the 35th day after the date of entry of this Interim Order if the Final Order has not been entered by the Court prior to such date, or (b) upon the occurrence of an Event of Default under the DIP Credit Agreement.

## <u>AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL</u>

2.      <u>Authorization For DIP Financing And Use of Cash Collateral</u>.

(a)      The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately subject to the terms of this Interim Order, the Approved Budget, and the DIP Loan Documents, in the aggregate principal amount of up to $11,000,000 (the "<u>Maximum Interim Borrowing</u>").  Available financing under the DIP Credit Agreement shall, on an interim basis, be made to fund, in accordance with the DIP Loan Documents and the Approved Budget, working

capital and general corporate requirements of the Debtors, bankruptcy-related costs and expenses (including interest, fees, and expenses in accordance with this Interim Order or the DIP Loan Documents), and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the Approved Budget and the DIP Loan Documents.

(b)      Subject to entry of the Final Order and subject to Section 15 hereof, the Debtors shall be deemed to have automatically paid in full the Prepetition First Lien Obligations by way of a dollar-for-dollar conversion of all Prepetition First Lien Obligations into DIP Obligations.

(c)      The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the Approved Budget (and permitted variances as set forth in the DIP Loan Documents) and the DIP Loan Documents, without further approval by the Court.

(d)      The Debtors have delivered to the Prepetition First Lien Agent, the DIP Agent and DIP Lenders a Budget that sets forth projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through October 11, 2015, a copy of which is attached hereto as Exhibit A (the "Approved Budget"). The Approved Budget shall at all times be in form and substance acceptable to the DIP Agent and the Required DIP Lenders,[4] and approved in writing by the DIP Agent and the Required DIP Lenders in their sole and absolute discretion. The Debtors shall provide updates to the Approved Budget and financial reporting with respect to the Debtors in accordance with the terms of the DIP Loan Documents. Funds borrowed under the DIP Credit Agreement and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with the DIP Loan

---

[4]      "Required DIP Lenders"  means "Required Lenders" as defined in the DIP Credit Agreement.

Documents and this Interim Order.  The consent of the DIP Agent, DIP Lenders and Prepetition First Lien Agent to any Approved Budget shall not be construed as a commitment to provide DIP Loans or, to the extent permitted by Paragraph 13 below, to permit the use of Cash Collateral after the occurrence of a Termination Event under this Interim Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(e)    Any amendments, supplements or modifications to the Approved Budget  must be consented to in writing by the DIP Agent and the Required DIP Lenders in their sole discretion prior to the implementation thereof and shall not require further notice, hearing, or court order.

(f)    The DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders (and, for the avoidance of doubt, the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders) (i) may assume the Debtors will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time.  Subject to the terms and conditions of this Interim Order, the DIP Agent and the DIP Lenders shall have the right but not the obligation to extend credit independent of any Approved Budget line item restrictions on loan availability set forth in the DIP Loan Documents, and all such DIP Loans shall be entitled to the benefits and protections of this Interim Order.

(g)    To the extent any court order is entered directing disgorgement of any payments made by the Debtors to the Prepetition First Lien Agent or the Prepetition First Lien Lenders either prior to or after the Petition Date, 100% of the proceeds recovered by the Debtors' estates

in connection with such order(s) directing disgorgement shall be applied first to repayment of the DIP Obligations, until the DIP Obligations are indefeasibly paid in full in cash, and then to repayment of claims in accordance with the priority scheme set forth in the Bankruptcy Code.

(h)     The Prepetition Second Lien Noteholders and the Prepetition Second Lien Trustee have consented, and are deemed to have consented pursuant to Section 4.02(b) of the Intercreditor Agreement, to the terms and provisions of the DIP Facility and the DIP Loan Documents.   Nothing in this Interim Order shall limit, abridge, waive, diminish, impair or otherwise affect the relative rights and obligations of the parties to the Intercreditor Agreement.

3.     <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)     Each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto and borrow money under the DIP Facility, on an interim basis, in accordance with the terms of this Interim Order and the DIP Loan Documents.   Each of the Debtors is further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, each as may be reasonably requested by the DIP Agent, for itself or on behalf of the DIP Lenders, or the DIP Lenders.   The Prepetition Liens shall be deemed continuing liens to secure (i) the DIP Obligations, (ii) the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations and (iii) the Adequate Protection Claims (as defined below) in accordance with the priorities set forth in this Interim Order.   All Prepetition First Lien Loan Documents and Prepetition Second Lien Note Documents evidencing the grant, priority and perfection of the Prepetition Liens on Prepetition Collateral (including, but not limited to, the security documents,

Mortgages and other filings related to the Oil and Gas Properties and the Control Agreements) shall (x) remain in full force and effect and continue to secure the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations, (y) be deemed, upon entry of this Order, to secure, *mutatis mutandis,* (1) the DIP Obligations (including, but not limited to, the DIP Revolving Facility and the Term Loan) for the benefit of the DIP Agent and the DIP Lenders and (2) the Adequate Protection Claims, and (z) inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Prepetition First Lien Agent.

(b)      Each of the Debtors is further authorized to (i) perform all of its obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

4.      <u>Valid and Binding Obligations</u>.  All obligations under the DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them, each of their estates, and each of their successors and assigns, jointly and severally, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case (as defined below), in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise),

counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.  The DIP Obligations include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtors to the DIP Lenders and the DIP Agent under the DIP Loan Documents, including without limitation all principal, interest, costs, fees, expenses and other amounts owed pursuant to the DIP Loan Documents.

5.    <u>Termination of DIP Loan Documents</u>.  Notwithstanding anything in this Interim Order to the contrary, the term of this Interim Order and the DIP Loan Documents shall expire, and the DIP Loans made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the date that is the earliest of: (i) the 35th day after the date of entry of this Interim Order, if a Final Order has not yet been entered on the docket of the Court; (ii) the date of final indefeasible payment and satisfaction in full in cash of the DIP Obligations and the termination of the commitments under the DIP Facility; (iii) the date of substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a confirmed plan of reorganization in the Chapter 11 Cases; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtors, whether done by one or a series of transactions; (v) November 15, 2015; (vi) the filing by any Debtor of a motion with the Bankruptcy Court seeking the conversion of any of the Chapter 11 Cases to a case Chapter 7 case or dismissal of the Chapter 11 Cases; (vii) any date on which the DIP Loans and DIP

Obligations accelerate or otherwise become due and payable following the occurrence of any Event of Default under the DIP Loan Documents or this Interim Order.

6.      Authorization for Payment of DIP Financing Fees and Expenses.  All fees paid and payable, and all costs and/or expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Loan Documents and the DIP Agent's attorneys' fees and expenses), as set forth in the DIP Loan Documents, by the Debtors to the DIP Agent are hereby approved.  The Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this Interim Order, without any requirement that any party or their counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.    Notwithstanding anything to the contrary herein, the fees, costs and expenses of the DIP Agent and DIP Lenders, whether incurred prior to or after the Petition Date, including, without limitation, all fees referred to in the DIP Loan Documents and all attorneys' fees and expenses, shall be deemed fully earned, non-refundable, and irrevocable as of the date of this Interim Order, except with respect to reimbursement of professional fees and expenses, which shall be subject to the fee review procedures (the "Fee Review Procedures") set forth below in Paragraph 6(a) and (b) below.

(a)      The payment of the fees, expenses and disbursements set forth in this paragraph of this Interim Order shall be made within ten (10) days after the receipt by the Debtors, the Committee, and the U.S. Trustee (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines), including a summary description of the services provided and the expenses incurred by the applicable professional arising before or after the Petition Date, as applicable; provided,

however, that any such invoice (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail.

(b)    The Debtors, the Committee and the U.S. Trustee may preserve their right to dispute the reasonableness of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, the Debtors, the Committee or the U.S. Trustee files with the Court a motion or other pleading, on at least ten (10) calendar days prior written notice to the DIP Agent of any hearing on such motion or other pleading, which must contain a specific basis for the objection to the Disputed Invoiced Fees and quantification of the undisputed amount of the fees and expenses invoiced.  The Debtors' payment of the Invoiced Fees (including any Disputed Invoiced Fees) shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of this Court.  Failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice.  None of the Invoiced Fees shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any payment on account thereof shall be required to file with respect thereto any interim or final fee application with the Court.

7.    Amendments, Consents, Waivers, and Modifications.  The Debtors may enter into any amendments, consents, waivers or modifications to the DIP Loan Documents in accordance with the terms of the DIP Loan Documents without the need for further notice and hearing or any order of this Court; provided however, that any material amendment, waiver or modification shall require Court approval.   Copies of all amendments, waivers, modifications, whether or not material, shall be provided by the Debtors to the counsel to the Committee and the U.S. Trustee.

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

8.      <u>DIP Liens & Priority</u>.

(a)      To secure the DIP Obligations, the DIP Agent is hereby granted for the benefit of itself and the DIP Lenders, pursuant to and in accordance with sections 364(d)(1), 364(c)(2), and 364(c)(3), valid, enforceable and fully perfected (i) first priority priming liens and senior security interests, senior to the Prepetition Liens, (ii) first priority liens and security interests on property that is not otherwise encumbered by a validly perfected lien on the Petition Date, and (iii) junior priority liens and security interests (collectively, the "<u>DIP Liens</u>"), in each case, in and on all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to: (x) all Oil and Gas Properties, cash, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, and shall not include avoidance actions under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") but,  subject to entry of a Final Order, shall include all proceeds or property recovered in connection with the pursuit of Avoidance Actions; (y) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; and (z) all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions,

offspring and profits of any of the collateral described above (collectively, the "DIP Collateral"), subject only to (A) the Permitted Priority Liens, and (B) prior payment of the Carve-Out.

(b)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens; and (ii) prior payment of the Carve-Out.

(c)    The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreement or any other agreements or instruments, such that no additional actions need be taken by the DIP Agent or the DIP Lenders to perfect such interests.  Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Agent, for the benefit of itself and the DIP Lenders, a security interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof, by any of the Debtors

in favor of the DIP Agent, for the benefit of itself and the DIP Lenders, in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents.

9.      <u>DIP Lenders' Superpriority Claim</u>.  The DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtor's Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "<u>Successor Case(s)</u>") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.  The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.  Except as set forth in this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case and the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the

Court in connection with any sale of the Debtors' assets and the Adequate Protection Claims (as defined below).

10.    <u>Survival of DIP Liens and DIP Superpriority Claim</u>.    The DIP Liens, DIP Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders, shall continue in this and any Successor Case(s) and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and/or upon the dismissal of any or all of the Debtor's Chapter 11 Cases or any Successor Case(s) and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Loan Documents.

## <u>ADEQUATE PROTECTION</u>

11.    <u>Adequate Protection for Prepetition First Lien Lenders</u>.    Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection for any diminution in the value of the Prepetition Collateral resulting from, among other things: (i) the incurrence of the DIP Obligations secured by a priming DIP Lien, (ii) the use of Cash Collateral, (iii) the imposition of the automatic stay, (iv) the agreement of the Prepetition First Lien Agent and Prepetition First Lien Lenders to subordinate their right to receive payment from the proceeds Prepetition Collateral to the prior payment of the Carve-Out, or (v) otherwise (collectively, the "<u>Prepetition First Lien Diminution Claim</u>"), the Prepetition First Lien Agent and the Prepetition First Lien Lenders are hereby granted (in each case subject to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following ((a) through (f) below shall be referred to collectively as the "<u>Prepetition First Lien Adequate Protection Obligations</u>"):

(a)        Prepetition First Lien Adequate Protection Liens.  To secure the Prepetition First

Lien Diminution Claim, the Prepetition First Lien Agent, for itself and for the benefit of the

Prepetition First Lien Lenders, is hereby granted (effective and perfected upon the date of this

Interim Order and without the necessity of execution by the Debtors of mortgages, security

agreements, pledge agreements, financing statements, and other agreements or instruments)

valid, perfected, postpetition security interests and liens (the "Prepetition First Lien Replacement

Liens") in and on all of the DIP Collateral, provided, however, that the Prepetition First Lien

Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or

payment of any DIP Obligations on account thereof, (ii) the Permitted Priority Liens, (iii) prior

payment of the Carve-Out and (iv) the Prepetition Senior Liens.  Subject to paragraph 15 below,

the Prepetition First Lien Replacement Liens shall be valid and enforceable against any trustee or

other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the

conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or

in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any

Successor Case.

(b)        Prepetition First Lien Adequate Protection Superpriority Claims.  As further

adequate protection for the Prepetition First Lien Diminution Claim, the Prepetition First Lien

Agent and the Prepetition First Lien Lenders are hereby granted a superpriority claim with

priority over all administrative expense claims and unsecured claims against the Debtors or their

estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without

limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105,

326, 328, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 552(b)

(subject to entry of a Final Order), 726, 1113 and 1114 and any other provision of the

Bankruptcy Code (the "Prepetition First Lien Adequate Protection Superpriority Claim"), which allowed Prepetition First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any Avoidance Action proceeds.  The Prepetition First Lien Adequate Protection Superpriority Claim shall be subordinate and subject only to the DIP Superpriority Claim, prior payment of the Carve-Out and the Prepetition First Lien Obligations.

(c)    Fees and Expenses.  As further adequate protection for the Prepetition First Lien Diminution Claim, upon the closing of the DIP Facility, the Debtors shall pay in cash to the Prepetition First Lien Agent all accrued or incurred and unpaid fees, costs and expenses in respect of the Prepetition First Lien Obligations and all other accrued or incurred and unpaid fees, costs and disbursements, accrued or incurred (whether before or after the Petition Date including those incurred prior to the Petition Date which remain unpaid as of the Petition Date) under any of the Prepetition First Lien Loan Documents, as applicable, as of such date.  During these Chapter 11 Cases, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall also receive current cash payment of their fees, costs and expenses, including all reasonable fees and disbursements of its counsel, financial advisors and all other professionals or consultants retained by the Prepetition First Lien Agent or the Prepetition First Lien Lenders with services performed prior to and during these Chapter 11 Cases to the extent such fees are payable under the Prepetition First Lien Loan Documents.  The payment of the fees, expenses and disbursements set forth in this paragraph of this Interim Order shall be made subject to the Fee Review Procedures set forth in Paragraph 6(a) and (b) above.

(d)    Interest.  As further adequate protection for the Prepetition First Lien Diminution Claim,  the Debtors shall pay interest on the Prepetition First Lien Obligations in cash, as and

when such interest is payable under the Prepetition First Lien Loan Documents, at the non-default rate until such time as the Prepetition First Lien Obligations are either (i) indefeasibly paid in full in cash or (ii) converted into a post-petition Term Loan.

(e)    <u>Right to Credit Bid</u>.    Subject to the provisions of the Restructuring Support Agreement, the DIP Agent, on behalf of the DIP Lenders, and the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Lenders, shall each have the right to "credit bid" their respective claims against the Debtors up to the full amount of (x) for the Prepetition First Lien Agent, the Prepetition First Lien Obligations and (y) for the DIP Agent, the DIP Obligations, during any sale of all or any portion of the DIP Collateral or Prepetition Collateral, as applicable, or any deposit or liquidated damages in connection with such sale, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.    For purposes of any such bid or deposit, the portion of the Prepetition First Lien Obligations or DIP Obligations  subject to a credit bid by the Prepetition First Lien Agent or DIP Agent, as applicable, shall be treated for all purposes as the equivalent of  a cash bid, cash deposit or cash payment.    The DIP Agent and the Prepetition First Lien Agent shall each have the absolute right to assign, sell, or otherwise dispose of its respective right to credit bid in connection with any credit bid by or on behalf of the DIP Lenders and the Prepetition First Lien Lenders, respectively, or any acquisition entity or joint venture formed in connection with such bid.

(f)    <u>Further Adequate Protection</u>.    Nothing in this Interim Order shall, or shall be deemed to, limit, abridge or otherwise affect the rights of the Prepetition First Lien Agent or Prepetition First Lien Lenders to request at any time that the Court provide additional or further

protection of their respective interests in the Prepetition Collateral (including the Cash Collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate.  The Prepetition First Lien Agent and the Prepetition First Lien Lenders consent to the Debtors' use of Cash Collateral and the priming provided for herein; provided, however, that consent to such priming, such use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order (in form and substance satisfactory to the Prepetition First Lien Agent and the Prepetition First Lien Lenders) relating to the DIP Loan Documents and DIP Loans as set forth herein, and such consent shall not be deemed to extend to any replacement or other postpetition financing other than the DIP Loans provided under the DIP Loan Documents; provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Loan Documents and DIP Loans as set forth herein are not approved.

12.    Adequate Protection for Prepetition Second Lien Noteholders.  As adequate protection in respect of any diminution in the value of the Prepetition Second Lien Trustee's interest in the Prepetition Second Lien Collateral (the "Prepetition Second Lien Diminution Claim"), the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders are hereby granted the following adequate protection ((a) and (b) below shall be referred to collectively as the "Prepetition Second Lien Adequate Protection Obligations"):

(a)    Prepetition Second Lien Replacement Liens.  To secure the Prepetition Second Lien Diminution Claim, the Prepetition Second Lien Trustee (on behalf of the Prepetition Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages,

security agreements, pledge agreements, financing statements, account control agreements and other agreements or instruments) valid, perfected, postpetition security interests in and liens (the "Prepetition Second Lien Replacement Liens", and collectively with the Prepetition First Lien Replacement Liens, the "Replacement Liens") on all of the DIP Collateral, provided, however, that, notwithstanding anything to the contrary, the Prepetition Second Lien Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) the Permitted Priority Liens, (iii) prior payment of the Carve-Out, (iv) the Prepetition Senior Liens and (v) the Prepetition First Lien Replacement Liens.

(b)    Prepetition Second Lien Noteholders Adequate Protection Superpriority Claim.  As further adequate protection for the Prepetition Second Lien Diminution Claim, the Prepetition Second Lien Trustee (on behalf of the Prepetition Second Lien Noteholders) is hereby granted a superpriority claim with priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "Prepetition Second Lien Adequate Protection Superpriority Claim" and, collectively, with the Prepetition First Lien Adequate Protection Superpriority Claim, the "Adequate Protection Claims").  The Prepetition Second Lien Adequate Protection Superpriority Claim shall be subordinate only to (i) the DIP Superpriority Claim, (ii) prior payment of the Carve-Out, (iii) payment of the Prepetition First Lien Obligations (iv) the Prepetition First Lien Adequate

Protection Superpriority Claim and (v) payment of any Prepetition First Lien Adequate Protection Obligations.

## **CARVE-OUT; RESTRICTIONS ON USE OF FUNDS**

13.    Carve-Out.

(a)    The DIP Liens, the DIP Superpriority Claim, the Replacement Liens, the Adequate Protection Claims and the Prepetition Liens shall be subject and subordinate only to prior payment of: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), (ii) unpaid professional fees and expenses  ("Professional Fees") payable to any legal or financial advisors retained by the Debtors or any Creditors' Committee pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code, as applicable (the "Case Professionals"), that are incurred or accrued prior to the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of an Event of Default under the DIP Credit Agreement (a "Termination Event"), but solely if, as and to the extent such Professional Fees are or have been provided for in, and are consistent with, the Approved Budget and are ultimately allowed by the Court pursuant to Section 330 of the Bankruptcy Code, and (iii) unpaid Professional Fees incurred or accrued on or after the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of a Termination Event, in an aggregate amount not to exceed $500,000 (collectively, the "Carve-Out").  Subject to the immediately preceding sentence, so long as no Termination Event has occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable by order under Bankruptcy Code Sections 330, 331 and 503, as provided in the DIP Loan Documents and the Approved Budget, provided that any such payment shall be subject to entry of a final order of

the Court on final application for allowance of fees and expenses to be filed for each Case Professional and any such payment shall not reduce the Carve-Out.  Any payment of Carve-Out expenses incurred after the occurrence of a Termination Event, including any payment of Professional Fees, shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  The DIP Lenders' obligation to permit the use of their Cash Collateral to fund or to otherwise pay the Carve-Out expenses may be reserved against borrowing availability under the DIP Loan Documents and, once funded and paid, shall be added to and made part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law, as applicable. Without limiting the generality of the foregoing, (A) no person or entity entitled to payment from the Carve-Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any DIP Collateral or Prepetition Collateral and (B) the Carve-Out shall not include, apply to, or be available for any success fee or similar payment to any professionals or other persons, including without limitation any such fee payable in connection with a restructuring or asset disposition with respect to any of the Debtors or otherwise.

(b)    Nothing contained in this Interim Order shall be construed:  (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Bankruptcy Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged; (ii) as consent to the allowance of any fees and expenses referred to above; (iii) to increase the Carve-Out if incurred or allowed Professional Fees are higher in fact than the fees and disbursements of Case Professionals set

forth in the Approved Budget; and (iv) to affect any right of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, the Prepetition Second Lien Noteholders or any other party-in-interest to object to the reasonableness of such amounts.  Other than the funding of the Carve-Out with the proceeds of the DIP Facility as provided herein and in the DIP Loan Documents, the DIP Agent and the DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with these Chapter 11 Cases, any Successor Cases, or otherwise.

14.    <u>Restrictions on Use of Funds</u>.  Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, a Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Cases, or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Agent or DIP Lenders, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, the Prepetition First Lien Obligations, and Prepetition First Lien Adequate Protection Obligations, or (b) investigate (except as set forth in paragraph 15 below), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the

Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders, on the one hand, and the Debtors or any of their affiliates, on the other; (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition First Lien Obligations, or the Prepetition Second Lien Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens or the Replacement Liens; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the Prepetition Liens or the Replacement Liens; (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, Prepetition First Lien Lenders the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders in respect of the enforcement of their liens and security interests in the DIP Collateral, Cash Collateral or the Prepetition Collateral; (vi) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Agent, the Prepetition First Lien Agent or the Prepetition Second Lien Trustee; and/or (vii) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Loan Documents.  Notwithstanding the foregoing, up to $75,000 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral, Prepetition Collateral and Carve-Out may be used by a Creditors' Committee to investigate the Prepetition First Lien

Obligations, the Prepetition Second Lien Obligations, the Prepetition Liens and/or claims against the Releasees prior to the Challenge Period Termination Date (as each is defined below).

15.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)    The Debtors' acknowledgements and stipulations set forth in Paragraph F above (the "<u>Debtors' Stipulations</u>") shall be binding upon the Debtors in all circumstances upon entry of this Interim Order.

(b)    The Debtors' Stipulations shall also be binding upon each other party in interest, including any Creditors' Committee unless such Creditors' Committee or any other party in interest having standing, including any Chapter 11 trustee (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case(s)):  (a) commences a Challenge (as defined below) by the earlier of (x) with respect to a Creditors' Committee, sixty (60) calendar days from the formation of a Creditors' Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or a Creditors' Committee, seventy five (75) calendar days following the date of entry of the Interim Order (such time period established by the earlier of clauses (x) and (y), shall be referred to as the "<u>Challenge Period</u>") and (b) obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action.

(c)    A "Challenge" means (A) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) a contested matter, adversary proceeding, or other action against any or all of the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the

Prepetition Second Lien Noteholders in connection with or related to the Prepetition First Lien Obligations or the Prepetition Second Lien Obligations, or the actions or inactions of any of the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders arising out of or related to the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations or otherwise, including, without limitation, any claim against the Prepetition First Lien Agent, any or all of the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or any or all of the Prepetition Second Lien Noteholders in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition First Lien Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge").

(d)    With respect to any party interest that (i) fails to raise a proper Challenge within the Challenge Period or (y) raises a proper Challenge within the Challenge Period which is fully and finally adjudicated in favor of Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders, as applicable, then for all purposes in these Chapter 11 Cases and any Successor Case(s), (i) all payments made to or for the benefit of the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders, as applicable, pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest (including, without limitation, a Creditors' Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in the

Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case) shall be deemed to be forever released, waived, and barred, (iii) the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations, as applicable, shall be deemed to be a fully allowed and fully secured claim within the meaning of section 506 of the Bankruptcy Code, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, (iv) any and all pre-petition claims or causes of action against the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders, as applicable, relating in any way to the Debtors shall be forever waived and released by the Debtors, the Debtors' estates and all creditors, interest holders, a Creditors' Committee and other parties in interest in the Chapter 11 Cases and any Successor Case and (v) all matters not subject to the Challenge, including, without limitation, all findings, the Debtors' Stipulations in paragraph F, all waivers, releases set forth herein, affirmations and other stipulations as to the priority, extent and validity as to the claims, liens and interests of the Prepetition First Lien Lenders, the Prepetition First Lien Agent, the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders, as applicable, shall be of full force and effect upon the Debtors, the Debtors' estates and all creditors, equity interest holders, a Creditors' Committee and other parties in interest in the Chapter 11 Cases and any Successor Case.

16.    <u>Prohibition on Granting of Additional Liens and Interests</u>.  No liens, claims, interests or priority status, other than the Carve-Out and the Permitted Priority Liens, having a lien or administrative priority superior to or *pari passu* with that of the DIP Liens, the DIP Superpriority Claim, the Prepetition First Lien Adequate Protection Superpriority Claims or the Prepetition First Lien Replacement Liens granted by this Interim Order, shall be granted while

any portion of the DIP Obligations or Prepetition First Lien Obligations remain outstanding, or any commitment under the DIP Loan Documents or Prepetition First Lien Loan Documents remains in effect, without the prior written consent of the DIP Agent and the Prepetition First Lien Agent.

17.     <u>Release</u>.     The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph 17 shall be deemed effective upon entry of the Interim Order, and subject only to the rights set forth in paragraph 15 above.  The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Chapter 11 Cases or any Successor Case) forever and irrevocably (a) release, discharge, and acquit the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders, on the one hand, and the Debtors and their affiliates, on the other hand, including any equitable subordination claims or defenses, with respect to or relating to the Prepetition First Lien Obligations, the Prepetition Senior Liens, the Prepetition First Lien Loan Documents, the DIP Facility, the DIP Liens, the DIP Loan Documents, the Debtors' attempts to restructure the Prepetition First Lien Obligations, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority,

perfection or avoidability of the liens or secured claims of the Prepetition First Lien Agent and the Prepetition First Lien Lenders; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Prepetition First Lien Obligations and the Prepetition Senior Liens.

## **REMEDIES; MODIFICATION OF AUTOMATIC STAY**

18.    <u>Remedies and Stay Modification.</u>

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following:

(i)    whether or not a Default or an Event of Default under the DIP Loan Documents or a default by any of the Debtors of any of their obligations under this Interim Order has occurred (A) to require all cash, checks or other collections or proceeds from DIP Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Agent and the DIP Lenders under the DIP Loan Documents in accordance with any requirements of the DIP Loan Documents, (B) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (C) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein, and (D) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order;

(ii)    Subject to paragraph 18(a)(iv) below, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified without the need for further

Court order to permit the DIP Agent, for itself and on behalf of the DIP Lenders, or the DIP Lenders, as applicable, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party interest, to (I)(A) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Loan Documents, and (B) declare all DIP Obligations immediate due and payable, and (II) subject to three (3) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all other rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) in the case of the DIP Agent, take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) in the case of the DIP Agent, foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (D) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order.  The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

(iii)    Immediately upon the occurrence of an Event of Default under the DIP Credit Agreement or any of their obligations under this Interim Order, the DIP Agent, for itself and the benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Loan Documents without being subject to the Remedies Notice Period.

(iv)    The automatic stay of Section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the

44

Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period. During the Remedies Notice Period, the Debtors shall not be permitted to use any Cash Collateral or any DIP Loan proceeds except to pay expenses reasonably necessary to preserve the Debtors' going concern value. The Debtors, a Creditors' Committee, if any, and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of Section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the sole issue at any hearing to re-impose the automatic stay or to obtain any other injunctive or other relief shall be limited to whether or not an Event of Default has occurred and is continuing under the DIP Loan Documents.

(v)     If the DIP Agent and/or DIP Lenders are entitled, and have elected in accordance with the provisions hereof, to enforce their respective liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Agent or the DIP Lenders in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent or the DIP Lenders (including any collateral liquidator or consultant), (B) providing the DIP Agent or the DIP Lenders and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Agent or the DIP Lenders or their respective representatives, (C) performing all other obligations set forth in the DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's or the DIP Lenders' enforcement of rights.

(vi)    Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order, the DIP Agent and the DIP Lenders shall have no further obligation to provide financing under the DIP Loan Documents and the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall have no further obligation to permit the continued use of Cash Collateral.

(vii)    Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order,  the DIP Lenders may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Loan Documents.

(viii)    This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Section 362(a) of the Bankruptcy Code or other injunctive relief requested.

## MISCELLANEOUS

19.    <u>Limitation on Section 506(c) Claims</u>.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Agent, the DIP Lenders, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, the Prepetition Second Lien Noteholders, or any of their respective claims, the Carve-Out, or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent or the DIP Lenders.  No action, inaction or acquiescence by the DIP Agent or the DIP Lenders shall be deemed to be or shall be considered evidence of any alleged

consent to a surcharge against the DIP Agent or the DIP Lenders, any of their respective claims, the Carve-Out, or the DIP Collateral.

20.    <u>No Marshaling</u>.   The DIP Agent, the DIP Lenders, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee and the Prepetition Second Lien Noteholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.  Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

21.    <u>Equities of the Case Waiver</u>.   Subject to entry of a Final Order, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  No person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Prepetition First Lien Agent or the Prepetition First Lien Lenders with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral.

22.    <u>Additional Perfection Measures</u>.   The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtors, the DIP Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, control

agreements, notices of lien or similar instruments in any jurisdiction (including, but not limited to, Mortgages relating to the Oil and Gas Properties, Control Agreement relating to bank accounts, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(a)    If the DIP Agent, in its sole discretion, chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, the DIP Agent is hereby authorized, but not directed to, take such action or to request that Debtors take such action on its behalf (and Debtors are hereby authorized to take such action) and:

(i)    any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)    no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent may, in its sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the Collateral, and such filing by the DIP Agent shall have the same effect as if such mortgages, deeds of trust, financing

statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

23. <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Loan Documents, after an Event of Default, the Debtors are hereby authorized and directed to remit to the DIP Agent or the DIP Lenders, as the case may be, subject to the payment of or reserve for the Carve-Out, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agent or the DIP Lenders to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents.  In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Agent (or its designee), (b) upon the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to comply at all times with any instructions originated by the DIP Agent (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its designee) by wire transfer (to such account as the DIP Agent (or its designee) shall specify, or in such other manner as the DIP Agent (or its designee) shall direct) all such cash, securities, investment property and other items held by it, and (c) any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the Prepetition First Lien Agent prior to the Petition Date in connection with the Prepetition First Lien Loan Documents shall establish co-control in

favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities,

investment property and other items of any Debtor deposited therein to secure the DIP

Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights

thereunder in favor of the Prepetition First Lien Agent shall inure also to the benefit of, and shall

be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been

indefeasibly paid in full, at which time exclusive control shall automatically revert to the

Prepetition First Lien Agent.

24.    <u>Access to Collateral</u>.  Notwithstanding anything contained herein to the contrary,

and without limiting any other rights or remedies of the DIP Agent or the DIP Lenders contained

in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and

subject to the terms of the DIP Loan Documents, upon three (3) business days' written notice to

the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or

intellectual property that an Event of Default under the DIP Loan Document or a default by any

of the Debtors of any of their obligations under this Interim Order has occurred and is

continuing, the DIP Agent or the DIP Lenders (i) may, unless otherwise provided in any separate

agreement by and between the applicable landlord or licensor and the DIP Agent or the DIP

Lenders (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any

leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with

respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and

privileges as lessee or licensee under the applicable lease or license and to use any and all

trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors,

which are owned by or subject to a lien of any third party and which are used by the Debtors in

their businesses, in either the case of subparagraph (i) or (ii) of this paragraph, without

interference from lienholders, landlords or licensors thereunder, subject to such lienholders, landlords or licensors rights under applicable law.  Nothing herein shall require the Debtors, the DIP Agent or the DIP Lenders to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent and the DIP Lenders in this paragraph.

25.   <u>Cash Management Systems</u>.  The Debtors are authorized to maintain their cash management system in a manner consistent with the DIP Loan Documents, this Interim Order, and the order of this Court approving the maintenance of the Debtors' cash management system, <u>provided</u>, <u>however</u>, that such order is and remains at all times on terms and conditions acceptable to the DIP Agent and such order is not inconsistent with the terms specified herein or the DIP Loan Documents.

26.   <u>Delivery of Documentation.</u>  The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Agent, counsel to the DIP Agent, and any financial advisors to the DIP Agent, all financial reports, Approved Budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Agent, the DIP Lenders, and/or the DIP Agent's legal and financial advisors pursuant to the DIP Loan Documents, or (ii) reasonably requested by the DIP Agent and/or the DIP Lenders (or their legal and financial advisors).

27.   <u>Access to Books and Records</u>.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) timely file all current, quarterly, and annual reports required to be filed with the SEC, (c) cooperate, consult with, and provide to the DIP Agent and the DIP

Lenders all such information as required or allowed under the DIP Loan Documents, the provisions of this Interim Order or that is afforded to the Committee and/or the Committee's respective legal or financial advisors, (d) permit, upon one (1) business days' notice and during normal business hours, representatives of the DIP Agent and/or the DIP Lenders to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (e) permit representatives of the DIP Agent and the DIP Lenders to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations.

28.    <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; (d) making the decision to make the loans and financial accommodations under the Prepetition First Lien Loan Documents and the Prepetition Second Lien Note Documents, as applicable; (e) administering the loans and financial accommodations extended under the Prepetition First Lien Loan Documents and the Prepetition Second Lien Note Documents, as applicable; (f) extending other financial accommodations to the Debtors under the Prepetition First Lien Loan Documents and the Prepetition Second Lien Note Documents, as applicable; and (g) making the decision to collect the indebtedness and obligations of the Debtors, neither the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee nor the Prepetition Second

Lien Noteholders, as applicable, shall be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

29.    <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code.  The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors (including the Prepetition Second Lien Trustee and Prepetition Second Lien Noteholders), any Creditors' Committee, equity holders, and all other parties in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

30.    <u>Binding Nature of Agreement</u>.  Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable in accordance with their terms.  The DIP Loan Documents have been or will be properly executed and delivered to the DIP Agent or the DIP Lenders by the Debtors.  Unless otherwise consented to in writing, the rights, remedies, powers, privileges, liens, and priorities of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders, as applicable, provided for in this Interim Order, the DIP Loan Documents, or otherwise shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code unless and until the DIP Obligations and the Prepetition First Lien Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with the DIP Loan Documents and the Prepetition First Lien Loan Documents.

31.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders, prior to the date of receipt by the DIP Agent, the Prepetition First Lien Agent, the

Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders prior to written notice to the DIP Agent, the Prepetition First Lien Agent, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders, shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

32.    Collateral Rights.  If any party who holds a lien or security interest in DIP Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, the Prepetition First Lien Replacement Liens or the Prepetition Senior Liens in such DIP Collateral or Prepetition Collateral receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral prior to the indefeasible payment in full in cash and the complete satisfaction of (a) all DIP Obligations under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents, and (b) the Prepetition First Lien Obligations under the Prepetition First Lien Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or Prepetition

Collateral in trust for the DIP Lenders and the Prepetition First Lien Lenders and shall immediately turn over such proceeds for application by the DIP Agent and the Prepetition First Lien Agent to repay the Prepetition First Lien Obligations and the DIP Obligations in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents and this Interim Order until indefeasibly paid in full.

33.    No Waiver.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Agent or DIP Lenders, Prepetition First Lien Agent, Prepetition First Lien Lenders, Prepetition Second Lien Trustee or Prepetition Second Lien Noteholders may have to bring or be heard on any matter brought before this Court.

34.    Sale/Conversion/Dismissal.

(a)    Absent the consent of the DIP Agent and the DIP Lenders, the Debtors shall not seek or support entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless, in connection with such event, the proceeds of such sale are or will be indefeasibly paid to the DIP Agent and DIP Lenders on account of the DIP Obligations and the commitments under the DIP Loan Documents and this Interim Order are terminated in accordance therewith on the closing date of such sale.

(b)    If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise, or appointing a chapter 11 trustee or a responsible officer or examiner with expanded powers, is at any time entered, such order shall provide that (a) the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Adequate Protection Claims granted hereunder and in the DIP Loan Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as

provided in this Interim Order and the DIP Loan Documents until all DIP Loan Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance with the DIP Loan Documents and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, Replacement Liens, the Prepetition First Lien Adequate Protection Obligations and the Prepetition Second Lien Adequate Protection Obligations.

35.    Limits on Lenders' Liability.    Nothing in this Interim Order and subject to Paragraph 15 or in any of the DIP Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition Second Lien Note Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders the Prepetition Second Lien Trustee or the Prepetition Second Lien Noteholders of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

36.    Priority of Terms.    To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, the Requested Relief, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

37.   <u>No Third Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

38.   <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and Adequate Protection Claims shall continue in these Chapter 11 Cases, in any such successor case or after any such dismissal.  The DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Claims shall maintain their priorities as provided in this Interim Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Agent or the DIP Lenders in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission.

39.   <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001, and Bankruptcy Local Rules 2002-1, 4001-1(a), and 9013-1(m).  Such notice was good and sufficient under the particular circumstances and no other or further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this

Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be *actually received* no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Central) by the following: (a) counsel to the Debtors, Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, TX 77002 (attn.: John F. Higgins and Eric M. English) and Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801 (attn.:  M. Blake Clearly and Joel A. Waite); (b) counsel to the DIP Agent and Prepetition First Lien Agent, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (Attn: Adam C. Harris and David M. Hillman) and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801 (Attn: Adam Landis); (c) counsel to the Prepetition Second Lien Trustee, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Mark R. Somerstein), and (d) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Mark S. Kenney).  The Court shall conduct a Final Hearing on the Requested Relief commencing on _____, 2015 at _____ (prevailing Eastern time).

40.    <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

41.    <u>Proofs of Claim</u>.  Notwithstanding any order of this Court to the contrary, the Prepetition First Lien Agent, Prepetition First Lien Lenders, Prepetition Second Lien Trustee, Prepetition Second Lien Noteholders, DIP Agent, and DIP Lenders hereby are relieved of any obligation or requirement to file proofs of claim in the Chapter 11 Cases with respect to any

01:17386080.1

Prepetition First Lien Obligations, Prepetition Second Lien Obligations, or DIP Obligations and any other claims or liens granted hereunder or created hereby.  Upon approval of this Interim Order, the Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders, and the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim.  Notwithstanding the foregoing, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Prepetition Second Lien Trustee, and the Prepetition Second Lien Noteholders are hereby authorized and entitled, in their discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

42.    <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

Dated:  Wilmington, Delaware

_____, 2015


_____
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT A

**APPROVED BUDGET**

**Milagro Oil & Gas**
**Weekly DIP Cash Flow Forecast**
*$ in thousands*

| | Bankruptcy Week 1 | Bankruptcy Week 2 | Bankruptcy Week 3 | Bankruptcy Week 4 | Bankruptcy Week 5 | Bankruptcy Week 6 | Bankruptcy Week 7 | Bankruptcy Week 8 | Bankruptcy Week 9 | Bankruptcy Week 10 | Bankruptcy Week 11 | Bankruptcy Week 12 | Bankruptcy Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week beginning | 16-Jul-15 | 20-Jul-15 | 27-Jul-15 | 3-Aug-15 | 10-Aug-15 | 17-Aug-15 | 24-Aug-15 | 31-Aug-15 | 7-Sep-15 | 14-Sep-15 | 21-Sep-15 | 28-Sep-15 | 5-Oct-15 |
| Week ending | 19-Jul-15 | 26-Jul-15 | 2-Aug-15 | 9-Aug-15 | 16-Aug-15 | 23-Aug-15 | 30-Aug-15 | 6-Sep-15 | 13-Sep-15 | 20-Sep-15 | 27-Sep-15 | 4-Oct-15 | 11-Oct-15 |
| **Receipts** | | | | | | | | | | | | | |
| Collected Gross Revenue | 116.2 | 4,453.2 | 1,147.0 | 117.0 | 117.0 | 3,275.8 | 1,169.9 | 114.8 | 114.8 | 1,000.0 | 3,361.3 | 100.0 | 100.0 |
| Royalty Payments | - | (1,636.2) | - | - | - | (970.9) | - | - | - | - | (772.8) | - | - |
| Total Net Revenue Receipts | 116.2 | 2,817.0 | 1,147.0 | 117.0 | 117.0 | 2,304.9 | 1,169.9 | 114.8 | 114.8 | 1,000.0 | 2,588.5 | 100.0 | 100.0 |
| Other (e.g., JIB) | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 |
| Total Net Revenue Receipts/(Disbursements) | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 | 86.7 |
| **TOTAL NET RECEIPTS** | 202.9 | 2,903.7 | 1,233.6 | 203.7 | 203.7 | 2,391.6 | 1,256.6 | 201.5 | 201.5 | 1,086.7 | 2,675.2 | 186.7 | 186.7 |
| **Disbursements** | | | | | | | | | | | | | |
| *Operating Disbursements* | - | 1,673.7 | 417.4 | 417.4 | 417.4 | 417.4 | 417.4 | 504.7 | 504.7 | 504.7 | 504.7 | 504.7 | 504.7 |
| Direct Operating | - | 482.1 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| Capital Investment - Drill Plan/Workover | - | 531.6 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 |
| Capital Investment - Other Operational & IT | - | 40.9 | 1.5 | 9.0 | - | 39.8 | 1.4 | 8.9 | - | - | 40.6 | 1.4 | 8.9 |
| Production Tax | - | - | - | - | 131.6 | - | - | - | 131.6 | - | - | - | 131.6 |
| Insurance | - | 134.7 | 48.2 | 48.2 | 48.2 | 48.2 | 48.2 | 44.5 | 44.5 | 44.5 | 44.5 | 44.5 | 44.5 |
| Expense Workover | | | | | | | | | | | | | |
| *General & Administrative* | | | | | | | | | | | | | |
| Payroll | - | 151.6 | 411.9 | 151.6 | 410.7 | 151.6 | 409.7 | 146.1 | - | 555.9 | - | 555.9 | - |
| Professional Services | - | 140.2 | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 | 13.0 | 13.0 | 13.0 | 13.0 | 37.8 | 37.8 |
| Office Rent | - | 175.3 | - | - | - | - | 175.3 | - | - | - | 175.3 | - | - |
| Capitalized Tech Services | - | - | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 25.5 | 25.5 | 25.5 | 25.5 | 20.4 | 20.4 |
| Insurance (D&O) | - | - | - | - | - | - | - | - | - | - | 206.0 | - | - |
| Other | - | - | 33.8 | 33.8 | 33.8 | 33.8 | 33.8 | 42.3 | 42.3 | 42.3 | 42.3 | 39.0 | 39.0 |
| **TOTAL DISBURSEMENTS** | - | 3,330.1 | 1,213.8 | 961.0 | 1,342.6 | 991.7 | 1,386.9 | 911.3 | 887.8 | 1,312.1 | 1,178.2 | 1,330.1 | 913.2 |
| **OPERATING CASH FLOW** | 202.9 | (426.4) | 19.9 | (757.4) | (1,139.0) | 1,399.9 | (130.3) | (709.8) | (686.3) | (225.4) | 1,497.0 | (1,143.4) | (726.5) |
| **Restructuring and Other One-Time** | | | | | | | | | | | | | |
| Professional Fees - Debtor | - | - | - | - | - | - | 432.0 | - | - | - | 804.0 | - | - |
| Professional Fees - 1st Lien | - | - | 375.0 | - | - | - | - | 200.0 | - | - | - | - | - |
| Professional Fees - Consenting Noteholders | - | - | 782.1 | - | - | - | - | 575.0 | - | - | - | - | - |
| Professional Fees - Other | - | - | - | - | - | - | 374.0 | - | - | - | 352.0 | - | - |
| Surety Bond Collateral | 7,023.4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Revolver Loan Fees & Expenses | - | - | 11.4 | - | - | - | 2.6 | - | - | - | - | 0.6 | - |
| Utility Deposits | - | - | - | 100.0 | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | 30.0 | - | - |
| Other | - | 5.6 | - | 53.3 | - | - | - | 56.2 | - | - | - | - | - |
| **TOTAL RESTRUCTURING AND OTHER ONE-TIME** | 7,023.4 | 5.6 | 1,168.5 | 153.3 | - | - | 808.6 | 775.0 | 56.2 | - | 1,186.0 | 0.6 | - |
| **1st Lien Debt Service / Bank Fees** | | | | | | | | | | | | | |
| Interest & Fees | - | - | 519.2 | - | - | - | 1,024.3 | - | - | - | 1,017.2 | - | - |
| **TOTAL 1ST LIEN DEBT SERVICE / BANK FEES** | - | - | 519.2 | - | - | - | 1,024.3 | - | - | - | 1,017.2 | - | - |
| **NET CASH FLOW** | (6,820.6) | (432.0) | (1,667.8) | (910.7) | (1,139.0) | 1,399.9 | (1,963.1) | (1,484.8) | (742.5) | (225.4) | (706.2) | (1,144.0) | (726.5) |
| **Balances and Liquidity** | | | | | | | | | | | | | |
| Beginning Book Balance | 4,318.7 | 6,498.1 | 6,066.1 | 4,398.3 | 3,487.6 | 5,348.7 | 6,748.5 | 4,785.4 | 5,300.6 | 4,558.1 | 4,332.7 | 3,626.5 | 2,482.5 |
| Net Cash Flow | (6,820.6) | (432.0) | (1,667.8) | (910.7) | (1,139.0) | 1,399.9 | (1,963.1) | (1,484.8) | (742.5) | (225.4) | (706.2) | (1,144.0) | (726.5) |
| DIP Revolver Draw/(Paydown) | 9,000.0 | - | - | - | 3,000.0 | - | - | 2,000.0 | - | - | - | - | - |
| Ending Book Balance | 6,498.1 | 6,066.1 | 4,398.3 | 3,487.6 | 5,348.7 | 6,748.5 | 4,785.4 | 5,300.6 | 4,558.1 | 4,332.7 | 3,626.5 | 2,482.5 | 1,756.0 |
| **Outstanding 1st Lien Debt/DIP Term Loan** | | | | | | | | | | | | | |
| Principal Balance | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 | 102,250.9 |
| **Outstanding DIP Revolver** | | | | | | | | | | | | | |
| Beginning DIP Revolver Balance | - | 9,000.0 | 9,000.0 | 9,000.0 | 9,000.0 | 12,000.0 | 12,000.0 | 12,000.0 | 14,000.0 | 14,000.0 | 14,000.0 | 14,000.0 | 14,000.0 |
| DIP Revolver Draw/(Paydown) | 9,000.0 | - | - | - | 3,000.0 | - | - | 2,000.0 | - | - | - | - | - |
| Ending DIP Revolver Balance | 9,000.0 | 9,000.0 | 9,000.0 | 9,000.0 | 12,000.0 | 12,000.0 | 12,000.0 | 14,000.0 | 14,000.0 | 14,000.0 | 14,000.0 | 14,000.0 | 14,000.0 |

# **EXHIBIT II**

## **Credit Agreement**

**EXECUTION VERSION**

_____

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**dated as of July 15, 2015**

**among**

**MILAGRO EXPLORATION, LLC and MILAGRO PRODUCING, LLC**,
each as debtors and debtors-in-possession,
as Borrowers,

**MILAGRO OIL & GAS, INC., AND EACH SUBSIDIARY OF MILAGRO OIL & GAS, INC.,
LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO**
each as debtors and debtors-in-possession,
as Guarantors,

**VARIOUS FINANCIAL INSTITUTIONS AND OTHER
PERSONS FROM TIME TO TIME PARTIES HERETO,**
as the Lenders,

**TPG SPECIALTY LENDING, INC.,**
as the Administrative Agent and Swing Line Lender

_____

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND ACCOUNTING TERMS.................................................................1
    SECTION 1.1 Defined Terms ...................................................................................1
    SECTION 1.2 Use of Defined Terms.......................................................................26
    SECTION 1.3 Cross-References and Other Provisions Relating to Terms...............26
    SECTION 1.4 Amendment of Defined Instruments................................................27
    SECTION 1.5 Accounting and Financial Determinations.......................................27

ARTICLE 2 COMMITMENTS, BORROWING AND ISSUANCE PROCEDURES AND NOTES.......27
    SECTION 2.1 Commitments.....................................................................................27
    SECTION 2.2 Termination of Commitments and Reduction of the Commitment Amounts.............28
    SECTION 2.3 Revolving Loans Procedures and Provisions....................................29
    SECTION 2.4 Swing Line Loan Procedures and Provisions ...................................30
    SECTION 2.5 Protective Advances...........................................................................32
    SECTION 2.6 Intentionally Omitted ........................................................................33
    SECTION 2.7 Evidence of Indebtedness; Register; Notes.......................................33
    SECTION 2.8 Reserve Report by Approved Engineer. ...........................................34

ARTICLE 3 REPAYMENTS, PREPAYMENTS, INTEREST AND FEES...........................................34
    SECTION 3.1 Repayments and Prepayments; Application.....................................34
    SECTION 3.2 Interest Provisions.............................................................................37
    SECTION 3.3 Fees...................................................................................................38

ARTICLE 4 CERTAIN LIBO RATE AND OTHER PROVISIONS .................................................38
    SECTION 4.1 LIBO Rate Lending Unlawful...........................................................38
    SECTION 4.2 Deposits Unavailable ........................................................................39
    SECTION 4.3 Increased LIBO Rate Loan Costs, etc. .............................................39
    SECTION 4.4 Funding Losses .................................................................................39
    SECTION 4.5 Increased Capital Costs.....................................................................40
    SECTION 4.6 Taxes.................................................................................................40
    SECTION 4.7 Payments, Computations; Proceeds of Collateral, etc. .....................43
    SECTION 4.8 Sharing of Payments .........................................................................44
    SECTION 4.9 Setoff.................................................................................................45
    SECTION 4.10    Payments and Deductions to a Defaulting Lender ........................45

ARTICLE 5 CONDITIONS ............................................................................................................45
    SECTION 5.1 Interim Facility Effective Date ........................................................45
    SECTION 5.2 Final Facility Effective Date .............................................................49
    SECTION 5.3 All Credit Extensions........................................................................49

ARTICLE 6 REPRESENTATIONS AND WARRANTIES ...............................................................50
    SECTION 6.1 Organization, etc. .............................................................................50
    SECTION 6.2 Due Authorization, Non-Contravention, Defaults etc.......................51
    SECTION 6.3 Government Approval, Regulation, etc. ............................................51
    SECTION 6.4 Validity, etc. .....................................................................................51
    SECTION 6.5 Financial Information........................................................................51
    SECTION 6.6 No Material Adverse Change............................................................51
    SECTION 6.7 Litigation, Labor Controversies, etc. ...............................................51
    SECTION 6.8 Subsidiaries ......................................................................................52
    SECTION 6.9 Ownership of Properties, Etc. ...........................................................52

# TABLE OF CONTENTS
(continued)

Page

SECTION 6.10    Taxes .................................................................................................... 53
SECTION 6.11    ERISA; Pension and Welfare Plans ..................................................... 53
SECTION 6.12    Environmental Warranties .................................................................... 53
SECTION 6.13    Disclosure of Material Information; Accuracy of Information .............. 54
SECTION 6.14    Regulations T, U and X ........................................................................ 54
SECTION 6.15    Labor Matters ....................................................................................... 54
SECTION 6.16    Compliance with Laws .......................................................................... 54
SECTION 6.17    Material Contracts ................................................................................ 55
SECTION 6.18    Budget ................................................................................................... 55
SECTION 6.19    Deposit Account and Cash Management Accounts ................................ 55
SECTION 6.20    Insurance ............................................................................................... 55
SECTION 6.21    Restrictions on Liens ............................................................................ 55
SECTION 6.22    Location of Business and Offices .......................................................... 56
SECTION 6.23    Maintenance of Properties ................................................................... 56
SECTION 6.24    Gas Imbalances ..................................................................................... 56
SECTION 6.25    Marketing of Production ....................................................................... 56
SECTION 6.26    Perfected Liens and Security Interests .................................................. 57
SECTION 6.27    Administrative Priority; Lien Priority. ................................................. 57
SECTION 6.28    Seismic Data ......................................................................................... 57
SECTION 6.29    Appointment of Trustee or Examiner; Liquidation ............................... 58
SECTION 6.30    Managerial Assistance and Related Persons ........................................ 58
SECTION 6.31    Patriot Act and FCPA ........................................................................... 58

ARTICLE 7 COVENANTS ............................................................................................. 58
SECTION 7.1  Affirmative Covenants ............................................................................. 58
SECTION 7.2  Negative Covenants .................................................................................. 68

ARTICLE 8 MULTIPLE BORROWERS ........................................................................ 75
SECTION 8.1  Obligations Joint and Several and Unconditional ................................... 75
SECTION 8.2  Reinstatement ........................................................................................... 76
SECTION 8.3  Subrogation .............................................................................................. 76
SECTION 8.4  Remedies ................................................................................................... 76
SECTION 8.5  Limitation on Obligations ........................................................................ 76
SECTION 8.6  Borrowers' Representative; Binding on All Borrowers ............................ 76

ARTICLE 9 EVENTS OF DEFAULT .............................................................................. 77
SECTION 9.1  Listing of Events of Default ..................................................................... 77
SECTION 9.2  Action if Event of Default ........................................................................ 80

ARTICLE 10 THE ADMINISTRATIVE AGENT ........................................................... 80
SECTION 10.1    Actions ................................................................................................. 80
SECTION 10.2    Funding Reliance, etc. .......................................................................... 80
SECTION 10.3    Indemnity; Exculpation ........................................................................ 81
SECTION 10.4    Successor ............................................................................................... 81
SECTION 10.5    Credit Extensions by the Administrative Agent ..................................... 82
SECTION 10.6    Credit Decisions .................................................................................... 82
SECTION 10.7    Copies, etc. ........................................................................................... 82
SECTION 10.8    Reliance by the Administrative Agent .................................................... 83
SECTION 10.9    Defaults ................................................................................................. 83
SECTION 10.10  Posting of Approved Electronic Communications ................................. 83

-ii-

# TABLE OF CONTENTS
## (continued)

Page

SECTION 10.11 [Intentionally Omitted] ................................................................. 84
SECTION 10.12 Security Matters; Authority of Administrative Agent to Release Collateral ......... 84
SECTION 10.13 The Administrative Agent ............................................................. 85

ARTICLE 11 MISCELLANEOUS; SECURITY AND ADMINISTRATIVE PRIORITY ...................... 85
SECTION 11.1 Waivers, Amendments, etc. ........................................................... 85
SECTION 11.2 Notices; Time ........................................................................ 86
SECTION 11.3 Payment of Costs and Expenses ....................................................... 86
SECTION 11.4 Indemnification ....................................................................... 87
SECTION 11.5 Survival ............................................................................. 89
SECTION 11.6 Severability ......................................................................... 89
SECTION 11.7 Headings ............................................................................. 89
SECTION 11.8 Execution in Counterparts, Effectiveness, etc. ....................................... 89
SECTION 11.9 Successors and Assigns ............................................................... 89
SECTION 11.10 Sale and Transfer of Credit Extensions; Participations in Credit Extensions; Notes ............................................................................................. 89
SECTION 11.11 Other Transactions .................................................................. 91
SECTION 11.12 Waiver of Jury Trial ................................................................ 91
SECTION 11.13 Confidentiality ..................................................................... 92
SECTION 11.14 Counsel Representation .............................................................. 92
SECTION 11.15 [Intentionally Omitted] ............................................................. 92
SECTION 11.16 Payment Set Aside ................................................................... 93
SECTION 11.17 [Intentionally Omitted] ............................................................. 93
SECTION 11.18 Governing Law; Submission to Jurisdiction .......................................... 93
SECTION 11.19 Usury Not Intended .................................................................. 93
SECTION 11.20 Usury Recapture ..................................................................... 94
SECTION 11.21 [Intentionally Omitted] ............................................................. 94
SECTION 11.22 Patriot Act ......................................................................... 94
SECTION 11.23 ORAL AGREEMENTS ..................................................................... 94
SECTION 11.24 Pre-Petition Obligations ............................................................ 95
SECTION 11.25 Acknowledgment of Security Interests ............................................... 95
SECTION 11.26 Binding Effect of Documents ......................................................... 95
SECTION 11.27 Collateral; Grant of Lien and Security Interest ..................................... 95
SECTION 11.28 Administrative Priority ............................................................. 96
SECTION 11.29 Grants, Rights and Remedies ......................................................... 96
SECTION 11.30 No Filings Required ................................................................. 96
SECTION 11.31 Survival ............................................................................ 97

DOC ID - 23131345.10

## TABLE OF CONTENTS
(continued)

Page

SCHEDULE I          -          Disclosure Schedule
SCHEDULE II         -          Notices; Percentages; Loan Commitments
SCHEDULE III        -          Chapter 11 Milestones


EXHIBIT A           -          Form of Borrowing Request
EXHIBIT B           -          Form of Compliance Certificate
EXHIBIT C           -          Form of Continuation/Conversion Notice
EXHIBIT D           -          Form of Holdco Guaranty
EXHIBIT E           -          Form of Lender Assignment Agreement
EXHIBIT F           -          Form of Mortgage
EXHIBIT G           -          Form of Interim Facility Effective Date Certificate
EXHIBIT H           -          Intentionally Omitted
EXHIBIT I           -          Form of Subsidiary Guaranty
EXHIBIT J           -          Form of Interim Bankruptcy Court Order

DOC ID - 23131345.10

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS **DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of July 15, 2015, is among (a) MILAGRO EXPLORATION, LLC, a Delaware limited liability company ("Milagro Exploration"), and MILAGRO PRODUCING, LLC, a Delaware limited liability company ("Milagro Producing"; together with Milagro Exploration, the "Borrowers" and individually, a "Borrower"), each as a debtor-in-possession, (b) MILAGRO OIL & GAS, INC., a Delaware corporation (the "Holdco Guarantor"), each subsidiary of the Holdco Guarantor listed as a "Guarantor" on the signature pages hereto (the "Subsidiary Guarantors" and individually a "Subsidiary Guarantor", and together with the Holdco Guarantor and each other Person that guaranties all or any part of the Obligations (as hereinafter defined), the "Guarantors" and individually, a "Guarantor"), each as a debtor-in-possession, (c) the various financial institutions and other Persons from time to time parties hereto (the "Lenders"), and (d) TPG SPECIALTY LENDING, INC. ("TSL"), as administrative agent (in such capacity, the "Administrative Agent") for the Lenders, and as the swing line lender (in such capacity, the "Swing Line Lender").

## RECITALS

A.       The Borrowers, the Holdco Guarantor and the Subsidiary Guarantors have commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and  have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession; and

B.       The Borrowers have asked the Lenders to make post-petition loans consisting of (i) a revolving credit facility in an aggregate principal amount not to exceed $15,000,000 and (b) a term loan credit facility in an aggregate principal amount of $102,250,857.81.  The Lenders have severally, and not jointly, agreed to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Borrowers, the Holdco Guarantor, the Subsidiary Guarantors, the Administrative Agent, the Swing Line Lender and the Lenders do hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND ACCOUNTING TERMS

**SECTION 1.1       Defined Terms**.  The following terms (whether or not underscored) when used in this Agreement, including its preamble, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an account, chattel paper, or a general intangible or intangible, as applicable, in each case, as such term is defined under the UCC.

"Accounts" means all "accounts" (as defined in the UCC) of the Obligors (or, if referring to another Person, of such Person), including, without limitation, accounts, accounts receivable, monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, instruments, general intangibles, or chattel paper), in each case whether arising out of goods sold

or services rendered or from any other transaction and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 10.4.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" of any Person means any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person or any Subsidiary of such Person.  The term control (including the terms "controlled by" or "under common control with") means the possession, directly or indirectly, of the power to (a) vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or (b) direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Agent Indemnified Party" is defined in Section 10.3.

"Agreed Administrative Expense Priorities" means those administrative expenses with respect to the Obligors and, with respect to sub-clause (ii) of clause "first", any official committee appointed by the Bankruptcy Court, shall have the following order of priority:

> first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (ii) all amounts payable in respect of Carve-Out Expenses, provided that the amount entitled to priority under this sub-clause (ii) of this clause first ("Priority Professional Expenses") shall not exceed the sum of (A) the aggregate amount of professional fees and disbursements accrued and not paid immediately prior to the commencement of a Carve-Out Expense Reduction Period, but solely if, as and to the extent such Professional Fees are or have been provided for in, and are consistent with, the Budget and are ultimately allowed by the Bankruptcy Court pursuant to Section 330 of the Bankruptcy Code and (B) $500,000 (the "Professional Expense Cap"); provided, however, that (1) during any Carve-Out Expense Reduction Period, any payments actually made in respect of Carve-Out Expenses shall reduce the Professional Expense Cap on a dollar-for-dollar basis, and (2) for the avoidance of doubt, so long as no Carve-Out Expense Reduction Period shall be continuing, the payment of Carve-Out Expenses shall not reduce the Professional Expense Cap,

> second, all Obligations,

> third, all Prepetition First Lien Adequate Protection Obligations and DIP Superpriority Claims (each as defined in the Bankruptcy Court Orders), and,

> fourth, all other allowed administrative expenses.

"Agreement" means this Debtor-In-Possession Credit Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

DOC ID - 23131345.10

"<u>Alternate Base Rate</u>" means, on any date and with respect to all Base Rate Loans, a fluctuating rate of interest per annum equal to the highest of (a) the Base Rate in effect on such day; (b) the Federal Funds Rate in effect on such day plus ½ of 1%; (c) the Daily One-Month LIBOR plus 1.00%; and (d) 3.50%.  Changes in the rate of interest on that portion of any Loans maintained as Base Rate Loans will take effect simultaneously with each change in the Alternate Base Rate.  The Administrative Agent will give notice promptly to the Borrowers and the Lenders of changes in the Alternate Base Rate; <u>provided</u> that, the failure to give such notice shall not affect the Alternate Base Rate in effect after such change.

"<u>Anti-Terrorism Laws</u>" means any Applicable Law relating to terrorism or money laundering, including, without limitation, (a) the Money Laundering Control Act of 1986 (*i.e.*, 18 U.S.C. §§ 1956 and 1957), (b) the Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) (the "<u>Bank Secrecy Act</u>"), (c) the Patriot Act, (d) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("<u>OFAC</u>"), (e) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (f) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B), or (g) any similar laws enacted in the United States or any other jurisdictions in which the parties to this Agreement operate, as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"<u>Applicable Law</u>" means with respect to any Person or matter, any United States or foreign, federal, state, regional, tribal or local statute, law, code, rule, treaty, convention, application, order, decree, consent decree, injunction, directive, determination or other requirement (whether or not having the force of law) relating to such Person or matter and, where applicable, any interpretation thereof by a Governmental Authority having jurisdiction with respect thereto or charged with the administration or interpretation thereof.

"<u>Applicable Margin</u>" means, with respect to all Loans maintained as LIBO Rate Loans or Base Rate Loans, the applicable percentage set forth below:

| LIBO Rate Loans: | Base Rate Loans: |
|---|---|
| 9.50% | 8.50% |

"<u>Approved Engineer</u>" means W.D. Von Gonten & Company or any other independent petroleum engineer satisfactory to the Administrative Agent in its sole and absolute discretion.

"<u>Approved Fund</u>" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"<u>Authorized Officer</u>" means, relative to any Obligor, any of the following whose signatures and incumbency shall have been certified to the Administrative Agent and the Lenders pursuant to <u>Section 5.1.2</u>:  (a) with respect to any Obligor that is a corporation, such Obligor's Chief Executive Officer, President, Chief Restructuring Officer, Chief Financial Officer, or Vice President, (b) with respect to any Obligor that is a limited liability company, if such Obligor has officers, then such Obligor's Chief

Executive Officer, President, Chief Restructuring Officer, Chief Financial Officer, or Vice President, and if such Obligor is managed by members, then an Authorized Officer of such Obligor's managing member, and if such Obligor is managed by managers, then a manager (if such manager is an individual) or an Authorized Officer of such manager (if such manager is an entity), and (c) with respect to any Obligor that is a general partnership, limited partnership or a limited liability partnership, an Authorized Officer of such Obligor's general partner or partners.

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Avoided Payments" has the meaning specified therefor in Section 3.1.1(s).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

"Bankruptcy Court Orders" means the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order.

"Base Rate" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the prime rate (currently defined as the base rate on corporate loans posted by at least 70% of the nation's ten (10) largest banks), as in effect from time to time.  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

"Base Rate Loan" means a Loan bearing interest at a fluctuating rate determined by reference to the Alternate Base Rate.

"Blocked Person" means any Person:

        (i)      that is publicly identified (i) on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo program or (ii) as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Anti-Terrorism Law;

        (ii)     that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in clause (a) above;

        (iii)    which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; and

        (iv)    that is affiliated or associated with a Person described in clauses (a), (b) or (c) above.

"Board of Directors" means, with respect to any Person that is (a) a corporation, the board of directors or other equivalent governing body of such Person, (b) a limited liability company, the managers or board of managers or other equivalent governing body of such Person, (c) a partnership, the general partner or partners thereof or persons serving an equivalent function with respect to such Person and (d)

any other entity, the equivalent governing body or Persons serving equivalent functions as a board of directors, managers, board of managers or general partner; provided, however, that where the context permits, the term "Board of Directors" shall include any duly authorized committee of the Board of Directors acting on its behalf.

"Borrower" is defined in the preamble.

"Borrowing Request" means a Loan request and certificate duly executed by an Authorized Officer of a Borrower and, if required therein, any two Authorized Officers of Holdco Guarantor, and substantially in the form of Exhibit A hereto.

"Budget" means (a) the 13-week cash requirement forecast setting forth projected cash receipts and disbursements of the Borrowers and the Holdco Guarantor and Loans of the Borrowers for the periods covered thereby, delivered by the Borrowers to the Administrative Agent and the Lenders (a) on or before the Interim Facility Effective Date pursuant to Section 5.1 hereof, (b) on or before the Final Facility Effective Date pursuant to Section 5.2 hereof and (c) thereafter pursuant to Section 7.1.1, in each case, in form, substance and detail satisfactory to the Administrative Agent and the Required Lenders in their sole and absolute discretion.  (For the avoidance of doubt, once delivered and approved by the Administrative Agent and the Required Lenders, the Budget may not be amended, supplemented or modified without the prior written consent of the Administrative Agent and the Required Lenders.)

"Budget Period" means (a) for purposes of determining the amount of Loans permitted to be outstanding during the Interim Period, each one week period set forth in the Budget, and (b) for all other purposes, (i) during the first two weeks following the Interim Facility Effective Date, the first two weeks following the Interim Facility Effective Date measured on a cumulative basis, (ii) during the first four weeks following the Interim Facility Effective Date, the first four weeks following the Interim Facility Effective Date measured on a cumulative basis, and (iii) at the end of each 2 week period thereafter, each 4-week period measured on a cumulative basis.

"Business Day" means (a) any day that is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in Texas and New York and (b) relative to the making, continuing, prepaying or repaying of any LIBO Rate Loans, any day that is a Business Day described in clause (a) above, and that is also a day on which dealings in Dollars are carried on in the London interbank eurodollar market.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital (including all capital stock, partnership, membership or other equity interests in such Person), whether now outstanding or issued after the Interim Facility Effective Date and whether or not certificated.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Carve-Out Expenses" means any payments permitted by the Bankruptcy Court to be made in respect of fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code.

"Carve-Out Expense Reduction Period" means any period (a) during which an Event of Default under this Agreement or a default by any Obligor in any of its obligations under any of the Bankruptcy Court Orders, in either case, shall have occurred and be continuing, and (b) commencing after the Administrative Agent has provided written notice of such Event of Default or default to the Borrowers and the creditors' committee.

"Cash Equivalent Investment" means, at any time:

(a) any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

(b) commercial paper maturing not more than 270 days from the date of issue, that is issued by (i) a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia, and rated A-1 or higher by S&P or P-1 or higher by Moody's or (ii) any Lender (or its holding company);

(c) any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, that is issued by (i) any bank organized under the laws of the United States (or any State thereof), and that has (A) a credit rating of A2 or higher from Moody's or A or higher from S&P and (B) a combined capital and surplus greater than $500,000,000, or (ii) any Lender;

(d) shares of money market mutual or similar funds which invest primarily in assets satisfying the requirements of clauses (a) through (c) of this definition;

(e) money market funds that (i) purport to comply generally with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P or Aaa by Moody's or carry an equivalent rating by another national recognized rating agency, and (iii) have portfolio assets of at least $5,000,000,000; or

(f) any repurchase agreement having a term of 30 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in clause (c)(i) that (i) is secured by a fully perfected security interest in any obligation of the type described in clause (a), and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder.

"Casualty Event" means the damage, destruction or condemnation, including by process of eminent domain or any transfer or disposition of property in lieu of condemnation, as the case may be, of property of any Person or any of its Subsidiaries, including by process of eminent domain or any transfer or disposition of property in lieu of condemnation.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response Compensation Liability Information System List.

DOC ID - 23131345.10

"Change in Control" means the occurrence of any of the following:

(a) the failure of the Parent and the Permitted Holders, in the aggregate, at any time to directly or indirectly own beneficially and of record on a fully diluted basis at least a majority of the Voting Securities of the Holdco Guarantor, free and clear of all Liens;

(b)  the failure of the Holdco Guarantor at any time to directly or indirectly own beneficially and of record on a fully diluted basis 100% of the outstanding Capital Securities of each Borrower, free and clear of all Liens (other than Liens granted under a Loan Document or existing on the Filing Date);

(c) the failure of a Borrower at any time to directly or indirectly own beneficially and of record on a fully diluted basis 100% of the outstanding Capital Securities of its Subsidiaries, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document or existing on the Filing Date); or

(d)  the failure of the Permitted Holders, in the aggregate, at any time to directly or indirectly own beneficially and of record on a fully diluted basis at least a majority of the Voting Securities of the Parent.

"Chapter 11 Cases" has the meaning specified therefor in the recitals hereto.

"Chapter 11 Milestones" has the meaning specified therefor in Schedule VII.

"Class" means, relative to any Loan, the determination of whether such Loan is a Term Loan, a Revolving Loan or a Swing Line Loan.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collateral" is defined in clause (a) of Section 11.27.

"Collateral Trustee" means Wilmington Trust, N.A. in its capacity as collateral trustee under, together with any successor thereto pursuant to, the terms of the collateral trust agreement entered into in connection with the HY Notes.

"Collections" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Obligors and their respective Subsidiaries.

"Commitment" means any Revolving Loan Commitment or Term Loan Commitment, as adjusted from time to time in accordance with this Agreement.

"Commitment Amount" means the Revolving Loan Commitment Amount or the Term Loan Commitment Amount, as applicable.

"Commitment Termination Date" means the Loan Commitment Termination Date.

"Commitment Termination Event" means (a) the occurrence of any Event of Default and either (i) the declaration of all or any portion of the Loans to be due and payable pursuant to Section 9.2, or (ii) the giving of notice by the Administrative Agent, acting at the direction of the Majority Lenders to the Borrowers that the Commitments have been terminated.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C § 1 et seq.), as amended from time to time, and any successor statute.

"Communications" is defined in clause (a) of Section 10.10.

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of the Borrowers, substantially in the form of Exhibit B hereto, together with such changes thereto as the Administrative Agent may from time to time request for the purpose of monitoring compliance with the financial covenants contained herein.

"Consolidated Capital Expenditures" means, for any period, the aggregate of all expenditures of the Holdco Guarantor and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are included in the calculation of "Property, Plant and Equipment" in the consolidated balance sheets of the Holdco Guarantor and its Subsidiaries and that are or will be included in "purchase of property and equipment or which should otherwise be capitalized" or similar items reflected in the consolidated statement of cash flows of the Holdco Guarantor and its Subsidiaries in the current period or in future periods.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of a Borrower, substantially in the form of Exhibit C hereto.

"Contribution Agreement" means the Contribution Agreement, dated as of July 15, 2015, by and among the Holdco Guarantor, Milagro Producing, Milagro Exploration, LLC, Milagro Resources, LLC, and White Oak Resources VI, LLC, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with this Agreement.

"Control Agreement" means (i) each control agreement in existence prior to the Filing Date securing the Pre-Petition Obligations and which shall be deemed to secure the Obligations and (ii) each other agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 9.106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 8.106 of the UCC, as such term relates to certificated securities, or as used in Section 9.104(a) of the UCC, as such term relates to deposit accounts).

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control that, together with the Obligors, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Covered Properties" is defined in Section 7.1.1(n).

"Credit Exposure" means, with respect to any Lender at any time, the sum of (a) the outstanding principal amount of such Lender's Revolving Loans, (b) such Lender's Percentage of the outstanding principal amount of the Swing Line Loans and, (c) the outstanding principal amount of such Lender's Term Loan.

"Credit Extension" means, as the context may require, the making of a Loan by a Lender (which shall not include the continuation or conversion of any Type of existing Loan).

"CRO" has the meaning ascribed to such term in Section 5.1.

"Daily One-Month LIBOR" means, for any day, the rate of interest equal to the LIBO Rate (Reserve Adjusted) then in effect for delivery of funds for a one (1) month period.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund its pro rata share of any Loan, or participations in Swing Line Loans which were required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder unless such failure has been cured within three Business Days (or such longer time period accepted by the Borrowers and the Administrative Agent) or unless such Lender notifies the Administrative Agent and the Borrowers in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or waived, (b) has otherwise failed to pay over to the Administrative Agent, Swing Line Lender or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute or unless such failure has been cured within three Business Days (or such longer time period accepted by the Administrative Agent, Swing Line Lender or such other Lender, as applicable), (c) has notified the Administrative Agent, or has stated publicly, that it will not comply with any such obligations hereunder, or (d) as to which a Lender Insolvency Event has occurred and is continuing with respect to such Lender. Any determination that a Lender is a Defaulting Lender will be made by the Administrative Agent in its sole discretion acting in good faith; provided, that a Lender shall not become a Defaulting Lender solely as the result of the acquisition or maintenance of an ownership interest in such Lender or its Lender Parent Company by a governmental authority or an instrumentality thereof.

"Default Rate" is defined in Section 3.2.2.

"Deposit Account" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"Development Plan" means the development plan of the Obligors setting forth the Obligors' development plans (with expenses broken out by well) for a specific period, including, without limitation, the Consolidated Capital Expenditures planned during such period, in form and substance reasonably satisfactory to the Administrative Agent.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule I, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by a Borrower with the written consent of the Majority Lenders.

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to,

any Guarantor's, any Borrower's or any Subsidiary's assets (including accounts receivable and Capital Securities) to any other Person (other than to a Borrower or any Subsidiary Guarantor) in a single transaction or series of transactions.

"Dollar" and the sign "$" mean lawful money of the United States.

"Domestic Office" means the office of a Lender designated as its "Domestic Office" in the Administrative Questionnaire or such other office within the United States as may be designated from time to time by notice from such Lender to the Administrative Agent and the Borrowers.

"Eligible Assignee" means (a) a Lender (other than a Defaulting Lender); (b)  an Approved Fund; or (c) any other Person (other than a natural Person, an Obligor, any Affiliate of an Obligor or any other Person taking direction from, or working in concert with, an Obligor or any of an Obligor's Affiliates).

"Environmental Laws" means all applicable foreign, federal, state, provincial or local statutes, laws, ordinances, codes, rules, regulations and guidelines (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

"ERISA Affiliate" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control that, together with the Obligors, are treated as a single employer under Section 414 (b) or 414 (c) of the Code or Section 4001(b)(1) of ERISA.

"Event of Default" is defined in Section 9.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Transaction" means the Disposition by the Borrowers in one or more transactions of the Excluded Assets.

"Exemption Certificate" is defined in Section 4.6.5.

"Existing Administrative Agent" means TPG Specialty Lending, Inc., in its capacity as the administrative agent to the Existing Lenders.

"Existing Credit Agreement" means the Second Amended and Restated First lien Credit Agreement, dated as of September 4, 2014, as amended prior to the Filing Date, among the Borrowers, the Holdco Guarantor, the Subsidiary Guarantors, the Existing Lenders and the Existing Administrative Agent.

"Existing Lenders" means the lenders party to the Existing Credit Agreement.

"Extraordinary Receipts" means any cash received by the Holdco Guarantor or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 3.1.1(h) and Section 3.1.1(i) hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (d) condemnation awards (and

payments in lieu thereof), (e) indemnity payments and (f) any purchase price adjustment received in connection with any purchase agreement.

"FCPA" is defined in Section 6.31.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent (in its individual capacity) on such day on such transactions as determined by the Administrative Agent.

"Filing Date" means July 15, 2015.

"Filing Statements" is defined in Section 5.1.11.

"Final Bankruptcy Court Order" means the final order of the Bankruptcy Court with respect to the Obligors, substantially in the form of the Interim Bankruptcy Court Order, as the same may be amended, modified or supplemented from time to time with the express written consent of the Administrative Agent and the Required Lenders.

"Final Bankruptcy Court Order Entry Date" means the date on which the Final Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court.

"Final Facility Effective Date" has the meaning specified therefor in Section 5.2.

"Final Maturity Date" means the date which is the earliest of (i) the date which is 35 days after the date of entry of the Interim Bankruptcy Court Order, if the Final Bankruptcy Court Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) November 15, 2015, (iii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (iv) the date of the consummation of a sale or other disposition of all or substantially all of the assets of the Obligors, whether done by one or a series of transactions, (v) the filing by any Obligor of an application with the Bankruptcy Court seeking the conversion of any Chapter 11 Case to a Chapter 7 case or the occurrence of an Event of Default under Section 9.1.17, (vi) the filing by any Obligor of an application with the Bankruptcy Court seeking the dismissal of any of the Chapter 11 Cases or the occurrence of an Event of Default under Section 9.1.19, and (vii) the date on which the Loans and other Secured Obligations become immediately due and payable pursuant to Section 9.2.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Final Maturity Date.

"Fiscal Quarter" means any period of three consecutive calendar months ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2015 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

11

*Credit Agreement*

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, applied on a basis consistent with the requirements of Section 1.5.

"Governmental Authority" means the government of the United States or any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" means the Holdco Guarantor, each Subsidiary Guarantor, and each other Person that guarantees all or any part of the Obligations.

"Guaranty" means, as applicable, the Holdco Guaranty, the Subsidiary Guaranty, or such other document delivered by any other Person whereby such Person becomes liable for the Secured Obligations as a guarantor.

"Hazardous Material" means (a)  any "hazardous substance", as defined by CERCLA; (b)  any "hazardous waste", as defined by the Resource Conservation and Recovery Act, as amended; or (c) any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other applicable foreign, federal, state, provincial or local law, regulation, ordinance or requirement (including consent decrees and administrative orders) relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended.

"Hedging Agreements" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, puts, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement; provided that, a "Hedging Agreement" shall not include any "Master Agreement" that provides solely for the sale by an Obligor or any Subsidiary of physical Hydrocarbons in exchange for cash in the ordinary course of its business.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under Hedging Agreements.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Highest Lawful Rate" means the maximum nonusurious interest rate under Applicable Law.

DOC ID - 23131345.10

"Holdco Guaranty" means the Guaranty executed and delivered by an Authorized Officer of Holdco Guarantor, substantially in the form of Exhibit D hereto, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Holdco Guarantor" is defined in the preamble.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, mineral term interests, subleases, farm-outs, overriding royalty and royalty interests, net profit interests, carried interests, back-in interests, reversionary interests, production payment interests, and other similar mineral interests, including any reserved or residual interests of whatever nature.

"Hydrocarbon Taxes" means all ad valorem taxes assessed against any Oil and Gas Properties or any part thereof and all production, swap, excise and other taxes assessed against, or measured by, production or the value or proceeds of the production therefrom.

"Hydrocarbons" means oil, gas, coal seam gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, and all other liquid and gaseous hydrocarbons produced or to be produced in conjunction therewith from a well bore and all products, by-products, and other substances derived therefrom or the processing thereof, and all other minerals and substances produced in conjunction with such substances, including sulfur, geothermal steam, water, carbon dioxide, helium, and any and all minerals, ores, or substances of value and the products and proceeds therefrom.

"HY Notes" means the senior, second-lien secured notes issued by the Holdco Guarantor on or about May 11, 2011.

"Impermissible Qualification" means any qualification, exception, explanatory paragraph or paragraph of emphasis to the opinion or certification of any independent public accountant as to any financial statement  (a) that relates to the limited scope of examination of matters relevant to such financial statement; or (b) that relates to the treatment or classification of any item in such financial statement and which, as a condition to its removal, would require an adjustment to such item the effect of which would be to cause an Obligor to be in Default.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, that is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means: (a) all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments or upon which interest payments are customarily made; (b) all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, banker's acceptances, performance, surety or appeal bonds (or similar obligations) issued for the account of such Person; (c) all Capitalized Lease Liabilities of such Person; (d) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Securities in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; (e) net Hedging Obligations of such Person; (f) whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention

agreement with respect to property used or acquired by such Person) (excluding trade accounts payable in the ordinary course of business that are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person); (g) obligations arising under Synthetic Leases; (h) all Contingent Liabilities of such Person; and (i) all obligations referred to in clauses (a) through (h) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person (but if not assumed by such Person or if limited in recourse, the amount thereof shall be equal to the lesser of the amount of such Indebtedness or the value of the encumbered property of such Person securing the same. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  The amount of any net Hedging Obligation on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any Capitalized Lease Liabilities as of any date shall be deemed to be the capitalized amount of the applicable capital lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP in respect thereof as of such date.

"Indemnified Liabilities" is defined in Section 11.4.

"Indemnified Parties" is defined in Section 11.4.

"Initial Reserve Report" means the reserve report concerning the Oil and Gas Properties of Borrowers and their respective Subsidiaries audited by W.D. Von Gonten & Company dated as of January 1, 2015.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of May 11, 2011, executed and delivered by the Wells Fargo Bank, N.A (as predecessor to TSL as Administrative Agent), the Collateral Trustee and the Obligors, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Interest Period" means, relative to any LIBO Rate Loan, the period beginning on (and including) the date on which such LIBO Rate Loan is made or continued as, or converted into, a LIBO Rate Loan pursuant to Sections 2.3 and shall end on (but exclude) the day that numerically corresponds to such date one or three months thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in either case as a Borrower may select in its relevant notice pursuant to Sections 2.3; provided, that, (a) the Borrowers shall not be permitted to select Interest Periods to be in effect at any one time that have expiration dates occurring on more than five different dates; (b) no Interest Period for any Loan may end later than the Final Maturity Date; (c) Interest Periods commencing on the same date for Loans comprising part of the same Borrowing shall be of the same duration; and (d) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided that if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day.

"Interim Bankruptcy Court Order" means the order of the Bankruptcy Court with respect to the Obligors, substantially in the form of Exhibit J hereto, as the same may be amended, modified or supplemented from time to time with the express written consent of the Administrative Agent and the Required Lenders.

"Interim Bankruptcy Court Order Entry Date" means the date on which the Interim Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court.

"Interim Facility Effective Date" has the meaning specified therefor in Section 5.1.

"Interim Facility Effective Date Certificate" means an Interim Facility Effective Date Certificate, substantially in the form of Exhibit G.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Final Maturity Date.

"Investment" means, relative to any Person, (a) any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person; (b)  Contingent Liabilities in favor of any other Person; and (c)  any Capital Securities held by such Person in any other Person.  The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or capital thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Legal Requirement" means Applicable Law.

"Lender Account" means a Deposit Account that is subject to a Control Agreement or a Lien in favor of the Administrative Agent pursuant to any Bankruptcy Court Order.

"Lender Assignment Agreement" means an assignment agreement substantially in the form of Exhibit E hereto.

"Lender Insolvency Event" means that (a) a Lender or its Lender Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (b) such Lender or its Lender Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its Lender Parent Company, or such Lender or its Lender Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment.

"Lenders" is defined in the preamble and includes the Swing Line Lender.

"Lender's Environmental Liability" means any and all losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages, (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) that may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent or any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

(a)  any Hazardous Material on, in, under or affecting all or any portion of any property of any Obligor or any Subsidiary or the groundwater thereunder to the extent caused by Releases from any

Obligor's or any Subsidiary's or any of their respective predecessors' properties or any surrounding areas thereof;

(b)    any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in Section 6.12;

(c)    any violation or claim of violation by any Obligor or any Subsidiary of any Environmental Laws; or

(d)    the imposition of any Lien for damages caused by, or the recovery of any costs with respect to, the cleanup, release or threatened release of Hazardous Material by any Obligor or any Subsidiary, or in connection with any property owned or formerly owned by any Obligor or any Subsidiary.

"Lender Parent Company" means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"LIBO Rate" means the greater of (i) 1.00% per annum and (ii) the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on the applicable Bloomberg LIBOR Screen page that displays such rate (or, in the event such rate does not appear on such page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided, that, if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time. "Interpolated Rate" means, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"LIBO Rate Loan" means a Loan bearing interest, at all times during an Interest Period applicable to such Loan, at a rate of interest determined by reference to the LIBO Rate (Reserve Adjusted).

"LIBO Rate (Reserve Adjusted)" means, relative to any Loan to be made, continued or maintained as, or converted into, a LIBO Rate Loan for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined pursuant to the following formula:

$$\text{LIBO Rate (Reserve Adjusted)} = \frac{\text{LIBO Rate}}{1.00 - \text{LIBOR Reserve Percentage}}$$

The LIBO Rate (Reserve Adjusted) for any Interest Period for LIBO Rate Loans will be determined by the Administrative Agent on the basis of the LIBOR Reserve Percentage in effect two Business Days before the first day of such Interest Period.

"LIBOR Office" means the office of a Lender designated as its "LIBOR Office" on its Administrative Questionnaire or such other office designated from time to time by notice from such

Lender to the Borrowers and the Administrative Agent, whether or not outside the United States, which shall be making or maintaining the LIBO Rate Loans of such Lender.

"LIBOR Reserve Percentage" means, relative to any Interest Period for LIBO Rate Loans, the reserve percentage (expressed as a decimal) equal to the maximum aggregate reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) specified under regulations issued from time to time by the F.R.S. Board and then applicable to assets or liabilities consisting of or including "Eurocurrency Liabilities", as currently defined in Regulation D of the F.R.S. Board, having a term approximately equal or comparable to such Interest Period.

"Lien" means any security interest, mortgage, pledge, hypothecation, encumbrance, lien (statutory or otherwise), privilege, charge against or security interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any Capitalized Lease Liability and any assignment, deposit arrangement or financing lease intended as security.

"Loan" means an extension of credit by a Lender to a Borrower under Article 2 in the form of a Term Loan, Revolving Loan or a Swing Line Loan.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at its office and with respect to the Borrowers, in which it will be charged with all Loans made to, and all other Obligations incurred by the Obligors.

"Loan Commitment" means, relative to any Lender, such Lender's Revolving Loan Commitment and/or Term Loan Commitment.

"Loan Commitment Termination Date" means the earliest of (a) the Final Maturity Date; (b) the date on which the Commitment Amounts are terminated in full or reduced to zero pursuant to the terms of this Agreement; and (c) the date on which any Commitment Termination Event occurs.  Upon the occurrence of any event described above, the Loan Commitments shall terminate automatically and without any further action.

"Loan Documents" means, collectively, this Agreement, the Notes, each Security Document, each Guaranty, the Intercreditor Agreement, the Final Bankruptcy Court Order, the Interim Bankruptcy Court Order, each Borrowing Request, and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Majority Lenders" means, at any time, Lenders holding more than 50% of the Total Exposure Amount; provided that the aggregate amount of a Lender's funded participation in the Swing Line Loans are deemed to be "held" by such Lender for purposes of this definition; provided further that, if there are two or more Lenders, the portion of the Total Exposure Amount held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Majority Lenders unless all Lenders are Defaulting Lenders.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Deviation from the amount set forth for any Budget Period in the Budget under any of the headings "Total Net Receipts", "Total Disbursements", "Total Restructuring and Other One-Time" or "Outstanding DIP Revolver"; provided, however, that (x) the amount of disbursements under the heading "Total Restructuring and Other One-Time" (excluding disbursements under the line item "Surety Bond Collateral") permitted to be made in any Budget Period as set forth in the Budget may be

increased by the amount by which (i) the amount of disbursements under the heading "Total Restructuring and Other One-Time" permitted to be made in any Budget Period as set forth in the Budget (excluding disbursements under the line item "Surety Bond Collateral") (the "Permitted Restructuring and Other Disbursements") is greater than (ii) the amount of disbursements under the heading "Total Restructuring and Other One-Time" (excluding disbursements under the line item "Surety Bond Collateral") actually made in such Budget Period (the "Actual Restructuring and Other Disbursements") (the amount by which Permitted Restructuring and Other Disbursements for such Budget Period exceeds the Actual Restructuring and Other Disbursements for such Budget Period, the "Carry-Over Amount"), which Carry-Over Amount may be carried forward to subsequent Budget Periods, and (y) disbursements under the heading "Total Restructuring and Other One-Time" made by the Obligors in any Budget Period shall be deemed to reduce first, the Permitted Restructuring and Other Disbursements for such Budget Period, and then, the Carry-Over Amount. For the avoidance of doubt, it is acknowledged and agreed that the amount set forth in any Budget Period under the line item "Surety Bond Collateral" under the heading "Total Restructuring and Other One-Time" in the Budget may only be used by the Obligors to fund cash collateral requirements to secure the Obligors' surety bond obligations solely to the extent that such surety bond provider requires such cash collateral and may not be used for any other purpose.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, condition (financial or otherwise), operations, or properties of the Obligors and its Subsidiaries taken as a whole, except for the commencement of the Chapter 11 Cases and events that commonly occur in cases under Chapter 11 of the Bankruptcy Code, similar to the Chapter 11 Cases (including actions, suits, investigations, litigation or proceedings which are stayed by the Chapter 11 Cases), (b) the rights and remedies of any Secured Party under any Loan Document, (c) the ability of any Obligor to perform its obligations under any Loan Document, (d) the legality, validity or enforceability of this Agreement or any other Loan Document or (e) the validity, perfection or priority of Liens with respect to any material portion of the Collateral in favor of the Administrative Agent for the benefit of the Secured Parties.

"Milagro Exploration" is defined in the preamble.

"Milagro Producing" is defined in the preamble.

"Monthly Payment Date" means the last Business Day of each calendar month.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means each mortgage filed prior to the Filing Date securing the Pre-Petition Obligations and which shall be deemed to secure the Obligations and each other mortgage, deed of hypothecation, debenture, pledge, deed of trust or agreement executed and delivered by any Obligor in favor of the Administrative Agent for itself and as agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement substantially in the form of Exhibit F or otherwise in form and substance reasonably satisfactory to the Administrative Agent, as applicable, under which a Lien is granted on the real property and fixtures described therein.

"Mortgaged Properties" is defined in Section 7.1.1(n).

"Net Cash Proceeds" means (a) with respect to any Disposition, all cash and Cash Equivalent Investments received by any Obligor from such Disposition after payment of, or provision for, all reasonable brokerage commissions, marketing expenses, estimated cash taxes attributable to such Disposition and payable by any Obligor, and other reasonable out of pocket fees and expenses actually incurred by any Obligor directly in connection with such Disposition, and (b) with respect to any Casualty Event, all cash and Cash Equivalent Investments received by any Obligor under any casualty, business

interruption or "key man" insurance policies in respect of any covered loss thereunder, or as a result of the condemnation or taking of any assets of the Holdco Guarantor or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, in each case, after payment of, any reasonable out of pocket fees and expenses costs actually incurred by any Obligor in connection with the adjustment or settlement of any claims of any Obligor in respect thereof.

"Non-Defaulting Lender" means, when determined, any Lender that is not then a Defaulting Lender.

"Non-Excluded Taxes" means any Taxes other than, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Obligor hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which such Obligor is located and (c) except as provided in the following sentence, in the case of a Non-US Lender (other than an assignee pursuant to a request by the Borrowers under Section 4.6.7), any withholding tax that is imposed on amounts payable to such Non-US Lender at the time such Non-US Lender becomes a party hereto (or designates a new lending office) or is attributable to such Non-US Lender's failure or inability (other than as a result of the introduction of or any change in or in the interpretation of any law) to comply with Section 4.6.5, except to the extent that such Non-U.S. Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to Section 4.1.6(a).

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means a Revolving Note or a Swing Line Note.

"NYMEX" means the New York Mercantile Exchange or its successor entity.

"NYMEX Strip Price" means as of any date of determination (a) for the 60-month period commencing with the month in which the date of determination occurs, the monthly futures contract prices for each of the appropriate crude oil and natural gas categories included in the most recent Reserve Report provided by the Borrowers to the Administrative Agent pursuant to Section 2.8, as quoted on NYMEX (but for purposes of natural gas liquids production, such determination for such period shall be based on the quotient of (i) the average realized sales price of the Borrowers' natural gas liquids production without regard to Hedge Agreement (using available historical 12-month average sales data) and (ii) the NYMEX WTI daily oil price (using a 12-month average) multiplied by the appropriate crude oil category), and (b) for periods after such 60 month period, the average of the monthly quoted futures contract price for months 49-60 (but for purposes of natural gas liquids production, such determination for such period shall be based on the quotient of (i) the average realized sales price of the Borrowers' natural gas liquids production without regard to Hedge Agreement (using available historical 12-month average sales data) and (ii) the NYMEX WTI daily oil price (using a 12-month average) multiplied by the appropriate crude oil category); provided that if NYMEX no longer provides futures contract price quotes or has ceased to operate, the comparable futures contract prices quoted on such other nationally recognized commodities exchange as the Administrative Agent shall designate.

"<u>Obligations</u>" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrowers and each other Obligor arising under or in connection with a Loan Document, including the principal of and premium, if any, and interest (including interest accruing (or which would have accrued) during the pendency of any insolvency proceeding, whether or not allowed in such proceeding) on the Loans and such obligations.

"<u>Obligor</u>" means, as the context may require, each Borrower, each Guarantor and each other Person (other than a Secured Party) obligated under any Loan Document.

"<u>OFAC</u>" has the meaning specified in the definition of "Anti-Terrorism Laws".

"<u>OFAC Sanctions Programs</u>" means (a) the Requirements of Law and Executive Orders administered by OFAC, including but not limited to, Executive Order No. 13224, and (b) the list of Specially Designated Nationals and Blocked Persons administered by OFAC, in each case, as renewed, extended, amended, or replaced.

"<u>Oil and Gas Business</u>" means (a) the acquisition, exploration, exploitation, development, operation and disposition of interests in Oil and Gas Properties and Hydrocarbons, (b) the gathering, marketing, treating, processing, storage, selling and transporting of any production from such interests or properties, including, without limitation, the marketing of Hydrocarbons obtained from unrelated Persons, (c) any business relating to or arising from exploration for or development, production, treatment, processing, storage, transportation or marketing of oil, gas and other minerals and products produced in association therewith, (d) any business relating to oilfield sales and service, and (e) any activity that is ancillary or necessary or desirable to facilitate the activities described in <u>clauses (a)</u> through <u>(d)</u> of this definition.

"<u>Oil and Gas Properties</u>" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) that may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, that relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and that may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests; and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property that may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"<u>Organizational Document</u>" means, relative to any Obligor, as applicable, its certificate or articles of incorporation, articles and memorandum of association, by-laws, certificate of partnership, partnership

agreement, certificate of formation, limited liability agreement, operating agreement and similar or comparable agreement or certificate, and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's Capital Securities.

"Other Taxes" means any and all stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of, or otherwise with respect to, any Loan Document.

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, or the Swing Line Lender, as the case may be, in accordance with banking industry rules on interbank compensation.

"Parent" means Milagro Holdings, LLC, a Delaware limited liability company.

"Participant" is defined in clause (d) of Section 11.10.

"Patriot Act" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended and supplemented from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA (other than a multiemployer plan as defined in Section 4001(a)(3) of ERISA), and to which any Obligor or any corporation, trade or business that is, along with any Obligor, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Percentage" means, relative to any Lender, the percentage set forth opposite its name on Schedule II hereto under the "Percentage" column for Revolving Loan Commitments and/or Term Loan Commitments, as applicable, or as set forth in a Lender Assignment Agreement duly accepted by the Administrative Agent under the applicable "Percentage" column, as any such percentage may be adjusted from time to time pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender (under the Lender Assignment Agreement) and duly accepted by the Administrative Agent and delivered pursuant to Section 11.10.  A Lender shall not have any Loan Commitment if its Percentage is zero.

"Period" means the Interim Period or the Final Period, as the context requires.

"Permitted Deviation" means (i) with respect to the amount set forth in any Budget Period in the Budget under the heading "Total Net Receipts, up to 20%, (ii) with respect to the amount set forth in any Budget Period in the Budget under the heading "Total Disbursements", up to 15%, (iii) with respect to the amount set forth in any Budget Period in the Budget under the heading "Total Restructuring and Other One-Time", up to 10%, and (iv) with respect to the amount set forth in any Budget Period in the Budget under the heading " Outstanding DIP Revolver", up to 10%.

"Permitted Holder" means (a) any Person other than a Permitted Institutional Holder that, on the Interim Facility Effective Date, owns Capital Securities of the Parent, (b) any Permitted Institutional

Holder, and (c) any fund, investment account, other account or other investment vehicle managed by any Permitted Institutional Holder or any such Person's investment manager.

"Permitted Institutional Holder" means Acon Funds Management, L.L.C., Guggenheim Corporate Funding, L.L.C., West Coast Energy Partners, LLC, Touradji Capital Management, LP, FS Investment Corporation, PineBridge Investments LLC or any other Person, a majority of whose outstanding Voting Securities are, directly or indirectly, held by Acon Funds Management, L.L.C., Guggenheim Corporate Funding, L.L.C., or West Coast Energy Partners, LLC.

"Permitted Liens" means the Liens permitted by Section 7.2.3.

"Permitted Priority Liens" means Permitted Liens described in Sections 7.2.3(c), 7.2.3(d) and 7.2.3(f).

"Person" means any natural person, corporation, limited liability company, partnership, limited partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Platform" is defined in clause (b) of Section 10.10.

"Pre-Petition Obligations" means all indebtedness, obligations and liabilities of the Obligors to the Existing Agent and the Existing Lenders incurred prior to the Filing Date arising from or related to the Existing Credit Agreement and the other agreements, instruments and other documents related thereto plus fees, expenses, yield maintenance and prepayment premiums, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Filing Date to the extent allowable under the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prior Title Opinion" is defined in Section 7.1.14(a).

"Priority Professional Expenses" means those expenses entitled to a priority as set forth in sub-clause (ii) of the clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Proceeds Account" is defined in Section 7.1.10.

"Professional Expense Cap" has the meaning specified in subclause (ii) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Protective Advances" is defined in Section 2.5.

"Proved Developed Nonproducing Reserves" means Proved Reserves which are categorized as both "Developed" and "Nonproducing" in the Reserve Definitions.

"Proved Developed Producing Reserves" means Proved Reserves which are categorized as both "Developed" and "Producing" in the Reserve Definitions.

"Proved Reserves" means "Proved Reserves" as defined in the Reserve Definitions.

"Proved Undeveloped Reserves" means Proved Reserves which are categorized as "Undeveloped" in the Reserve Definitions.

"Register" is defined in clause (a) of Section 2.7.

"Release" means a "release", as such term is defined in CERCLA or any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Replacement Lender" is defined in Section 4.6.7.

"Replacement Notice" is defined in Section 4.6.7.

"Required Lenders" means, at any time, Lenders holding more than 50% of the Total Exposure Amount; provided that the aggregate amount of a Lender's funded participation in the Swing Line Loans are deemed to be "held" by such Lender for purposes of this definition; provided further that, if there are two or more Lenders, the portion of the Total Exposure Amount held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders unless all Lenders are Defaulting Lenders.

"Required Prepayment Date" is defined in Section 3.1.1(q).

"Required Percentages" is defined in Section 7.1.11.

"Reserve Definitions" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question and reasonably acceptable to the Administrative Agent.

"Reserve Report" means the Initial Reserve Report and each other report setting forth, as of July 1st, the oil and gas reserves attributable to the Oil and Gas Properties of the Borrowers and their respective Subsidiaries, together with a projection of the rate of production and future net income, severance and ad valorem taxes, operating expenses and capital expenditures with respect thereto as of such date, consistent with SEC reporting requirement at the time, provided that each such report hereafter delivered must (a) separately report on the Proved Developed Producing Reserves, Proved Developed Nonproducing Reserves and Proved Undeveloped Reserves of the Borrowers and their respective Subsidiaries, (b) take into account the Borrowers' actual experiences with leasehold operating expenses and other costs in determining projected leasehold operating expenses and other costs, (c) identify and take into account any "overproduced" or "under-produced" status under gas balancing arrangements, and (d) contain information and analysis comparable in scope to that contained in the Initial Reserve Report.

"Resource Conservation and Recovery Act" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Restricted Payment" means (a) the declaration or payment of any dividend by a Person (other than dividends payable solely in Capital Securities of such Person) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Securities of such Person or any warrants, options or other right or obligation to purchase or acquire any such Capital Securities, whether now or hereafter outstanding, or (b) the making of any other distribution in respect of such

DOC ID - 23131345.10

Capital Securities, in each case either directly or indirectly, whether in cash, property or obligations or otherwise.

"Restructuring Support Agreement" means the Restructuring Support Agreement, dated as of July 15, 2015, by and among the Holdco Guarantor and its direct and indirect Subsidiaries, the Parent, White Oak Resources VI, LLC, the Administrative Agent, the Lenders, the "Consenting Noteholders" party thereto, and the "Equity Holders" party thereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with this Agreement.

"Revolving Borrowing" means the Loans of the same Type and, in the case of LIBO Rate Loans having the same Interest Period made by all Lenders required to make such Loans on the same Business Day and pursuant to the same Borrowing Request in accordance with Section 2.3.

"Revolving Loan" is defined in Section 2.1.1.

"Revolving Loan Commitment" means, relative to any Lender, such Lender's obligation (if any) to make Revolving Loans pursuant to Section 2.1.1.

"Revolving Loan Commitment Amount" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrowers in the amount set forth in Schedule II or as set forth in a Lender Assignment Agreement duly accepted by the Administrative Agent under the "Revolving Loan Commitment" column, as any such amount may be adjusted from time to time pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender (under the Lender Assignment Agreement) and duly accepted by the Administrative Agent and delivered pursuant to Section 11.10.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Secured Obligations" means the Obligations.

"Secured Parties" means, collectively, the Lenders,  the Administrative Agent, and each of their respective successors, transferees and assigns.

"Security Documents" means each Mortgage, each Guaranty, each Control Agreement delivered pursuant to the terms of the Loan Documents, and all other security agreements, deeds of trust, mortgages, chattel mortgages, pledges, guaranties, control agreements, financing statements, continuation statements, extension agreements and other agreements or instruments now, heretofore, or hereafter delivered by any Obligor to the Administrative Agent in connection with this Agreement or any transaction contemplated hereby to secure or guarantee the payment of any part of the Secured Obligations or the performance of any Obligor's other duties and obligations under the Loan Documents.

"Seismic Licenses" is defined in Section 6.28.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any Person, a majority of whose outstanding Voting Securities (other than directors' qualifying shares) shall at any time be owned by such parent or one or more Subsidiaries of such parent.  Unless otherwise

specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdco Guarantor.

"Subsidiary Guaranty" means the Guaranty executed and delivered by an Authorized Officer of each Subsidiary of Holdco Guarantor, substantially in the form of Exhibit I hereto, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Subsidiary Guarantor" is defined in the preamble.

"Swap Termination Value" means, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements.

"Swing Line Amount" means, on any date, a maximum amount of $2,500,000; provided that, on and after the Loan Commitment Termination Date, the Swing Line Amount shall be zero.

"Swing Line Borrowing" means the Borrowing consisting of a Swing Line Loan made by the Swing Line Lender pursuant to Section 2.1.3.

"Swing Line Lender" is defined in the preamble and includes each other Person appointed as the successor Swing Line Lender pursuant to Section 10.4.

"Swing Line Loan" is defined in Section 2.1.3.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means all taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Tax Related Person" means any Person (including a beneficial owner of an interest in a pass-through entity) whose income is realized through or determined by reference to the Administrative Agent, a Lender or Participant or any Tax Related Person of any of the foregoing.

"Termination Date" means the date that all Obligations (other than contingent Obligations with respect to indemnity and reimbursement of expenses as to which no claim has been made as of the time of determination) have been paid in full in cash, and all Commitments shall have terminated.

"Term Loan" is defined in Section 2.1.2.

"Term Loan Commitment" means, relative to any Lender, such Lender's obligation (if any) to make the Term Loan pursuant to Section 2.1.2.

"Term Loan Commitment Amount" means, with respect to each Lender, the commitment of such Lender to make the Term Loan to the Borrowers in the amount set forth in Schedule II or as set forth in a Lender Assignment Agreement duly accepted by the Administrative Agent under the "Term Loan Commitment" column, as any such amount may be adjusted from time to time pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender (under the Lender Assignment Agreement) and duly accepted by the Administrative Agent and delivered pursuant to Section 11.10.

"Total Exposure Amount" means, on any date of determination (and without duplication), the outstanding principal amount of all Loans and the unfunded amount of the Commitments.

"TSL" is defined in the preamble.

"Type" means, relative to any Loan, the portion thereof, if any, being maintained as a Base Rate Loan or a LIBO Rate Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection or priority of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection or priority.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of the members of the Board of Directors of such Person.

"Welfare Plan" means a "welfare plan", as such term is defined in Section 3(1) of ERISA.

"wholly owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by Applicable Law) is owned directly or indirectly by Holdco Guarantor.

**SECTION 1.2      Use of Defined Terms**.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

**SECTION 1.3      Cross-References and Other Provisions Relating to Terms**.  Unless otherwise specified, (a) references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition; (b) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement; (c) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (d) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (e) any reference herein to any Person shall be construed to include such Person's successors and assigns, provided such successors and assigns

are permitted by the Loan Documents; and (f) all references to instruments, documents, contracts, and shall include all schedules and exhibits thereto unless otherwise specified.

SECTION 1.4    **Amendment of Defined Instruments**.    Unless the context otherwise requires or unless otherwise provided herein the terms defined in this Agreement that refer to a particular agreement, instrument or document also refer to and include all renewals, extensions, modifications, amendments and restatements of such agreement, instrument or document in accordance with the Loan Documents, provided that nothing contained in this section shall be construed to authorize any such renewal, extension, modification, amendment or restatement.

SECTION 1.5    **Accounting and Financial Determinations**.    Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder shall be made, in accordance with GAAP applied on a basis consistent with those used in the preparation of the financial statements referred to in clause (a) of Section 5.1.6.

# ARTICLE 2
## COMMITMENTS, BORROWING AND ISSUANCE
## PROCEDURES AND NOTES

SECTION 2.1    **Commitments**.    On the terms and subject to the conditions of this Agreement, the Lenders severally agree to make Credit Extensions as set forth below.

SECTION 2.1.1    Revolving Loans.    Subject to the terms and conditions of this Agreement, from time to time on any Business Day occurring on or after the Interim Facility Effective Date but prior to the Loan Commitment Termination Date, each Lender with a Revolving Loan Commitment severally agrees that it will make loans (relative to such Lender, its "Revolving Loans") to any requesting Borrower in an aggregate amount equal to such Lender's Percentage of the aggregate amount of each Revolving Borrowing of the Revolving Loans requested by such Borrower to be made on such day.  On the terms and subject to the conditions hereof, the Borrowers may from time to time borrow, prepay and reborrow Revolving Loans.  No Lender shall be permitted or required to make any Revolving Loan if, after giving effect thereto, (a) such Lender's outstanding Revolving Loans would exceed such Lender's Percentage of the Revolving Loan Commitment Amount or (b) the aggregate outstanding Revolving Loans of all Lenders would exceed the Revolving Loan Commitment Amount.  Notwithstanding anything to the contrary contained in this Section 2.1.1, (A) the aggregate principal amount of Revolving Loans outstanding to the Borrowers during any Budget Period shall not exceed the maximum aggregate principal amount of Revolving Loans projected to be outstanding during such Budget Period pursuant to the terms of the Budget (after giving effect to the Permitted Deviation therefrom), (B) the aggregate principal amount of Revolving Loans made during the Interim Period shall not exceed $11,000,000, (C) each Revolving Loan shall be in a principal amount of at least $1,000,000, and (D) up to $8,000,000 of the proceeds of the Revolving Loans may only be used by the Borrowers to fund cash collateral requirements to secure the Borrowers' surety bond obligations solely to the extent that such surety bond provider requires such cash collateral.

SECTION 2.1.2    Term Loan.    Subject to the terms and conditions of this Agreement, on the Final Facility Effective Date, the Lenders with Term Loan Commitments severally agree that they will be deemed to have made loans (collectively, the "Term Loan") to the Borrowers equal to the Term Loan Commitment Amount and for each Lender in an amount equal to such Lender's Percentage of the Term Loan Commitment Amount pursuant to a dollar-for-dollar conversion of the Pre-Petition Obligations to the Term Loan.  The Term Loan Commitments shall terminate immediately and without further action on

the Final Facility Effective Date after giving effect to the funding by the Lenders of such Commitments. Amounts under this <u>Section 2.1.2</u> repaid or prepaid may not be reborrowed.

      **SECTION 2.1.3**   <u>Swing Line Subfacility</u>.  From time to time on any Business Day occurring on or after the Interim Facility Effective Date but prior to the Loan Commitment Termination Date and subject to the terms and conditions set forth herein and in reliance upon the agreements of the other Lenders set forth in this <u>Section 2.1.3</u>, the Swing Line Lender may, but is not obligated to, make loans (each such loan, a "<u>Swing Line Loan</u>") in an aggregate amount not to exceed at any time outstanding the Swing Line Amount, notwithstanding the fact that such Swing Line Loans, when aggregated with the Revolving Loans of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Loan Commitment; <u>provided</u>, that no Borrower shall use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan.  The Swing Line Lender shall not be permitted to make any Swing Line Loan if, after giving effect thereto, (a) the aggregate amount of all Swing Line Loans outstanding would exceed the Swing Line Amount or (b) the aggregate amount of all Revolving Loans of all Lenders would exceed the Revolving Loan Commitment Amount.  On the terms and subject to the conditions hereof, the Borrowers may from time to time, subject to the sole discretion of the Swing Line Lender, borrow, repay, prepay and reborrow Swing Line Loans.  Each Swing Line Loan shall be a Base Rate Loan.  Immediately upon the making of a Swing Line Loan, each Lender (other than the Swing Line Lender) shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Percentage times the amount of such Swing Line Loan.  Notwithstanding any terms to the contrary contained herein, the Swing Line facility provided herein (i) is an uncommitted facility and the Swing Line Lender may, but shall not be obligated to, make Swing Line Loans, and (ii) may be terminated at any time by the Swing Line Lender upon written notice to the Borrowers.

      **SECTION 2.2**      <u>**Termination of Commitments and Reduction of the Commitment Amounts**</u>.

      **SECTION 2.2.1**   <u>Terminations and Reductions</u>.  Unless previously terminated, the Loan Commitments shall terminate on the Loan Commitment Termination Date.  The Borrowers may, from time to time on any Business Day voluntarily reduce the amount of the Revolving Loan Commitment Amount on the Business Day so specified by the Borrowers; <u>provided</u> that, (a) all such reductions shall be applied <u>pro rata</u> among the Lenders and shall be permanent, (b) the Borrowers shall have delivered at least one Business Day's prior notice to the Administrative Agent, and (c) any partial reduction of the Revolving Loan Commitment Amount shall be in a minimum amount of $1,000,000 and in an integral multiple of $500,000 in excess thereof.  Any optional or mandatory reduction of the Revolving Loan Commitment Amount pursuant to the terms of this Agreement that reduces the Revolving Loan Commitment Amount below the Swing Line Amount shall result in an automatic and corresponding reduction of the Swing Line Amount to an aggregate amount not in excess of the Revolving Loan Commitment Amount, as so reduced.

      **SECTION 2.2.2**   <u>Defaulting Lender's Commitment</u>.  At any time when a Lender is a Defaulting Lender, the Borrowers, at the Borrowers' election may elect to terminate such Defaulting Lender's Loan Commitment hereunder; <u>provided</u>, that (i) such termination must be of the Defaulting Lender's entire Loan Commitment, (ii) subject to the set-off rights set forth in the immediately following sentence, the Borrowers shall pay all amounts owed by the Borrowers to such Defaulting Lender under this Agreement and under the other Loan Documents (including principal of and interest on the Loans owed to such Defaulting Lender and accrued commitment fees but specifically excluding any breakage costs or losses as result of such payment of Loans), (iii) unless otherwise consented to by the Administrative Agent, a Defaulting Lender's Loan Commitment may be terminated by the Borrowers under this <u>Section 2.2.2</u> if and only if at such time, the Borrowers have elected, or is then electing, to

DOC ID - 23131345.10

terminate the Loan Commitments of all then existing Defaulting Lenders, after giving effect to the assignments, if any, of such Loan Commitments to Non-Defaulting Lenders.  Upon written notice to the Defaulting Lender and Administrative Agent of the Borrowers' election to terminate a Defaulting Lender's Loan Commitment pursuant to this Section 2.2.2, and the payment and deposit of amounts required to be made by the Borrowers under clause (ii) above, (A) such Defaulting Lender shall cease to be a "Lender" hereunder for all purposes except that such Lender's rights under Sections 4.5, 4.6, and 11.4 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Lender" hereunder, (B) such Defaulting Lender's Loan Commitment shall be deemed terminated, and (C) such Defaulting Lender shall be relieved of its obligations hereunder except as to its obligations under Section 10.3 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Lender" hereunder, provided that, any such termination will not be deemed to be a waiver or release of any claim by Borrowers, the Administrative Agent, the Swing Line Lender or any Lender may have against such Defaulting Lender.

> **SECTION 2.3**    <u>Revolving Loans Procedures and Provisions</u>.

> **SECTION 2.3.1**    <u>Borrowing Request</u>.  In the case of Revolving Loans, by delivering (i) a Borrowing Request and (ii) a certificate from an Authorized Officer of the Borrowers certifying (a) that the aggregate principal amount of Revolving Loans outstanding on the date of the proposed Revolving Loan (after giving effect to the proposed Revolving Borrowing) shall not exceed the maximum aggregate principal amount of Revolving Loans projected to be outstanding during the then current Budget Period as set forth in the Budget (subject to the Permitted Deviation therefrom), and (b) the use of proceeds of such Revolving Loan, to the Administrative Agent on or before 10:30 a.m., New York City time, on a Business Day, any Borrower may from time to time irrevocably request, on at least one Business Days' notice in the case of Base Rate Loans, or at least three Business Days' notice in the case of LIBO Rate Loans (and in any event, at least five days' notice for any Borrowing Request to be made when aggregate outstanding Revolving Loans exceed $5,000,000, either before or after giving effect to such requested Credit Extension), that a Revolving Borrowing be made, (a) in the case of LIBO Rate Loans, in an aggregate minimum amount of $1,000,000 and an integral multiple of $500,000, (b) in the case of Base Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $100,000 or, in either case, in the unused amount of the Revolving Loan Commitment; provided, that all of the initial Revolving Loans shall be made as Base Rate Loans; provided, further that no LIBO Rate Loans may be advanced when any Default has occurred and is continuing.  Each such irrevocable request shall be made by delivery by e-mail or facsimile to the Administrative Agent of the applicable Borrowing Request; provided that any such Borrowing Request made when aggregate outstanding Revolving Loans exceed $5,000,000, either before or after giving effect to such requested Credit Extension, may not be made by telephone.  On the terms and subject to the conditions of this Agreement, each Revolving Borrowing shall be comprised of the Type of Revolving Loans, and shall be made on the Business Day, specified in such Borrowing Request.  On or before 12:00 p.m., New York City time, on such Business Day, each Lender that has a Revolving Loan Commitment being requested shall deposit with the Administrative Agent same day funds in an amount equal to such Lender's Percentage of the requested Revolving Borrowing.  Such deposit will be made to an account which the Administrative Agent shall specify from time to time by notice to the Lenders.  To the extent funds are received from the Lenders, the Administrative Agent shall make such funds available to the Borrowers by wire transfer to the accounts as the requesting Borrower shall have specified in its Borrowing Request.  The obligations of the Lenders hereunder to make Revolving Loans are several and not joint.  No Lender's obligation to make any Revolving Loan shall be affected by any other Lender's failure to make any Revolving Loan.

> **SECTION 2.3.2**    <u>Continuation and Conversion Elections</u>.    By delivering a Continuation/Conversion Notice to the Administrative Agent on or before 10:30 a.m., New York City time, on a Business Day, any Borrower may from time to time irrevocably elect, on not less than one

Business Days' notice in the case of Base Rate Loans, or three Business Days' notice in the case of LIBO Rate Loans, and in either case not more than five Business Days' notice, that all, or any portion in an aggregate minimum amount of $1,000,000 and an integral multiple of $500,000 be, in the case of Base Rate Loans, converted into LIBO Rate Loans, or in the case of LIBO Rate Loans, converted into Base Rate Loans or continued as LIBO Rate Loans (in the absence of delivery of a Continuation/Conversion Notice with respect to any LIBO Rate Loan at least three Business Days (but not more than five Business Days) before the last day of the then current Interest Period with respect thereto, such LIBO Rate Loan shall, on such last day, automatically convert to a Base Rate Loan); provided that, (a) each such conversion or continuation shall be pro-rated among the applicable outstanding Loans of all Lenders that have made such Loans, and (b) no portion of the outstanding principal amount of any Loans may be continued as, or be converted into, LIBO Rate Loans when any Default has occurred and is continuing. Each such irrevocable request may be made by telephone confirmed promptly by hand delivery or facsimile to the Administrative Agent of the applicable Continuation/Conversion Notice. The conversion of a Base Rate Loan into a LIBO Rate Loan or a LIBO Rate Loan into a Base Rate Loan shall not constitute a novation of the Loan so converted. In the event the Borrowers fail to specify between a Base Rate Loan or a LIBO Rate Loan in the applicable Continuation/Conversion Notice, such Loan (if outstanding as a LIBO Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event the Borrowers fail to specify an Interest Period for any LIBO Rate Loan in the applicable Conversion/Continuation Notice, the Borrowers shall be deemed to have selected an Interest Period of one month. At any time that a Default or an Event of Default has occurred and is continuing, the Borrowers no longer shall have the option to request that any portion of the Loans bear interest at the LIBO Rate and the Administrative Agent shall have the right to convert the interest rate on all outstanding LIBO Rate Loans to the rate of interest then applicable to Base Rate Loans of the same type hereunder on the last day of the then current Interest Period.

**SECTION 2.3.3**    Funding.  Each Lender may, if it so elects, fulfill its obligation to make, continue or convert LIBO Rate Loans hereunder by causing one of its foreign branches or Affiliates (or an international banking facility created by such Lender) to make or maintain such LIBO Rate Loan; provided that, such LIBO Rate Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrowers to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility.  In addition, each Borrower hereby consents and agrees that, for purposes of any determination to be made for purposes of Sections 4.1, 4.2, 4.3 or 4.4, it shall be conclusively assumed that each Lender elected to fund all LIBO Rate Loans by purchasing Dollar deposits in its LIBOR Office's interbank eurodollar market.

**SECTION 2.4**    **Swing Line Loan Procedures and Provisions**.

**SECTION 2.4.1**    Borrowing Request.  In the case of Swing Line Loans, by delivering (i) a Borrowing Request and (ii) a certificate from an Authorized Officer of the Borrowers certifying (a) that the aggregate principal amount of Loans outstanding on the date of the proposed Swing Line Loan (after giving effect to the proposed Swing Line Borrowing) shall not exceed the maximum aggregate principal amount of Revolving Loans projected to be outstanding during the then current Budget Period as set forth in the Budget (subject to the Permitted Deviation therefrom), and (b) the use of proceeds of such Swing Line Loan, to the Swing Line Lender and the Administrative Agent, on or before 10:30 a.m. New York City time on at least one Business Days' notice, any Borrower may irrevocably request that the Swing Line Lender make a Swing Line Loan a minimum amount of $500,000 or the unused amount of the Swing Line Commitment; provided, that all of the Swing Line Loans shall be made as Base Rate Loans. Each such irrevocable request may be made by telephone confirmed promptly by hand delivery or facsimile to the Administrative Agent and the Swing Line Lender of the applicable Borrowing Request.

Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof.  Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Lender) prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in Section 2.1.3 or (B) that one or more of the applicable conditions specified in Article 5 is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m. on the requested borrowing date, make the amount of its Swing Line Loan available to the requesting Borrower at its office by crediting the account of such Borrower on the books of the Swing Line Lender in same day funds.

**SECTION 2.4.2**    Refinancing of Swing Line Loans.

(a)    The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of any Borrower (and each Borrower hereby irrevocably authorizes the Swing Line Lender to so request on its behalf), that each Lender make a Revolving Loan as a Base Rate Loan in an amount equal to such Lender's Percentage of the amount of Swing Line Loans then outstanding.  Such request shall be made in writing (which written request shall be deemed to be a Borrowing Request by the Borrowers for purposes hereof) and in accordance with the requirements of Section 2.3.1, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Loan Commitments and the conditions set forth in Section 2.1.1.  The Swing Line Lender shall furnish the Borrowers with a copy of the applicable Borrowing Request promptly after delivering such notice to the Administrative Agent.  Each Lender shall make an amount equal to its Percentage of the amount specified in such Borrowing Request available to the Administrative Agent in same day funds for the account of the Swing Line Lender at the Administrative Agent's office not later than 1:00 p.m. on the day specified in such Borrowing Request, whereupon, subject to Section 2.4.2(b), each Lender that so makes funds available shall be deemed to have made a Revolving Loan as a Base Rate Loan to the requesting Borrower in such amount.  The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(b)    If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Borrowing in accordance with Section 2.4.2(a), the request for the Revolving Loans as Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Lenders fund its risk participation in the relevant Swing Line Loan and each Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 2.4.2(a) shall be deemed payment in respect of such participation.

(c)    If any Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.4.2 by the time specified in Section 2.4.2(a), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the Overnight Rate from time to time in effect.  A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.4.2 shall be conclusive absent manifest error.

(d)    Each Lender's obligation to make Revolving Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.4.2 shall be absolute and unconditional and

DOC ID - 23131345.10

shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, any Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default, or (iii) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Lender's obligation to make Revolving Loans pursuant to this Section 2.4.2 is subject to the conditions set forth in Section 5.1, Section 5.2 and Section 5.3.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Company to repay Swing Line Loans, together with interest as provided herein.

(e)     The obligations of the Lenders hereunder to fund participations in Swing Line Loans are several and not joint.  No Lender's obligation to fund participations in Swing Line Loans shall be affected by any other Lender's failure to fund participations in Swing Line Loans.

**SECTION 2.4.3**     Repayment of Participations.

(a)     At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(b)     If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 11.16 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Lender shall pay to the Swing Line Lender its Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the applicable Overnight Rate.  The Administrative Agent will make such demand upon the request of the Swing Line Lender.  The obligations of the Lenders under this clause shall survive the payment in full of the Secured Obligations and the termination of this Agreement.

**SECTION 2.4.4**     Interest for Account of Swing Line Lender.  The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans.  Until each Lender funds its Revolving Loan or risk participation pursuant to this Section 2.4 to refinance such Lender's Percentage of any Swing Line Loan, interest in respect of such Percentage shall be solely for the account of the Swing Line Lender.

**SECTION 2.4.5**     Payments Directly to Swing Line Lender.  The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**SECTION 2.5**     **Protective Advances**.  Subject to the limitations set forth below, and whether or not an Event of Default or a Default shall have occurred and be continuing, the Administrative Agent is authorized by the Borrowers and the Lenders, from time to time in the Administrative Agent's sole discretion (but the Administrative Agent shall have absolutely no obligation to), to make disbursements or advances to the Borrowers, which the Administrative Agent, in its sole discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement and the other Loan Documents, including, without limitation, payments of principal, interest, fees and reimbursable expenses (any of such Loans are in this Section 2.5 referred to as "Protective Advances").  Protective Advances may be made even if the conditions precedent set forth in Article Five have not been satisfied.  The interest rate on all Protective Advances shall be at the Base Rate

plus the Applicable Margin for Base Rate Loans. Each Protective Advance shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. The Protective Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.7. The Borrowers shall pay the unpaid principal amount and all unpaid and accrued interest of each Protective Advance on the earlier of the Loan Commitment Termination Date and the date on which demand for payment is made by the Administrative Agent. The Administrative Agent shall notify each Lender and the Borrowers in writing of each such Protective Advance, which notice shall include a description of the purpose of such Protective Advance. Without limitation to its obligations pursuant to Section 10.3, each Lender with a Loan Commitment agrees that it shall make available to the Administrative Agent, upon the Administrative Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Percentage of each such Protective Advance. If such funds are not made available to the Administrative Agent by such Lender with a Loan Commitment, the Administrative Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for three Business Days and thereafter at the Base Rate.

**SECTION 2.6** **Intentionally Omitted.**

**SECTION 2.7** **Evidence of Indebtedness; Register; Notes**.

**SECTION 2.7.1** Register. The Loans made by each Lender shall be evidenced by one or more accounts or records set forth in a register (the "Register") maintained by the Administrative Agent and on which the Administrative Agent will record each Lender's Commitments, the Term Loans made by each Lender, the Revolving Loans made by each Lender, the Swing Line Loans made by the Swing Line Lender, and each repayment in respect of the principal amount of the Loans, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 11.10. Each Borrower hereby designates the Administrative Agent to serve as such Borrower's agent, solely for the purpose of this clause, to maintain the Register. The accounts or records maintained by Administrative Agent, the Swing Line Lender and the Lenders shall be conclusive absent manifest error of the amount of the Loans and participations in Swing Line Loans made by the Lenders to the Borrowers and the interest and payments thereon and the Borrowers, the Administrative Agent, the Swing Line Lender and the Lenders shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary. In the event of any conflict between the accounts and records maintained by any Lender or the Swing Line Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Any failure to make any recordation, or any error in such recordation, shall not limit or otherwise affect any Secured Obligations. Any assignment or transfer of a Commitment or the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to Section 11.10. No assignment or transfer of a Lender's Commitment or Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

**SECTION 2.7.2** Notes. The Borrowers agree that, upon the request of any Lender, the Borrowers will execute and deliver to such Lender a Note evidencing the Revolving Loans made by, and payable to the order of, such Lender in a maximum principal amount equal to such Lender's Percentage of the original applicable Commitment Amount. The Borrowers agree that, upon the request of any Lender, the Borrowers will execute and deliver to such Lender a Note evidencing the Term Loans made by, and

payable to the order of, such Lender in a maximum principal amount equal to such Lender's Percentage of the original Term Loan Amount. The Borrowers agree that, upon the request of the Swing Line Lender, the Borrowers will execute and deliver to the Swing Line Lender a Swing Line Note evidencing the Swing Line Loans made by, and payable to the order of, the Swing Line Lender in a maximum principal amount equal to the Swing Line Amount. Each Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby. Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Obligor absent manifest error; provided that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Secured Obligations of any Obligor.

SECTION 2.8    **Reserve Report by Approved Engineer**. On or before September 1, 2015, the Borrowers shall furnish to the Administrative Agent and the Lenders a Reserve Report in form and substance satisfactory to the Administrative Agent, prepared by an Approved Engineer, which Reserve Report shall be dated as of July 1, 2015 and shall set forth the Proved Reserves (including separately identifying the Proved Developed Producing Reserves) attributable to the Oil and Gas Properties owned directly by the Borrowers and their respective Subsidiaries and a projection of the rate of production and future revenues, taxes, operating expenses and capital expenditures with respect thereto as of such date, based on pricing assumptions consistent with the NYMEX Strip Price at the time or such other pricing assumptions acceptable to the Administrative Agent, together with additional data concerning pricing, hedging, quantities and purchasers of production, and other information and engineering and geological data as the Administrative Agent or any Lender may reasonably request.

## ARTICLE 3
## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1    **Repayments and Prepayments; Application**. Each Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1    Repayments and Prepayments. The Borrowers shall repay in full the unpaid principal amount of each Revolving Loan and each Swing Line Loan upon the Final Maturity Date. The Term Loan, together with all other amounts owed hereunder with respect thereto, shall be paid in full no later than the Final Maturity Date. Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)    Optional Prepayment. From time to time on any Business Day, the Borrowers may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Revolving Loans and/or the outstanding principal amount of any Term Loan; provided that, in each case, (i) all such voluntary prepayments shall require, in the case of Base Rate Loans at least one Business Day's prior written notice (such notice to be delivered before noon (New York City time) on such day), and in the case of LIBO Rate Loans, at least three Business Days' prior written notice (such notice to be delivered before noon (New York City time) on such day), and, in either case, not more than five Business Days' prior irrevocable written notice to the Administrative Agent or the Swing Line Lender in case of the Swing Line Loans; and (ii) all such voluntary partial prepayments shall be, in the case of LIBO Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $100,000 and, in the case of Base Rate Loans that are Revolving Loans or Term Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $100,000 and, in the case of Swing Line Loans, in an aggregate minimum amount of $100,000 and an integral multiple of $100,000, or in any case, the unpaid principal amount of the Loans to be repaid. Each notice of prepayment sent pursuant to this clause shall specify the

prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.  Each such notice shall be irrevocable and shall commit the Borrowers to prepay such Loan by the amount stated therein on the date stated therein.

(b)    <u>Reduction in Aggregate Loan Commitments</u>.  On each date when, after giving effect to any termination or reduction of the Loan Commitments pursuant to <u>Section 2.2</u>, the sum of the aggregate outstanding principal amount of all Revolving Loans exceeds the Revolving Loan Commitment Amount (as it may be reduced from time to time pursuant to this Agreement), the Borrowers shall make a mandatory prepayment of the Revolving Loans in an aggregate amount equal to such excess.

(c)    [Intentionally Omitted].

(d)    [Intentionally Omitted].

(e)    <u>Swing Line Loans</u>.  The Borrowers shall repay each Swing Line Loan in full on the 15th day and the last day of each calendar month (it being agreed that, subject to the terms and conditions of this Agreement, such Swing Line Loans may be repaid with the proceeds of Revolving Borrowings when due on such dates, as provided in <u>Section 2.4.2(a)</u>.

(f)    <u>Acceleration</u>.  Immediately upon any acceleration of the Final Maturity Date of any Loans pursuant to <u>Section 9.2</u>, the Borrowers shall repay all the Loans, unless, pursuant to <u>Section 9.2</u>, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

(g)    [Intentionally Omitted].

(h)    <u>Dispositions</u>.  No later than the first Business Day following the date of receipt by any Obligor of any Net Cash Proceeds from Dispositions (other than the sale of Hydrocarbons in the ordinary course of business), the Borrowers shall prepay the Loans as set forth in <u>Section 3.1.1(q)</u> in an aggregate amount equal to 100% of such Net Cash Proceeds.  Nothing contained in this <u>Section 3.1.1(h)</u> shall permit the Holdco Guarantor or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with <u>Section 7.2.10</u>.

(i)    <u>Insurance/Condemnation Proceeds</u>.  No later than the first Business Day following the date of receipt by the Holdco Guarantor or any of its Subsidiaries, or the Administrative Agent as loss payee, of any Net Cash Proceeds in excess of $250,000 in the aggregate during the term of this Agreement from any Casualty Events, the Borrowers shall prepay the Loans as set forth in <u>Section 3.1.1(q)</u> in an aggregate amount equal to 100% of such Net Cash Proceeds.

(j)    <u>Issuance of Capital Securities</u>.  On the date of receipt by the Holdco Guarantor of any cash proceeds from a capital contribution to, or the issuance of any Capital Securities of, the Holdco Guarantor or any of its Subsidiaries, the Borrowers shall prepay the Loans and/or the Loan Commitments shall be permanently reduced as set forth in <u>Section 3.1.1(q)</u> in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(k)    <u>Issuance of Debt</u>.  On the date of receipt by the Holdco Guarantor or any of its Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of the Holdco Guarantor or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to <u>Section 7.2.2</u>), the Borrowers shall prepay the Loans and/or the Loan Commitments shall be permanently reduced as set forth in <u>Section 3.1.1(q)</u> in an aggregate amount equal to 100% of such proceeds, net of

underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(l)    [Intentionally Omitted].

(m)    Extraordinary Receipts.  On the date of receipt by the Holdco Guarantor or any of its Subsidiaries of any Extraordinary Receipts in any Fiscal Year, the Borrowers shall prepay the Loans and/or the Loan Commitments shall be reduced as set forth in Section 3.1.1(q) in the amount equal to 100% of such Extraordinary Receipts.

(n)    Amounts in Excess of Budget.  The Borrowers will immediately prepay the Loans as set forth in Section 3.1.1(q) on any date that the aggregate principal amount of all Revolving Loans exceeds the maximum aggregate principal amount of Revolving Loans projected to be outstanding during the then current Budget Period as set forth in the Budget (subject to the Permitted Deviation therefrom), to the full extent of any such excess.  On (i) any borrowing date of a Revolving Loan or (ii) any delivery date of a Budget, the Borrowers shall hereby be deemed to represent and warrant to the Administrative Agent and the Lenders that the aggregate principal amount of all Revolving Loans outstanding on such day does not exceed the maximum aggregate principal amount of Revolving Loans projected to be outstanding during the then current Budget Period as set forth in the Budget (subject to the Permitted Deviation therefrom).

(o)    Revolving Loans.  If the Holdco Guarantor and/or any of its Subsidiaries have cash and Cash Equivalents in excess of $8,000,000 in the aggregate at any time Revolving Loans are outstanding, the Borrowers shall immediately prepay the outstanding Revolving Loans in the amount of such excess.

(p)    General Terms; Notice.  Each prepayment of any Loans made pursuant to this Section 3.1.1 shall be accompanied by all interest then accrued and unpaid on the principal so prepaid and all amounts required pursuant to Section 4.4. Additionally, Borrower shall provide Agent with one Business Day's prior written notice of any mandatory prepayment required under this Section 3.1.1.

(q)    Application.  Each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, first, to the principal amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to Section 4.4.  Each prepayment or repayment of the principal of the Term Loans shall be applied ratably.  So long as no Event of Default has occurred and is continuing, (x) any mandatory prepayment of any Loan pursuant to Section 3.1.1 (other than pursuant to Sections 3.1.1(b), 3.1.1(e), Section 3.1.1(n) and Section 3.1.1(o)), in each case, shall be applied as follows: (i) first, ratably, to prepay the principal of the Term Loan until paid in full; and (ii) second, to prepay the principal of the Revolving Loan until paid in full and to permanently reduce the Loan Commitments by the amount of such prepayment and (y) any mandatory prepayment of any Loan pursuant to Section 3.1.1(b), Section 3.1.1(e), Section 3.1.1(n), and Section 3.1.1(o) shall be applied as follows: (i) first, to prepay the principal of the Revolving Loan until paid in full and (ii) second, ratably, to prepay the principal of the Term Loan until paid in full.

(r)    Disgorgement.  In the event that the Lenders are required to repay or disgorge to any Borrower and/or the Holdco Guarantor, or any representative of any such Person's estate, and have repaid, all or any portion of the Pre-Petition Obligations authorized and directed to be repaid pursuant to the Final Facility Bankruptcy Court Order, or any payment on account of the Pre-Petition Obligations made to any Lender is disgorged for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of the Bankruptcy Code or any applicable state law, or any other similar provisions under any other state or

federal statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, the Borrowers shall prepay the outstanding principal amount of the Loans as set forth in Section 3.1.1(q) in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by any Borrower and/or the Holdco Guarantor or any representative of any such Person's estate.

(s)    Final Bankruptcy Court Order.  Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of Loans in whole or in part, the Borrowers shall prepay the Loans in full as set forth in Section 3.1.1(q) without premium or penalty on the date which is 35 days following the entry of the Interim Facility Bankruptcy Court Order in the event the Final Bankruptcy Court Order shall not have been entered on the docket of the Bankruptcy Court on or before such date.

**SECTION 3.2**    **Interest Provisions**.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

**SECTION 3.2.1**    Rates.    Subject to Section 2.3, pursuant to an appropriately delivered Borrowing Request or Continuation/Conversion Notice, the Borrowers may elect that the Revolving Loans and the Term Loans accrue interest at a rate per annum:

(a)    on that portion maintained from time to time as a Base Rate Loan, equal to the sum of the Alternate Base Rate, from time to time in effect plus the Applicable Margin; and

(b)    on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus the Applicable Margin.

All LIBO Rate Loans shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to such LIBO Rate Loan.  All Swing Line Loans shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Alternate Base Rate from time to time in effect plus the Applicable Margin.

**SECTION 3.2.2**    Post-Default Rates.  After the date any Event of Default has occurred and for so long as such Event of Default is continuing, the Borrowers shall pay, but only to the extent permitted by Applicable Law, interest (after, as well as before, judgment) on all outstanding Obligations at a rate per annum equal to the following (the "Default Rate") (a) in the case of principal on any Loan, subject to Applicable Law, the rate of interest that otherwise would be applicable to such Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, subject to Applicable Law, the Base Rate from time to time in effect, plus the Applicable Margin for Loans accruing interest at the Base Rate, plus 2% per annum.

**SECTION 3.2.3**    Payment Dates.  Interest accrued on each Loan shall be payable, without duplication:

(a)    on the Final Maturity Date therefor;

(b)    on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

DOC ID - 23131345.10

(c)     with respect to Base Rate Loans (including a Swing Line Loan), on each Monthly Payment Date occurring after the Interim Facility Effective Date;

(d)     with respect to LIBO Rate Loans, on each Monthly Payment Date occurring after the Interim Facility Effective Date;

(e)     with respect to any Base Rate Loans converted into LIBO Rate Loans on a day when interest would not otherwise have been payable pursuant to underline clause (c), on the date of such conversion; and

(f)     on that portion of any Loans the Final Maturity Date of which is accelerated pursuant to Section 9.2, immediately upon such acceleration.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Final Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

**SECTION 3.3**    **Fees**.  The Borrowers agree to pay the fees set forth below.  All such fees shall be non-refundable.

**SECTION 3.3.1**    Commitment Fee.  The Borrowers agree to pay to the Administrative Agent for the account of each Lender with a Revolving Loan Commitment in accordance with its Percentage, for the period (including any portion thereof when its Revolving Loan Commitment is suspended by reason of the Borrowers' inability to satisfy any condition of Article 5) commencing on the Interim Facility Effective Date and continuing through the Loan Commitment Termination Date, a commitment fee in an amount equal to (a) the average of the daily difference between (i) the aggregate amount of the Revolving Loan Commitments and (ii) the sum of the aggregate principal amount of outstanding Revolving Loans, times (b) 0.75% per annum; provided that, (a) solely for purposes of this Section 3.3.1, the outstanding amount of the Swing Line Loans shall not be included to reduce the unused portion of the Revolving Loan Commitments and (b) no such fee shall accrue on the Revolving Loan Commitment of a Defaulting Lender during the period such Lender is a Defaulting Lender.  All commitment fees payable pursuant to this Section 3.3.1 shall be calculated on a year comprised of 360 days and payable by the Borrowers in arrears on each Monthly Payment Date, commencing with the first Monthly Payment Date following the Interim Facility Effective Date, and on the Loan Commitment Termination Date.

**SECTION 3.3.2**    Facility Fee.  The Borrowers agree to pay to the Administrative Agent for the account of each Lender with a Revolving Loan Commitment in accordance with its Percentage, a facility fee in an amount equal to 3.00% of the aggregate amount of the Revolving Loans Commitments, which facility fee shall be earned in full on the Interim Facility Effective Date and due and payable to the Administrative Agent on the Final Maturity Date.

## ARTICLE 4
## CERTAIN LIBO RATE AND OTHER PROVISIONS

**SECTION 4.1**    **LIBO Rate Lending Unlawful**.  If any Lender shall determine (which determination shall, upon notice thereof to the Borrowers and the Administrative Agent, be conclusive and binding on the Borrowers) that the introduction of or any change in or in the interpretation of any law makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a LIBO Rate Loan, the obligations of such Lender to make, continue or convert any such LIBO Rate Loan shall, upon such determination, forthwith be suspended until such Lender shall notify the Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding LIBO Rate Loans payable to such Lender shall

DOC ID - 23131345.10

automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

SECTION 4.2    **Deposits Unavailable**.  If the Administrative Agent shall have determined that (a) Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or (b) by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate Loans; then, upon notice from the Administrative Agent to the Borrowers and the Lenders, the obligations of all Lenders under Section 2.3 to make or continue any Loans as, or to convert any Loans into, LIBO Rate Loans shall forthwith be suspended until the Administrative Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 4.3    **Increased LIBO Rate Loan Costs, etc.**  The Borrowers agree to reimburse each Lender for any increase in the cost to such Lender or any reduction in the amount of any sum receivable by such Secured Party in respect of, such Secured Party's Commitments and the making of Credit Extensions hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, LIBO Rate Loans) that arise in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in after the Interim Facility Effective Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority; provided, however, that any such changes with respect to increased capital costs and Taxes shall be subject to and governed by the terms of Sections 4.5 and 4.6, respectively.  Each affected Secured Party shall promptly notify the Administrative Agent and the Borrowers in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Secured Party for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrowers directly to such Secured Party within five days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers. Notwithstanding anything herein to the contrary, for purposes of this Agreement, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case under this clause (ii) pursuant to Basel III, deemed to have gone into effect and adopted after the date of this Agreement.

SECTION 4.4    **Funding Losses**.  In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a LIBO Rate Loan) as a result of:

(a)    any conversion or repayment or prepayment of the principal amount of any LIBO Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article 3 or otherwise;

(b)    any Loans not being made as LIBO Rate Loans in accordance with the Borrowing Request therefor;

(c)    any Loans not being continued as, or converted into, LIBO Rate Loans in accordance with the Continuation/Conversion Notice therefor; or

(d)      any LIBO Rate Loans not being prepaid in accordance with any notice delivered pursuant to clause (a) of Section 3.1.1 (as a result of a revocation of such notice or as a result of such payment not being made);

then, upon the written notice of such Lender to the Borrowers (with a copy to the Administrative Agent), the Borrowers shall, within five (5) days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense. Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

**SECTION 4.5      Increased Capital Costs**.  If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Secured Party or any Person controlling such Secured Party, and such Secured Party determines (in good faith) that the rate of return on its or such controlling Person's capital as a consequence of the Commitments or the Credit Extensions made by such Secured Party is reduced to a level below that which such Secured Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Secured Party to the Borrowers, the Borrowers shall within five days following receipt of such notice pay directly to such Secured Party additional amounts sufficient to compensate such Secured Party or such controlling Person for such reduction in rate of return.  A statement of such Secured Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrowers.  In determining such amount, such Secured Party may use any method of averaging and attribution that it shall deem applicable.  Notwithstanding anything herein to the contrary, for purposes of this Agreement (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case under this clause (ii) pursuant to Basel III, are deemed to have gone into effect and adopted after the date of this Agreement.

**SECTION 4.6      Taxes**.  The Borrowers covenant and agree as follows with respect to Taxes.

**SECTION 4.6.1      Payment of Taxes**.  Any and all payments by the Borrowers and each other Obligor under each Loan Document shall be made without setoff (other than as expressly provided herein as to amounts owing to a Defaulting Lender), counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes.  In the event that any Taxes are imposed and required to be deducted or withheld from any payment required to be made to or on behalf of any Secured Party under any Loan Document, then:

(a)  subject to Section 4.6.6, if such Taxes are Non-Excluded Taxes, the Borrowers and each Obligor shall increase the amount of such payment so that each Secured Party receives an amount sufficient to put it and its Tax Related Persons in the same after-tax position they would have been in, after withholding and deduction and payment of all Taxes (including income Taxes) had no such deduction or withholding been made; and

(b)  the Borrowers or the Administrative Agent (as applicable) shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a) above) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with Applicable Law.

**SECTION 4.6.2**    Other Taxes.  In addition, the Borrowers shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with Applicable Law.

**SECTION 4.6.3**    Tax Receipt.  As promptly as practicable after the payment of any Taxes that the Borrowers are required to pay on account of any payment made or required to be made under any Loan Document, and in any event within 45 days of any such payment being due, the Borrowers shall furnish to the Administrative Agent an official receipt (or a certified copy thereof), or other proof of payment satisfactory to the Administrative Agent, acting reasonably, evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

**SECTION 4.6.4**    Tax Indemnification.  Subject to Section 4.6.6, each Borrower shall, and does hereby, indemnify each Secured Party for any Non-Excluded Taxes and Other Taxes levied, imposed or assessed on (and whether or not paid directly by) such Secured Party whether or not such Non-Excluded Taxes or Other Taxes are correctly or legally asserted by the relevant Governmental Authority.  In addition, each Borrower shall, and does hereby, indemnify each Secured Party for any Taxes that may become payable by such Secured Party or its Tax Related Persons as a result of indemnification payments (net of any reduction in Taxes resulting from the losses being indemnified) or as a result of any failure of a Borrower to pay any Taxes when due to the appropriate Governmental Authority or to deliver to the Administrative Agent, pursuant to Section 4.6.3, documentation evidencing the payment of Taxes or Other Taxes.  With respect to indemnification for Non-Excluded Taxes and Other Taxes actually paid by any Secured Party or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Secured Party makes written demand therefor.  The Borrowers and each other Obligor acknowledges that any payment made to any Secured Party or to any Governmental Authority in respect of the indemnification obligations of the Borrowers or other Obligor provided in this Section 4.6.4 shall constitute a payment in respect of which the provisions of Section 4.6.1 and this Section 4.6.4 shall apply.

**SECTION 4.6.5**    Non-U.S. Lenders.  Each Non-U.S. Lender making Loans to the Borrowers, on or prior to the date on which such Non-U.S. Lender becomes a Lender hereunder (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent, but only for so long as such non-U.S. Lender is legally entitled to do so), shall deliver to the Borrowers and the Administrative Agent either (i) two duly completed copies of either (x) Internal Revenue Service Form W-8BEN or W-8IMY claiming eligibility of the Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in Section 4.6.5(i), (x) a certificate to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of Section 981(c)(3)(A) of the Code, (B) a "10 percent shareholder" of a Borrower within the meaning of Section 981(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 981(c)(3)(C) of the Code (referred to as an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8IMY or applicable successor form, or (ii) in the case of a Lender that is not a Non-U.S. Lender, two duly completed copies of Internal Revenue Service form W-9 or applicable successor form.  Each Lender, Eligible Assignee or Participant, as the case may be, agrees to promptly notify the Borrowers and the Administrative Agent of any change in circumstances that would modify or render invalid any claimed exemption or reduction.  In addition, each Lender, Eligible Assignee or Participant, as the case may be, shall timely deliver to the Borrowers and the Administrative Agent two further copies of such Form W-8BEN, W-8IMY, W-8ECI or W-9 or successor forms on or before the date that any previously executed form expires or becomes obsolete, or after the occurrence of any event requiring a change in the most recent form delivered by such Person to the Borrowers.

DOC ID - 23131345.10

**SECTION 4.6.6**    Certain Obligations.    The Borrowers shall not be obligated to pay any additional amounts to any Lender pursuant to Section 4.6.1(a), or to indemnify any Lender pursuant to Section 4.6.4, in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure of such Lender to deliver to the Borrowers the form or forms and/or an Exemption Certificate, as applicable to such Lender, pursuant to Section 4.6.5, (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Lender being untrue or inaccurate on the date delivered in any material respect, or (iii) the Lender designating a successor lending office at which it maintains its Loans that has the effect of causing such Lender to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided that, the Borrowers shall be obligated to pay additional amounts to any such Lender pursuant to Section 4.6.1(a), and to indemnify any such Lender pursuant to Section 4.6.4, in respect of United States federal withholding taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other Applicable Law or any interpretation of any of the foregoing occurring after the Interim Facility Effective Date, which change rendered such Lender no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, or rendered the information or certifications made in such form or forms or Exemption Certificate untrue or inaccurate in a material respect, (ii) the redesignation of the Lender's lending office was made at the request of the Borrowers or (iii) the obligation to pay any additional amounts to any such Lender pursuant to Section 4.6.1(a) or to indemnify any such Lender pursuant to Section 4.6.4 is with respect to an Assignee Lender that becomes an Assignee Lender as a result of an assignment made at the request of the Borrowers or made during the continuance of an Event of Default.

**SECTION 4.6.7**    Replacing Lenders.    If any Lender (an "Affected Lender") (a) makes a demand upon the Borrowers for amounts pursuant to Section 4.6 (and the payment of such amounts are, and are likely to continue to be, materially more onerous in the reasonable judgment of the Borrowers than with respect to the other Lenders), or (b) is a Defaulting Lender, then the Borrowers may, within 30 days of receipt by the Borrowers of such demand or at any time after receiving notice that a Defaulting Lender exists, give notice in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all of its Loans, Commitments and/or Notes to an Eligible Assignee designated in such notice and, in the case of a Defaulting Lender, the Administrative Agent may, at any time after delivering notice to the Borrowers and the Affected Lender of such Affected Lender's status as a Defaulting Lender, give notice in writing to the Borrowers and such Affected Lender of its intention to cause such Affected Lender to sell all of its Loans, Commitments and/or Notes to an Eligible Assignee designated in such notice (such notice, whether provided by the Borrowers or the Administrative Agent being referred to herein as the "Replacement Notice" and such replacement Lender being referred to herein as the "Replacement Lender"); provided, however, that no Replacement Notice may be given by the Borrowers or the Administrative Agent and no Lender may be replaced pursuant to this Section 4.6.7 if (i) such replacement conflicts with any Applicable Law, (ii) any Event of Default shall have occurred and be continuing at the time of such replacement or (iii) prior to any such replacement, such Affected Lender shall have taken any necessary action under Section 4.6 (if applicable) so as to eliminate the continued need for payment of amounts owing pursuant to Section 4.6 or shall have waived its right to payment of the specific amounts that give rise or would give rise to such Replacement Notice (it being understood for sake of clarity that the Affected Lender shall be under no obligation to waive such rights to payment and that such Affected Lender, if it is replaced in accordance with this Section 4.6.7 but not if such Affected Lender is a Defaulting Lender, shall be entitled to be reimbursed for all breakage losses in connection with such replacement) or is no longer a Defaulting Lender. If the Administrative Agent shall, in the exercise of its reasonable discretion, notify the Borrowers and such Affected Lender in writing that the Replacement Lender is satisfactory to the Administrative Agent (such

consent not being required where the Replacement Lender is already a Lender), then such Affected Lender shall, subject to the payment of any amounts due pursuant to Section 4.4, assign, in accordance with Section 11.11, all of its Commitments, Loans, Notes (if any), and other rights and obligations under this Agreement and all other Loan Documents designated in the replacement notice to such Replacement Lender; provided, however, that (A) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender (other than a Defaulting Lender) and such Replacement Lender, (B) the purchase price paid by such Replacement Lender shall be in the amount of such Affected Lender's Loans designated in the Replacement Notice, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts (including the amounts demanded and unreimbursed under Section 4.6 but not including any breakage losses of a Defaulting Lender) and (C) the Borrowers shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender (other than a Defaulting Lender) and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in Section 11.11).  Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents.  Solely for purposes of effecting any assignment involving a Defaulting Lender under this Section 4.6.7 and to the extent permitted under applicable Legal Requirements, each Lender hereby designates and appoints the Administrative Agent as true and lawful agent and attorney-in-fact, with full power and authority, for and on behalf of and in the name of such Lender to execute, acknowledge and deliver the assignment documents required hereunder if such Lender is a Defaulting Lender and such Lender shall be bound thereby as fully and effectively as if such Lender had personally executed, acknowledged and delivered the same.  In lieu of the Borrower or the Administrative Agent replacing a Defaulting Lender as provided in this Section 4.6.7, the Borrower may terminate such Defaulting Lender's Loan Commitment as provided in Section 2.2.2.  Notwithstanding anything herein or in such assignment documents to the contrary, (y) such Affected Lender's rights under Sections 4.5, 4.6, and 11.4 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Lender" hereunder, and (z) such Affected Lender's obligations under Section 10.3 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Lender" hereunder.

**SECTION 4.7    Payments, Computations; Proceeds of Collateral, etc.**    (a) Unless otherwise expressly provided in a Loan Document, all payments by the Borrowers pursuant to each Loan Document shall be made by the Borrowers to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment.  All payments shall be made without setoff (other than as expressly provided herein as to amounts owing to a Defaulting Lender), deduction or counterclaim not later than noon, New York City time, on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrowers.  Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day.  The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party.  All interest (including interest on LIBO Rate Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days.  Payments due on a day other than a Business Day shall (except as otherwise required by clause (ii) of the proviso in the definition of "Interest Period") be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.  The Lenders and the Borrowers hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account with any amount due and payable by the Borrowers under any Loan Document.  Each of the Lenders and the Borrowers agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Section 5.3 have been satisfied.  Any amount charged to the Loan Account shall be deemed a Revolving Loan hereunder made by the Lenders to the

Borrowers, funded by the Administrative Agent on behalf of the Lenders and subject to <u>Section 2.1.1</u>. The Lenders and the Borrowers confirm that any charges which the Administrative Agent may so make to the Loan Account as herein provided will be made as an accommodation to the Borrowers and solely at the Administrative Agent's discretion.

(b)     After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon direction from the Majority Lenders, shall, apply all amounts received under the Loan Documents (including from the proceeds of collateral securing the Secured Obligations) or under Applicable Law upon receipt thereof to the Secured Obligations as follows: (i) *first*, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Administrative Agent, in its capacity as the Administrative Agent (including the fees and expenses of counsel to the Administrative Agent), (ii) *second*, after payment in full in cash of the amounts specified in <u>clause (b)(i)</u>, to the payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) in respect of the Protective Advances, until paid in full in cash, (iii) *third*, after payment in full in cash of the amounts specified in <u>clauses (b)(i)</u> and <u>(b)(ii)</u>, to the payment of the principal amount in respect of the Protective Advances then outstanding, until paid in full in cash, (iv) *fourth*, after payment in full in cash of the amounts specified in <u>clauses (b)(i)</u>, <u>(b)(ii)</u> and <u>(b)(iii)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Loan Documents, and all costs and expenses owing to the Secured Parties pursuant to the terms of the Loan Documents, until paid in full in cash, (v) *fifth*, after payment in full in cash of the amounts specified in <u>clauses (b)(i)</u> through <u>(b)(iv)</u>, to the ratable payment of all other Secured Obligations owing to the Secured Parties, and (viii) *sixth*, after payment in full in cash of the amounts specified in <u>clauses (b)(i)</u> through <u>(b)(v)</u>, and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus.

**SECTION 4.8     Sharing of Payments**.  If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Credit Extension (other than pursuant to the terms of this Agreement) in excess of its <u>pro rata</u> share of payments obtained by all Secured Parties, such Secured Party shall purchase from the other Secured Parties such participations in Credit Extensions made by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u> that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party that has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered.  The Borrowers agree that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to <u>Section 4.9</u>) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrowers in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

44
*Credit Agreement*

**SECTION 4.9      Setoff**.  Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default, have the right to appropriate and apply to the payment of the Secured Obligations owing to it (whether or not then due), and (as security for such Secured Obligations) each Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of such Borrower then or thereafter maintained with such Secured Party; provided that, any such appropriation and application shall be subject to the provisions of Section 4.8.  Each Secured Party agrees promptly to notify the Borrowers and the Administrative Agent after any such appropriation and application made by such Secured Party; provided that, the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under Applicable Law or otherwise) which such Secured Party may have.

**SECTION 4.10      Payments and Deductions to a Defaulting Lender**.  (a)  If any Lender shall fail to make any payment to the Administrative Agent or the Swing Line Lender required to be made by it pursuant to the terms hereof, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid in cash.

(b)      If a Defaulting Lender as a result of the exercise of a set-off shall have received a payment in respect of its outstanding Loans which results in its outstanding Loans being less than its pro rata share of the aggregate outstanding Loans, then no payments will be made to such Defaulting Lender until such time as all amounts due and owing to the Lenders have been equalized in accordance with each Lender's respective pro rata share of the aggregate outstanding Loans.  Further, if at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the borrowings of Loans for which such Defaulting Lender(s) shall have failed to fund its pro rata share until such time as such borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its pro rata share of all Loans then outstanding.   After acceleration or maturity of the Loans, subject to the first sentence of this Section 4.10(b), all principal will be paid ratably as provided in Section 4.8.

**ARTICLE 5**
**CONDITIONS**

**SECTION 5.1      Interim Facility Effective Date**.  The effectiveness of this Agreement and the obligation of the Administrative Agent or any Lender to make any Revolving Loans during the Interim Period shall commence as of the Business Day (the "Interim Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Administrative Agent:

**SECTION 5.1.1      Interim Bankruptcy Court Order**.  The Interim Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect, shall not be subject to appeal and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent and the Required Lenders.

**SECTION 5.1.2      Credit Agreement**.  The Administrative Agent (or its counsel) shall have received from each party hereto (or intended to become a party hereto) either (a) a counterpart of this Agreement signed on behalf of such party or (b) written evidence satisfactory to the Administrative Agent

DOC ID - 23131345.10

(which may include facsimile transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

**SECTION 5.1.3**    Guaranties.  The Administrative Agent shall have received (a) a Guaranty, dated as of the Interim Facility Effective Date, duly executed and delivered by an Authorized Officer of the Holdco Guarantor, and (b) a Subsidiary Guaranty, duly executed and delivered by an Authorized Officer of each Subsidiary Guarantor.

**SECTION 5.1.4**    UCC-1s.  The Administrative Agent shall have received, to the extent required by the Administrative Agent, Uniform Commercial Code Form UCC-1 financing statements, suitable in form for naming each Obligor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the security interests of the Administrative Agent pursuant to the Loan Documents.

**SECTION 5.1.5**    Secretaries' Certificates, etc.  The Administrative Agent shall have received from each Obligor, as applicable, (a) a copy of a good standing certificate, dated a date reasonably close to the Interim Facility Effective Date, for such Obligor from the jurisdiction in which such Obligor is organized and each other jurisdiction in which such Obligor is qualified to do business and (b) a certificate, dated as of the Interim Facility Effective Date, duly executed and delivered by such Obligor's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

(i)    resolutions of such Obligor's Board of Directors then in full force and effect authorizing, to the extent relevant, and the execution, delivery and performance of each Loan Document to be executed by such Obligor and the transactions contemplated hereby and thereby;

(ii)   the incumbency and signatures of those of its officers, managers, managing member or general partner (or officers or managers of its managing member or general partner), as applicable, authorized to act with respect to each Loan Document to be executed by such Obligor; and

(iii)  the Organizational Documents of such Obligor and the full force and validity thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner (or Secretary or Assistant Secretary of the managing member or general partner), as applicable, of any such Obligor canceling or amending the prior certificate of such Obligor.

**SECTION 5.1.6**    Interim Facility Effective Date Certificate.  The Administrative Agent shall have received the Interim Facility Effective Date Certificate, dated as of the Interim Facility Effective Date and duly executed and delivered by an Authorized Officer of the Holdco Guarantor and each Borrower, in which certificate such Obligors shall (a) agree and acknowledge that the statements made therein shall be deemed to be true and correct representations and warranties of the Holdco Guarantor and each Borrower as of such date, and, at the time each such certificate is delivered, such statements shall in fact be true and correct, and (b) certify as to the identity of the holders of Capital Securities of the Parent as of the Interim Facility Effective Date.  All documents and agreements required to be appended to the Interim Facility Effective Date Certificate shall be in form and substance satisfactory to the Administrative Agent, shall have been executed and delivered by the requisite parties, and shall be in full force and effect.

**SECTION 5.1.7**    <u>Consents, Licenses, Permits and Approvals</u>. The Administrative Agent shall have received (a) a certificate of an Authorized Officer of each Obligor dated as of the Interim Facility Effective Date either (i) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by such Obligor and the validity against such Obligor of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (ii) stating that no such consents, licenses or approvals are so required (except as have already been obtained by the appropriate Obligor and such licenses, permits and approvals from Governmental Authorities related to the assets which the Borrowers cannot obtain as a non-operator of the assets and such approvals from the Bureau of Ocean Energy Management as an approved holder or operator of Properties subject to the authority of the Bureau of Ocean Energy Management), and (b) a certificate of an Authorized Officer of each Obligor dated as of the Interim Facility Effective Date to the effect that, to the knowledge of such Authorized Officer after due inquiry, (i) the Borrowers and their respective Subsidiaries have complied in all material respects with all Applicable Law and regulatory requirements (including, without limitation, all Applicable Law relating to the operation of the Oil and Gas Properties) and (ii) the Borrowers and their respective Subsidiaries have received all material and necessary permits, licenses and approvals to operate their respective Oil and Gas Properties as currently operated (other than such licenses, permits and approvals from Governmental Authorities related to the assets which the Borrowers cannot obtain as a non-operator of the assets and such approvals from the Bureau of Ocean Energy Management as an approved holder or operator of Properties subject to the authority of the Bureau of Ocean Energy Management), and all such permits, licenses and approvals are then in full force and effect.

**SECTION 5.1.8**    <u>Budget</u>. The Administrative Agent shall have received from the Borrowers the Budget, together with an officers' certificate from the Borrowers' chief executive officer and chief financial officer regarding the Budget and containing the certifications set forth in Section 6.18.

**SECTION 5.1.9**    <u>UCC Searches</u>. The Administrative Agent shall have received certified copies of UCC Requests for Information or Copies (Form UCC-11), or a similar search report certified by a party acceptable to the Administrative Agent, dated a date reasonably near to the Filing Date, listing all effective financing statements that name any Obligor (under its present name and any previous names) as the debtor, together with copies of such financing statements (none of which shall, except with respect to Permitted Liens), evidence a Lien on any collateral described in any Loan Document).

**SECTION 5.1.10**    <u>Insurance</u>. The Administrative Agent shall have received a certificate, reasonably satisfactory to the Administrative Agent, from the Borrowers' and their Subsidiaries' insurance broker(s), dated as of (or a date reasonably near) the Interim Facility Effective Date relating to each insurance policy required to be maintained pursuant to <u>Section 7.1.4</u>, identifying types of insurance and the insurance limits of each such insurance policy and naming the Administrative Agent as loss payee, and each of the Secured Parties as an additional insured, as appropriate, to the extent required under <u>Section 7.1.4</u> and stating that such insurance is in full force and effect and that all premiums due have been paid.

**SECTION 5.1.11**    <u>Material Adverse Effect</u>. There shall not have occurred any event, change or condition since the Filing Date, after giving pro forma effect to the transactions hereunder, that individually or in the aggregate, has had, or could reasonably be expected to have, a material adverse effect on the business, operations or financial condition of the Parent, the Obligors and their respective Subsidiaries on a combined basis, after giving pro forma effect to the transactions hereunder.

**SECTION 5.1.12**    <u>Fees, Expenses, etc</u>. The Administrative Agent shall have received for its own account, or for the account of each Lender, as the case may be, all fees, costs and expenses due and payable pursuant to <u>Sections 3.3</u> and, if then invoiced, <u>11.3</u>.

**SECTION 5.1.13** <u>Patriot Act Disclosures</u>.  The Administrative Agent and each Lender shall have received all Patriot Act disclosures requested by them prior to execution of this Agreement.

**SECTION 5.1.14** <u>Minimum Liquidity</u>.  After giving effect to the initial Loans to be made or deemed made hereunder on the Interim Facility Effective Date and the transactions contemplated hereby to occur on the Interim Facility Effective Date (including, without limitation, after giving effect to all amounts to be paid on the Interim Facility Effective Date), the Borrowers' unrestricted cash on hand is at least $2,500,000.

**SECTION 5.1.15** <u>Priority</u>.  The Administrative Agent shall be satisfied that it has been granted, and holds, for the benefit of the Administrative Agent and the Lenders, a perfected, first priority Lien on, and security interest in, all of the Collateral, subject only to Permitted Priority Liens.

**SECTION 5.1.16** <u>Retention of CRO</u>.  Each Lender shall have received evidence satisfactory to it that the Borrowers have executed an engagement letter with Zolfo Cooper appointing a principal of Zolfo Cooper as the chief restructuring officer of the Obligors (the "CRO"), which engagement letter shall be on terms and conditions (including, without limitation, as to the identity of the principal and scope of authority) reasonably acceptable to the Administrative Agent and the Lenders.

**SECTION 5.1.17** <u>Existing Credit Agreement</u>.  The Existing Lenders shall have received adequate protection in respect of the Liens securing the Pre-Petition Obligations in the form of (a) replacement Liens on the Collateral, subject only to the Liens securing the Obligations and the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (b) priority administrative expense claim status with respect to the Pre-Petition Obligations, subject only to the super-priority administrative expense claim status of the Obligations to the extent of any diminution in value of the collateral securing the Pre-Petition Obligations caused by the Liens granted hereunder and under the other Loan Documents and the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", and (c) payment of fees, expenses and interest in respect of the Pre-Petition Obligations at the rate of interest in effect under the Existing Credit Agreement immediately prior to the Filing Date during the pendency of the Chapter 11 Cases.

**SECTION 5.1.18** <u>First Day Motions</u>.  The Administrative Agent shall have received on or before the Filing Date, copies of the first day motions to be filed by the Obligors with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Bankruptcy Court shall have issued an order approving each of such first day motions.

**SECTION 5.1.19** <u>Hedging Agreements</u>.  (i) The Administrative Agent shall have received evidence, in form and substance reasonably satisfactory to the Administrative Agent, that all Hedging Agreements of the Obligors shall have been terminated on or before the Filing Date and (ii) not less than $21,000,000 of the proceeds of the unwinding or termination of such hedge positions shall have been applied to repay the Pre-Petition Obligations.

**SECTION 5.1.20** <u>Commencement of Chapter 11 Cases</u>.  The Obligors shall have commenced the Chapter 11 Cases in the Bankruptcy Court and no trustee, examiner or receiver shall have been appointed or designated with respect to the Obligors or their business, properties or assets and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral.

DOC ID - 23131345.10

For purposes of determining compliance with the conditions specified in this Section 5.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Interim Facility Effective Date specifying its objection thereto.

**SECTION 5.2**      **Final Facility Effective Date**.  The obligation of the Administrative Agent or any Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Administrative Agent:

**SECTION 5.2.1**      Final Bankruptcy Court Order, Etc.  The Final Bankruptcy Court Order shall have been signed and entered by the Bankruptcy Court within a date which is 35 days after the date of the entry of the Interim Facility Bankruptcy Court Order, and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not be subject to appeal or have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Administrative Agent and the Required Lenders.

**SECTION 5.2.2**      CRO.  The CRO shall still be retained by and working for the Obligors and either (i) the Bankruptcy Court shall have entered an order approving the Obligors' retention of the CRO and such order shall be in full force and effect and shall not be subject to appeal or have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Administrative Agent and the Required Lenders or (ii) the Obligors have filed a motion, in form and substance reasonably satisfactory to the Administrative Agent, with the Bankruptcy Court to have the Bankruptcy Court approve the Obligor's retention of the CRO.

**SECTION 5.2.3**      Legality.  The making of the Loans on the Final Facility Effective Date shall not contravene any law, rule or regulation applicable to Administrative Agent or any Lender.

**SECTION 5.2.4**      Updated Budget.  The Administrative Agent shall have received on or before the Final Facility Effective Date an updated Budget, together with an officers' certificate from the Borrowers' chief executive officer and chief financial officer regarding the Budget and containing the certifications set forth in Section 6.18.

**SECTION 5.2.5**      Liens; Priority.  The Administrative Agent shall be satisfied that it has been granted, and still continues to hold, for the benefit of the Administrative Agent and the Lenders a perfected, first priority Lien on and security interest in all of the Collateral, subject only to Permitted Priority Liens.  At the request of the Administrative Agent, the Administrative Agent shall receive UCC, tax and judgment Lien searches and, title reports with respect to all real property of the Obligors and other appropriate evidence, evidencing the absence of any Liens or mortgages on the Collateral, except Permitted Liens.

**SECTION 5.2.6**      Pre-Petition Obligations.  The Pre-Petition Obligations shall have been repaid in full with the proceeds of the Term Loan pursuant to the conversion set forth in Section 2.1.2.

**SECTION 5.2.7**      Material Adverse Effect.  No event or development shall have occurred since the Filing Date that is not stayed by the Chapter 11 Cases which could reasonably be expected to have a Material Adverse Effect.

**SECTION 5.3**      **All Credit Extensions**.  The obligation of each Lender to make any Credit Extension, including any Credit Extension to be made or deemed made on and after the Interim Facility

DOC ID - 23131345.10

Effective Date, shall be subject to the satisfaction of each of the conditions precedent set forth below:Compliance with Warranties, No Default, etc.  Both before and after giving effect to any Credit Extension the following statements shall be true and correct:

(a)      the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) as of such earlier date);

(b)      no Material Adverse Effect has occurred since the Filing Date, after giving pro forma effect to the transactions hereunder; and

(c)      no Default shall have then occurred and be continuing.

**SECTION 5.3.2**     Credit Extension Request, etc.  The Administrative Agent shall have received a Borrowing Request, accompanied by the certificates specified in Section 2.3.1 or 2.4, as applicable. Each of the delivery of a Borrowing Request and the acceptance by any Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by the Borrowers that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the statements made in Section 5.3.1 are true and correct.

**SECTION 5.3.3**     Satisfactory Legal Form.  All documents executed or submitted pursuant hereto by or on behalf of any Obligor shall be reasonably satisfactory in form and substance to the Administrative Agent.

**SECTION 5.3.4**     Fees and Expenses, etc.  The Administrative Agent shall have received for its own account, or for the account of each Lender, as the case may be, all fees, costs and expenses due and payable pursuant to Sections 3.3 and, if then invoiced, 11.3.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

In order to induce the Secured Parties to enter into this Agreement and to make Credit Extensions hereunder, each Obligor represents and warrants to each Secured Party as set forth in this Article.

**SECTION 6.1**     **Organization, etc.**  Each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except for such jurisdictions where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect and, subject to the entry and terms of the Bankruptcy Court Orders, has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except for those licenses, permits or other approvals, the absence of which could not reasonably be expected to have a Material Adverse Effect.

**SECTION 6.2    Due Authorization, Non-Contravention, Defaults etc.**    The execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it are in each case within such Person's powers, have been duly authorized by all necessary action, and do not (a) contravene any (i) Obligor's Organizational Documents, (ii) court decree or order binding on or affecting any Obligor (including, without limitation, any order entered in the Chapter 11 Cases) or (iii) law or governmental regulation binding on or affecting any Obligor; or (b) result in (i) or require the creation or imposition of, any Lien on any Obligor's properties, (ii) a default under any material contractual restriction binding on or affecting any Obligor (other than conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases) or (iii) any noncompliance, suspension, impairment, forfeiture or nonrenewal of any material license, permit or other governmental approval.    No Obligor is in default under any agreement, instrument or undertaking to which it is a party or by which it or any of its property is bound that could reasonably be expected to have a Material Adverse Effect.

**SECTION 6.3    Government Approval, Regulation, etc.**    No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than the entry of the Bankruptcy Court Orders) is required for the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party.    No Obligor and no Subsidiary of any Obligor is (a) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended or (b) subject to regulation under the Federal Power Act, as amended or any other Applicable Law which regulates the incurring by such Person of Indebtedness, including Applicable Law relating to common contract carriers or the sale of electricity, gas, steam, water or other public utility services.

**SECTION 6.4    Validity, etc.**    Each Loan Document to which any Obligor is a party constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

**SECTION 6.5    Financial Information**.    All balance sheets, all statements of income and of cash flow and all other financial information of each of Holdco Guarantor and its Subsidiaries furnished pursuant to Section 7.1.1 have been and will for periods following the Interim Facility Effective Date be prepared in accordance with GAAP consistently applied, and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

**SECTION 6.6    No Material Adverse Change**.    Other than as to any of the matters disclosed in Item 6.6 of the Disclosure Schedules that have not been stayed by the Chapter 11 Cases, there has been no material adverse change in the business, condition (financial or otherwise), operations, performance, or properties of the Holdco Guarantor and its Subsidiaries taken as a whole since the Filing Date.

**SECTION 6.7    Litigation, Labor Controversies, etc.**    There is no pending or, to the knowledge of any Obligor or any Subsidiary thereof, threatened litigation, action, proceeding, investigation or labor controversy (a) except as disclosed in Item 6.7 of the Disclosure Schedule, affecting any Borrower, any Subsidiary or any other Obligor, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect, and no material adverse development has occurred in any labor controversy, litigation, arbitration or governmental investigation or proceeding disclosed in Item 6.7; or (b) which purports to affect the legality, validity or enforceability of any Loan Document.

SECTION 6.8    **Subsidiaries**.  No Obligor has any Subsidiaries except those Subsidiaries that are identified in Item 6.8 of the Disclosure Schedule, or that are permitted to have been organized or acquired in accordance with Sections 7.2.5 or 7.2.9.

SECTION 6.9    **Ownership of Properties, Etc.**  (a) Each Borrower and each Subsidiary has good and defensible title to their respective Oil and Gas Properties evaluated in the most recently delivered Reserve Report and which are Proved Reserves and good title to all their other Oil and Gas Properties and respective personal Properties, in each case, free and clear of all Liens except Permitted Liens.  After giving full effect to all Liens and any other instruments or agreements affecting Mortgagor's ownership of such Proved Reserves, such Borrower or such Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate such Borrower or such Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in such Borrower's or such Subsidiary's net revenue interest in such Property.

(b)    All material leases and agreements necessary for the conduct of the business of the Obligors and their respective Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance that is not stayed as a result of the Chapter 11 Cases which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, that could reasonably be expected to have a Material Adverse Effect.

(c)    The rights and Properties presently owned, leased or licensed by the Obligors and their respective Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Obligors and their respective Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.  No Obligor has received any written notice concerning, and to the Obligors' knowledge, there is no existing order of, proceeding pending before, or other requirements of, any Governmental Authority, including, without limitation, the Federal Energy Regulatory Commission, or any comparable state or local Governmental Authority that is not stayed as a result of the Chapter 11 Cases, which could or will materially interfere with, limit or otherwise restrict the Oil and Gas Business of any of the Obligors or which could or will require any such Obligor to refund or otherwise return any portion (other than an immaterial amount) of the proceeds received or to be received from the sale of Hydrocarbons by any such Obligor.

(d)    All of the material Properties of the Obligors and their respective Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition (ordinary wear and tear excepted) and are maintained in accordance with prudent business standards other than as for the matters and to the extent disclosed in Item 6.6 of the Disclosure Schedules.

(e)    The Obligors and their respective Subsidiaries own, or are licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to their respective businesses, and the use thereof by an Obligor or a Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Obligors and their respective Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of

Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.10    Taxes. Each Obligor and each Subsidiary thereof has filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, (except to the extent not required to be paid under Section 7.1.2) and has paid all Taxes shown to be due on any assessment received to the extent that such Taxes have become due and payable (except to the extent not required to be paid under Section 7.1.2), except where the failure to file any such returns or reports or to pay any such Taxes could not reasonably be expected to give rise to a Material Adverse Effect.

SECTION 6.11    ERISA; Pension and Welfare Plans. Except to the extent resulting from, or related to the Chapter 11 Cases or the entry and the terms of the Bankruptcy Court Orders, each Obligor, each Subsidiary thereof, and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Pension or Welfare Plan. During the twelve-consecutive-month period prior to the Interim Facility Effective Date and prior to the date of any Credit Extension hereunder, no steps have been taken to terminate any Pension Plan, and no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA. Except to the extent resulting from, or related to the Chapter 11 Cases or the entry and the terms of the Bankruptcy Court Orders, no condition exists or event or transaction has occurred with respect to any Pension Plan that might result in the incurrence by any Obligor or any member of the Controlled Group of any material liability, fine or penalty. Except as disclosed in Item 6.11 of the Disclosure Schedule, no Obligor and no member of the Controlled Group has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA.

SECTION 6.12    Environmental Warranties. Except as set forth in Item 6.12 of the Disclosure Schedule: (a) all facilities and property owned, operated or leased by any Obligor or any Subsidiary thereof are owned, operated or leased by such Obligor and its Subsidiaries and have been, and continue to be, in compliance with all Environmental Laws in all material respects;  (b) there have been no past, and there are no pending or, to any Obligor's knowledge, threatened (i) claims, complaints, notices or governmental requests for information received by any Obligor or any Subsidiary thereof with respect to any alleged violation of any Environmental Law which violation could reasonably be expected to have a Material Adverse Effect, or (ii) written complaints, notices or inquiries to any Obligor or any Subsidiary thereof regarding potential liability of any Obligor or any Subsidiary thereof under any Environmental Law which liability could reasonably be expected to have a Material Adverse Effect; (c) there have been no Releases of Hazardous Materials at, on or under any property now or previously owned, operated, or leased by any Obligor or any Subsidiary thereof that have, or could reasonably be expected to have, a Material Adverse Effect; (d) the Obligors and their respective Subsidiaries have been issued and are in compliance, in all material respects, with all permits, certificates, approvals, licenses, registrations and other authorizations relating to environmental matters; (e) no property currently, or to the knowledge of any Obligor previously, owned, operated or leased by any Obligor or any Subsidiary thereof is listed, or proposed for listing in the Federal Register or similar governmental publication (with respect to owned property only), on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar foreign, federal, state or provincial list of sites requiring investigation or clean-up under Environmental Laws that could reasonably be expected to have a Material Adverse Effect; (f) there are no underground storage tanks, active or abandoned, including petroleum storage tanks, on or under any property now or previously owned, operated or leased by any Obligor or any Subsidiary thereof that, singly or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect; (g) to the knowledge of any Obligor or any Subsidiary thereof, no Obligor and no Subsidiary thereof has directly transported or directly arranged for the transportation of any Hazardous Material to any location

that is listed or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar federal, provincial or state list or that is the subject of federal, state, provincial or local enforcement actions or other investigations that could reasonably be expected to result in claims against any Obligor or any Subsidiary thereof for any remedial work, damage to natural resources or personal injury, including claims under CERCLA or Environmental Laws which could reasonably be expected to have a Material Adverse Effect; (h) there are no polychlorinated biphenyls or friable asbestos present at any Property now or previously owned or leased by any Obligor or any Subsidiary thereof that could reasonably be expected to result in any liability, claims, or costs having, individually or in the aggregate, a Material Adverse Effect; and (i) no conditions exist at, on or under any property now or previously owned or leased by any Obligor or any Subsidiary thereof that, with the passage of time or the giving of notice or both, could reasonably be expected to result in any liability, claims, or costs under any Environmental Law that could reasonably be expected have a Material Adverse Effect.

SECTION 6.13    **Disclosure of Material Information; Accuracy of Information**.    Each Obligor has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.    None of the factual information heretofore or contemporaneously furnished in writing to any Secured Party by or on behalf of any Obligor in connection with any Loan Document or any transaction contemplated hereby contains any untrue statement of a material fact, or omits to state any material fact necessary to make any information not misleading, and no other factual information hereafter furnished in connection with any Loan Document by or on behalf of any Obligor to any Secured Party will contain any untrue statement of a material fact or will omit to state any material fact necessary to make any information not misleading on the date as of which such information is dated or certified.

SECTION 6.14    **Regulations T, U and X**.    No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Credit Extensions will be used to purchase or carry margin stock or otherwise for a purpose that violates, or would be inconsistent with, F.R.S. Board Regulations T, U or X.    Terms for which meanings are provided in F.R.S. Board Regulations T, U or X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.15    **Labor Matters**.    Except as set forth on Item 6.15 of the Disclosure Schedule, as of the date hereof no Obligor is subject to any labor or collective bargaining agreement.    Except as set forth on Item 6.15 of the Disclosure Schedule, there are no existing or threatened strikes, lockouts or other labor disputes involving any Obligor that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect.    Hours worked by and payments made to employees of each Obligor are not in violation of the Fair Labor Standards Act or any other Applicable Law, rule or regulation dealing with such matters where such violation could reasonably be expected to have a Material Adverse Effect.

SECTION 6.16    **Compliance with Laws**.    Each Obligor is in compliance in all material respects with the requirements of all Applicable Law and all orders, writs, injunctions and decrees applicable to it or to its properties (except for Environmental Laws that are the subject of Section 6.12), and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property (including its Oil and Gas Properties) and the conduct and operation of its business, except in such instances in which the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

DOC ID - 23131345.10

**SECTION 6.17    Material Contracts**. Each Obligors and its respective Subsidiary's material contracts (a) are in full force and effect and are binding upon and enforceable against each Obligor that is a party thereto and, to the knowledge of the Obligors and their respective Subsidiaries, all other parties thereto in accordance with its terms, and (b) are not in default in any material respect due to the action of such Obligor, other than as for the matters and to the extent disclosed in Item 6.6 of the Disclosure Schedules which will be stayed by virtue of the filing of the Chapter 11 Cases. To the extent any Obligor is the operator of any of the Oil and Gas Properties of the Borrowers or any of their Subsidiaries, all material royalties, overriding royalties, compensatory royalties and other payments due from or in respect of Hydrocarbon production from or allocable to such Oil and Gas Properties, that are due or payable by any Obligors, are paid in full, before delinquency, in accordance with the terms of the applicable material contracts and Applicable Law.

**SECTION 6.18    Budget**. The Budget has been prepared on a reasonable basis and in good faith by the Borrowers and the Holdco Guarantor, are based on good faith estimates and assumptions made by the management of the Borrowers and the Holdco Guarantor that are reasonable at the time made and upon the best information then reasonably available to the Borrowers and the Holdco Guarantor, and the Borrowers and the Holdco Guarantor are not aware of any facts or information that would lead them to believe that such Budget is not reasonably attainable.

**SECTION 6.19    Deposit Account and Cash Management Accounts**. Set forth on Item 6.19(a) of the Disclosure Schedule is a complete and accurate list of all Deposit Accounts of each Obligor and each Subsidiary thereof and set forth on Item 6.19(b) of the Disclosure Schedule is a complete and accurate list of all securities accounts (as defined in the UCC) of each Obligor and each Subsidiary thereof, if any as updated in accordance with Section 7.1.9.

**SECTION 6.20    Insurance**. Each Obligor and each Subsidiary thereof keeps its property adequately insured, as is customary in the industry for companies of similar size and in the same or similar businesses, and maintains (a) insurance to such extent and against such risks, including fire, as is customary with companies of similar size and in the same or similar businesses, (b) workmen's compensation insurance in the amount required by Applicable Law, (c) public liability insurance, which shall include product liability insurance, in the amount customary with companies of similar size and in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (d) such other insurance as may be required by Applicable Law. Item 6.20 of the Disclosure Schedule contains an accurate and complete description of all performance bonds related to operations on or pertaining to the Oil and Gas Properties owned or held by the Obligors and each of their Subsidiaries. Except as set forth on Item 6.20 of the Disclosure Schedule, such bonds are sufficient for compliance in all material respects with all Applicable Law and all insurance agreements to which the Obligors or any of their Subsidiaries is a party (i) are valid, outstanding and enforceable policies, and (ii) provide adequate coverage in at least such amounts and against at least such risks (but including in any event public liability) as are required by Governmental Authorities and/or usually insured or bonded against in the same general area by companies engaged in the same or a similar business. Neither any Obligor nor any Subsidiary has been refused any bonds or insurance with respect to its assets or operations, nor has its coverage been limited below usual and customary bond or policy limits, by any bonding company or insurance carrier to which it has applied for any such bond or insurance or with which it has carried insurance during the last three years.

**SECTION 6.21    Restrictions on Liens**. No Obligor and no Subsidiary thereof is a party to any material agreement or arrangement or subject to any order, judgment, writ or decree, that either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Lenders on or

DOC ID - 23131345.10

in respect of their Properties to secure the Secured Obligations and the Loan Documents other than provisions in the Loan Documents.

**SECTION 6.22    Location of Business and Offices**.  The jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office of each Borrower, the Holdco Guarantor and each Subsidiary is stated on Item 6.22 of the Disclosure Schedule (or as set forth in a notice delivered pursuant to Section 11.2).

**SECTION 6.23    Maintenance of Properties**.  Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Obligors and their respective Subsidiaries have been maintained, operated and developed in a good and workmanlike manner, in accordance with customary practices in the industry, and in conformity with all Applicable Law and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Obligors and their respective Subsidiaries. Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (a) no Oil and Gas Property of any Obligor or any Subsidiary thereof is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (b) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of any Obligor or any Subsidiary thereof is deviated from the vertical more than the maximum permitted by Applicable Law, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of such Obligor or such Subsidiary. All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by any Obligor or any Subsidiary thereof that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing that are operated by any Obligor or any Subsidiary thereof, in a manner consistent with any Obligor or any Subsidiary past practices (other than those the failure of which to maintain in accordance with this Section 6.23 could not reasonably be expected to have a Material Adverse Effect).

**SECTION 6.24    Gas Imbalances**.    Except as set forth on Item 6.24 of the Disclosure Schedule or on the most recent certificate of the Borrowers delivered in connection with a Reserve Report, on a net basis there are no gas imbalances, take or pay or other prepayments that would require any Obligor or any Subsidiary thereof to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding an equivalent of 1.5 bcf of natural gas (with each barrel of crude oil being deemed equivalent to six mcf of natural gas) in the aggregate.

**SECTION 6.25    Marketing of Production**.  Except for contracts listed and in effect on the date hereof on Item 6.25 of the Disclosure Schedule, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts each Obligor represents that it or its Subsidiaries are receiving a price for all production sold thereunder that is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist that are not cancelable on 60 days' notice or less without penalty or material detriment for the sale of production from any Obligor's or Subsidiary's Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being

exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

**SECTION 6.26      Perfected Liens and Security Interests**.  The Interim Bankruptcy Court Order creates in favor of the Administrative  Agent, for the benefit of the Administrative Agent and the Secured Parties, a legal, valid and enforceable security interest in the Collateral secured thereby.  Upon the entry of the Interim Bankruptcy Court Order, such security interests in and Liens on the Collateral granted thereby shall be perfected, first priority security interests as set forth in the Interim Bankruptcy Court Order subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens to the extent the Collateral is of a type for which entry of the Interim Bankruptcy Court Order would be sufficient to perfect a security interest herein (it being understood and agreed that nothing contained in this representation shall eliminate the requirement of the Obligors to deliver any Collateral Documents required hereunder).

**SECTION 6.27      Administrative Priority; Lien Priority**.

(a)      After the Interim Bankruptcy Court Order Entry Date or the Final Bankruptcy Court Order Entry Date, as the case may be, the Obligations of the Obligors will constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against the Obligors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

(b)      Upon entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, the Lien and security interest of the Administrative Agent on the Collateral shall be a valid and perfected first priority Lien, subject only to Permitted Priority Liens and the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

(c)      On or after the Interim Bankruptcy Court Order Entry Date and prior to the Final Bankruptcy Court Order Entry Date, the Interim Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Administrative Agent, the Required Lenders and the Borrowers, and after the Final Bankruptcy Court Order Entry Date, the Final Bankruptcy Court Order is in full force and effect, is not subject to appeal, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Administrative Agent and the Required Lenders.

**SECTION 6.28      Seismic Data**.  Item 6.28 of the Disclosure Schedule identifies all of the license agreements relating to the performance of seismic exploration on the Oil and Gas Properties ("Seismic Licenses") to which the Obligors are parties.  With respect to the Seismic Licenses:  (i) all Seismic Licenses are in effect and have not expired or terminated; (ii) no Obligor is in material breach or material default, and there has occurred no event, fact, or circumstance (other than conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases), that, with the lapse of time or the giving of notice, or both, would constitute such a material breach or material default by an Obligor with respect to the terms of any Seismic License; and (iii) no Obligor, nor, to the knowledge of any Obligor, any other party to any Seismic License has given written notice of any action to terminate, cancel, rescind, or procure a judicial reformation of any Seismic License or any provision

thereof.  To the extent not prohibited by the terms of the Seismic Licenses or any confidential agreement, all of the transfer fees or similar amounts payable by the Obligors under the terms of the Seismic Licenses upon the consummation of the transactions contemplated herein, or the method of calculating same, are set forth in Item 6.28 of the Disclosure Schedule.

**SECTION 6.29**    **Appointment of Trustee or Examiner; Liquidation**.  No order has been entered in any Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (c) to convert any Chapter 11 Case to a Chapter 7 case or to dismiss any Chapter 11 Case.

**SECTION 6.30**    **Managerial Assistance and Related Persons**.  (a) TSL has offered to make available to each Obligor "significant managerial assistance" (as defined in Section 2(a)(47) of the Investment Company Act of 1940) and, to the extent any Obligor accepts such offer from TSL, the scope, terms and conditions of such significant managerial assistance are set forth in a separate agreement between such Obligor and TSL and (b) it is not a "person" related to TSL as described in Section 57(b) or 57(e) of the Investment Company Act of 1940.

**SECTION 6.31**    **Patriot Act and FCPA**.  To the extent applicable, each Obligor is in compliance with (a) the laws, regulations and Executive Orders administered by OFAC, and (b) the Bank Secrecy Act, as amended by the Patriot Act.  Neither the Obligors nor any of their officers, directors, employees, agents or shareholders acting on the Obligors' behalf shall use the proceeds of the Loans to make any payments, directly or indirectly (including through any third party intermediary), to any Foreign Official in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA").  None of the Obligors nor, to Obligor's knowledge, any Affiliates of any Obligors, is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the Anti-Terrorism Laws.  None of the Obligors, nor, to Obligor's knowledge, any Affiliates of any Obligors, or their respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, is a Blocked Person.  None of the Obligors, nor, to Obligor's knowledge, any of their agents acting in any capacity in connection with the Loans or other transactions hereunder (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any OFAC Sanctions Programs.

# ARTICLE 7
# COVENANTS

**SECTION 7.1**    **Affirmative Covenants**.  Each Obligor agrees with each Lender and the Administrative Agent that until the Termination Date has occurred, the Borrowers and Holdco Guarantor will, and will cause their respective Subsidiaries to, perform or cause to be performed the obligations set forth below.

**SECTION 7.1.1**    Financial Information, Reports, Notices, etc.  The Borrowers will furnish the Administrative Agent and each Lender, copies of the following financial statements, reports, notices and information:

(a)    except for the fiscal months of March, June, September and December of each year, as soon as available and in any event within 30 days after the end of each fiscal month of each Fiscal Year, an unaudited consolidated balance sheet of the Holdco Guarantor and its Subsidiaries, in each case, as of

the end of such fiscal month and consolidated statements of income and cash flows of the Holdco Guarantor and its Subsidiaries for such fiscal month and for the period commencing at the end of the previous fiscal month and ending with the end of such fiscal month, and including (in each case), in comparative form the figures for the corresponding fiscal month in, and year to date portion of, the immediately preceding Fiscal Year, in each case, certified by an Authorized Officer of the Holdco Guarantor and each Borrower as complete and correct in all material respects and as fairly presenting the financial condition, results of operations, and cash flows of the Holdco Guarantor and its Subsidiaries, in each case, in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(b)       as soon as available and in any event within 45 days after the end of each Fiscal Quarter of each Fiscal Year, (A) an unaudited consolidated balance sheet of the Holdco Guarantor and its Subsidiaries, in each case, as of the end of such Fiscal Quarter and consolidated statements of income and cash flows of the Holdco Guarantor and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case), in comparative form the figures for the corresponding Fiscal Quarter in, and year to date portion of, the immediately preceding Fiscal Year, in each case, certified by an Authorized Officer of the Holdco Guarantor and each Borrower as complete and correct in all material respects and as fairly presenting the financial condition, results of operations, and cash flows of the Holdco Guarantor and its Subsidiaries, in each case, in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, (B) a quarterly production summary based on average daily production, (C) a report of the production performance of each of the Obligors' Oil and Gas Properties (broken down by month) with a comparison to the projections in the most recently delivered Budget under Section 7.1.1(e) and the Development Plan, (D) realized price data, (E) an updated lease expiration report, (F) a plugging and abandonment liability report, (G) a drilling activity report with a comparison (with respect to both costs and drilling activity) to (1) the Development Plan, (2) the drilling development reports delivered pursuant to clause (o) below, and (H) copies of any notice or other correspondence related to any Oil and Gas Property of any Obligor to the extent not previously delivered to the Administrative Agent pursuant to any other clause of Section 7.1.1;

(c)       as soon as available and in any event within 90 days after the end of each Fiscal Year, a copy of the consolidated balance sheet of the Holdco Guarantor and its Subsidiaries, and the related consolidated statements of income and cash flows of the Holdco Guarantor and its Subsidiaries for such Fiscal Year, setting forth in comparative form the figures for the immediately preceding Fiscal Year, audited (without any Impermissible Qualification) by independent public accountants acceptable to the Administrative Agent; and stating that, in performing the examination necessary to deliver the audited financial statements of the Holdco Guarantor, no knowledge was obtained of any Event of Default; ;

(d)       concurrently with the delivery of the financial information pursuant to clauses (b) and (c) above, a Compliance Certificate, executed by an Authorized Officer of the Holdco Guarantor and each Borrower, (i) stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Obligors have taken or propose to take with respect thereto), and (ii) stating that no Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate (or, if a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied with Section 7.1.8);

(e)       not later than 5 Business Days prior to the expiration of the most recent 4-week period for the most recently-delivered Budget, deliver to the Administrative Agent and the Lenders an updated Budget for the succeeding 13-week period and an officers' certificate from the Company's chief executive officer and chief financial officer regarding the Budget and containing the certifications set forth in

DOC ID - 23131345.10

Section 5.8, which Budget, upon approval by the Lenders thereof, shall become the Budget for all purposes of the Loan Documents;

(f)       not later than 5:00 p.m. (NY time) on each Tuesday following the end of a Budget Period, a variance report prepared by the CRO, in form and substance acceptable to the Administrative Agent and the Lenders in their sole and absolute discretion (an "Approved Variance Report"), showing comparisons of actual results for the line items "Total Net Receipts", "Total Disbursements", "Total Restructuring and Other One-Time", "Outstanding DIP Revolver" and "Surety Bond Collateral" against such headings in the Budget for such preceding Budget Period, accompanied by a narrative explanation, in detail satisfactory to the Agents and the Lenders in their sole discretion, of each adverse variance in excess of any Permitted Deviation (or in the case of "Surety Bond Collateral", 15%) with respect to any such item during such Budget Period;

(g)       as soon as possible and in any event within five days after any Borrower or any other Obligor obtains knowledge of the occurrence of a Default, a statement of an Authorized Officer of each Borrower setting forth details of such Default and the action that the Borrowers or such Obligor has taken and proposes to take with respect thereto;

(h)       as soon as possible and in any event within five days after any Borrower or any other Obligor obtains knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in Item 6.7 of the Disclosure Schedule, (ii) the commencement of any litigation, action, proceeding or labor controversy of the type and materiality described in Section 6.7 or (iii) the filing or commencement of, or the threat in writing of, any material action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority (including under Environmental Laws or with respect to ERISA matters) against or affecting any Borrower or any Affiliate thereof not previously disclosed in writing to the Lenders, notice thereof and, to the extent the Administrative Agent requests, copies of all documentation relating thereto;

(i)       promptly upon becoming aware of (i) the institution of any steps by any Person to terminate any Pension Plan, (ii) the failure to make a required contribution to any Pension Plan if such failure is sufficient to give rise to a Lien under Section 302(f) of ERISA, (iii) the taking of any action with respect to a Pension Plan that could result in the requirement that any Obligor furnish a bond or other security to the PBGC or such Pension Plan, or (iv) the occurrence of any event with respect to any Pension Plan that could result in the incurrence by any Obligor of any material liability, fine or penalty, notice thereof and copies of all documentation relating thereto;

(j)       promptly upon receipt thereof, copies of all "management letters" or reports submitted to any Borrower or any other Obligor by the independent public accountants referred to in clause (b) in connection with each audit made by such accountants or any other interim or special audit conducted by them;

(k)       promptly (i) if any Obligor obtains knowledge that any Obligor or any Person that owns, directly or indirectly, any Capital Securities of any Obligor, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Anti-Terrorism Laws, the Borrowers will notify the Administrative Agent and (ii) upon the request of any Lender, the Borrowers will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(l)       concurrently with any delivery of financial statements under clause (b) above, or within five days following any change to any existing insurance policy that could reasonably be expected to have a material and adverse effect on the Lenders, a certificate of insurance coverage from each insurer with

respect to the insurance required by <u>Section 7.1.4</u>, in form and substance satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, copies of the applicable policies;

(m)      concurrently with the delivery of any Reserve Report to the Administrative Agent pursuant to <u>Section 2.8</u>, a list of Persons who purchase (or did purchase in the last six months) at least 50% of the Hydrocarbons from the Borrowers and their Subsidiaries;

(n)      concurrently with the delivery of any Reserve Report, the Borrowers shall provide to the Administrative Agent and each Lender, a certificate from the president or chief financial officer of each Borrower certifying that, to the best of his knowledge and in all material respects: (i) the information contained in such Reserve Report and any other information delivered in connection therewith is true and correct, (ii) the Borrowers and their respective Subsidiaries own good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report (in this Section called the "<u>Covered Properties</u>") and are free of all Liens except for Permitted Liens, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments with respect to its Oil and Gas Properties evaluated in such Engineering Report (other than those permitted by the Security Documents) that would require such Borrower or such Subsidiary to deliver hydrocarbons produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of the Covered Properties has been sold since the date of the last Reserve Report except as set forth on an exhibit to the certificate, which certificate shall list all such Covered Properties sold and in such detail as reasonably required by the Administrative Agent, (v) set forth on a schedule attached to the certificate is the present discounted value of all Covered Properties that are part of the Oil and Gas Properties that are encumbered by the Mortgages (the "<u>Mortgaged Properties</u>"), (vi) Oil and Gas Properties that comprise at least the Required Percentages of the total value of the reserves that are included within the Covered Properties are part of the Mortgaged Properties, and (vii) Oil and Gas Properties that comprise at least the Required Percentages of the total value of the Proved Developed Producing Reserves that are included within the Covered Properties are part of the Mortgaged Properties;

(o)      as soon as possible and in any event within 30 days after the end of each calendar month (or in the case of clauses (v) and (vii) below, within 45 days after the end of each Fiscal Quarter of each Fiscal Year), a report setting forth, (i) the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for such calendar month, including, without limitation, transportation, gathering and marketing costs, and all categories of applicable expenses, (ii) capital expenditures for such calendar month, (iii) cash flow for such calendar month, (iv) all Restricted Payments made during such calendar month, in each case, at a level of detail reasonably acceptable to the Administrative Agent, (v) a comparison of the amounts described in the preceding <u>clauses (ii)</u> and <u>(iii)</u> to those projected or budgeted in the most recently delivered Budget under <u>Section 7.1.1(e)</u>, (vi) an internally-prepared aggregate lease operating statement, (vii) a summary report of drilling development activity based on field level operating estimates, (viii) a listing all Accounts of the Obligors as of such day, which shall include the amount and age of each such Account, showing separately those which are more than 30, 60, 90 and 120 days old and a description of all Liens, set-offs, defenses and counterclaims with respect thereto, (ix) a listing of all accounts payable of the Obligors as of each such day which shall include the amount and age of each such account payable, and (x) a listing of the total accrued vendor payables of the Obligors as of each such day, all in detail and in form satisfactory to the Administrative Agent;

(p)        prompt written notice, and in any event within five Business Days, of the occurrence of any material Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a material Casualty Event;

(q)        prompt written notice (and in any event within thirty (30) days prior thereto) of any change (i) in any Borrower or any Guarantor's legal name, (ii) in the location of any Borrower or any Guarantor's chief executive office or principal place of business, (iii) in any Borrower or any Guarantor's identity or organizational structure or in the jurisdiction in which such Person is organized, (iv) in any Borrower or any Guarantor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in any Borrower or any Guarantor's federal taxpayer identification number;

(r)        with the delivery of quarterly financial statements under Section 7.1.1(b) and in any event, no later than 45 days after the end of each Fiscal Quarter, (A) a report setting forth, for each calendar month during the then current fiscal year to date on a production date basis, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month, including, without limitation, transportation, gathering and marketing costs, and all categories of applicable expenses (at a level of detail reasonably acceptable to the Administrative Agent) charged to the Holdco Guarantor or its Subsidiaries under the relevant operating agreements and (B) a list of all Oil and Gas Properties acquired or disposed of by the Obligors during such Fiscal Quarter;

(s)        promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other Organizational Document of any Obligor;

(t)        Promptly after the sending thereof, copies of all written reports given by any Obligor to the holders of the HY Notes, the Collateral Trustee or any official or unofficial creditors' committee in the Chapter 11 Cases;

(u)        as soon as available and in any event within 30 days after the end of each fiscal month of each Fiscal Year commencing with the month ended May 31, 2015, a roll-forward report (in form reasonably satisfactory to the Administrative Agent) of the most recent Reserve Report adjusted for pricing changes and run-off and disposition of assets for the preceding fiscal month; provided, that such report for the fiscal month ended May 31, 2015 shall be delivered on or before July 17, 2015; and

(v)        such other financial and other information as any Lender through the Administrative Agent may from time to time reasonably request (including information and reports in such detail as the Administrative Agent may request with respect to the terms of and information provided pursuant to the Compliance Certificate).

**SECTION 7.1.2**    Maintenance of Existence; Compliance with Laws, etc.  Each Obligor will, and will cause each of its Subsidiaries to, preserve and maintain its and their respective legal existence (except as otherwise permitted by Section 7.2.9), perform in all material respects their obligations under material agreements to which such Obligor or a Subsidiary is a party (except any non-compliance resulting in a default, the enforcement of which is stayed by the Chapter 11 Cases), and comply in all material respects with all Applicable Law, including the payment (before the same become delinquent), of all Taxes (including, without limitation, any Hydrocarbon Taxes), imposed upon such Obligor or its Subsidiaries or upon their property except to the extent being diligently contested in good faith by

appropriate proceedings, so long as (a) adequate reserves in accordance with GAAP have been set aside on the books of such Obligor or its Subsidiaries, as applicable and (b) in the case of Taxes which has or may become a Lien against any of the Collateral, (1) such contest proceedings conclusively operate to stay imposition of any penalty, fine or Lien resulting from the non-payment thereof, or (2) to the extent that compliance therewith or payment thereof or any enforcement action with respect thereto is excused or stayed as a result of the Chapter 11 Cases.  Each Obligor shall take all reasonable and necessary actions to ensure that no portion of the Loans will be used, disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of any of the Anti-Terrorism Laws and shall take all reasonable and necessary action to comply in all material respects with all Anti-Terrorism Laws with respect thereto.

**SECTION 7.1.3**    Operation and Maintenance of Properties.

(a)    Except where failure to do so could not reasonably be expected to have a Material Adverse Effect, each Obligor will, and will cause each of its Subsidiaries to, at its own expense, do or cause to be done all things reasonably necessary to preserve and keep in good repair, working order and efficiency all of its Oil and Gas Properties and other material Properties including, without limitation, all equipment, machinery and facilities, and from time to time will make all the reasonably necessary repairs, renewals and replacements so that at all times the state and condition of its Oil and Gas Properties and other material Properties will be preserved and maintained in accordance with industry standards, except to the extent a portion of such Properties is no longer capable of producing Hydrocarbons in economically reasonable amounts.

(b)    Each Obligor will, and will cause each of its Subsidiaries to, promptly:  (i) pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all material delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties (except to the extent that payment thereof is excused or stayed as a result of the Chapter 11 Cases), and (ii) perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, all material obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties (except any non-compliance resulting in a default, the enforcement of which is stayed by the Chapter 11 Cases).

(c)    Except where failure to do so could not reasonably be expected to cause a Material Adverse Effect, the Obligors will, and will cause their respective Subsidiaries to, operate their respective Oil and Gas Properties and other material Properties or cause or make reasonable and customary efforts to cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance in all material respects with all Applicable Law.

(d)    Notwithstanding the foregoing, to the extent any Obligor or any Subsidiary is not the operator of any Oil and Gas Property (other than to the extent that such operator is an Affiliate of a Borrower), each Obligor will, and will cause each of its Subsidiaries to, use reasonable efforts to cause the operator to comply with this Section 7.1.3.

**SECTION 7.1.4**    Insurance; Casualty Events.  Holdco Guarantor and each Borrower will, and will cause each of its Subsidiaries to maintain: (a) insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as such Obligor and its Subsidiaries; and (b) all worker's compensation, employer's liability insurance or similar insurance as may be required under the laws of any state or jurisdiction in which it may be engaged in business, in

each case to the reasonable satisfaction of the Administrative Agent.  Without limiting the foregoing, all insurance policies required pursuant to this Section shall (i) name the Administrative Agent on behalf of the Secured Parties as lender loss payee (in the case of property insurance) or name the Administrative Agent and other Secured Parties as additional insured (in the case of liability insurance), as applicable, and (ii) provide that no cancellation or modification of the policies will be made without thirty days' prior written notice to the Administrative Agent.  Each Obligor and the Administrative Agent will cause all proceeds of insurance in connection with a Casualty Event to prepay any outstanding Loans or other Secured Obligations to the extent provided in Section 3.1.1(i).  After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon direction from the Majority Lenders, shall, apply all insurance proceeds upon receipt thereof to the Secured Obligations in accordance with Section 4.7.  During any period that any Obligor or any of its Subsidiaries is engaged in the drilling of wells or the construction of any other improvements comprising a part of the Oil and Gas Properties, the Obligors shall obtain and maintain well control insurance (including coverage for costs and redrilling) in such form and amounts as is customary in the industry and worker's compensation insurance covering all persons employed by any of the Obligors, any of their Subsidiaries or any of their agents or subcontractors of any tier in connection with any construction affecting such Oil and Gas Properties, including, without limitation, all agents and employees of the Obligors and the Obligors' subcontractors with respect to whom death or bodily injury claims could be asserted against the Obligors.  Holdco Guarantor and each Borrower will, and will cause each of its Subsidiaries to cause, all insurance agreements to which the Obligors or any of their Subsidiaries is a party (i) to remain in full force and effect through the respective dates set forth in Item 6.20 of the Disclosure Schedule without the payment of additional premiums except as set forth on Item 6.20 of the Disclosure Schedule, and (ii) to not be affected by, or terminate or lapse by reason of, the transactions contemplated by this Agreement.

**SECTION 7.1.5**    Books and Records.    Each Obligor will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP that accurately reflect all of its business affairs and transactions.  Each Obligor will permit, and will cause each of its Subsidiaries to permit, any officer, employee or agent of the Administrative Agent or of any Secured Party to visit and inspect any of the assets of any such Obligor, examine each such Obligor's books of record and accounts, take copies and extracts thereof and therefrom, and discuss the affairs, finances and accounts of each such Obligor with each such Obligor's officers, accountants and auditors, all upon prior written notice to the Borrowers at such reasonable times during such Borrower's or such Obligor's normal business hours (and in a manner so as, to the extent practicable, not to interfere with the normal business operations of the such Borrower or such Obligor) and as often as the Administrative Agent or any Lender may reasonably request; provided that, the Administrative Agent or such Secured Party's shall execute Borrower's customary waiver form in respect of inspections of Borrowers' field assets not located at its corporate offices.    In furtherance of the foregoing, each Obligor executing this Agreement authorizes the Administrative Agent to communicate directly with such Obligor's independent certified public accountants and authorizes and shall instruct those accountants to communicate with the Administrative Agent and each Lender information relating to any Obligor with respect to the business, results of operations and financial condition of any Obligor, all, so long as no Event of Default has occurred and is continuing, upon prior written notice to the Borrowers.  Notwithstanding the foregoing, as long as no Event of Default has occurred and is continuing, the Obligors will not be required to bear the expense of more than one (1) inspection by the Administrative Agent (on behalf of the Secured Parties) during any calendar year; provided that if an Event of Default has occurred and is continuing, the Administrative Agent shall be entitled to conduct more frequent inspections at the expense of the Obligors.

**SECTION 7.1.6**    Environmental Law Covenant.  Each Obligor will, and will cause each of its Subsidiaries to, (a) use and operate all of its and their facilities and properties in material compliance with all Environmental Laws, keep all necessary permits, approvals, certificates, licenses and other authorizations relating to environmental matters in effect and remain in material compliance therewith,

and handle all Hazardous Materials in compliance with all applicable Environmental Laws in all material respects; and (b) promptly notify the Administrative Agent and provide copies upon receipt of all material written claims, complaints, notices or inquiries relating to the condition of its owned, operated and leased facilities and properties in respect of, or as to compliance with, Environmental Laws, and shall promptly resolve any material non-compliance with Environmental Laws and keep its owned property free of any Lien imposed by any Environmental Law.

**SECTION 7.1.7**    Use of Proceeds.    The Borrower will apply the proceeds of the Credit Extensions in accordance with the terms of the Budget (subject to Permitted Deviations), (a) (i) to pay for the fees, costs and expenses incurred in connection with the transactions contemplated hereby and in connection with the Chapter 11 Cases and (ii) to fund working capital of the Obligors (including, without limitation, payments of fees and expenses to professionals under Sections 328 and 331 of the Bankruptcy Code and administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Obligors or otherwise approved by the Bankruptcy Court (and not otherwise prohibited under this Agreement), subject to the priorities set forth in the definition of "Agreed Administrative Expense Priorities" herein) and (b) in the case of the Term Loan made on the Final Facility Effective Date, to repay the Pre-Petition Obligations in full pursuant to the conversion set forth in Section 2.1.2.    Without limiting the foregoing, none of the proceeds of the Loans shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Existing Administrative Agent, Existing Lenders, Administrative Agent or Lenders, including in connection with the validity of the liens granted to the Existing Administrative Agent, Existing Lenders, Administrative Agent or Lenders (whether under the Existing Credit Agreement (or any of the loan documents related thereto), the Loan Documents, or otherwise); provided, that up to $75,000 may be used by any statutory committee of unsecured creditors to investigate the validity and enforceability of the Pre-Petition Obligations and the Liens securing the Pre-Petition Obligations.    No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

**SECTION 7.1.8**    Future Subsidiary Guarantors, Security, etc.    Each Obligor will, and will cause each of its Subsidiaries to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under Applicable Law, or that the Administrative Agent may reasonably request, (a) in order to effectuate the transactions contemplated by the Loan Documents, and (b) in order to grant, preserve, protect and perfect the validity and first priority (subject to Permitted Liens) of the Liens created or intended to be created by the Loan Documents.    Each Obligor will cause any subsequently acquired or organized Subsidiary to execute, within 10 Business Days of its acquisition or organization, a supplement (in form and substance satisfactory to the Administrative Agent) to the Subsidiary Guaranty and each other applicable Loan Document in favor of the Secured Parties.

**SECTION 7.1.9**    Cash Management.    Each Obligor and its Subsidiaries will keep all of their operating accounts, Deposit Accounts and other bank accounts separate from, and will not co-mingle any of its cash or money with, any other Persons (but not including the Borrowers and or any other Subsidiary).    Each Obligor will, and will cause each Subsidiary Guarantor to: (a) maintain no deposit accounts other than (i) Lender Accounts and (ii) other accounts holding funds not in excess of $200,000 in the aggregate at any time, (b) request that such Person's Account Debtors forward payment of all amounts owed by them to such Person to a Lender Account, and (c) deposit, or cause to be deposited, promptly, and in any event no later than the second Business Day after the date of receipt thereof, all of such Person's Collections in a Lender Account.

DOC ID - 23131345.10

**SECTION 7.1.10**    Proceeds Account.    The Mortgages contain an assignment to the Administrative Agent by the applicable mortgagor of all Production and Production Proceeds (in each case as defined in the Mortgages).  Notwithstanding such assignment, such Obligor or such Subsidiary, as applicable, may receive such Production and Production Proceeds until the Administrative Agent shall have given written notice to the contrary upon the occurrence and during the continuance of an Event of Default, as provided in the Mortgages.  Thereafter, during the continuance of an Event of Default, all Production and Production Proceeds shall be paid directly into an account of any Obligor maintained in the name of the Administrative Agent (the "Proceeds Account").  Each Obligor hereby grants to the Administrative Agent for the benefit of the Secured Parties, subject to the prior assignment in favor of the Administrative Agent of such Production and Production Proceeds, a security interest in the Proceeds Account and all proceeds thereof.

**SECTION 7.1.11**    Maintenance of Liens on Properties.    Each Obligor shall cause the Mortgaged Properties to constitute at least ninety-five percent (95%) of the total value of the Proved Reserves of the Obligors and their respective Subsidiaries and at least ninety-five percent (95%) of the total value of the Proved Developed Producing Reserves of the Obligors and their respective Subsidiaries (respectively, the "Required Percentages").  In addition, the Borrowers will furnish to the Administrative Agent title due diligence in form and substance satisfactory to the Administrative Agent and will furnish all other documents and information relating to such properties as the Administrative Agent may reasonably request.

**SECTION 7.1.12**    [Intentionally Omitted].

**SECTION 7.1.13**    Title Information.    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 2.8, the Borrowers will deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall be reasonably satisfied with the status of title to at least 80% (by value) of the Oil and Gas Properties evaluated by such Reserve Report.  If the Borrowers have provided title information for additional Properties under the preceding sentence, the Borrowers shall, within 60 days of notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, either (a) cure any such title defects or exceptions (including defects or exceptions as to priority) that are not permitted by Section 7.2.3 raised by such information, (b) substitute acceptable Mortgaged Properties with no title defects or exceptions except for Permitted Liens having an equivalent value or (c) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall be reasonably satisfied with the status of title to at least 80% (by value) of the Oil and Gas Properties evaluated by such Reserve Report.  If the Borrowers are unable to cure any title defect requested by the Administrative Agent or the Lenders to be cured within the 60-day period or the Borrowers do not comply with the requirements to provide acceptable title information to the Oil and Gas Properties evaluated in the most recent Reserve Report, such default shall not be a Default under Section 9.1.3, but instead the Administrative Agent and/or the Majority Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Lenders.

**SECTION 7.1.14**    Well Drilling.    After the Interim Facility Effective Date and in connection with commencement of drilling operations by any Obligor,

(a) to the extent that no prior title opinion mutually acceptable to the Administrative Agent and the Obligors (a "Prior Title Opinion") confirming Obligor's record title of an interest of no less than the interest set forth on the most recently completed Reserve Report is available for such Oil and Gas

Property, prior to commencement of such operations, the Borrowers will deliver a customary drilling title opinion, in form and substance acceptable to the Administrative Agent in its reasonable credit judgment, that confirms Obligor's record title to such interest covering the Oil and Gas Property subject to such proposed drilling operations, and

(b) to the extent that a Prior Title Opinion is available for such Oil and Gas Property, (i) Borrowers will notify Administrative Agent of the location of such proposed operations at least 10 calendar days prior to the commencement of drilling operations on such Oil and Gas Property and (ii) Borrowers will deliver a customary supplemental drilling title opinion, in form and substance acceptable to the Administrative Agent in its reasonable credit judgment, covering the Oil and Gas Property subject to such proposed drilling operations within 30 days of commencement of operations on such Oil and Gas Property; provided, that if at the end of such 30 days the Borrowers have (i) fully taken all actions within their control to comply with such requirement and (ii) delivered an executed certificate of an Authorized Officer of the Borrowers certifying to such effect, such time period shall be automatically extended an additional 15 days or for any additional periods as may be mutually agreed upon by the Borrowers and the Administrative Agent under reasonable business circumstances.

**SECTION 7.1.15**   Further Assurances.   Each Obligor at its expense will, and will cause each Subsidiary to, subject to the terms of the Bankruptcy Court Orders, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the covenants and agreements of any Obligor or any Subsidiary, as the case may be, in the Loan Documents, including the Notes, if requested, or to further evidence and more fully describe the collateral intended as security for the Indebtedness, or to correct any omissions in this Agreement or the Security Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Documents or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Administrative Agent, in connection therewith.   Each Obligor hereby authorizes the Administrative Agent, upon prior delivery to such Obligor, to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of any Mortgaged Property or any part thereof or any other collateral without the signature of such Obligor or any of its Subsidiary Guarantors where permitted by law.   A carbon, photographic or other reproduction of the Security Documents or any financing statement covering the Mortgaged Property or any part thereof or any other collateral shall be sufficient as a financing statement where permitted by law.   The assurances contemplated by this Section 7.1.15 shall be given under applicable non-bankruptcy law (to the extent not inconsistent with the Bankruptcy Code and the Bankruptcy Court Orders) as well as the Bankruptcy Code, it being the intention of the parties that Administrative Agent may request assurances under applicable non-bankruptcy law, and such request shall be complied with (if otherwise made in good faith by Administrative Agent) whether or not any of the Bankruptcy Court Orders are in force and whether or not dismissal of the Chapter 11 Cases or any other action by the Bankruptcy Court is imminent, likely or threatened.

**SECTION 7.1.16**   Chapter 11 Milestones.   Satisfy, in form and substance satisfactory to the Required Lenders, each of the Chapter 11 Milestones set forth on Schedule III by the date set forth opposite such Chapter 11 Milestone; provided, that if the Chapter 11 Milestones set forth in the Restructuring Support Agreement are amended, modified or waived with the consent of the Requisite Secured Lenders (as defined in the Restructuring Support Agreement), then, subject to Section 11.1, the Administrative Agent and the Required Lenders agree to consent to a corresponding amendment, modification or waiver to the Chapter 11 Milestones set forth in this Agreement.

DOC ID - 23131345.10

**SECTION 7.1.17**    Lenders Conference Calls.  Upon the request of the Administrative Agent and five (5) days prior notice, after delivery of financial statements and other information required to be delivered pursuant to Section 7.1.1(c), the Holdco Guarantor shall cause its chief restructuring officer to participate in a conference call with the Administrative Agent and all Lenders who choose to participate in such conference call during which conference call the chief restructuring officer shall review the financial condition of the Holdco Guarantor and its Subsidiaries and such other matters as the Administrative Agent or any Lender may reasonably request.

**SECTION 7.2**    **Negative Covenants**.  Each Obligor covenants and agrees with each Lender and the Administrative Agent that until the Termination Date has occurred, each Obligor will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below:

**SECTION 7.2.1**    Business Activities.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, engage in any business activity except those business activities engaged in on the date of this Agreement and activities reasonably incidental thereto.  From and after the date hereof, no Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties or businesses not located within the geographical boundaries of the United States or the offshore area in the Gulf of Mexico over which the United States of America asserts jurisdiction or otherwise purchase, make, incur, assume or permit to exist any Investment in any Person not organized under the laws of the United States or one of the States thereof.

**SECTION 7.2.2**    Indebtedness.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    the Secured Obligations;

(b)    Indebtedness existing on the Filing Date, and all interest, fees, charges and related items in respect thereof;

(c)    unsecured Indebtedness incurred in the ordinary course of business of any Obligor or any Subsidiary (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services (including insurance premium payables in the ordinary course), that are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Obligor or such Subsidiary) but excluding any Indebtedness incurred through the borrowing of money (other than in connection with the financing of insurance premiums);

(d)    Indebtedness of any Obligor owing to any other Obligor;

(e)    Indebtedness consisting of sureties or bonds provided to any Governmental Authority or other Person and assuring payment of Contingent Liabilities of any Borrower in connection with the operation of the Oil and Gas Properties, including with respect to plugging, facility removal and abandonment of its Oil and Gas Properties; and

(f)    Contingent Liabilities of any Obligor with respect to Indebtedness of any other Obligor otherwise permitted under this Section 7.2.2;

provided that, no Indebtedness otherwise permitted by clause (c) (other than trade payables incurred in the ordinary course of business and indebtedness that may be incurred after the Filing Date of up to $350,000 in the aggregate in the form of surety bonds (or similar credit support) to support Borrower's plugging and

abandonment obligations in the State of Texas, and limited as set forth in such <u>clause (c)</u>), shall be assumed, created, refinanced or otherwise incurred if a Default has occurred and is then continuing or would result therefrom.

**SECTION 7.2.3**    <u>Liens</u>.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a)    Liens securing payment of the Secured Obligations;

(b)    Liens existing on the Filing Date, but not the extension of coverage thereof to other property or the extension of maturity (other than as a result of the filing of the Chapter 11 Cases), refinancing or other modification of the terms thereof or the increase of the Indebtedness secured thereby;

(c)    Liens in favor of carriers, warehousemen, mechanics, contractors, carriers, laborers, suppliers, operators, non-operators, materialmen and landlords arising by operation of law or granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings (or as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to order of the Bankruptcy Court) and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(d)    Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(e)    judgment Liens in existence for less than 30 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 9.1.6;

(f)    easements, rights-of-way, restrictions, servitudes, permits and other similar encumbrances, and minor defects in the chain of title that are customarily accepted in the oil and gas financing industry, including in respect of surface operations or for pipelines or power lines, none of which secure any monetary obligations and none of which interfere with the ordinary conduct of the business of any Borrower or any Subsidiary or materially detract from the value or use of the Property to which they apply;

(g)    Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings (or as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to order of the Bankruptcy Court) and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(h)    any zoning or similar law or right reserved or vested in any governmental office or agency to control or regulate the use of, or any reservation in the grant from the crown in respect of, any real property;

(i)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution;

69
*Credit Agreement*

(j)    Liens in the form of royalties, overriding royalties, net profits interests, production payments, reversionary interests, calls on production, preferential purchase rights and other burdens on or deductions from the proceeds of production, in each case that are customary in the oil, gas and mineral production business and that do not secure Indebtedness for borrowed money;

(k)    Liens reserved in leases, joint operating agreements, unitization and pooling agreements and orders, farmout agreements, exploration agreements, development agreements, and other similar agreements, in each case that are customary in the oil, gas and mineral production business, that are entered into in the ordinary course of business and that do not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto;

(l)    Liens in favor of the provider of insurance premium financings which encumber cash or letters of credit held by the party, the proceeds of insurance the premiums of which are financed thereby, or prepaid premiums, and which secure the Indebtedness incurred from such provider to pay insurance premiums; and

(m)    prior to the Final Facility Effective Date, the Liens on the Collateral securing the Pre-Petition Obligations.

**SECTION 7.2.4**    Intentionally Omitted.

**SECTION 7.2.5**    Investments.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)    Investments existing on the Interim Facility Effective Date and identified in Item 7.2.5(a) of the Disclosure Schedule;

(b)    cash and Cash Equivalent Investments;

(c)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)    Investments by way of contributions to capital or purchases of Capital Securities by any Obligor in any other Obligor;

(e)    Investments constituting (i) payment intangibles and accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(f)    intercompany loans, advances or guaranties among the Obligors, all to the extent permitted by clause (d) of Section 7.2.2; and

(g)    loans or advances to employees, officers or directors in the ordinary course of business of the Obligors, in each case only as permitted by Applicable Law and the Bankruptcy Court Orders, but in any event not to exceed $500,000 in the aggregate at any time;

<u>provided</u> that, any Investment that when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements.

**SECTION 7.2.6**   <u>Restricted Payments</u>.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment, except Restricted Payments made by an Obligor to any other Obligor.

**SECTION 7.2.7**   <u>Change in Management</u>.   Neither Holdco Guarantor nor any Obligor shall permit any Change of Management.   For purposes of this <u>Section 7.2.7</u>, "Change of Management" shall mean that (i) the president of the Parent ceases to be the president for any reason and a successor reasonably acceptable to the board of directors of Holdco Guarantor is not appointed within sixty (60) days thereafter, or (ii) the chief restructuring officer of the Parent ceases to be chief restructuring officer for any reason and a successor reasonably acceptable to the Administrative Agent is not appointed within thirty (30) days thereafter.

**SECTION 7.2.8**   <u>Issuance of Capital Securities</u>.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, issue any Capital Securities (whether for value or otherwise) to any Person other than in the case of Subsidiaries, to any other Obligor.

**SECTION 7.2.9**   <u>Consolidation, Merger, etc</u>.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge or amalgamate into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof), except that:

(a)      any Borrower or Subsidiary of a Borrower may liquidate or dissolve voluntarily into, and may merge or amalgamate with and into, any Borrower or any other such Subsidiary; <u>provided</u> that, (i) in any merger or amalgamation involving a Borrower, such Borrower is the surviving Person (or if two Borrowers are involved in such merger or amalgamation, one of such Borrowers is the surviving Person), (ii) a Guarantor may only merge with and into another Guarantor or a Borrower, and (iii) no Borrower or any Subsidiary may merge with or into Holdco Guarantor;

(b)      the assets or Capital Securities of any Subsidiary of a Borrower may be purchased or otherwise acquired by any Borrower or any other Subsidiary of a Borrower; <u>provided</u> that, the assets or Capital Securities of any Subsidiary Guarantor that is a Subsidiary of a Borrower may only be purchased or otherwise acquired by any Borrower or another Subsidiary Guarantor of a Borrower); provided, further, that in no event shall any Subsidiary consolidate with or merge with and into any other Subsidiary unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and outstanding interests of Capital Securities (on a fully diluted basis) and other assets of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation in form and substance satisfactory to the Administrative Agent and its counsel, pursuant to such documentation and opinions as shall be necessary in the opinion of the Administrative Agent to create, perfect or maintain the collateral position of the Secured Parties therein; and

(c)      any purchase which constitutes a permitted Investment made in accordance with <u>Section 7.2.5</u>.

**SECTION 7.2.10**   <u>Permitted Dispositions</u>.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, Dispose of any Obligor's or such Subsidiaries' assets (including accounts receivable

and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is:

(a)        inventory or obsolete, damaged, worn out or surplus tangible personal property Disposed of in the ordinary course of its business, or the discounted sale of defaulted or delinquent trade receivables written off or reserved against in the ordinary course of business, or Property (that is not Oil and Gas property) no longer necessary for the business of such Person or Property contemporaneously replaced by Property of at least comparable value and use;

(b)        the sale of Hydrocarbons in the ordinary course of business; and

(c)        Investments made in accordance with Section 7.2.5 and Restricted Payments made in accordance with Section 7.2.6(a).

**SECTION 7.2.11**   Modification of Certain Agreements.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in the Organizational Documents of any Obligor or any Subsidiary thereof, the Contribution Agreement or the Restructuring Support Agreement if, in any case, the result would have an adverse effect on the rights or remedies of any Obligor or any Secured Party.

**SECTION 7.2.12**   Transactions with Affiliates.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract (i) is on fair and reasonable terms no less favorable to such Obligor or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate and that are fully disclosed to the Administrative Agent in writing prior to the consummation thereof, if they involve one or more payments by an Obligor or any of its Subsidiaries in excess of $100,000 for any single transaction or series of related transactions and (ii) is of the kind that would be entered into by a prudent Person in the position of such Obligor or such Subsidiary with a Person that is not one of its Affiliates other than: (a) transactions among the Obligors otherwise permitted hereunder; (b) reasonable fees and compensation (including employee benefits) paid to, an indemnity provided for the benefit of, officers, directors, board members, employees or consultants of any Obligor or any Subsidiary as determined in good faith by such Obligor's board of managers; and (c) the Development Services Agreement between the Borrowers.

**SECTION 7.2.13**   Restrictive Agreements, etc.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, enter into any agreement prohibiting (a) the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired; (b) the ability of any Obligor to amend or otherwise modify any Loan Document; or (c) the ability of any Obligor to make any payments, directly or indirectly, to any other Obligor, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.  The foregoing prohibitions shall not apply to restrictions contained in any Loan Document.

**SECTION 7.2.14**   Sale and Leaseback.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person.

**SECTION 7.2.15**   Intentionally Omitted.

**SECTION 7.2.16**   Pension Plans.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, make any contribution in respect of any Pension Plan in any Fiscal Year in excess of the maximum amount recommended to be contributed by such Obligor and its Subsidiaries as determined by a valuation provided to such Obligor by a nationally recognized agency providing such valuations for purposes of complying with ERISA, the Code and Internal Revenue Service rules and regulations.

**SECTION 7.2.17**   Limitation on Leases.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, create, incur, assume or suffer to exist any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal but excluding Capital Leases, seismic leases and leases of Hydrocarbon Interests and short term operating leases having a term of not more than six months incurred in the ordinary course of business), under leases or lease agreements that would cause the aggregate amount of all payments made by the Obligors and their respective Subsidiaries pursuant to all such leases or lease agreements, including, without limitation, any residual payments at the end of any lease, to exceed $3,000,000 in any period of twelve consecutive calendar months during the life of such leases.

**SECTION 7.2.18**   Subsidiaries.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, create or acquire any additional Subsidiary unless the Borrowers give written notice to the Administrative Agent of such creation or acquisition and complies with Section 7.1.8.  No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, sell, assign or otherwise dispose of any Capital Securities in any of its Subsidiary except in compliance with Section 7.2.10(e).

**SECTION 7.2.19**   Gas Imbalances, Take or Pay or Other Prepayments.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of such Obligor or any of its Subsidiaries that would require such Obligor or such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed, after netting all over-production and all under-production, an equivalent of 1.5 bcf of natural gas (with each barrel of crude oil being deemed equivalent to six mcf of natural gas) in the aggregate.

**SECTION 7.2.20**   Restrictions on Hedging Agreements.   No Obligor shall, nor shall any Obligor permit any of its Subsidiaries to:

(a)       enter into any Hedging Agreements with any Person;

(b)       purchase, assume, or hold a speculative position in any commodities market or futures market or enter into any Hedging Agreement for speculative purposes,

(c)       be party to or otherwise enter into any Hedging Agreement or establish any hedge position which is entered into for reasons other than as a part of its normal business operations as a risk management strategy and/or hedge against changes resulting from market conditions related to the Borrowers' operations;

(d)       purchase any calls other than calls corresponding to an existing permitted collar already executed or being executed in conjunction with such purchased call; or

(e)       be party to or otherwise enter into any Hedging Agreement or establish any hedge position which is secured with collateral or otherwise post cash or margin in respect of its Hedging Agreements.

DOC ID - 23131345.10

**SECTION 7.2.21**   Holdco Guarantor Operations.  Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, the Holdco Guarantor shall not have any assets other than the Capital Securities of the Borrowers and shall not have any operations other than tax, accounting and other general and administrative operations performed as the parent of a consolidated group of companies.

**SECTION 7.2.22**   Anti-Terrorism Laws.  None of the Obligors, nor any of their Affiliates or agents shall:

(i)  conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person,

(ii)  deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the OFAC Sanctions Programs or

(iii)  engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the OFAC Sanctions Programs, the Patriot Act or any other Anti-Terrorism Law.

**SECTION 7.2.23**   No Excess Cash.  None of the Obligors will maintain, or permit any of their respective Subsidiaries to maintain, immediately prior to and for the five (5) days immediately after any drawing of a Revolving Loan, cash and Cash Equivalent Instruments in excess of $8,000,000 in the aggregate.

**SECTION 7.2.24**   Accounting Methods.  The Obligors will not and will not permit any of their Subsidiaries to modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**SECTION 7.2.25**   Payments.  No Obligor shall, or shall permit any of its Subsidiaries to make any payment of principal or interest or otherwise on account of any Indebtedness or trade payable incurred prior to the Filing Date other than in accordance with the Budget (subject to Permitted Deviations).

**SECTION 7.2.26**   Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims.  No Obligor shall, or shall permit any of its Subsidiaries to:

(a)    at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Bankruptcy Court Orders, except for modifications and amendments agreed to by the Administrative Agent and the Required Lenders;

(b)    at any time, suffer to exist a priority for any administrative expense or unsecured claim against any of the Obligors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except as provided in Section 11.32 and for the Carve-Out Expenses having priority of payment over the Obligations to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities";

(c)      at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders in respect of the Collateral, except for Permitted Priority Liens; and

prior to the date on which the Obligations have been paid in full in cash, the Obligors shall not pay any administrative expense claims except (i) Priority Professional Expenses and other payments pursuant to sub-clause (i) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (ii) Obligations due and payable hereunder, and (iii) other administrative expense and professional claims incurred in the ordinary course of the business of the Obligors or their respective Chapter 11 Cases, in each case, to the extent and having the order of priority set forth in the definition of the term "Agreed Administrative Expense Priorities".

## ARTICLE 8
## MULTIPLE BORROWERS

**SECTION 8.1      Obligations Joint and Several and Unconditional**. The obligations of each Borrower under this Agreement and the Notes are joint and several and absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the other Borrowers under this Agreement, the Notes or any other Loan Document (collectively, the "Other Borrower Obligations"), or any substitution, release or exchange of any other guarantee of or security for any of the Other Borrower Obligations, and, to the fullest extent permitted by Applicable Law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Article 8 that the obligations of each Borrower under this Agreement shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not affect the liability of any Borrower under this Agreement, the Notes or any other agreement referred to herein or therein:

(a)      at any time or from time to time, without notice to any Borrower, the time for any performance of or compliance with any of the Other Borrower Obligations shall be extended, or such performance or compliance shall be waived;

(b)      any of the acts mentioned in any of the provisions of this Agreement or the Notes or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)      the maturity of any of the Other Borrower Obligations shall be accelerated, or any of the Other Borrower Obligations shall be modified, supplemented or amended in any respect, or any right under this Agreement or the Notes or any other Loan Document shall be waived or any other guarantee of any of the Other Borrower Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(d)      any Lien granted to, or in favor of, the Administrative Agent or any Lender, Swing Line Lender or Lenders as security for any of the Other Borrower Obligations shall fail to be perfected.

Each Borrower hereby expressly waives, with respect to the Other Borrower Obligations diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent, the Swing Line Lender or any Lender exhaust any right, power or remedy or proceed against the other Borrowers under this Agreement or the Notes or any other Loan Document, or against any other Person under any other guarantee of, or security for, any of the Other Borrower Obligations.

DOC ID - 23131345.10

SECTION 8.2    **Reinstatement**.  The obligations of a Borrower under this Agreement, the Notes or any other agreement or instrument referred to herein or therein, shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the other Borrowers in respect of the Other Borrower Obligations is rescinded or must be otherwise restored by any holder of any of the Other Borrower Obligations, whether as a result of any proceedings in a bankruptcy or reorganization or otherwise, and each Borrower agrees that it will indemnify the Administrative Agent, the Swing Line Lender and each Lender on demand for all reasonable costs and expenses (including fees of counsel) incurred by the Administrative Agent, the Swing Line Lender or such Lender in connection with such rescission or restoration.

SECTION 8.3    **Subrogation**.  Each Borrower hereby agrees that until the Termination Date, it shall not exercise any right or remedy arising by reason of any performance by it of any of its obligations hereunder, whether by subrogation or otherwise, against the Other Borrower Obligations or any security for any of the Other Borrower Obligations.

SECTION 8.4    **Remedies**.  Each Borrower agrees that, as between such Borrower and the Secured Parties, (a) the obligations of the other Borrowers under this Agreement and the Notes may be declared to be forthwith due and payable as provided in Article 9 hereof (and shall be deemed to have become automatically due and payable in the circumstances provided in Article 9) notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from being deemed to have become automatically due and payable) and (b) such obligations (whether or not due and payable by such other Borrowers) shall forthwith become due and payable by such Borrower.

SECTION 8.5    **Limitation on Obligations**.  Notwithstanding any provision to the contrary contained herein, in any of the Notes or any other Loan Document, to the extent the joint obligations of the Borrowers would be adjudicated to be invalid or unenforceable for any reason (including because of applicable state or federal law relating to fraudulent conveyances or transfers) then the aggregate obligations of each Borrower hereunder and under the Notes and all other agreements and instruments referred to herein or therein shall be limited to the maximum amount that is permissible under Applicable Law (whether federal or state and including, with limitation, any bankruptcy, insolvency, reorganization, moratorium, or similar law affecting creditors' rights generally).

SECTION 8.6    **Borrowers' Representative; Binding on All Borrowers**.  Each Borrower hereby designates each other Borrower as its representative and agent on its behalf for the purposes of issuing Borrowing Requests, Issuance Requests, Continuation/Conversion Notices, delivering Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options and for the purposes of giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions on behalf of any Borrower or Borrowers under the Loan Documents.  Each Borrower Representative hereby accepts such appointments.  Unless otherwise expressly required hereunder, the Administrative Agent, the Swing Line Lender and each Lender may regard any notice or other communication pursuant to any Loan Document from a Borrower as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or Borrowers hereunder to any single Borrower on behalf of all Borrowers; provided that, the failure to give such notice to any Borrower or all Borrowers shall not release or diminish or otherwise affect in any way the Borrowers' obligation to pay any amounts owing under this Agreement or any other Loan Document or to otherwise comply with terms hereof or thereof.  Each Borrower agrees that each action taken or omitted to be taken by, and any notices and consents received by any Borrower, and any notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by any other Borrower shall be deemed for all

purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

# ARTICLE 9
# EVENTS OF DEFAULT

**SECTION 9.1**    <u>Listing of Events of Default</u>.  Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

**SECTION 9.1.1**    <u>Non-Payment of Obligations</u>.  The Borrowers shall default in the payment or prepayment when due of (a) any principal of any Loan; or (b) any interest, any fee described in <u>Article 3</u> or any other monetary Obligation (other than principal of any Loan), and such default shall continue unremedied for a period of three Business Days after such amount was due.

**SECTION 9.1.2**    <u>Breach of Warranty</u>.  Any representation or warranty of any Obligor made or deemed to be made in any Loan Document (including any certificates delivered pursuant to <u>Article 5</u>) is or shall be incorrect when made or deemed to have been made in any material respect.

**SECTION 9.1.3**    <u>Non-Performance of Certain Covenants and Obligations</u>.  Any Obligor shall default in the due performance or observance of any of its obligations under <u>Section 2.8</u>, <u>Section 7.1.1(a)</u>, <u>Section 7.1.1(b)</u>, <u>Section 7.1.1(c)</u>, <u>Section 7.1.1(d)</u>, <u>Section 7.1.1(e)</u>, <u>Section 7.1.1(f)</u>, <u>Section 7.1.1(o)</u>, <u>Section 7.1.1(r)</u>, <u>Section 7.1.1(t)</u>, <u>Section 7.1.2</u>, <u>Section 7.1.4</u>, <u>Section 7.1.7</u>, <u>Section 7.1.9</u>, <u>Section 7.1.11</u>, <u>Section 7.1.13</u>, <u>Section 7.1.14</u>, <u>Section 7.1.16</u>, <u>Section 7.1.17</u>,  or <u>Section 7.2</u>, or any Guarantor shall default under any payment or guarantee obligation under a Guaranty.

**SECTION 9.1.4**    <u>Non-Performance of Other Covenants and Obligations</u>.  Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, except as set forth in <u>Section 9.1.1</u>, <u>Section 9.1.2</u> and <u>Section 9.1.3</u>, and such default, if capable of being remedied, shall continue unremedied for a period of (i) 10 days in the case of any agreement contained in <u>Section 7.1.1</u> (other than <u>Section 7.1.1(a)</u>, <u>Section 7.1.1(b)</u>, <u>Section 7.1.1(c)</u>, <u>Section 7.1.1(d)</u>, <u>Section 7.1.1(e)</u>, <u>Section 7.1.1(f)</u>, <u>Section 7.1.1(o)</u>, <u>Section 7.1.1(r)</u>, and <u>Section 7.1.1(t)</u>) or (ii) in all other cases, 30 days after the earlier of (a) the date on which any Obligor has knowledge of such Default or (b) notice thereof given to the Borrowers by the Administrative Agent or any Lender.

**SECTION 9.1.5**    [Intentionally Omitted].

**SECTION 9.1.6**    <u>Judgments</u>.  Any judgment or order for the payment of money individually or in the aggregate in excess of $5,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible)) shall be rendered against any Obligor or any of its Subsidiaries and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

**SECTION 9.1.7**    <u>Pension Plans</u>.  Any of the following events shall occur with respect to any Pension Plan: (a) the institution of any steps by any Obligor, any member of its Controlled Group or any other Person to terminate a Pension Plan if, as a result of such termination, any Obligor or any such member could be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan, in excess of $2,500,000; or (b) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.

**SECTION 9.1.8**    <u>Change in Control</u>.  Any Change in Control shall occur.

**SECTION 9.1.9**     [Intentionally Omitted].

**SECTION 9.1.10**     Impairment of Security, etc.  (a)  Any Obligor shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Administrative and/or the Lenders, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (b) any Lien or security interest created by this Agreement, any of the other Loan Documents or the Bankruptcy Court Orders shall, for any reason, cease to be valid or (c) any action is commenced by any Obligor which contests the validity, perfection or enforceability of any of the Liens and security interests of the Administrative Agent and/or the Lenders created by any of the Bankruptcy Court Orders, this Agreement, or any of the other Loan Documents,

**SECTION 9.1.11**     Appointment of Trustee.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Obligor shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (a) a trustee under Section 1104, or (b) an examiner or other responsible person or officer with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

**SECTION 9.1.12**     Dissolution.  Any order, judgment or decree shall be entered against any Obligor decreeing the dissolution or split up of such Obligor and such order shall remain undischarged or unstayed for a period in excess of thirty days.

**SECTION 9.1.13**     Proceedings.  The indictment of any Obligor or any of its Subsidiaries under any criminal statute, or commencement of criminal or civil proceedings against any Obligor or any of its Subsidiaries pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person.

**SECTION 9.1.14**     Cessation of Business.  (i) Any Obligor or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business for more than 15 days; (ii) any other cessation of a substantial part of the business of the Holdco Guarantor or any of its Subsidiaries for a period which materially and adversely affects the Holdco Guarantor or any of its Subsidiaries; or (iii) any material damage to, or loss, theft or destruction of, any Collateral whether or not insured or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 15 consecutive days, the cessation or substantial curtailment of revenue producing activities at a real property.

**SECTION 9.1.15**     Intentionally Omitted.

**SECTION 9.1.16**     Change in Management.  (i) Any president of the Parent appointed ceases to be the president for any reason and a successor reasonably acceptable to the board of directors of the Holdco Guarantor is not appointed within sixty (60) days thereafter or (ii) any chief restructuring officer of the Parent appointed ceases to be the chief restructuring officer for any reason and a successor reasonably acceptable to the Administrative Agent is not appointed within thirty (30) days thereafter.

**SECTION 9.1.17**     Conversion to Chapter 7.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case.

**SECTION 9.1.18**     Confirmation of Plan of Reorganization.  An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases which does not (a) contain a provision for termination of the Commitments and indefeasible payment in full in

cash of all Obligations of the Obligors hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (b) provide for the continuation of the Liens and security interests granted to the Administrative Agent for the benefit of the Administrative Agent and the Lenders and priorities until such plan effective date.

**SECTION 9.1.19**  Dismissal of Chapter 11 Cases.  An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations of the Obligors hereunder and under the other Loan Documents upon entry thereof.

**SECTION 9.1.20**  Certain Court Orders.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the Lenders, (a) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (b) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Obligors equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except for allowed administrative expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", or (c) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien.

**SECTION 9.1.21**  Relief From Automatic Stay.  An order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Obligor with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate.

**SECTION 9.1.22**  Application for Orders.  An application for (a) any of the orders described in Section 9.1.10, Section 9.1.11, and Sections 9.1.17 through Section 9.2.21 above shall be made (i) by a Person other than an Obligor and such application is not contested by Obligors in good faith or (ii) by an Obligor, (b) an order for the use of cash collateral without the prior written consent of the Required Lenders is made, or (c) an order for the use of Collateral (or the obtaining of financing or loans, secured by liens that are senior, pari passu, or junior to the Administrative Agent's Liens on Collateral) without the prior written consent of the Required Lenders is made.

**SECTION 9.1.23**  Sale of Business.  The determination of any Obligor, whether by vote of such Person's board of directors or otherwise, to liquidate all or substantially all of such Person's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing, in each case, other than in connection with a sale, the Net Cash Proceeds of which will repay all the Obligations indefeasibly in full upon the consummation of such sale(s).

**SECTION 9.1.24**  Material Adverse Deviation.  A Material Adverse Deviation shall have occurred and, solely in the case of the first Budget Period tested during the Interim Period, the Administrative Agent has provided three Business Days' notice to the Borrowers of the occurrence of such Material Adverse Deviation.

**SECTION 9.1.25**  Loss of CRO.  The CRO shall (a) resign or, except as provided in clause (b) below), otherwise cease to act as the chief restructuring officer of the Obligors and their Subsidiaries in the same capacity and with the same responsibilities as on the Interim Facility Effective Date, and a successor acceptable to Required Lenders is not appointed on terms (including with respect to start date) reasonably acceptable to the Required Lenders within 30 days of such cessation of involvement, or (b) be terminated by the Obligors.

**SECTION 9.1.26**    Contribution Agreement and Restructuring Support Agreement.    The Contribution Agreement and/or the Restructuring Support Agreement shall have been terminated for any reason.

**SECTION 9.2**    **Action if Event of Default**.    If any Event of Default shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the direction of the Majority Lenders, shall by notice to the Borrowers declare all or any portion of the outstanding principal amount of the Loans and other Secured Obligations to be due and payable and/or the Commitments (if not theretofore terminated) to be terminated, whereupon the full unpaid amount of such Loans and other Secured Obligations that shall be so declared due and payable shall be and become immediately due and payable, without further order of, or application to, the Bankruptcy Court (except as otherwise expressly provided in the Bankruptcy Court Orders), notice, demand or presentment, and/or, as the case may be, the Commitments shall terminate.    Furthermore, the Administrative Agent shall at the request of, or may with the consent of, the Majority Lenders (subject to the delivery of three Business Days' notice to the Borrowers, any official committee of unsecured creditors and the U.S. Trustee, without application or motion to, or further orders from, the Bankruptcy Court or any other court, and without interference from any Obligor or any other party in interest, set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of the Administrative Agent and the Lenders) proceed to enforce its rights and remedies under the Security Documents, the Guaranties, any other Loan Document, and applicable law (including, but not limited to, the Bankruptcy Code and the Uniform Commercial Code), subject only to satisfaction of any notice requirement set forth in the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as applicable, for the ratable benefit of itself and the other Secured Parties.

## ARTICLE 10
## THE ADMINISTRATIVE AGENT

**SECTION 10.1**    **Actions**.    Each Lender hereby appoints TSL as its Administrative Agent under and for purposes of each Loan Document.    Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and to appoint other agents or sub-agents to assist in its actions under the Loan Documents and, in the absence of other written instructions from the Majority Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, except as otherwise provided in this Section or as otherwise advised by counsel in order to avoid contravention of Applicable Law), to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents).

**SECTION 10.2**    **Funding Reliance, etc.**    Unless the Administrative Agent shall have been notified in writing by any Lender by 3:00 p.m. on the Business Day prior to a Borrowing that such Lender will not make available the amount that would constitute its Percentage of such Borrowing on the date specified therefor, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent and, in reliance upon such assumption, make available to the Borrowers a corresponding amount.    If and to the extent that such Lender shall not have made such amount available to the Administrative Agent, such Lender and the Borrowers severally agree to repay the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date the Administrative Agent made such amount available to the Borrowers to the date such amount is repaid to the Administrative Agent, at the interest rate applicable at the time to Loans comprising such Borrowing (in the case of the Borrowers) and (in the case of a Lender), at the Overnight Rate (for the first two Business Days after which such amount has not been repaid), and thereafter at the interest rate applicable to Loans comprising such Borrowing.

DOC ID - 23131345.10

**SECTION 10.3      Indemnity; Exculpation**.  Neither the Administrative Agent nor any of its directors, officers, employees or agents (each, an "Agent Indemnified Party") shall be liable to any other Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence (as determined by a court of competent jurisdiction in a final and non-appealable judgment), nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Obligor of its Secured Obligations.  Any such inquiry that may be made by the Administrative Agent shall not obligate any of them to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing that it believes to be genuine and to have been presented by a proper Person.  EACH LENDER HEREBY INDEMNIFIES (WHICH INDEMNITY SHALL SURVIVE ANY TERMINATION OF THIS AGREEMENT) EACH AGENT INDEMNIFIED PARTY, PRO RATA ACCORDING TO SUCH LENDER'S PROPORTIONATE TOTAL EXPOSURE AMOUNT, FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, CLAIMS, COSTS OR EXPENSES OF ANY KIND OR NATURE WHATSOEVER WHICH MAY AT ANY TIME BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST, SUCH AGENT INDEMNIFIED PARTY IN ANY WAY RELATING TO OR ARISING OUT OF ANY LOAN DOCUMENT, (INCLUDING REASONABLE ATTORNEYS' FEES), AND AS TO WHICH SUCH AGENT INDEMNIFIED PARTY, IS NOT REIMBURSED BY THE BORROWERS; PROVIDED THAT, NO LENDER SHALL BE LIABLE FOR THE PAYMENT OF ANY PORTION OF SUCH LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, CLAIMS, COSTS OR EXPENSES THAT ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL PROCEEDING TO HAVE RESULTED FROM SUCH AGENT INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  <u>NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, AND SPECIFICALLY WITH REFERENCE TO THE PROVISIONS OF SECTIONS 10.1, 10.3, 10.5 AND 10.10, IT IS THE INTENTION OF THE PARTIES HERETO THAT EACH AGENT INDEMNIFIED PARTY BE REIMBURSED OR INDEMNIFIED IN THE CASE OF, AND NOT BE LIABLE FOR, ITS OWN NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS SET FORTH ABOVE), REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL</u>.  THE ADMINISTRATIVE AGENT SHALL NOT BE REQUIRED TO TAKE ANY ACTION UNDER ANY LOAN DOCUMENT, OR TO PROSECUTE OR DEFEND ANY SUIT IN RESPECT OF ANY LOAN DOCUMENT, UNLESS IT IS INDEMNIFIED HEREUNDER TO ITS SATISFACTION.  IF ANY INDEMNITY IN FAVOR OF AN AGENT INDEMNIFIED PARTY SHALL BE OR BECOME, IN THE ADMINISTRATIVE AGENT'S DETERMINATION, INADEQUATE, THE ADMINISTRATIVE AGENT MAY CALL FOR ADDITIONAL INDEMNIFICATION FROM THE LENDERS AND CEASE TO DO THE ACTS INDEMNIFIED AGAINST HEREUNDER UNTIL SUCH ADDITIONAL INDEMNITY IS GIVEN.  TO THE EXTENT THAT THE INDEMNITY OBLIGATIONS PROVIDED IN THIS SECTION 10.3 ARE FOR THE BENEFIT OF THE ADMINISTRATIVE AGENT AS THE NAMED SECURED PARTY UNDER THE LIENS GRANTED UNDER THE SECURITY DOCUMENTS, EACH LENDER HEREBY AGREES THAT IF SUCH LENDER CEASES TO BE A LENDER HEREUNDER

**SECTION 10.4      Successor**.  The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrowers and all Lenders.  If the Administrative Agent at any time shall resign, the Majority Lenders (and if no Default has occurred and is continuing, with the consent of the Borrowers) may appoint another Lender as a successor Administrative Agent that shall thereupon become the Administrative Agent hereunder.  If no successor Administrative Agent shall have been so appointed by the Majority Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be one of the Lenders or

a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution or trust company, and having a combined capital and surplus of at least $250,000,000; provided that, if such retiring Administrative Agent is unable to find a commercial banking institution that is willing to accept such appointment and that meets the qualifications set forth in above, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall be entitled to receive from the retiring Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and Section 11.3 and Section 11.4 shall continue to inure to its benefit.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.  Any resignation by TSL as Administrative Agent pursuant to this Section shall also constitute its resignation as Swing Line Lender.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Swing Line Lender, and (ii) the retiring Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents.

**SECTION 10.5    Credit Extensions by the Administrative Agent**.  The Administrative Agent shall have the same rights and powers with respect to (a) the Credit Extensions made by it or any of its Affiliates, and (b) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not an Agent.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrowers or any Subsidiary or Affiliate of a Borrower as if such Agent were not an Agent hereunder.

**SECTION 10.6    Credit Decisions**.  Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Obligors, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend its Commitments.  Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.  In this regard, each Lender acknowledges that Schulte Roth & Zabel LLP is acting in this transaction as special counsel to the Administrative Agent only.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

**SECTION 10.7    Copies, etc.**  The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Obligors pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrowers).  The Administrative Agent will distribute to each Lender each document or instrument received (other than Borrowing Requests, Issuance Requests and other notices delivered pursuant to

Articles 2 and 3) for its account and copies of all other communications received by the Administrative Agent from the Borrowers for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

SECTION 10.8    **Reliance by the Administrative Agent**.  The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Majority Lenders or all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.

SECTION 10.9    **Defaults**.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless it has received a written notice from a Secured Party or the Borrowers specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to Section 10.1) take such action with respect to such Default as shall be directed by the Majority Lenders; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Majority Lenders or all Lenders.

SECTION 10.10    **Posting of Approved Electronic Communications**.  (a)  In addition to providing the Administrative Agent with all originals or copies of all Communications (as defined below) in the manner specified by Section 11.2, each Obligor hereby also agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to any Obligor, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Section 7.1.1, including all notices, requests, financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.

(b)    Each Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on *Intralinks* or a substantially similar electronic transmission system (the "Platform").

(c)    THE PLATFORM IS PROVIDED "**AS IS**" AND "**AS AVAILABLE**".  THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE

DOC ID - 23131345.10

BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  **IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

(d)     Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

(e)     Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

**SECTION 10.11     [Intentionally Omitted]**.

**SECTION 10.12     Security Matters; Authority of Administrative Agent to Release Collateral**.  (a)  Each Lender and other Secured Party (by their acceptance of the benefits of any Lien encumbering Collateral) acknowledges and agrees that the Administrative Agent has entered into the Security Documents on behalf of itself and the Secured Parties, and the Secured Parties hereby agree to be bound by the terms of such Security Documents, acknowledge receipt of copies of such Security Documents and consent to the rights, powers, remedies, indemnities and exculpations given to the Administrative Agent thereunder.  All rights, powers and remedies available to the Administrative Agent and the Secured Parties with respect to the Collateral, or otherwise pursuant to the Security Documents, shall be subject to the provisions of such Security Documents.  In the event of any conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of such Security Documents, the terms and provisions of such Security Documents shall govern and control except that this Agreement shall govern and control the rights, powers, duties, immunities and indemnities of the Administrative Agent.

(b)     Each Lender and other Secured Party (by their acceptance of the benefits of any Lien encumbering the Collateral) hereby authorizes the Administrative Agent to release any collateral that is permitted to be Disposed or released pursuant to the terms of the Loan Documents.  Each Lender hereby authorizes the Administrative Agent to execute and deliver to the Borrowers, at the Borrowers' sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrowers in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of this Agreement or is otherwise authorized by the terms of the Loan Documents; in that event, Administrative Agent shall, at the Borrowers' sole cost and expense, execute and deliver such releases, terminations, assignments and other documents as may be reasonably requested by any Borrower.

DOC ID - 23131345.10

(c)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrowers, the Holdco Guarantor, the Administrative Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or any sale of the Collateral in a case under the Bankruptcy Code, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Majority Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale.

(d)    Each Lender hereby grants to the Administrative Agent all requisite authority to enter into or otherwise become bound by, and to perform its obligations and exercise its rights and remedies under and in accordance with the terms of, the Restructuring Support Agreement and to bind the Lenders thereto by the Administrative Agent's entering into or otherwise becoming bound thereby, and no further consent or approval on the part of any Lender is or will be required in connection with the performance by the Administrative Agent of the Restructuring Support Agreement.

SECTION 10.13    **The Administrative Agent**.  The Administrative Agent shall not have or be deemed to have any fiduciary relationship with any other Lender or any Obligor.  Each Lender acknowledges that it has not relied, and will not rely, on the Administrative Agent in deciding to enter into this Agreement and each other Loan Document to which it is a party or in taking or not taking action hereunder or thereunder.

## ARTICLE 11
## MISCELLANEOUS; SECURITY AND ADMINISTRATIVE PRIORITY

SECTION 11.1    **Waivers, Amendments, etc.**  The provisions of each Loan Document, which shall be modified only in accordance with its respective terms) may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrowers and the Majority Lenders; provided, that no other such amendment, modification or waiver shall:modify clause (b) of Section 4.7, Section 4.8 (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

(b)    increase the aggregate amount of any Credit Extensions required to be made by a Lender pursuant to its Commitments, extend the final Commitment Termination Date of Credit Extensions made (or participated in) by a Lender or extend the Final Maturity Date for any Lender's Loan, in each case without the consent of such Lender (it being agreed, however, that any vote to rescind any acceleration made pursuant to Section 9.2 of amounts owing with respect to the Loans and other Secured Obligations shall only require the vote of the Majority Lenders);

(c)    reduce, the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in Article 3 payable to any Lender or extend the date on which interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender (provided that, the vote of Majority Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under Section 3.2.2);

(d)    reduce the percentage set forth in the definition of "Required Lenders" or "Majority Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders;

(e)    except as otherwise expressly provided in a Loan Document, release (i) any Borrower from its Obligations under the Loan Documents or any Guarantor from its Obligations under a Guaranty or (ii) all or substantially all of the collateral under the Loan Documents, in each case without the consent of all Lenders;

(f)    affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) or the Swing Line Lender (in its capacity as Swing Line Lender) unless consented to by the Administrative Agent or the Swing Line Lender, as the case may be; or

(g)    modify, waive, release or subordinate the Liens securing the Obligations or the superpriority claim status of the Obligations (except, in each case, as permitted in this Agreement and the Loan Documents).

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 11.2    **Notices; Time**.  All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Obligors, the Administrative Agent, Swing Line Lender or a Lender, to the applicable Person at its address or facsimile number set forth on Schedule II hereto or set forth in the Lender Assignment Agreement or in the Administrative Questionnaire for a particular Lender, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.  Electronic mail and Internet and intranet websites may be used only to distribute routine communications by the Administrative Agent to the Lender, such as financial statements and other information as provided in Section 7.1.1 and for the distribution and execution of Loan Documents for execution by the parties thereto, and may not be used for any other purpose.  The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by facsimile (or electronic transmission) shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document.  Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York City time.

Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Obligors or any other Person to serve upon the Administrative Agent and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Administrative Agent and the Lenders pursuant to the Bankruptcy Code.

SECTION 11.3    **Payment of Costs and Expenses**.  The Borrowers agree to pay within 10 days after demand all reasonable out-of-pocket expenses of the Administrative Agent (including the

reasonable fees and out-of-pocket expenses of Schulte Roth & Zabel LLP, counsel to the Administrative Agent, and of local counsel (including, without limitation, Landis Rath & Cobb LLP), if any, who may be retained by or on behalf of the Administrative Agent and including, without limitation, the reasonable fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, including all *Intralinks* expenses, and the cost of environmental audits and surveys and appraisals) in connection with: (a) the negotiation, preparation, execution and delivery of each Loan Document, including schedules and exhibits, and any amendments, waivers, consents, supplements or other modifications to any Loan Document as may from time to time hereafter be required, whether or not the transactions contemplated hereby are consummated; and (b) the filing or recording of any Loan Document (including the Filing Statements) and all amendments, supplements, amendment and restatements and other modifications to any thereof, searches made following the Interim Facility Effective Date in jurisdictions where Filing Statements (or other documents evidencing Liens in favor of the Secured Parties) have been recorded and any and all other documents or instruments of further assurance required to be filed or recorded by the terms of any Loan Document; and (c) the preparation and review of the form of any document or instrument relevant to any Loan Document.   The Borrowers further agree to pay, and to save each Secured Party harmless from all liability for, any stamp or other taxes that may be payable in connection with the execution or delivery of each Loan Document, the Credit Extensions or the issuance of the Notes.  The Borrowers also agree to reimburse the Secured Parties upon demand for all out-of-pocket expenses (including reasonable attorneys' fees and legal expenses of counsel and settlement costs) incurred in connection with (x) the negotiation of any restructuring or "work-out" with any Borrower, whether or not consummated, of any Secured Obligations and (y) the enforcement of any Secured Obligations.

**SECTION 11.4    Indemnification**.  In consideration of the execution and delivery of this Agreement by each Secured Party, each Borrower hereby indemnifies, exonerates and holds each Secured Party and each of their respective officers, directors, employees and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all actions, causes of action, suits, losses, costs, liabilities and damages, and expenses incurred in connection therewith (irrespective of whether any such Indemnified Party is a party to the action for which indemnification hereunder is sought), including reasonable attorneys' fees and disbursements, whether incurred in connection with actions between or among the parties hereto or the parties hereto and third parties (collectively, the "Indemnified Liabilities"), incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to

(a)    ANY TRANSACTION FINANCED OR TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY CREDIT EXTENSION, INCLUDING ALL INDEMNIFIED LIABILITIES ARISING IN CONNECTION WITH THE TRANSACTION;

(b)    THE ENTERING INTO AND PERFORMANCE OF ANY LOAN DOCUMENT BY ANY OF THE INDEMNIFIED PARTIES (INCLUDING ANY ACTION BROUGHT BY OR ON BEHALF OF ANY BORROWER AS THE RESULT OF ANY DETERMINATION BY THE MAJORITY LENDERS PURSUANT TO ARTICLE 5 NOT TO FUND ANY CREDIT EXTENSION, PROVIDED THAT, ANY SUCH ACTION IS RESOLVED IN FAVOR OF SUCH INDEMNIFIED PARTY);

(c)    THE LOAN DOCUMENTS, THE CREDIT EXTENSIONS AND THE EXTENSION OF THE COMMITMENTS, THE FAILURE OF ANY OBLIGOR TO COMPLY WITH THE TERMS OF THE LOAN DOCUMENTS OR APPLICABLE LAW, THE INACCURACY OF ANY REPRESENTATION OR WARRANTY OF ANY OBLIGOR SET FORTH IN THE LOAN DOCUMENTS OR IN A CERTIFICATE, INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION THEREWITH, AND THE USE BY ANY OBLIGOR OF THE PROCEEDS OF ANY CREDIT EXTENSION;

(d) ANY INVESTIGATION, LITIGATION OR PROCEEDING RELATED TO ANY ACQUISITION OR PROPOSED ACQUISITION BY ANY OBLIGOR OR ANY SUBSIDIARY THEREOF OF ALL OR ANY PORTION OF THE CAPITAL SECURITIES OR ASSETS OF ANY PERSON, WHETHER OR NOT AN INDEMNIFIED PARTY IS PARTY THERETO;

(e) ANY INVESTIGATION, LITIGATION OR PROCEEDING RELATED TO ANY ENVIRONMENTAL CLEANUP, AUDIT, COMPLIANCE OR OTHER MATTER RELATING TO THE PROTECTION OF THE ENVIRONMENT OR THE RELEASE BY ANY OBLIGOR OR ANY SUBSIDIARY THEREOF OF ANY HAZARDOUS MATERIAL;

(f) THE PRESENCE ON OR UNDER, OR THE ESCAPE, SEEPAGE, LEAKAGE, SPILLAGE, DISCHARGE, EMISSION, DISCHARGING OR RELEASES FROM, ANY REAL PROPERTY OWNED OR OPERATED BY ANY OBLIGOR OR ANY SUBSIDIARY THEREOF OF ANY HAZARDOUS MATERIAL (INCLUDING ANY LOSSES, LIABILITIES, DAMAGES, INJURIES, COSTS, EXPENSES OR CLAIMS ASSERTED OR ARISING UNDER ANY ENVIRONMENTAL LAW), REGARDLESS OF WHETHER CAUSED BY, OR WITHIN THE CONTROL OF, SUCH OBLIGOR OR SUBSIDIARY; OR

(g) EACH LENDER'S ENVIRONMENTAL LIABILITY (THE INDEMNIFICATION HEREIN SHALL SURVIVE REPAYMENT OF THE OBLIGATIONS AND ANY TRANSFER OF THE PROPERTY OF ANY OBLIGOR OR ITS SUBSIDIARIES BY FORECLOSURE OR BY A DEED IN LIEU OF FORECLOSURE FOR ANY LENDER'S ENVIRONMENTAL LIABILITY, REGARDLESS OF WHETHER CAUSED BY, OR WITHIN THE CONTROL OF, SUCH OBLIGOR OR SUCH SUBSIDIARY);

<u>PROVIDED</u> THAT NO BORROWER SHALL BE REQUIRED TO INDEMNIFY ANY INDEMNIFIED PARTY TO THE EXTENT THE APPLICABLE INDEMNIFIED LIABILITY ARISES BY REASON OF SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT). EACH OBLIGOR AND ITS SUCCESSORS AND ASSIGNS HEREBY WAIVE, RELEASE AND AGREE NOT TO MAKE ANY CLAIM OR BRING ANY COST RECOVERY ACTION AGAINST, ANY INDEMNIFIED PARTY UNDER CERCLA OR ANY STATE, PROVINCIAL OR FOREIGN EQUIVALENT, OR ANY SIMILAR LAW NOW EXISTING OR HEREAFTER ENACTED, EXCEPT FOR LIABILITIES ARISING FROM AN INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT). IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT TO THE EXTENT THAT ANY INDEMNIFIED PARTY IS STRICTLY LIABLE UNDER ANY ENVIRONMENTAL LAWS, EACH OBLIGOR'S OBLIGATION TO SUCH INDEMNIFIED PARTY UNDER THIS INDEMNITY SHALL LIKEWISE BE WITHOUT REGARD TO FAULT ON THE PART OF ANY OBLIGOR WITH RESPECT TO THE VIOLATION OR CONDITION THAT RESULTS IN LIABILITY OF AN INDEMNIFIED PARTY. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH OBLIGOR AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES THAT IS PERMISSIBLE UNDER APPLICABLE LAW. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGORS SHALL NOT ASSERT, AND HEREBY WAIVE, ANY CLAIM AGAINST ANY INDEMNIFIED PARTY, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF. <u>NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IT IS THE INTENTION OF THE PARTIES HERETO THAT EACH INDEMNIFIED PARTY BE INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT), REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL.</u>

**SECTION 11.5**     **Survival**.  The obligations of the Borrowers under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Section 10.1, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4), the occurrence of the Termination Date.  The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

**SECTION 11.6**     **Severability**.  Any provision of any Loan Document that is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

**SECTION 11.7**     **Headings**.  The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

**SECTION 11.8**     **Execution in Counterparts, Effectiveness, etc.**  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any Notes) and all of which shall constitute together but one and the same agreement.

**SECTION 11.9**     **Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Obligors pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); provided that, no Obligor may assign or transfer its rights or obligations hereunder without the consent of all Lenders.

**SECTION 11.10**     **Sale and Transfer of Credit Extensions; Participations in Credit Extensions; Notes**.  Each Lender may assign, or sell participations in, its Loans and Commitments to one or more other Persons in accordance with the terms set forth below.

(a)     Any Lender may, with the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed and shall not be required for an assignment to any other Lender or Agent), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments or Loans at the time owing to it, (including for purposes of this clause (a), participations in Swing Line Loans)); provided that:

(i)     the aggregate amount of the Commitments (which for this purpose includes Loans outstanding thereunder), principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000, unless (A) the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed); (B) such assignment is an assignment of the entire remaining amount of the assigning Lender's Commitments and Loans at the time owing to it, or (C) such assignment is an assignment to a Lender or an Approved Fund with respect to a Lender;

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans,

and/or the Commitments assigned; except that this <u>clause (ii)</u> shall not apply to rights in respect of Swing Line Loans;

(iii)    any assignment of a Commitment must be approved by the Administrative Agent and the Swing Line Lender unless the Person that is the proposed assignee is itself a Lender (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and

(v)    the parties to each assignment shall (A) electronically execute and deliver to the Administrative Agent a Lender Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) with the consent of the Administrative Agent, manually execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with, in either case, a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and if the Eligible Assignee is not a Lender, administrative details information with respect to such Eligible Assignee and applicable tax forms.

(b)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>clause (c)</u>, from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Lender Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender Assignment Agreement, subject to <u>Section 11.5</u>, be released from its obligations under this Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement that by their terms survive the termination of this Agreement).

(c)    The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to <u>Section 2.7.1</u> and periodically give the Borrowers notice of such assignments.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Any Lender may, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including such Lender's participations in Swing Line Loans) owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the items set forth in <u>clauses (a)</u> through <u>(d)</u> or <u>(f)</u> of <u>Section 11.1</u>, in each case, except as otherwise specifically provided in a Loan Document.  Subject to <u>clause (e)</u>, each Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>7.1.1</u>, <u>10.3</u> and <u>10.4</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (b)</u>.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 4.9</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 4.8</u> as though it were a Lender.  Each Lender shall, as agent of the Borrowers solely for the purpose of this Section, record in book entries maintained by such Lender the

name and the amount of the participating interest of each Participant entitled to receive payments in respect of any participating interests sold pursuant to this Section.

(e)    A Participant shall not be entitled to receive any greater payment under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, as of the time of the sale of such participation, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.  A Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 4.6 unless the Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with the requirements set forth in Section 4.6 as though it were a Lender.  In addition, if at the time of the sale of such participation, any greater Taxes subject to payment under Section 4.6 would apply to the Participant than applied to the applicable Lender, then such Participant shall not be entitled to any payment under Section 4.6 with respect to the portion of such Taxes as exceeds the Taxes applicable to the Lender at the time of the sale of the participation unless the Participant's request for the Borrowers' prior written consent for the Participation described in the first sentence of this clause states that such greater Taxes would be applicable to such Participant, it being understood that the Participant shall be entitled to additional payments under Section 4.6 to the extent such Lender selling the participation would be entitled to any payment resulting from a change in law occurring after the time the participation was sold.

(f)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, if at any time TSL assigns all of its Commitment and Loans pursuant to clause (a) above, TSL may, upon 30 days' written notice to the Borrowers, resign as Swing Line Lender.  In the event of any such resignation as Swing Line Lender, the Borrowers shall be entitled to appoint from among the Lenders a successor Swing Line Lender hereunder; provided, however, that no failure by the Borrowers to appoint any such successor shall affect the resignation of TSL as Swing Line Lender, as the case may be.  If TSL resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Revolving Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.4).  Upon the appointment of a successor Swing Line Lender, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Swing Line Lender.

**SECTION 11.11    Other Transactions**.    Nothing contained herein shall preclude the Administrative Agent or any other Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with any Borrower or any of its Affiliates in which such Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

**SECTION 11.12    Waiver of Jury Trial**.    THE ADMINISTRATIVE AGENT, EACH LENDER AND EACH OBLIGOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, ANY OTHER SECURED PARTY

OR ANY OBLIGOR IN CONNECTION THEREWITH. EACH OBLIGOR ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN DOCUMENTS.

**SECTION 11.13    Confidentiality**.  (a) Subject to the provisions of clause (b) of this Section, each Lender agrees that it will follow its customary practice in an effort not to disclose without the prior consent of the Borrowers (other than to its employees, auditors, advisors or counsel or to another Lender if the Lender or such Lender's Lender Parent Company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender) any information that is now or in the future furnished pursuant to this Agreement or any other Loan Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this clause by the respective Lender or any other Person to whom such Lender has provided such information as permitted by this Section, (ii) as may be required or appropriate in any report, filing, statement or testimony submitted to any municipal, state, provincial or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, (vi) to any pledgee referred to in clause (f) of Section 11.10 or any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section, (vii) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty has  a need to know the information disclosed and agrees to be bound by the provisions of this Section), (viii) to any rating agency when required by it, provided that such rating agency agrees to be bound by the confidentiality provisions contained in this Section, (ix) to any investors and partners of the Administrative Agent or any Lender, provided that such investor or partner agrees to be bound by the confidentiality provisions contained in this Section and (x) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender.

(b)       Each Obligor hereby acknowledges and agrees that each Lender may share with any of its Affiliates, and such Affiliates may share with such Lender, any information related to any Obligor or any of its Subsidiaries, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender.

**SECTION 11.14    Counsel Representation**.  EACH OBLIGOR ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS AGREEMENT, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING SUCH OBLIGOR TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS AGREEMENT SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE ADMINISTRATIVE AGENT OR THE OTHER SECURED PARTIES ARE HEREBY WAIVED BY EACH OBLIGOR.

**SECTION 11.15    [Intentionally Omitted]**.

**SECTION 11.16    Payment Set Aside**.  To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Applicable Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Secured Obligations and the termination of this Agreement.

**SECTION 11.17    [Intentionally Omitted]**.

**SECTION 11.18    Governing Law; Submission to Jurisdiction**.  (a) This Agreement, the Notes and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (including Section 5-1401 and Section 5-1402 of the General Obligations Law of the State of New York), without reference to any other conflicts or choice of law principles thereof, except as governed by the Bankruptcy Code.

(b)    The parties hereto hereby agree that any suit or proceeding arising in respect of this Agreement or any other Loan Document or any of the matters contemplated hereby or thereby will be tried exclusively in the Bankruptcy Court, and the parties hereto hereby agree to submit to the exclusive jurisdiction of, and venue in, the Bankruptcy Court.  The parties hereto hereby agree that service of any process, summons, notice or document by registered mail addressed to the applicable party will be effective service of process against such party for any action or proceeding relating to any such dispute.  The parties hereto irrevocably and unconditionally waive any objection to venue of any such action or proceeding brought in any such court and any claim that any such action or proceeding has been brought in an inconvenient forum.  A final judgment in any such action or proceeding may be enforced in any other courts with jurisdiction over an applicable party.

**SECTION 11.19    Usury Not Intended**.  It is the intent of each Borrower, each Lender, the Administrative Agent and the Swing Line Lender in the execution and performance of this Agreement and the other Loan Documents to contract in strict compliance with applicable usury laws, including conflicts of law concepts, governing the Loans of each Lender and the Swing Line Lender including such Applicable Laws of the State of New York, the State of Texas, the United States from time to time in effect, and any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement.  In furtherance thereof, the Lenders, the Swing Line Lender and the Borrowers stipulate and agree that none of the terms and provisions contained in this Agreement or the other Loan Documents shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Highest Lawful Rate and that for purposes of this Agreement and all other Loan Documents, "interest" shall include the aggregate of all charges which constitute interest under such laws that are contracted for, charged or received under this Agreement or any other Loan Document; and in the event that, notwithstanding the foregoing, under any circumstances the aggregate amounts taken, reserved, charged, received or paid on the Loans, include amounts which by Applicable Law are deemed interest which

DOC ID - 23131345.10

would exceed the Highest Lawful Rate, then such excess shall be deemed to be a mistake and each Lender receiving same shall credit the same on the principal of its Loans owing to such Lender or Swing Line Lender (or if all such Loans shall have been paid in full, refund said excess to the Borrowers). In the event that the maturity of the Loans are accelerated by reason of any election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the Highest Lawful Rate, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the applicable Loans (or, if the applicable Loans shall have been paid in full, refunded to the Borrowers of such interest). In determining whether or not the interest paid or payable under any specific contingencies exceeds the Highest Lawful Rate, the Borrowers, the Lenders and the Swing Line Lender shall to the maximum extent permitted under Applicable Law amortize, prorate, allocate and spread in equal parts during the period of the full stated term of the Loans all amounts considered to be interest under Applicable Law at any time contracted for, charged, received or reserved in connection with the Loans. The provisions of this Section shall control over all other provisions of this Agreement or the other Loan Documents which may be in apparent conflict herewith.

**SECTION 11.20    Usury Recapture**. In the event the rate of interest chargeable under this Agreement or any other Loan Document at any time is greater than the Highest Lawful Rate, the unpaid principal amount of the Loans shall bear interest at the Highest Lawful Rate until the total amount of interest paid or accrued on the Loans equals the amount of interest which would have been paid or accrued on the Loans if the stated rates of interest set forth in this Agreement or applicable Loan Document had at all times been in effect. In the event, upon payment in full of the Loans, the total amount of interest paid or accrued under the terms of this Agreement and the Loans is less than the total amount of interest which would have been paid or accrued if the rates of interest set forth in this Agreement or such Loan Document had, at all times, been in effect, then the Borrowers shall, to the extent permitted by Applicable Law, pay the Administrative Agent for the account of the applicable Lender an amount equal to the difference between (i) the lesser of (A) the amount of interest which would have been charged on Loans owed to it if the Highest Lawful Rate had, at all times, been in effect and (B) the amount of interest which would have accrued on such Loans if the rates of interest set forth in this Agreement had at all times been in effect and (ii) the amount of interest actually paid under this Agreement or any Loan Document on Loans owed to it. In the event the any Lender ever receive, collect or apply as interest any sum in excess of the Highest Lawful Rate, such excess amount shall, to the extent permitted by law, be applied to the reduction of the principal balance of the Loans, and if no such principal is then outstanding, such excess or part thereof remaining shall be paid to the Borrowers.

**SECTION 11.21    [Intentionally Omitted]**.

**SECTION 11.22    Patriot Act**. Each Lender hereby notifies each Obligor that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Obligor, which information includes the name and address of each Obligor and other information that will allow such Lender to identify each Obligor in accordance with the Patriot Act.

**SECTION 11.23    ORAL AGREEMENTS**. THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS, AS DEFINED IN THIS AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

DOC ID - 23131345.10

**SECTION 11.24    Pre-Petition Obligations**.    Each of the Obligors hereby acknowledges, confirms and agrees that the Borrowers are indebted to the Existing Agent and the Existing Lenders for the Pre-Petition Obligations, as of the Filing Date, in an aggregate principal amount of not less than $87,625,000 in respect of Pre-Petition Obligations constituting loans under the Existing Credit Agreement, together with interest (including default interest), fees, premiums, yield maintenance fees and prepayment premiums accrued thereon in respect of such loans, and costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges owed by the Borrowers to the Existing Agent and the Existing Lenders, all of which are unconditionally owing by the Borrowers to the Existing Agent and the Existing Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.    As of July 1, 2015, the Existing Agent and the Existing Lenders have determined and advised the Obligors that the amount of the Yield Maintenance Premium (as defined in the Existing Credit Agreement) due and payable is $16,649,787.    The Existing Agent, the Existing Lenders, the Administrative Agent, the Lenders and the Obligors have agreed that upon the entry of the Final Bankruptcy Court Order, the Yield Maintenance Premium due and payable shall be set at $14,000,000 without defense, offset, withholding, counterclaim or deduction of any kind.    As of the Filing Date, the Existing Agent and the Existing Lenders have determined and advised the Obligors that the amount of accrued and unpaid interest due and payable on the Pre-Petition Obligations is $640,376.44.    The Existing Agent, the Existing Lenders, the Administrative Agent, the Lenders and the Obligors have agreed that upon the entry of the Final Bankruptcy Court Order, the amount of accrued and unpaid interest due and payable on the Pre-Petition Obligations as of the Filing Date shall be set at $625,857.81 without defense, offset, withholding, counterclaim or deduction of any kind.

**SECTION 11.25    Acknowledgment of Security Interests**.    As of the Filing Date, each of the Obligors hereby acknowledges, confirms and agrees that the Existing Agent and the Existing Lenders have valid, enforceable and perfected first priority and senior liens (subject only to Permitted Liens (as defined in the Existing Credit Agreement) to the extent set forth in the Existing Credit Agreement) upon and security interests in all of the Collateral (as defined in the Existing Credit Agreement) pursuant to the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) as in effect on the Filing Date to secure all of the Pre-Petition Obligations.

**SECTION 11.26    Binding Effect of Documents**.    Each of the Obligors hereby acknowledges, confirms and agrees that:  (a) each of the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) to which it is a party is in full force and effect as of the date hereof, (b) the agreements and obligations of each of the Obligors contained in the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) constitute the legal, valid and binding obligations of each of the Obligors enforceable against it in accordance with their respective terms and the Obligors have no valid defense, offset or counterclaim to the enforcement of such obligations and (c) the Existing Administrative Agent and the Existing Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement), except as clauses (b) and (c) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

**SECTION 11.27    Collateral; Grant of Lien and Security Interest**.

(a)    As security for the full and timely payment and performance of all of the Obligations, each of the Obligors hereby, assigns, pledges and grants to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, a security interest in and to and Lien on all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate"

95
*Credit Agreement*

(within the meaning of the Bankruptcy Code) of such Obligor, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property (including all Facilities), Oil and Gas Properties, fixtures, leases, all of the issued and outstanding Capital Securities of each Subsidiary of such Obligor, all of the Capital Securities of all other Persons directly owned by such Obligor, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, after entry of the Final Bankruptcy Court Order, the proceeds of all Avoidance Actions (which shall be available for payment of the DIP Superpriority Claims and the Prepetition First Lien Adequate Protection Superpriority Claim (each as defined in the Bankruptcy Court Orders)), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all property of the Borrowers and the Holdco Guarantor subject to the security interest referred to in this Section 11.30(a) being hereinafter collectively referred to as the "Collateral").

(b)     Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as the case may be, the Liens and security interests in favor of the Administrative Agent referred to in Section 11.30(a) hereof shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral, other than the Permitted Priority Liens and the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".  Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been repaid in cash in full.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds, income and other revenues received by any Obligor, any Subsidiary of such Obligor, Administrative Agent or any Lender from the Collateral subject to the Liens granted in this Section 11.30 and in each other Loan Document and by the Bankruptcy Court Orders shall be subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", and (ii) no Person entitled to Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

**SECTION 11.28   Administrative Priority**.  Each of the Obligors agrees for itself that the Obligations of such Person shall, pursuant to Section 364(c)(1) of the Bankruptcy Code, constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

**SECTION 11.29   Grants, Rights and Remedies**.  The Liens and security interests granted pursuant to Section 11.30(a) hereof and the administrative priority granted pursuant to Section 11.32 hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Bankruptcy Court Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.

**SECTION 11.30   No Filings Required**.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, and entry of the Interim Bankruptcy Court Order shall have occurred on or before the date of any Loan and entry of the Final Bankruptcy Court Order shall have

occurred on or before the date of the initial Loans.  The Administrative Agent shall not be required to file any financing statements, mortgages, vessel mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document.  The parties hereto hereby agree that the existing Mortgages and the existing Control Agreements (each as defined in the Existing Credit Agreement) shall be deemed to secure the Obligations under this Agreement and the other Loan Documents without the requirement of the Administrative Agent to take any further action.

**SECTION 11.31    Survival**.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the Bankruptcy Court Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Obligor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" as set forth in Section 11.32, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Administrative Agent and the Lenders against any Obligor in respect of any Obligation;

(b)    the Liens in favor of the Administrative Agent and the Lenders set forth in Section 11.30(a) hereof shall constitute valid and perfected first priority Liens and security interests, subject only to Permitted Priority Liens to which such Liens and security interests may be subordinate and junior, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the Liens in favor of the Administrative Agent and the Lenders set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Administrative Agent file financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

[Remainder of this page intentionally left blank.  Signature pages follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**BORROWERS:**

**MILAGRO EXPLORATION, LLC, as a debtor and debtor-in-possession**

By: _____
Name: _____
Title: _____

**MILAGRO PRODUCING, LLC, as a debtor and debtor-in-possession**

By: _____
Name: _____
Title: _____

**HOLDCO GUARANTOR:**

**MILAGRO OIL & GAS, INC., as a debtor and debtor-in-possession**

By: _____
Name: _____
Title: _____

**SUBSIDIARY GUARANTORS:**

**MILAGRO MID-CONTINENT, LLC, as a debtor and debtor-in-possession**

By: _____
Name: _____
Title: _____

**MILAGRO RESOURCES, LLC, as a debtor and debtor-in-possession**

By: _____
Name: _____
Title: _____

*Credit Agreement*

**ADMINISTRATIVE AGENT/LENDER:**

**TPG SPECIALTY LENDING, INC.,**
as the Administrative Agent, Swing Line Lender and a
Lender

By: _____
Name: _____
Title: _____

*Credit Agreement*

**LENDERS:**

**TPG SL SPV, LLC,**
as Lender

By: _____
Name: _____
Title: _____

*Credit Agreement*

**LAURA AND JOHN ARNOLD FOUNDATION,**
as a Lender


By: _____
Name:_____
Title:_____

**CERBERUS OFFSHORE LEVERED LOAN
OPPORTUNITIES MASTER FUND II, L.P.**, as a Lender
By: Cerberus Levered Opportunities Master Fund II GP, LLC
Its: General Partner


By: _____
Name:
Title:


**CERBERUS ASRS HOLDINGS LLC**, as a Lender


By: _____
Name:
Title:


**CERBERUS ICQ LEVERED LOAN OPPORTUNITIES FUND, L.P.**, as a Lender
By: Cerberus ICQ Levered Opportunities GP, LLC
Its: General Partner


By: _____
Name:
Title:

*Credit Agreement*

**CERBERUS NJ CREDIT OPPORTUNITIES FUND, L.P.**, as a Lender

By: Cerberus NJ Credit Opportunities GP, LLC

Its: General Partner

By: _____

Name:

Title:

**CERBERUS KRS LEVERED LOAN OPPORTUNITIES FUND, L.P.**, as a Lender

By: Cerberus KRS Levered Opportunities GP, LLC

Its: General Partner

By: _____

Name:

Title:

**CERBERUS AUS LEVERED HOLDINGS**, as a Lender

By: CAL I GP Holdings LLC

Its: General Partner

By: _____

Name:

Title:

**CERBERUS SWC LEVERED LOAN OPPORTUNITIES MASTER FUND, L.P.**, as a Lender

By: Cerberus SWC Levered Opportunities GP, LLC

Its: General Partner

By: _____

Name:

Title:

*Credit Agreement*

**CERBERUS AUS LEVERED II LP**, as a Lender
By: CAL II GP LLC
Its: General Partner


By: _____
Name:
Title:


**CERBERUS ICQ LEVERED LLC**, as a Lender


By: _____
Name:
Title:


**CERBERUS ONSHORE II CLO-2 LLC**, as a Lender


By: _____
Name:
Title:


**CERBERUS SWC LEVERED LP**, as a Lender
By: Cerberus Sl GP LLC
Its: General Partner


By: _____
Name:
Title:


*Credit Agreement*

**GOLDMAN SACHS SPECIALTY LENDING HOLDINGS, INC.,**
as a Lender

By: _____

Name: _____

Title: _____

DOC ID - 23131345.10