**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                                                           :
**In re**                                                  :     **Chapter 11**
                                                           :
**MILAGRO HOLDINGS, LLC,** *et al.,*                       :     **Case No. 15-11520 (KG)**
                                                           :
           **Debtors.**[1]                                 :     **Jointly Administered**
                                                           :
---------------------------------------------------------- x

---

**DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

YOUNG CONAWAY STARGATT & TAYLOR, LLP             PORTER HEDGES LLP
M. Blake Cleary (No. 3614)                            John F. Higgins
Joel A. Waite (No. 2925)                              Eric M. English
Ryan M. Bartley (No. 4985)                   1000 Main Street, 36th Floor
Ian J. Bambrick (No. 5455)                          Houston, TX 77002
1000 N. King Street                          Telephone: (713) 226-6687
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600

*Co-Counsel for the Debtors and Debtors in Possession*

Dated:  September 1, 2015

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Milagro Holdings, LLC (7232); Milagro Oil & Gas, Inc. (7173); Milagro Exploration, LLC (9260); Milagro Producing, LLC (9330); Milagro Mid-Continent, LLC (8804); and Milagro Resources, LLC (6134). The Debtors' mailing address is 1301 McKinney Street, Suite 500, Houston, Texas 77010.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I . DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...................................................................................**4**
    A.    Defined Terms ........................................................................................................4
    B.    Rules of Interpretation .......................................................................................15
    C.    Computation of Time ..........................................................................................16
    D.    Governing Law ....................................................................................................16
    E.    Reference to Monetary Figures ...........................................................................16
    F.    Controlling Document..........................................................................................16

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** ............................................**16**
    A.    Administrative Claims .........................................................................................16
    B.    DIP Claims ..........................................................................................................17
    C.    Priority Tax Claims..............................................................................................17
    D.    Professional Fee Claims.......................................................................................17
    E.    U.S. Trustee Statutory Fees ................................................................................18

**ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** ...........**18**
    A.    Summary of Classifications .................................................................................18
    B.    Treatment of Classes of Claims and Equity Interests.........................................19
    C.    Special Provision Governing Unimpaired Claims ...............................................22
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................22

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** ......................................................**22**
    A.    Substantive Consolidation....................................................................................22
    B.    Sources of Consideration for Plan Distributions .................................................23
    C.    General Settlement of Claims ..............................................................................23
    D.    Contribution Agreement Transaction...................................................................23
    E.    Rights Offering ....................................................................................................24
    F.    Plan Release Consideration Assets Implementation Procedure ...........................25
    G.    The Post-Effective Date Reorganized Debtor .....................................................26
    H.    Cancellation of Instruments, Certificates, and Other Documents: .......................27
    I.    Offering and Issuance of Securities .....................................................................28
    J.    Vesting of Assets in the Reorganized Debtor ......................................................29
    K.    Corporate Action..................................................................................................29
    L.    New Holdings Units..............................................................................................29
    M.    New Holdings Operating Agreement ...................................................................29
    N.    Boards of Managers .............................................................................................29
    O.    Restructuring Recognition Awards. .....................................................................30
    P.    Effectuating Documents; Further Transactions....................................................30
    Q.    Exemption from Certain Taxes and Fees .............................................................31
    R.    Causes of Action .................................................................................................31
    S.    Closing the Chapter 11 Cases ..............................................................................31

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......................**32**
    A.    Assumption and Assignment of Executory Contracts and Unexpired Leases ................32
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.....................32
    C.    Pre-existing Payment and Other Obligations ......................................................33
    D.    Claims Based on Rejection of Executory Contracts and Unexpired Leases .................33
    E.    Contribution Agreement; Assumed Contracts .....................................................33
    F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements....................33
    G.    D&O Policies........................................................................................................34
    H.    Indemnification Obligations.................................................................................34

I.       Reservation of Rights ...................................................................................34

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ...........................................**34**
A.       Allowance of Claims and Administrative Expenses for Purposes of this Plan ...........34
B.       Calculation of Amounts to Be Distributed ...........................................................34
C.       Rights and Powers of the Debtors and the Reorganized Debtor .............................35
D.       Delivery of Distributions and Undeliverable or Unclaimed Distributions................35
E.       Compliance with Tax Requirements/Allocations ...................................................37
F.       Claims Paid or Payable by Third Parties .............................................................37

**ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS**............................................................................................................**38**
A.       Resolution of Disputed Claims ..........................................................................38
B.       Disallowance of Claims ....................................................................................39
C.       Amendments to Claims .....................................................................................39
D.       No Interest .......................................................................................................40
E.       Second Lien Notes Trustee as Claim Holder .......................................................40

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .....................**40**
A.       Compromise and Settlement of Claims, Equity Interests, and Controversies ................40
B.       Release of Liens ...............................................................................................40
C.       Subordinated Claims ........................................................................................40
D.       Debtor Release .................................................................................................41
E.       Third Party Release ..........................................................................................41
F.       Exculpation .....................................................................................................42
G.       Injunction ........................................................................................................42
H.       Waiver of Statutory Limitations on Releases .......................................................43
I.       Setoffs .............................................................................................................44
J.       Discharge of the Debtors ...................................................................................44

**ARTICLE IX CONFIRMATION AND SUBSTANTIAL CONSUMMATION OF THE PLAN** ...................**44**
A.       Conditions Precedent to Consummation of this Plan .............................................44
B.       Waiver of Conditions ........................................................................................45
C.       Effect of Non-Occurrence of Conditions to the Effective Date ...............................45

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**................................**45**
A.       Modification and Amendments...........................................................................45
B.       Effect of Confirmation on Modifications..............................................................46
C.       Revocation or Withdrawal of this Plan ................................................................46
D.       Confirmation of this Plan ..................................................................................46

**ARTICLE XI RETENTION OF JURISDICTION** ................................................................**46**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ...............................................................**48**
A.       Immediate Binding Effect ..................................................................................48
B.       Additional Documents .......................................................................................48
C.       Dissolution of Committee ..................................................................................48
D.       Reservation of Rights ........................................................................................49
E.       Successors and Assigns......................................................................................49
F.       Service of Documents ........................................................................................49
G.       Term of Injunctions or Stays..............................................................................50
H.       Entire Agreement ..............................................................................................50
I.       Plan Supplement Exhibits ..................................................................................50
J.       Nonseverability of Plan Provisions .....................................................................51
K.       Waiver or Estoppel............................................................................................51

## INTRODUCTION

The Debtors propose the following *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*. Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in Article I of this Plan. On July 17, 2015, the Bankruptcy Court entered an order [Docket No. 33] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). Reference is made to the Disclosure Statement, filed in connection herewith, for a discussion of the Debtors' history, as well as a summary and analysis of this Plan and certain related matters. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below or, if not defined herein, as set forth in that certain *Contribution Agreement*, dated July 15, 2015, between Milagro Oil & Gas, Inc., a Delaware corporation, its Subsidiaries, and White Oak Resources VI, LLC, a Delaware limited liability company (the "Contribution Agreement").[2]

1.    "*Accredited Investor*" means an "Accredited Investor" as defined in Rule 501 promulgated under the Securities Act of 1933, as amended.

2.    "*Administrative Agent*" means TPG Specialty Lending, Inc., a Delaware corporation, as administrative agent for the lenders under the Credit Agreement.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (ii) Allowed Professional Fee Claims; (iii) DIP Claims; and (vi) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; provided, that, notwithstanding anything herein to the contrary, DIP Claims shall be treated as provided in Article II.B.

4.    "*Administrative Claims Objection Deadline*" means the first Business Day that is one (1) year following the Effective Date, except as specifically set forth in this Plan or a Final Order, including, without limitation, the Bar Date Order.

5.    "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in this Plan or a Final Order, including, without limitation, the Bar Date Order.

6.    "*Affiliate*" means affiliate as set forth at section 101(2) of the Bankruptcy Code.

7.    "*Allowed*" means, except as otherwise provided herein, with respect to any Claim or Equity Interest: (i) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules (to the extent Filed) as other than disputed, contingent, or unliquidated and as to which no timely Proof of Claim asserting a different amount or interest has been Filed; (ii) a Claim or Equity Interest that either is not Disputed or has been allowed by a Final Order; (iii) a Claim or Equity

---

[2]    The Contribution Agreement is attached as **Exhibit 1** and incorporated herein in full.

Interest that is allowed (a) in any stipulation of amount and nature of Claim executed prior to the entry of the Confirmation Order and approved by the Bankruptcy Court; (b) in any stipulation with the Debtors of amount and nature of Claim or Equity Interest executed on or after the entry of the Confirmation Order; or (c) in or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (iv) a Claim or Equity Interest that is allowed pursuant to the terms hereof; or (v) a Disputed Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the deadline fixed by the Bankruptcy Court for objecting to Claims. Notwithstanding the foregoing, a Claim or Administrative Claim shall be "Allowed" under this Plan if it is based on or arising out of a liability of a Debtor that was assumed by White Oak pursuant to the Contribution Agreement; however, any such Claim or Administrative Claim shall automatically be deemed satisfied on the Effective Date without further order of the Bankruptcy Court, provided that the Reorganized Debtor shall file a Notice of Satisfaction with the Clerk of the Court identifying the applicable Proofs of Claim, requests for allowance of administrative expenses, and claims listed in the Schedules satisfied by the Debtors or assumed by White Oak (which notice shall be in form and substance reasonably satisfactory to White Oak as it relates to claims assumed by White Oak). "*Allow*" shall have a correlative meaning.

8. "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 547, and 548 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9. "*Backstop Commitment*" has the meaning given to it in Article IV.E.6 herein.

10. "*Backstop Commitment Fee*" means a fee payable to each Backstop Party (based on such Backstop Party's share of the Backstop Commitment) in shares of Reorganized Debtor Common Stock equal to its pro rata share of 5% of the Reorganized Debtor Common Stock to be initially offered in connection with the Rights Offering regardless of whether such amount is reduced as provided in Article IV.E.3 herein, which immediately following the Effective Date shall be converted to New Holdings Units.

11. "*Backstop Commitment Letter*" means that certain letter agreement dated July 15, 2015, by and among MOG and the Backstop Parties, a copy of which is attached as an exhibit to the Disclosure Statement.

12. "*Backstop Parties*" means the Backstop Purchasers as identified in the Backstop Commitment Letter.

13. "*Ballot*" means a ballot authorized by the Bankruptcy Court pursuant to the Disclosure Statement Order to indicate acceptance or rejection of this Plan and to make an election with respect to the third party release provided by Article VIII.E hereof.

14. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as the same may be amended from time to time.

15. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

16. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, and general orders and chambers

procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

17.      "*Bar Date Order*" means the Final Order entered by the Bankruptcy Court setting deadlines for certain parties in interests to file against the Debtors Claims arising prepetition [Docket No. 145].

18.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19.      "*Cash*" means the legal tender of the United States or the equivalent thereof.

20.      *Cash-Out Payment*" means with respect to each Non-Eligible Participant, a Cash payment equal to the value of the pro rata share of Rights such Non-Eligible Participant would have received if it was an Eligible Participant as determined by the Debtors, with the consent of the Requisite Consenting Noteholders.

21.      "*Cash Payment*" means, in total, the Cash Payment Cap.

22.      "*Causes of Action*" means, subject to the releases, exculpations, and injunctions set forth in this Plan, any claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, which was not conveyed to White Oak in connection with the Contribution Agreement Transaction and which was property of the Debtors or in which the Debtors held rights as of the Effective Date.

23.      "*Chapter 11 Cases*" means, with respect to each Debtor, the case initiated under chapter 11 of the Bankruptcy Code by such Debtor's Filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court.

24.      "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against one of the Debtors (or all or some of them) whether or not asserted or Allowed.

25.      "*Claims Agent*" means Prime Clerk LLC.

26.      "*Claims Objection Deadline*" means the first Business Day that is one (1) year after the Effective Date or such later date as may be fixed by the Bankruptcy Court upon a motion Filed by the Reorganized Debtor and served only on the Bankruptcy Rule 2002 service list (which motion to extend the objection deadline shall not be deemed a modification of this Plan).

27.      "*Claims Register*" means the official register of Claims maintained by the Claims Agent.

28.      "*Committee*" means any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

29.      "*Committee Members*" means all current and former members of the Committee, to the extent one is appointed.

30.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

31.     "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

32.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

33.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan.

34.     "*Consenting Noteholders*" means (i) each of the Noteholders identified on the signature pages of the Restructuring Support Agreement (together with any of their respective successors and permitted assigns under the Restructuring Support Agreement) and (ii) each of the other Noteholders that becomes a party to the Restructuring Support Agreement after the Restructuring Support Effective Date (as defined in the Restructuring Support Agreement) in accordance with the terms thereof by executing and delivering a Joinder Agreement (as defined in the Restructuring Support Agreement) (together with any of their respective successors and permitted assigns under the Restructuring Support Agreement).

35.     "*Consolidation*" has the meaning ascribed to it in Article IV.A herein.

36.     "*Consummation*" means the occurrence of the Effective Date.

37.      "*Contribution Agreement Transaction*" means that transaction contemplated by the Contribution Agreement.

38.     "*Credit Agreement*" means that certain Second Amended and Restated First Lien Credit Agreement, dated as of September 4, 2014 (as amended and restated, restated, supplemented, or otherwise modified from time to time) by and among (i) Milagro Exploration, LLC, a Delaware limited liability company, and Milagro Producing, LLC, a Delaware limited liability company, as borrowers, (ii) MOG, a Delaware corporation, as guarantor, (iii) the various financial institutions and other persons from time to time parties thereto as the lenders, and (iv) the Administrative Agent.

39.     "*D&O Policies*" means all insurance policies for directors, members, managers, trustees, and officers' liability maintained by the Debtors' Estates as of the Effective Date.

40.     "*Debtors*" means, collectively, each of the following:  (i) Milagro Holdings, LLC; (ii) MOG; (iii) Milagro Exploration, LLC; (iv) Milagro Producing, LLC; (v) Milagro Mid-Continent, LLC; and (vi) Milagro Resources, LLC.

41.     "*Debtor Release*" has the meaning provided in Article VIII.D herein.

42.     "*Definitive Documents*" means Company Governance Documents (as defined in the Restructuring Support Agreement), documents required to close on the Contribution Agreement Transaction, and any other documents required for the Plan to go effective or by the Contribution Agreement.

43.     "*DIP Agent*" means TPG Specialty Lending, Inc., a Delaware corporation, in its capacity as administrative agent and collateral agent for the DIP Lenders, or its permitted successor or assignee.

44.     "*DIP Claim*" means a Claim of the DIP Lenders or the DIP Agent arising under the DIP Facility, the other DIP Loan Documents (as defined in the DIP Facility), the Interim DIP Order and/or Final DIP Order.

45.    "*DIP Credit Agreement*" means that certain Debtor-in-Possession Credit Agreement, dated as of July 15, 2015, by and among MOG, the other borrowers and guarantors party thereto, the DIP Agent, the DIP Lenders and other parties thereto.

46.    "*DIP Facility*" means the senior secured credit facility provided by the DIP Lenders in an aggregate principal amount of up to $117,250,857.80 made pursuant to the DIP Credit Agreement.

47.    "*DIP Lenders*" means those certain lenders who are lenders under the DIP Facility.

48.    "*Disclosure Statement*" means the disclosure statement related to this Plan and approved by the Bankruptcy Court pursuant to the Disclosure Statement Order, as such disclosure statement may be amended, modified, or supplemented (including all exhibits and schedules annexed thereto or referenced therein).

49.    "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement [Docket No. 192].

50.    "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (i) listed on the Schedules as unliquidated, disputed, or contingent, unless a Proof of Claim has been timely Filed; (ii) as to which the Debtors or the Reorganized Debtor have interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (iii) as otherwise disputed by the Debtors or the Reorganized Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order.

51.    "*Distribution Record Date*" shall mean the Confirmation Date.

52.    "*District*" means the District of Delaware.

53.    "*Effective Date*" means (i) the first business day after the entry of the Confirmation Order on which (a) the Confirmation Order is final and non-appealable unless this requirement has been waived, (b) no stay of the Confirmation Order is in effect, (c) all conditions precedent to effectiveness of this Plan shall have been satisfied or waived, (d) all conditions precedent to the closing of the Contribution Agreement Transaction shall have been satisfied or waived, and (e) all conditions precedent to the closing of the Rights Offering shall have been satisfied or waived or (ii) such other date as may be selected by the Debtors, subject to obtaining any consents required under the Restructuring Support Agreement.

54.    "*Election Form*" means a form pursuant to which a Noteholder that is a Holder of a Notes Claim certifies whether or not it is an Accredited Investor, pursuant to the Rights Offering Procedures.

55.    "*Election Form Deadline*" means the date by which a Noteholder that is a Holder of a Notes Claim may submit its Election Form, as set forth in the Rights Offering Procedures.

56.    "*Eligible Participant*" means a Noteholder that, in accordance with the terms set forth in the Election Form and the Rights Offering Procedures, has submitted a completed Election Form certifying that such holder is an Accredited Investor.

57.    "*Eligible Plan Release Consideration Recipient*" means any Holder of a General Unsecured Claim (only to the extent such Claim is ultimately Allowed) other than any Holder of (i) a Claim that has been assumed by White Oak under the Contribution Agreement, (ii) a Notes Claim with respect to any deficiency, or (iii) a Claim (regardless of type) of an Equity Holder or Insider of the Debtors or any of the Affiliates of any such persons, including, without limitation, any Claims for management, advisory, or similar services.

58.    "*Entity*" means an entity (as that term is defined in section 101(15) of the Bankruptcy Code).

59.    "*Equity Holders*" means the Holders of Equity Interests.

60.    "*Equity Interests*" means either (i) the legal, equitable, contractual, or other rights of any Entity with respect to the preferred or common stock, membership interests or any other direct or indirect equity interest in any of the Debtors, including any options, warrants or other securities or other interest in or right to convert or exchange into such equity interest or (ii) the legal, equitable, contractual, or other right of any Entity to acquire or receive any of the foregoing.

61.    "*Escrow Accounts*" means escrow accounts for Allowed Administrative Claims, Allowed Priority Tax Claims, Professional Fee Claims (to the extent necessary), Other Priority Claims, Other Secured Claims and Plan Implementation Expenses.

62.    "*Estate*" means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

63.    "*Estate Assets*" means any assets not transferred to White Oak pursuant to the Contribution Agreement.

64.    "*Exculpated Parties*" means, collectively:  (i) the Debtors; (ii) the Reorganized Debtor; (iii) the Committee and the Committee Members; and (iv) with respect to each of the foregoing Entities, such Entity's respective successors and assigns and current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investments bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such.

65.    "*Exculpation*" means the exculpation provision set forth in Article VIII.F herein.

66.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

67.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

68.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims Agent.

69.    "*Final DIP Order*" means the Final Order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders dated July 15, 2015 [Docket No. 150].

70.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has otherwise been dismissed with prejudice.

71.    "*General Unsecured Claim*" means an unsecured non-priority Claim against a Debtor that is not an Administrative Claim, a Priority Tax Claim, a Professional Fee Claim, a Senior Debt Claim, an Other Priority Claim, an Other Secured Claim, or a Notes Claim.

72.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

73.    "*GUC Settlement Payment*" means the pro rata distribution of the Plan Release Consideration Assets to the Plan Release Consideration Recipients, not to exceed the full amount of such Holder's Allowed General Unsecured Claim.  For the avoidance of doubt, (i) any GUC Settlement Payment that is returned or is not negotiated within ninety (90) days of distribution shall be forfeited and such amount shall revest in the Reorganized Debtor and (ii) any amount of the Plan Release Consideration Assets that would provide a Plan Release Consideration Recipient with a greater than 100% recovery on account of its Allowed Claims shall be retained by the Reorganized Debtor.

74.    "*GUC Third Party Consent*" means the written consent Eligible Plan Release Consideration Recipients must execute and return to the Reorganized Debtor in order to elect to become a Releasing Party, which will be provided with the Release Consideration Notice.

75.    "*Holder*" means an Entity holding legal title to a Claim or an Equity Interest as of the Distribution Record Date.

76.    "*Impaired*" means, with respect to a Claim or Equity Interest, or Class of Claims or Equity Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

77.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions as of the Effective Date whether in the bylaws, certificates of incorporation or formation, other formation documents, board resolutions, or employment contracts for the current and former directors, managers, officers, employees, attorneys, other professionals, and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates.

78.    "*Initial Distribution Date*" means the date on which the Debtors or the Reorganized Debtor make initial distributions to Holders of Allowed Claims pursuant to this Plan, which will be the Effective Date.

79.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

80.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

81.    "*Interim DIP Order*" means the interim order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders dated July 17, 2015 [Docket No. 35].

82.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

83.    "*Milagro Interests*" means the Company Interest in White Oak to be issued to the Reorganized Debtor under section 2.4 of the Contribution Agreement and pursuant to the Second Amended Company Agreement of White Oak, which contains certain restrictions and allows for the possibility of dilution of the Reorganized Debtor's interest in White Oak.

84.    "*MOG*" means Milagro Oil & Gas, Inc.

85.    "*Motions and Orders*" has the meaning set forth in the Restructuring Support Agreement.

86.    "*New Holdings Operating Agreement*" means the Operating Agreement to be adopted by the Reorganized Debtor, after the conversion of such entity to a limited liability company on the Effective Date.

87.    "*New Holdings Units*" means the membership interests in New Milagro LLC, which membership units in such entity shall initially be issued in exchange for shares of Reorganized Debtor

Common Stock on a one for one basis in connection with the conversion of the Reorganized Debtor to New Milagro LLC, a limited liability company, on the Effective Date.

88.　　"*New Milagro LLC*" means the limited liability company to be organized in Delaware upon the conversion of the Reorganized Debtor on the Effective Date, as contemplated by the Plan.

89.　　"*Non-Eligible Participant*" means a Noteholder that, in accordance with the terms set forth in the Election Form and the Rights Offering Procedures, has submitted a completed Election Form certifying that such holder is not an Accredited Investor.

90.　　"*Noteholders*" means the beneficial owners (or investment managers or advisors for the beneficial owners) of the Notes.　For the avoidance of doubt, in no event shall the Second Lien Notes Trustee be considered a Noteholder.

91.　　"*Notes*" means the 10.500% Senior Secured Second Lien Notes due May 11, 2016, issued by MOG pursuant to the Second Lien Notes Indenture.

92.　　"*Notes Claim*" means any Claim arising under, derived from, or based upon the Second Lien Notes Indenture, the Notes, and the other Note Documents (as defined in the Second Lien Notes Indenture).

93.　　 "*Notice of Satisfaction*" means a notice filed by the Debtors or Reorganized Debtor upon satisfaction of Allowed Claims with the Bankruptcy Court, which shall provide the Holder of the satisfied Allowed Claim twenty-one (21) days to object to the stated satisfaction of its Allowed Claim.　If the Holder of an Allowed Claim fails to timely object to such notice of satisfaction, such Holder shall be forever barred from asserting an argument that the Claim has not been satisfied.

94.　　"*Other Priority Claim*" means priority Claims against the Debtors under section 507(a), other than Administrative Claims and Priority Tax Claims.

95.　　"*Other Secured Claim*" means Claims against any Debtor that are secured by a lien on property in which the Estate of any Debtor has an interest, which liens are valid, perfected, and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

96.　　"*Per Interest Price*" has the meaning given to it in Article IV.E herein.

97.　　"*Petition Date*" means the date on which the Debtors Filed the Chapter 11 Cases.

98.　　"*Plan*" means this *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or otherwise modified from time to time, including the Plan Supplement, which is incorporated in this Plan by reference and made part of this Plan as if set forth in this Plan.

99.　　"*Plan Documents*" has the meaning set forth in the Restructuring Support Agreement.

100.　　"*Plan Release Consideration Assets*" means the $1.0 million in the aggregate being given by the Noteholders from the Rights Offering Proceeds or the amounts otherwise subject to the liens of the Second Lien Notes Trustee for the benefit of itself and the Noteholders on the Effective Date for the eventual distribution by the Reorganized Debtor to the Plan Release Consideration Recipients.

101.    "*Plan Release Consideration Recipient*" means any Eligible Plan Release Consideration Recipient that consents to become a Releasing Party and, therefore, is entitled to share in the Plan Release Consideration Assets.

102.    "*Plan Implementation Expenses*" means any reasonable costs and expenses necessary to implement the Plan, including to wind-down the Estates and/or the Debtors, other than the Reorganized Debtor, after the Effective Date, including, without limitation, any reasonable compensation and reimbursement of professionals and consultants retained by the Reorganized Debtor, and the payment of statutory fees and taxes required to be paid in connection with dissolving each of the former Debtors other than the Reorganized Debtor.

103.    "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than five (5) days prior to the deadline for voting on the Plan or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, which documents shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the Restructuring Support Agreement, this Plan, the Disclosure Statement and the respective exhibits, annexes, and schedules attached hereto and thereto (in each case as may be amended or otherwise modified from time to time in accordance with the terms hereto and thereto) and otherwise acceptable to the Requisite Consenting Noteholders and/or the Requisite Secured Lenders (as applicable) in their reasonable discretion, except that the Contribution Documents (as defined in the Restructuring Support Agreement) shall also be reasonably acceptable to White Oak and the Company Governance Documents need only be reasonably acceptable to (A) the Requisite Consenting Noteholders and (B) so long as it holds at least 10% of the total amount of Second Lien Notes, Credit Suisse Securities USA LLC.

104.    "*Priority Tax Claim*" means a Claim against the Debtors under section 507(a)(8) of the Bankruptcy Code.

105.    "*Professional*" means any Entity employed pursuant to a Final Order in accordance with sections 327, 328, or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106.    "*Professional Fee Claim*" means a Claim for all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by the Bankruptcy Court or any other court of competent jurisdiction) for legal, financial advisory, accounting, and other services and reimbursement of expenses related thereto that are awardable and allowable under sections 328, 330(a), 331, 503(b), or 1103(a) of the Bankruptcy Code or otherwise and that are incurred (i) prior to the Effective Date or (ii) thereafter in connection with (a) applications Filed pursuant to section 330, 331, 503(b), or 1103(a) of the Bankruptcy Code and (b) motions seeking the enforcement of the provisions of this Plan or Confirmation Order, or appeals relating thereto, by all Professionals retained in the Chapter 11 Cases, except to the extent that (x) the Bankruptcy Court has disallowed or denied authority to pay or reimburse such fees and expenses by a Final Order or (y) any such fees and expenses have previously been paid, regardless of whether a fee application has been Filed for any such amount. To the extent that any amount of a Professional's fees or expenses are denied by a Final Order, then those amounts shall no longer constitute Professional Fees.

107.    "*Professional Fee Claims Estimate*" means the estimate to be prepared by the Professionals of their fees accrued before and as of the Effective Date, taking into account any prior payments, which shall be delivered to the Debtors no later than three (3) calendar days before the commencement of the Confirmation Hearing.

108.     "*Professional Fees' Escrow Account*" means the escrow created at Closing for Professional Fee Claims (to the extent necessary).

109.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

110.     "*Release Consideration Notice*" means that notice to be provided to Eligible Plan Release Consideration Recipients in accord with Article IV.F.

111.     "*Released Parties*" means each of, and solely in its capacity as such, (i) the Debtors, (ii) the Reorganized Debtor; (iii) White Oak, (iv) the Initial Equity Holders and the Additional Equity Holders (each as defined in the Restructuring Support Agreement), (v) the Secured Lenders, (vi) Consenting Noteholders and any other Noteholder or Holders of Notes Claims who do not opt-out of the Third Party Release, (vii) the Second Lien Notes Trustee, (viii) the Administrative Agent, (ix) the Plan Release Consideration Recipients and (x) each of the foregoing Entities' respective current and former officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, investment bankers, accountants, and other professionals and representatives, and each of their direct and indirect shareholders' and owners' respective officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, investment bankers, accountants, and other professionals and representatives.

112.     "*Releasing Parties*" means each of, and solely in its capacity as such, (i) the Debtors, (ii) the Reorganized Debtor, (iii) White Oak, (iv) the Initial Equity Holders and the Additional Equity Holders (each as defined in the Restructuring Support Agreement), (v) the Secured Lenders, (vi) Consenting Noteholders and any other Noteholder or Holders of Notes Claims who do not opt-out of the Third Party Release, (vii) the Second Lien Notes Trustee, (viii) the Administrative Agent, (ix) Plan Release Consideration Recipients, (x) with respect to the foregoing Entities, to the extent they could assert Claims on behalf of such Entities, such Entities' respective successors and assigns and current and former officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equity holders, partners, and other professionals.

113.     "*Reorganized Debtor*" means, MOG, in its capacity as the sole remaining Debtor after the Effective Date of this Plan, which shall be converted immediately upon the Effective Date of the Plan to New Milagro LLC.

114.     "*Reorganized Debtor Causes of Action*" means the Causes of Action that are not transferred to White Oak, waived, relinquished, exculpated, released, compromised, or settled under this Plan.

115.     "*Reorganized Debtor Common Stock*" means the common stock of the Reorganized Debtor, which common stock shall be converted to membership interests in such entity on a one for one basis in connection with the conversion of the Reorganized Debtor to New Milagro LLC, a limited liability company, on the Effective Date.

116.     "*Requisite Consenting Noteholders*" shall have the meaning set forth in the Restructuring Support Agreement.

117.     "*Requisite Backstop Parties*" means, as of any date of determination, the Backstop Parties who own or control as of such date at least a majority of the Backstop Commitment as of such date.

118.     "*Restructuring Documents*" has the meaning set forth in the Restructuring Support Agreement.

119.     "*Restructuring Recognition Awards*" shall mean the cash payments of $416,000 to Gary Mabie and $384,000 to Marshall Munsell.

120. "*Restructuring Recognition Event*" shall mean each of (i) the closing of the Contribution Agreement Transaction, (ii) the completion and closing of the Rights Offering, and (iii) the occurrence of the Effective Date.

121. "*Restructuring Support Agreement*" means that certain agreement, dated as of July 15, 2015 by and among (i) the Debtors, (ii) White Oak, (iii) the Consenting Noteholders, (iv) the Secured Lenders and the Administrative Agent, and (v) the Equity Holders pursuant to which (subject to the terms and conditions set forth therein), among other things, the aforesaid parties have (A) agreed to vote in favor of this Plan (to the extent entitled to vote), (B) to support this Plan and the other transactions contemplated herein, (C), to seek or support as applicable, Confirmation of this Plan in the Chapter 11 Cases and (D) to provide for certain approval rights in respect of the Plan Documents, the Motions and Orders, the Plan Supplement Documents (which includes the Plan Supplement and the other documents set forth under such definition in the Restructuring Support Agreement) and the Restructuring Documents.

122. "*Rights*" has the meaning given to it in Article IV.E herein.

123. "*Rights Interests*" has the meaning given to it in Article IV.E herein.

124. "*Rights Offering*" has the meaning given to it in Article IV.E herein.

125. "*Rights Offering Procedures*" means the procedures with respect to the Rights Offering, as approved by order of the Bankruptcy Court and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

126. "*Rights Offering Proceeds*" has the meaning given to it in Article IV.E herein.

127. "*Schedules*" means the schedules of assets and liabilities Filed by each Debtor pursuant to Bankruptcy Rule 1007, unless the Debtors are excused from the requirement to File such documents.

128. "*Second Lien Notes Trustee Charging Lien*" means any Lien or other priority in payment arising prior to the Effective Date to which the Second Lien Notes Trustee is entitled, pursuant to the Second Lien Notes Indenture, against distributions to be made to Noteholders that are Holders of Allowed Notes Claims for payment of any Second Lien Notes Trustee Fees.

129. "*Second Lien Notes Indenture*" means that certain Indenture dated as of May 11, 2011 (as amended, modified or otherwise supplemented from time to time prior to the Petition Date) by and among MOG, the guarantors party thereto, and the Second Lien Notes Trustee.

130. "*Second Lien Notes Trustee*" means Wilmington Trust, National Association (as successor in interest to Wells Fargo Bank, N.A.), as trustee under the Second Lien Notes Indenture.

131. "*Second Lien Notes Trustee Fees*" means the reasonable compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Second Lien Notes Trustee in accordance with and subject to the terms of the Note Documents (as defined in the Second Lien Notes Indenture), whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan.

132. "*Secured Lenders*" means the Holders of the Senior Debt.

133. "*Securities Act*" means the Securities Act of 1933, as amended.

134.    "*Senior Debt*" means indebtedness of any of the Debtors arising under or related to the Credit Agreement, the Fee Letter (as defined in the Credit Agreement) and the other Loan Documents (as defined in the Credit Agreement), including without limitation, all principal, accrued and unpaid interest, fees and the Yield Maintenance Premium and Prepayment Premium (each as defined in the Fee Letter), in the aggregate amounts set forth in Section 11.24 of the DIP Credit Agreement.

135.    "*Senior Debt Claim*" means any Claims arising under or related to the Senior Debt.

136.    "*Subscription Agent*" means the agent designated under the Rights Offering Procedures to receive subscriptions for the Reorganized Debtor Common Stock in the Rights Offering.

137.    "*Subscription Deadline*" means a date certain specified in the Rights Offering Procedures, which shall be the last date and time that Rights may be exercised in accordance with the Rights Offering Procedures.

138.    "*Subsequent Distribution Date*" means the date following the Initial Distribution Date on which the Reorganized Debtor in its reasonable discretion elects to make distributions to Holders of Allowed Claims pursuant to this Plan.

139.     "*Third Party Release*" has the meaning provided in Article VIII.E herein.

140.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

141.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

142.    "*United States*" means the United States of America and its agencies.

143.    "*United States Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Delaware.

144.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and any accrued interest thereon arising under 31 U.S.C. § 3717.

145.    "*White Oak*" means White Oak Resources VI, LLC, a Delaware limited liability company.

B.    *Rules of Interpretation*

For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference in this Plan to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference in this Plan to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented from time to time; (iv) unless otherwise specified, all references in this Plan to "Articles" are references to Articles hereof or hereto; (v) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (viii) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (ix) references to docket numbers of documents Filed in

the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (x) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interest," "Holders of Equity Interests," "Disputed Equity Interests," and the like as applicable; (xi) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (xii) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in this Plan.

D.      *Governing Law*

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflict of laws principles.

E.      *Reference to Monetary Figures*

All references in this Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided in this Plan.

F.      *Controlling Document*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, this Plan shall control.  In the event of any inconsistency between this Plan and the Confirmation Order, the Confirmation Order shall control.

# ARTICLE II

# ADMINISTRATIVE AND PRIORITY CLAIMS

A.      *Administrative Claims*

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) as follows: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due and payable, when such Allowed Administrative Claim is due and payable or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter (or, if not then due and payable, when such Allowed Administrative Claim is due and payable or as soon as reasonably practicable thereafter); (iii) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtor, as applicable; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

1.    <u>Administrative Claims Bar Date</u>

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by this Article II, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Estate Assets, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Deadline.

2.    <u>Administrative Claims' Escrow Account</u>

On the Effective Date and after satisfaction of the DIP Claims and Senior Debt Claims, if any, in accordance with this Plan, the Debtors shall fund the Administrative Claims' Escrow Account in Cash as described in Article IV.G.2 hereof.  Any amounts remaining in the Administrative Claims' Escrow Account after payment of all Allowed Administrative Claims shall be retained and available for use by the Reorganized Debtor.

B.    *DIP Claims*

On the Effective Date, the DIP Claims shall be indefeasibly paid in full in Cash.

C.    *Priority Tax Claims*

In accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed, (iii) the date on which such Allowed Priority Tax Claim becomes due and payable, and (iv) such other date as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtor, as applicable.  Any Claims asserted by a governmental unit on account of any penalties and assessments shall not be Priority Tax Claims.

1.    <u>Priority Tax Claims' Escrow Account</u>

On the Effective Date, the Debtors shall fund the Priority Tax Claims' Escrow Account in Cash as described in Article IV.G.2 hereof.  Any amounts remaining in the Priority Tax Claims' Escrow Account after payment of all Allowed Priority Tax Claims shall be retained and available for use by the Reorganized Debtor.

D.    *Professional Fee Claims*

1.    <u>Professional Fees' Escrow Account</u>

The Debtors shall establish and fund an Escrow Account for Professional Fee Claims.  The Professionals shall estimate their Professional Fee Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimate to the Debtors no later than three (3) business days before the commencement of the Confirmation Hearing.  For the avoidance of doubt, the Professional Fee Claims Estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. The Debtors shall fund the Professional Fees' Escrow Account with Cash equal to the Professional Fee Claims Estimate.  If a Professional does not provide a Professional Fee Claims Estimate within the timeframe described herein, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  Except as provided in the next sentence, the Professional Fees' Escrow Account shall be funded on the Effective Date and maintained in trust by the Reorganized Debtor for the

Professionals and shall not be considered property of the Debtors' Estates. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fees' Escrow Account, if any, shall be released to the Reorganized Debtor.

To the extent that funds held in the Professional Fees' Escrow Account are unable to satisfy the amount of an Allowed Professional Fee Claim owing to a Professional after application of funds deposited into the Professional Fees' Escrow Account pursuant to such Professional's Professional Fee Claim Estimate, such Professional shall have an Allowed Administrative Claim for any such deficiency, which Allowed Administrative Claim shall be satisfied in accordance with this Plan.

        2.      <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims shall be Filed no later than the first Business Day that is 30 days after the Effective Date. After notice provided in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. Subject to Article II.D.1 hereof, the amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fees' Escrow Account, or as otherwise provided herein, when such Claims are Allowed by an order of the Bankruptcy Court, which order is not subject to a stay.

E.      *U.S. Trustee Statutory Fees*

The Debtors or the Reorganized Debtor, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**ARTICLE III**

**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Equity Interests set forth in this Article.

A.      *Summary of Classifications*

All Claims and Equity Interests, other than Administrative Claims (including DIP Claims), Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in this Article for all purposes, including voting, Confirmation, and distributions under this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Debtors reserve the right to withdraw this Plan with respect to one or more Debtors while seeking Confirmation or approval of this Plan with respect to all other Debtors.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Equity Interests set forth herein shall apply separately to each of the Debtors.

        1.      <u>Substantive Consolidation of the Estates</u>

Pursuant to Article IV.A hereof, this Plan provides for the Consolidation of the Estates into a single Estate for all purposes associated with Confirmation (including voting) and Consummation. As a result of the

Consolidation of the Estates, each Class of Claims and Equity Interests will be treated as a single consolidated Estate without regard to the separate identification of the Debtors.

2.    Class Identification

The classification of Claims against and Equity Interests in each Debtor (as applicable) pursuant to this Plan is as set forth below. To the extent there are no Holders of Claims or Equity Interests in a particular Class or Classes, such Claims or Equity Interests shall be treated as set forth in Article III hereof.

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Senior Debt Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 4 | Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Classes of Claims and Equity Interests*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Equity Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under this Plan the treatment described below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Equity Interest. Unless otherwise indicated, each Holder of an Allowed Claim or Equity Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Debtors or the Reorganized Debtor, as applicable.

Notwithstanding the foregoing, no Claim or Administrative Claim Allowed under this Plan that is based on or arising out of a liability of a Debtor that was assumed by White Oak pursuant to the Contribution Agreement shall receive a distribution under this Plan or from any Debtor or Reorganized Debtor, and any such Claim or Administrative Claim shall automatically be deemed satisfied on the Effective Date without further order of the Bankruptcy Court, provided that the Reorganized Debtor shall file a Notice of Satisfaction with the Clerk of the Court, identifying the applicable Proofs of Claim, requests for allowance of administrative expenses, and claims listed in the Schedules by the Debtors or assumed by White Oak.

Any transfers of Claims or Interests are subject to orders of the Bankruptcy Court.

1.    Class 1—Senior Debt Claims

(a)    *Classification*: Class 1 consists of any Senior Debt Claims against the Debtors.

(b)    *Allowance:* The Senior Debt Claims shall be Allowed in the aggregate amounts set forth in Section 11.24 of the DIP Credit Agreement, inclusive of principal, accrued and unpaid

interest (including default interest), fees and the Yield Maintenance Premium and Prepayment Premium.

(c)     *Treatment*:  To the extent not previously paid, each Senior Debt Holder shall receive, on the Effective Date, in full and indefeasible satisfaction and discharge thereof, Cash equal to the full amount of such Holder's Senior Debt Claim or such other treatment agreed to by mutual consent of the parties.  Additionally, the Reorganized Debtor shall pay the Transaction Expenses (as defined in the Restructuring Support Agreement) of the Administrative Agent as provided for in the Restructuring Support Agreement.  To the extent that Senior Debt Claims become DIP Claims, such Senior Debt Claims will not receive additional payments and treatment under Class 1.

(d)     *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted this Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject this Plan.

2.     Class 2—Other Priority Claims

(a)     *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

(b)     *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Other Priority Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, (iii) the date on which such Allowed Other Priority Claim becomes due and payable, and (iv) such other date as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtor, as applicable.  On the Effective Date, the Debtors shall fund the Other Priority Claims' Escrow Account in Cash as described in Article IV.G.2 hereof. Any amounts remaining in the Other Priority Claims' Escrow Account after payment of all Allowed Other Priority Claims shall be retained and available for use by the Reorganized Debtor.

(c)     *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted this Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject this Plan.

3.     Class 3—Other Secured Claims

(a)     *Classification*:  Class 3 consists of any Other Secured Claims against the Debtors.

(b)     *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors and in full satisfaction and discharge thereof, (i) Cash equal to the unpaid amount of such Allowed Other Secured Claim (except to the extent that such Holder agrees to less favorable treatment thereof), (ii) the collateral securing the Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) other treatment rendering such Claim Unimpaired; in any case, on or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, (c) the date on which such Allowed Other Secured Claim becomes due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtor, as applicable.  On the Effective Date, the Debtors shall fund the Other Secured Claims' Escrow Account in Cash as described in Article IV.G.2 hereof.  Any amounts remaining in the Other Secured Claims' Escrow Account after payment of all Allowed Other Secured Claims shall be retained and available for use by the Reorganized Debtor.

(c)  *Voting*:  Class 3 is Unimpaired.  Holders of Allowed Class 3 Claims are conclusively presumed to have accepted this Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject this Plan.

4.  <u>Class 4—Notes Claims</u>

(a)  *Classification*:  Class 4 consists of all Notes Claims against the Debtors.

(b)  *Allowance*:  Notes Claims shall be Allowed in the aggregate principal amount of $250,000,000 as of the Petition Date, plus accrued and unpaid interest or penalties payable pursuant to the Second Lien Notes Indenture.  Acceptance of this Plan by Class 4 shall constitute an election under this Plan, pursuant to section 1111(b)(2) of the Bankruptcy Code, to have the Notes Claims treated as a secured claim to the extent that such Notes Claims are Allowed; provided that such election shall be deemed to be made solely with respect to this Plan, and the right of Holders of Notes Claims to make or not to make such an election in the event that this Plan is not confirmed is expressly reserved and preserved.

(c)  *Treatment*:  Each Holder of an Allowed Notes Claim that is a Noteholder shall receive, (i) in full satisfaction and discharge thereof, but subject to the Second Lien Notes Trustee Charging Lien, its pro rata share of 100% of the Reorganized Debtor Common Stock (the Reorganized Debtor Common Stock issued on the Effective Date to be immediately converted to New Holdings Units in the Reorganized Debtor upon its conversion to a limited liability company as set forth in this Plan and, in connection therewith, each such Holder will be automatically bound by the terms of the New Holdings Operating Agreement without any requirement to become a signatory thereto), subject to dilution from the Reorganized Debtor Common Stock issued in connection with the Rights Offering and the Backstop Commitment Fee, and (ii) if applicable, Rights Interests or the Cash-Out Payment; <u>provided</u>, <u>however</u>, that in accordance with the Contribution Agreement, if White Oak acquires any Notes in a Note Purchase, there shall be no distribution on account of such Notes (whether held by White Oak or subsequently transferred by White Oak) and, instead, such Notes shall be cancelled, and the Adjusted Equity Component of the Purchase Price under the Contribution Agreement shall be adjusted in accordance with section 3.4(a)(13) of the Contribution Agreement. Additionally, the Reorganized Debtor shall pay the Transaction Expenses (as defined in the Restructuring Support Agreement) of the Consenting Noteholders and the Second Lien Notes Trustee and their respective legal counsel as provided for in the Restructuring Support Agreement.

(d)  *Voting*:  Class 4 is Impaired.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject this Plan.

5.  <u>Class 5—General Unsecured Claims</u>

(a)  *Classification*:  Class 5 consists of all General Unsecured Claims against the Debtors.

(b)  *Treatment*:  All General Unsecured Claims shall be cancelled, extinguished, and discharged on the Effective Date, and no Holder of a General Unsecured Claim shall receive or retain any property or interest on account of such claim.

(i)  Notwithstanding the foregoing, Holders of Allowed General Unsecured Claims who are Eligible Plan Release Consideration Recipients that consent to become Releasing Parties shall be entitled to, in exchange for the Third Party Releases, a GUC Settlement Payment.

(c)     *Voting*:  Class 5 is Impaired.  Holders of Claims in Class 5 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

6.     Class 6—Equity Interests

(a)     *Classification*:  Class 6 consists of all Equity Interests of the Debtors.

(b)     *Treatment*:  All Equity Interests of the Debtors shall be cancelled, extinguished, and discharged on the Effective Date, and no Holder of such Equity Interest shall receive or retain any property or interest on account of such claim.

(c)     *Voting*:  Class 6 is Impaired.  Holders of Equity Interests in Class 9 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors, the Debtors' Estates, or the Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Equity Interests to render such Class of Claims or Equity Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *Substantive Consolidation*

The Plan shall serve as a motion by the Debtors seeking entry of an order pursuant to sections 105(a), 363(b), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation (the "Consolidation").  The tabulation of votes to accept or reject this Plan shall be counted on a consolidated basis.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a), 541, 1123, and 1129 of the Bankruptcy Code, effective as of the Effective Date, of the Consolidation of the Debtors for all purposes.  On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be pooled and shall be the responsibility of the remaining Reorganized Debtor; (ii) all of the Intercompany Claims shall be disallowed and expunged and no distributions shall be made on account of such Intercompany Claims; (iii) no distributions shall be made under this Plan on account of any Equity Interest held by a Debtor in any other Debtor; (iv) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor, and any joint or several liability of any of the Debtors, shall be one obligation of the Reorganized Debtor following the Consolidation of the Debtors and the dissolution of the Debtors other than MOG, as provided in Article IV.G.3 of this Plan; and (v) each and every Claim Filed or to be Filed in the case of any of the Debtors other than the Reorganized Debtor shall be deemed Filed against the Reorganized Debtor.

The Consolidation (other than for purposes of effectuating this Plan) shall not affect:  (i) the legal and corporate structures of the Debtors; (ii) pre- and post-Effective Date guarantees, liens, and security interests that are required to be maintained; (iii) distributions from any insurance policies or proceeds of such policies; (iv) vesting of the Estate Assets in the Reorganized Debtor; and (v) satisfaction of the DIP Claims and Senior Debt Claims in accordance with this Plan.  If the Bankruptcy Court does not approve the Consolidation, or approves the Consolidation but with respect to less than all of the Debtors' Estates, then this Plan shall be treated as a separate plan of liquidation for each Debtor not substantively consolidated and such Debtor(s) shall not, nor shall be required to, resolicit votes with respect to this Plan, nor will the failure of the Bankruptcy Court to approve the Consolidation alter the distributions set forth in this Plan.

Notwithstanding the Consolidation provided for herein, U.S. Trustee Fees payable pursuant to 28 U.S.C. § 1930 shall continue to accrue for each and every Debtor until a particular Debtor's case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

B.      *Sources of Consideration for Plan Distributions*

Distributions under this Plan shall be made from (i) funds in the Debtors' or Reorganized Debtor's possession, including without limitation, from the Cash Payment by White Oak under the Contribution Agreement, the Rights Offering Proceeds, funds received from the disposition of the Estate Assets not being acquired by White Oak and other Cash on hand and (ii) issuance of the Reorganized Debtor Common Stock (and the New Holdings Units to be issued in connection with the conversion of the Reorganized Debtor into a limited liability company).

C.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests, and controversies resolved pursuant to this Plan.

D.      *Contribution Agreement Transaction*

On the Effective Date and in accordance with Article IV.D hereof, the Reorganized Debtor and any other Entity party to the Contribution Agreement Transaction shall take all actions that are necessary or appropriate to effect the Contribution Agreement Transaction, including, but not limited to:

1.      Subject to the terms and conditions of the Contribution Agreement, the Debtors will contribute, assign, transfer, and convey to White Oak, and White Oak will acquire and accept from the Debtors, the Assets;

2.      In consideration of the contribution of the Assets by the Debtors, White Oak will, on the Effective Date, issue the Milagro Interests to the Reorganized Debtor as set forth in Section 2.4 of the Contribution Agreement;

3.      White Oak will pay to MOG the Cash Payment Cap as set forth in Section 3.2(a) of the Contribution Agreement; and

4.      The Reorganized Debtor shall make indefeasible payments to the DIP Agent or the Administrative Agent, as applicable, in satisfaction of the DIP Claims and Senior Debt Claims in accordance with this Plan.

E.    *Rights Offering*

1.    <u>Generally</u>

Each Holder of a Notes Claim that is an Accredited Investor will have the opportunity to make an election, in conjunction with voting on this Plan, to purchase (each, a "<u>Right</u>" and together, the "<u>Rights</u>") contemporaneously with the Effective Date, a pro rata share of shares of Reorganized Debtor Common Stock (the Reorganized Debtor Common Stock issued on the Effective Date to be immediately converted to New Holdings Units in the Reorganized Debtor upon its conversion to a limited liability company as set forth in this Plan), resulting in gross Cash proceeds (the "<u>Rights Offering Proceeds</u>") of up to $20,000,000 (as determined by the Company and the Requisite Backstop Parties) pursuant to the Rights Offering Procedures and the Plan (the "<u>Rights Offering</u>," and such shares of Reorganized Debtor Common Stock subject to the Rights Offering, the "<u>Rights Interests</u>").    Notwithstanding anything contained in the Plan or the Rights Offering Procedures to the contrary, the Debtors may, with the consent of the Requisite Backstop Parties, modify the Rights Offering Procedures or adopt such additional procedures.    The closing of the Rights Offering is conditioned on the consummation of the Plan, the Rights Offering Procedures and the Contribution Agreement Transaction.    Amounts held by the Subscription Agent with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts.

2.    <u>Election Form</u>

In accordance with the terms of the Rights Offering Procedures, the Debtors will deliver an Election Form to each Noteholder that is a Holder of a Notes Claim to determine which such Holders will be considered Eligible Participants and which such Holders will be considered Non-Eligible Participants.    To determine that such Holder is an Eligible Participant, such Holder must, in accordance with the terms set forth in the Election Form, validly complete and return the Election Form by the Election Form Deadline certifying that such Holder is an Accredited Investor and each Holder shall indicate the extent of its interest in participating in the Rights Offering.    To determine that such Holder is a Non-Eligible Participant, such Holder must, in accordance with the terms set forth in the Election Form, validly complete and return the Election Form by the Election Form Deadline certifying that such Holder is not an Accredited Investor.    Only Eligible Participants shall be able to participate in the Rights Offering. Only Non-Eligible Participants shall be eligible to receive the Cash-Out Payment.    Any Noteholder that is a Holder of a Notes Claim that does not return a validly completed Election Form by the Election Form Deadline shall not be entitled to participate in the Rights Offering and shall not be eligible to receive the Cash-Out Payment.

3.    <u>Issuance of Rights</u>

The number of Rights Interests allocated pursuant to the Rights Offering will be based upon a pro rata share of all Notes Claims.    The number of Rights Interests will be adjusted to reflect the final amount of Rights Offering Proceeds, which amount shall initially be sized above the projected Cash needs of the Estates prior to the Effective Date, with excess funds returned to the subscribers to the Rights Offering at the closing of the Rights Offering. Notwithstanding anything to the contrary herein or in the Rights Offering Procedures, fractional Rights shall not be issued and any such fractional Rights will be rounded up or down to the nearest whole number. The price per equity interest ("<u>Per Interest Price</u>") shall be determined using the Deemed Equity Value of White Oak determined pursuant to Section 2.4 of the Contribution Agreement and the pro forma restructured capital structure, and applying a 30% discount to the equity value thereto (after giving effect to the Rights Offering).

4.    <u>Transfer Restrictions and Revocation</u>

The Rights shall not be assignable or detachable, and shall not be transferrable other than in connection with the transfer of the corresponding Claims.    After a Right has been exercised, the underlying Claim corresponding to the Right will cease to be transferrable.    In addition, once an Eligible Participant has properly exercised its Rights, such exercise cannot be revoked, rescinded or annulled for any reason unless the Effective Date has not occurred on or before forty-five (45) days following the Subscription Deadline, at which time any Eligible Participant may revoke the exercise of all, but not less than all, of the Rights it has exercised by delivery of a revocation notice pursuant to the Rights Offering Procedures.

5.        Issuance of New Holdings Units

On the Effective Date, the Reorganized Debtor shall issue shares of Reorganized Debtor Common Stock, in exchange for payment therefor, to those Eligible Participants that, in accordance with the Plan and the Rights Offering Procedures, validly exercised their respective Rights to participate in the Rights Offering. The New Holdings Operating Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Holdings Units shall be bound thereby.

6.        Backstop Commitment

The Backstop Parties have committed (the "Backstop Commitment"), pursuant to the Backstop Commitment Letter, to purchase (on a several and not joint basis) the Rights Interests (based on a Per Interest Price) that are not purchased by the Holders of Notes Claims as part of the Rights Offering, based initially on a percentage to be set forth in the Backstop Commitment Letter, which percentage shall be based on the amount of Notes held by such Backstop Party relative to the aggregate amount of Notes held by all Backstop Parties on the Petition Date. On the Effective Date, the Reorganized Debtor will pay each Initial Consenting Noteholder providing a Backstop Commitment its portion of the Backstop Commitment Fee.

The Debtors intend to rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemptions from Blue Sky Laws in respect of the Rights Interests associated with the Backstop Commitment and the Backstop Commitment Fee.

7.        Refund of Payments

If the Rights Offering is terminated, including by termination of the Backstop Commitment Letter, any payment made by an Eligible Participant pursuant to the Rights Offering shall be refunded as soon as practicable thereafter, without interest or deduction. If an Eligible Participant participating in the Rights Offering has made an overpayment, including in respect of the Rights, the amount of such overpayment shall be refunded as soon as practicable following the Subscription Deadline, without interest or deduction.

8.        Rights Offering Dates

The Rights Offering shall be commenced and completed in accordance with the dates set forth in the Rights Offering Procedures; provided, however, that the Debtors may modify such dates and deadlines consistent with the Rights Offering Procedures, subject to the consent of the Requisite Backstop Parties.

For the avoidance of doubt, nothing herein constitutes an offer of Rights Interests.

F.        *Plan Release Consideration Assets Implementation Procedure*

Within 180 days of the Effective Date, the Reorganized Debtor shall provide to Eligible Plan Release Consideration Recipients the Release Consideration Notice. The Release Consideration Notice will explain that, in exchange for consenting to the Third Party Release and thereby becoming a Releasing Party, Plan Release Consideration Recipients will be entitled to the GUC Settlement Payment. In order to consent, Eligible Plan Release Consideration Recipients will be required to execute and return the GUC Third Party Consent, which will accompany the Release Consideration Notice, to the Reorganized Debtor within thirty (30) days of service of the Release Consideration Notice. Once all Disputed General Unsecured Claims for which a GUC Third Party Consent has been executed and returned have been resolved, the Reorganized Debtor shall distribute the GUC Settlement Payment to the Plan Release Consideration Recipients. In administering the GUC Settlement Payment, including, without limitation, objecting to and resolving Claims and in making distributions to Plan Release Consideration Recipients, the Reorganized Debtor shall be entitled to act in its sole discretion (and not in a fiduciary capacity) and shall have no liability to any Plan Release Consideration Recipient or any other party in connection therewith.

G.      *The Post-Effective Date Reorganized Debtor*

All Debtors other than MOG shall be deemed dissolved on the Effective Date and their assets transferred to the Reorganized Debtor or funded into the Escrow Accounts for distribution in accordance with the terms of this Plan by the Reorganized Debtor.  From and after the Effective Date, the Reorganized Debtor shall take actions it deems necessary or desirable in connection with this Plan and the Estate, including, without limitation, (i) winding up the Debtors' affairs as is appropriate under the circumstances, (ii) liquidating, by conversion to Cash or other methods, including by way of abandonment, any remaining assets of the Estates, to the extent necessary to fund the Escrow Accounts, (iii) enforcing and prosecuting claims, interests, rights, and privileges of the Debtors and their Estates, (iv) resolving Disputed Claims, (v) confirming and administering this Plan and taking such actions as are necessary to effectuate this Plan, and (vi) filing appropriate tax returns.

Upon the Effective Date, all equity interests of MOG shall be cancelled and new shares of Reorganized Debtor Common Stock shall be issued, as set forth under this Plan, to the Noteholders that are Holders of the Allowed Notes Claims, Eligible Participants that exercised their respective Rights to participate in the Rights Offering and to the Backstop Parties.  Immediately after the issuance of such shares of common stock to the Noteholders that are Holders of the Allowed Notes Claims, MOG shall convert to a limited liability company (New Milagro LLC) and the shares of common stock shall convert to limited liability company interests on a one for one basis.  New Milagro LLC will adopt the New Holdings Operating Agreement, and it shall make a "check-the-box" election to be taxed as a corporation pursuant to the Internal Revenue Code.

Further, the Reorganized Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Reorganized Debtor to file motions or substitutions of parties or counsel in each such matter.  From and after the Effective Date, the Reorganized Debtor shall be authorized to conduct its business as a reorganized limited liability company pursuant to the New Holdings Operating Agreement and to operate, buy, sell, or transfer its assets without Bankruptcy Court supervision.

1.      <u>Tax Returns</u>

After the Effective Date, the Reorganized Debtor shall complete and file all final or otherwise required federal, state, and local tax returns for each of the other Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

2.      <u>Escrow Accounts</u>

On the Effective Date, the Debtors shall establish escrow accounts for Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims (to the extent necessary), Allowed Other Priority Claims, Allowed Other Secured Claims and Plan Implementation Expenses.  Funds in the Escrow Accounts shall be used by the Reorganized Debtor only for the payment of, Administrative Claims, Priority Tax Claims, Professional Fee Claims, Other Priority Claims and Other Secured Claims Allowed after the Effective Date to the extent that such Claims have not been paid in full on or prior to the Effective Date and Plan Implementation Expenses.  Any amounts remaining in the Escrow Accounts after payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims shall be retained and available for use by the Reorganized Debtor and shall vest in the Reorganized Debtor free and clear of all liens, Claims, encumbrances, charges, and other interests, except as otherwise specifically provided in this Plan or in the Confirmation Order.

3.      <u>Wind-Down of Certain Debtors</u>

On and after the Effective Date, the Reorganized Debtor will be authorized to implement this Plan and any applicable orders of the Bankruptcy Court, and the Reorganized Debtor shall have the power and authority to take

any action necessary to wind-down and dissolve the Debtors' (other than that of the Reorganized Debtor) and their respective Estates.

As soon as reasonably practicable after the Effective Date, except with respect to the Reorganized Debtor as set forth herein, the Reorganized Debtor shall:  (i) cause the Debtors to comply with, and abide by, the terms of the Contribution Agreement; (ii), by the Plan:

> (A) in the Reorganized Debtor's capacity as the sole direct or indirect member of Milagro Exploration, LLC, Milagro Producing, LLC, Milagro Mid-Continent, LLC, and Milagro Resources, LLC (collectively, the "Subsidiary Debtors"), be appointed, authorized and directed, on behalf of each Subsidiary Debtor, to cause each such Subsidiary Debtor to wind up such Subsidiary Debtor's affairs and, upon the completion of the winding up of the affairs of each Subsidiary Debtor, to file for each of such Subsidiary Debtor a certificate of cancellation to effect the dissolution and termination of the Subsidiary Debtors under and in accordance with  sections 801 through 806 of  the Delaware Limited Liability Company Act, 6 Del. C. §18-101 *et seq.* (the "LLC Act"); and

> (B) as agent for Milagro Holdings, LLC, (1) seek, to the extent not previously granted, the unanimous consent of the Board of Milagro Holdings, LLC required under the Amended and Restated Limited Liability Company Operating Agreement of Milagro Holdings, LLC, dated November 30, 2007, as amended from time to time (the "Milagro Holdings LLC Agreement"), in order to cause the dissolution and winding up of Milagro Holdings, LLC, and (2) after the receipt of such consent, cause Milagro Holdings, LLC to wind up its affairs and, upon the completion of the winding up of the affairs of Milagro Holdings, LLC, to file for Milagro Holdings, LLC a certificate of cancellation to effect the dissolution and termination of Milagro Holdings, LLC under and in accordance with the Milagro Holdings LLC Agreement and the LLC Act; and

(iii) take such other actions as the Reorganized Debtor may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, except with respect to the Reorganized Debtor as set forth herein, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have cancelled pursuant to the Plan and to the extent permitted or required under applicable law all Equity Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, except with respect to the Reorganized Debtor as set forth herein, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Reorganized Debtor.

H.      *Cancellation of Instruments, Certificates, and Other Documents:*

1.      Cancellations

On the Effective Date, except to the extent otherwise provided herein, all instruments, certificates, and other documents evidencing debt or equity interests in the Debtors, including, without limitation, all Notes and the Second Lien Notes Indenture, shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged; provided, that, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing such Holders to receive distributions under this Plan as provided herein; and provided, further, that the

Notes and the Second Lien Notes Indenture shall continue in effect solely for the purposes of (i) allowing the Noteholders to receive their distributions hereunder, (ii) allowing the Second Lien Notes Trustee to make the distributions, if any, to be made on account of the Notes, and (iii) permitting the Second Lien Notes Trustee to assert its Second Lien Notes Trustee Charging Lien against such distributions for payment of the Second Lien Notes Trustee Fees.

2.      Letter of Transmittal to Holders of Notes Claims

As soon as practicable after the Effective Date, the Reorganized Debtor with the cooperation of the Second Lien Notes Trustee shall send a letter of transmittal to each Noteholder, advising such Noteholder of the effectiveness of this Plan and providing instructions to such Noteholder to deliver to the Second Lien Notes Trustee such Noteholder's Note(s) in exchange for the distributions to be made pursuant to this Plan. Delivery of any Note will be effected, and risk of loss and title thereto shall pass, only upon delivery of such Note to the Second Lien Notes Trustee in accordance with the terms and conditions of such letter of transmittal, such letter of transmittal to be in such form and have such other provisions as the Reorganized Debtor or its representatives may reasonably request.

3.      Delivery and Surrender

Each Noteholder shall surrender its Note to the Second Lien Notes Trustee, or, at the option of the Second Lien Notes Trustee, be deemed to have surrendered such Note. No distribution hereunder shall be made to or on behalf of any such Noteholder unless and until such Note is received by the Second Lien Notes Trustee, if required by the first sentence of this Article IV.H.3, or the loss, theft or destruction of such Note is established to the satisfaction of the Second Lien Notes Trustee, including requiring such Noteholder to (i) submit a lost instrument affidavit and an indemnity bond, and (ii) hold the Debtors, the Reorganized Debtor and the Second Lien Notes Trustee harmless in respect of such Note and any distributions made in respect thereof. Upon compliance with this Article IV.H.3 by a Noteholder, such Noteholder shall, for all purposes under this Plan, be deemed to have surrendered such Note. Any such Noteholder that fails to surrender such Note or satisfactorily explain its non-availability to the Second Lien Notes Trustee within eighteen months of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtor or their property or the Second Lien Notes Trustee in respect of such Claim and shall not participate in any distribution hereunder. If such unclaimed distributions are held by the Second Lien Notes Trustee after eighteen months, the distribution that would otherwise have been made to such Noteholder shall be distributed by the Second Lien Notes Trustee to all Noteholders who have surrendered such Notes to the Second Lien Notes Trustee or satisfactorily explained their non-availability to the Second Lien Notes Trustee by such date.

I.      *Offering and Issuance of Securities*

To the maximum extent available, the issuance of any securities under this Plan, including the Reorganized Debtor Common Stock, New Holdings Units, the Rights, and the Rights Interests, shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act, and any other applicable law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code. To the extent section 1145 is unavailable, such securities shall be exempt from registration under the Securities Act through a private placement pursuant to Section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements.

In addition, any and all Reorganized Debtor Common Stock, New Holdings Units, the Rights, and the Rights Interests issued as contemplated by this Plan will be freely tradable by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, and state securities and "blue sky" laws, if any, applicable at the time of any future transfer of such securities or instruments.

The issuance of the Reorganized Debtor Common Stock and conversion of such common stock into New Holdings Units is authorized without the need for any further corporate action or without any further action by the

Debtors or the Reorganized Debtor, as applicable.  The charter of the Reorganized Debtor, as applicable, shall authorize for issuance and distribution on the Effective Date all of such shares of Reorganized Debtor Common Stock in accord with the Rights Offering and the distribution of the shares of Reorganized Debtor Common Stock to Holders of Allowed Notes Claims.  All such shares of Reorganized Debtor Common Stock, issued and distributed pursuant to this Plan and all New Holdings Units into which such shares are converted, shall be duly authorized, validly issued, fully paid, and non-assessable.

J.        *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided herein or in any agreement, instrument, or other document incorporated in this Plan, on the Effective Date, the Estate Assets, all Causes of Action not transferred to White Oak pursuant to the Contribution Agreement, and any other property acquired by any of the Debtors under this Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, the Reorganized Debtor may operate its business and use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or retained Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K.        *Corporate Action*

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Debtors prior to the Effective Date and the Reorganized Debtor after the Effective Date) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, the Debtors, or any other Entity or person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

L.        *New Holdings Units*

Effective upon the conversion of Reorganized Debtor Common Stock to New Holdings Units, the New Holdings Operating Agreement shall authorize the issuance and distribution on the Effective Date of New Holdings Units to the holders of Reorganized Debtor Common Stock in exchange on a one for one basis for such shares of common stock.  All New Holdings Units, which will be converted from shares of Reorganized Debtor Common Stock, issued and distributed pursuant to this Plan, shall be duly authorized, validly issued, fully paid, and non-assessable.  The holders of New Holdings Units shall not be required to execute the New Holdings Operating Agreement before receiving their respective distributions of New Holdings Units under the Plan.  Any such persons who do not execute the New Holdings Operating Agreement shall be automatically deemed to have accepted the terms of the New Holdings Operating Agreement (in their capacity as members of New Milagro LLC) and to be parties thereto without further action.  The New Holdings Operating Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with its terms, and each holder of New Holdings Units shall be bound thereby.

M.        *New Holdings Operating Agreement*

On the Effective Date, the New Holdings Operating Agreement shall become effective, a summary of which shall be set forth in the Plan Supplement.  The New Holdings Operating Agreement, once adopted on the Effective Date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Holdings Units shall be bound thereby.

N.        *Boards of Managers*

Upon the Effective Date, the existing boards of directors and managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members, and any and all remaining officers or directors of each Debtor other than the

Reorganized Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders of such Debtor, or the officers and directors of such Debtor. All of the members of the new board of managers of the Reorganized Debtor, and the members of the board of managers of White Oak (the "White Oak Board") to be selected by the Reorganized Debtor shall be selected as provided in the Company Governance Documents. The Reorganized Debtor shall initially have the right to nominate and elect two (2) members of the White Oak Board, which pursuant to that certain Amended and Restated Voting and Transfer Restriction Agreement, to be dated as of the Effective Date, among White Oak and the other signatories thereto (the "Voting and Transfer Agreement"), may over time, depending on the level of the Reorganized Debtor's ownership interest in White Oak, be reduced to one (1) manager or a non-voting observer to attend meetings of the White Oak Board. The Requisite Consenting Noteholders have agreed that the second manager to be initially appointed to the White Oak Board shall be a person designated by ACON Funds Management, LLC ("ACON") or its designee or designees. During the two (2) year period following the Effective Date of the Plan, the Reorganized Debtor shall, and the Consenting Noteholders shall, and shall at all times cause the Reorganized Debtor to, take all actions necessary in order to cause the nomination and election of the person designated by ACON or its designee or designees as the Reorganized Debtor's second manager on the White Oak Board. On or as soon as practicable after the Effective Date of the Plan, ACON (or its designee or designees) shall receive $2.0 million from the Reorganized Debtor as an advance payment in respect of acting as a manager (or observer) on the White Oak Board, whether from proceeds of the Rights Offering or otherwise.

The directors, managers, and officers of the Debtors and the Reorganized Debtor, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of this Article. Additionally, in accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the new board of managers of the Reorganized Debtor and any Entity proposed to serve as an officer of the Reorganized Debtor shall be disclosed in the Plan Supplement.

The authorizations and approvals contemplated by this Article shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

O.      *Restructuring Recognition Awards.*

In accordance with the Restructuring Support Agreement, the New Holdings Operating Agreement will provide for the Reorganized Debtor to pay, and the Consenting Noteholders shall at all times cause the Reorganized Debtor to and for the New Holdings Operating Agreement to require payment of, a performance-driven restructuring recognition payment designed to reward key members of the Debtors' management for contributing to a successful and timely reorganization of the Debtors, by providing them with one-time cash Restructuring Recognition Awards in an aggregate amount of $800,000. The Restructuring Recognition Awards shall be payable to the Debtors' (i) President and Chief Operating Officer and (ii) EVP Business Development/Land, who are the two persons integral to ensuring that the Restructuring Recognition Events, and thus the restructuring proposed in the Plan, occur. Additionally, the Restructuring Recognition Awards shall be in recognition of the recipients' agreements to continue to provide reasonable services in connection with an orderly wind-down and transition of the Debtors' operations to White Oak and the Reorganized Debtor's transition to its post-Effective Date operations; provided that the Restructuring Recognition Awards will be in addition to, and not in lieu of, any ordinary course (or otherwise agreed to) compensation payable to the (either as an employee or as an independent contractor receiving net compensation comparable to what they would otherwise receive as an employee) recipients through their date of termination by Holdings and the Reorganized Debtor. Payment of the Restructuring Recognition Awards shall be conditioned upon the occurrence of each and every one of the Restructuring Recognition Events, and the Restructuring Recognition Awards shall be earned and payable upon the last to occur of the Restructuring Recognition Events, as well as the delivery of a release and waiver of any amounts owed to the participant by any of the Debtors for severance, whether contractual or otherwise, and the Reorganized Debtor shall pay the Restructuring Recognition Awards solely from the Rights Offering Proceeds at such time.

P.      *Effectuating Documents; Further Transactions*

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtor, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue,

execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Rights Offering, the New Holdings Operating Agreement, the Reorganized Debtor Common Stock issued pursuant to the Plan and the conversion of the Reorganized Debtor Common Stock into the New Holdings Units, in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

Q.      *Exemption from Certain Taxes and Fees*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R.      *Causes of Action*

Other than Causes of Action against an Entity that are transferred to White Oak as part of the Contribution Agreement Transaction or otherwise waived, relinquished, exculpated, released, compromised, or settled under this Plan or any Final Order (including, for the avoidance of doubt, any claims or Causes of Action released pursuant to Article VIII.D hereof), the Debtors reserve and, as of the Effective Date, assign to the Reorganized Debtor the Reorganized Debtor Causes of Action, which shall include, for the avoidance of doubt, those Causes of Action identified as being retained in the Plan Supplement.  On and after the Effective Date, the Reorganized Debtor may pursue the Reorganized Debtor Causes of Action on behalf of and for the benefit of the applicable beneficiaries.

No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors reserve such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with sections 1123(b)(3) and 1141(b) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Reorganized Debtor, shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

S.      *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Reorganized Debtor shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of the Reorganized Debtor, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of the Reorganized Debtor.  The Reorganized Debtor shall make payments of U.S. Trustee Fees payable pursuant to 28 U.S.C. § 1930 for each Debtor whose case is closed for all amounts accruing prior to the Effective Date.

When all Disputed Claims have become Allowed or disallowed and all pending contested matters have been adjudicated to Final Order or dismissed, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close its Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE V**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    *Assumption and Assignment of Executory Contracts and Unexpired Leases*

Subject to and in accord with section 5.5 of the Contribution Agreement, all executory contracts and unexpired leases to which the Debtors are a party shall be rejected under this Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code unless a particular executory contract or unexpired leases (i) is designated as a Desired 365 Contract by White Oak at any time prior to five (5) calendar days before the commencement of the Confirmation Hearing (or, if any contract to be assumed by Milagro  is first identified to White Oak by Milagro or first identified to Milagro by White Oak between the beginning of such five (5) calendar days and the commencement of the Confirmation Hearing, within one (1) Business Day of such identification); provided, however, that White Oak may not subtract from Schedule 5.5(b) of the Contribution Agreement any Desired 365 Contract that is identified as an "Operating Agreement" on the 365 Schedule of the Contribution Agreement, (ii) is the Restructuring Support Agreement, (iii) is the Contribution Agreement, (iv) is another contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, or (v), if not designated as a Desired 365 Contract, is subject to a pending motion to assume or assume and assign.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Costs under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Costs in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitation described below, by the Debtors or by White Oak in accordance with the Contribution Agreement, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (i) the amount of the Cure Cost, (ii) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption  (and assignment, if applicable); provided, that prior to the Effective Date, the Debtors, and on and after the Effective Date, the Reorganized Debtor or White Oak  (to the extent that the relevant contract or lease has been assigned to White Oak), as applicable, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court, at least twenty-one (21) days before the Confirmation Hearing, the Debtors shall cause notice of proposed assumption and proposed Cure Costs to be sent to applicable counterparties.  Any objection by such counterparty must be Filed, served, and actually received by the Debtors within fourteen (14) days after service of notice of the Debtors' proposed assumption and assignment to White Oak, assumption by the Reorganized Debtor, and associated Cure Costs.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such assumption or Cure Cost.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Costs, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment.  **Anything in the Schedules and any Proofs of Claim Filed with respect to amounts arising under an Executory Contract or Unexpired Lease that**

**has been assumed shall be deemed satisfied, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity**.

C.      *Pre-existing Payment and Other Obligations*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtor, as applicable, under such contract or lease.  In particular, to the extent permissible under applicable nonbankruptcy law, the Debtors and the Reorganized Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide (i) payment to the contracting Debtors or Reorganized Debtor, as applicable, of outstanding and future amounts owing under or in connection with rejected Executory Contracts or Unexpired Leases or (ii) maintenance of, or to repair or replace, goods previously purchased by the contracting Debtors or Reorganized Debtor, as applicable.

D.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to this Plan or otherwise, must be Filed with Bankruptcy Court and served on the Debtors or, after the Effective Date, the Reorganized Debtor, as applicable, no later than thirty (30) days after the effective date of rejection of such Executory Contract or Unexpired Lease.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, (ii) be permitted to vote to accept or reject this Plan on account of any Claim arising from such rejection, or (iii) elect to receive a GUC Settlement Payment on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtor, the Debtors' Estates, or the property of any of the foregoing without the need for any objection by the Debtors or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

E.      *Contribution Agreement; Assumed Contracts*

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to this Plan shall be subject in all respects to White Oak's rights and obligations, including any Cure Costs assumed by White Oak in accordance with the Contribution Agreement, with respect to any such Executory Contracts or Unexpired Leases that constitute contracts to be assumed by Milagro and transferred and conveyed to White Oak as an assumed and assigned contract, as set forth in the Contribution Agreement, including Schedule 5.5(b) thereof.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder.

Modifications, amendments, supplements, and restatements to prepetition 365 Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the 365 Contract or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    D&O Policies

The D&O Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Reorganized Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

H.    Indemnification Obligations

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, officers, employees, attorneys, other professionals, and agents of the Debtors, respectively, against any Claims or Causes of Action under the Indemnification Provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Reorganized Debtor, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; provided, however, that, notwithstanding anything herein to the contrary, the Reorganized Debtor's obligation to fund such Indemnification Provisions shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Reorganized Debtor, including the D&O Policies.

I.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtor, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in this Plan.

**ARTICLE VI**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.    Allowance of Claims and Administrative Expenses for Purposes of this Plan

For purposes of making distributions under this Plan, but without in any way limiting the definition of "Allowed," a claim or administrative expense shall not be considered "Allowed" if the underlying obligation has been assumed by White Oak under the Contribution Agreement; instead, such claim or administrative expense shall be deemed satisfied.

B.    Calculation of Amounts to Be Distributed

Each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class from the Debtors or the Reorganized Debtor on behalf of the Debtors.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Notwithstanding anything to the contrary in this Plan, no

34

Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Bankruptcy Code.

C.    *Rights and Powers of the Debtors and the Reorganized Debtor*

      1.      <u>Powers of the Debtors and the Reorganized Debtor</u>

Except as otherwise set forth herein, all distributions under this Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter by the Debtors or the Reorganized Debtor (or its designee(s)), the timing of which shall, as long as in accord with the Contribution Agreement, be subject to the reasonable discretion of the Debtors or the Reorganized Debtor, as applicable.

After the Effective Date, the Reorganized Debtor or representatives shall have the right to object to, Allow, or otherwise resolve any Disputed Claims, subject to the terms hereof.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

      1.      <u>Record Date for Distribution</u>

As of the close of business on the Distribution Record Date, (i) the Claims Register shall be closed and the Debtors, the Reorganized Debtor, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date, (ii) the transfer books and records of the Notes as maintained by the Second Lien Notes Trustee or its agent shall be closed and (iii) any transfer of any Notes Claim or any interest therein shall be prohibited. The Debtors, the Reorganized Debtor, and the Second Lien Notes Trustee shall have no obligation to recognize any transfer of any Notes Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of record as of the close of business on the Distribution Record Date.

      2.      <u>Delivery of Distributions in General</u>

            (a)      Payments and Distributions on Disputed Claims

Except as otherwise provided in this Plan, a Final Order or as otherwise agreed to by the Debtors or the Reorganized Debtor (as the case may be) and the Holder of the applicable Claim or Interest, on the Effective Date or as soon as practicable thereafter, the Reorganized Debtor shall make initial distributions under this Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtor's right to object to Claims; <u>provided</u>, <u>however</u>, that Claims based on liabilities not yet due shall be paid as they become due in the ordinary course of business.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Reorganized Debtor, be deemed to have been made by the Reorganized Debtor on the Effective Date unless the Reorganized Debtor and the Holder of such Claim agree otherwise.

            (b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in this Plan and except as may be agreed to by, as applicable, the Debtors or the Reorganized Debtor, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)        Distributions

On and after the Effective Date, the Debtors and the Reorganized Debtor, as applicable, shall make the distributions required to be made on account of Allowed Claims under this Plan.

Distributions on account of DIP Claims shall be deposited with the DIP Agent for the benefit of the DIP Lenders, at which time such distributions shall be deemed complete and the DIP Agent shall deliver such distributions in accordance with this Plan, the Interim DIP Order, the Final DIP Order and the terms of the DIP Facility.  Distributions on account of Allowed Class 1 Claims, if any, shall be deposited with the Administrative Agent for the benefit of the Secured Lenders, at which time such distributions shall be deemed complete and the Administrative Agent shall deliver such distributions in accordance with this Plan and the terms of the Credit Agreement.

The distributions to be made under the Plan to Holders of Allowed Notes Claims shall be made to the Second Lien Notes Trustee, which, subject to the right of the Second Lien Notes Trustee to assert its Second Lien Notes Trustee Charging Lien against the distributions to be made under the Plan, shall transmit such distributions to the Holders of such Allowed Notes Claims. All payments to Holders of Allowed Notes Claims shall only be made to such Holders after the surrender by each such Holder of the Note certificates representing such Notes Claim, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the Holder's compliance with the requirements set forth in Article IV.H.3 above.  Upon surrender of such Note certificates, the Second Lien Notes Trustee shall cancel and destroy such Notes. As soon as practicable after surrender of Note certificates evidencing Allowed Notes Claims, the Second Lien Notes Trustee shall distribute to the Holder thereof such Holder's pro rata share of the distribution, but subject to the rights of the Second Lien Notes Trustee to assert its Second Lien Notes Trustee Charging Lien against such distribution.  Any distribution that is not made on the Initial Distribution Date or on any other date specified in this Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor in the applicable Escrow Account and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed.  In accordance with Article VII.D hereof, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to this Plan.

The Second Lien Notes Trustee shall not be required to give any bond or surety or other security for making any distributions hereunder.  To the extent that the Second Lien Notes Trustee provides services related to distributions pursuant to the Plan, the Second Lien Notes Trustee will receive from the Reorganized Debtor, without further court approval, reasonable compensation for such services and reimbursement of reasonable expenses incurred in connection with such services.  These payments will be made on terms agreed to between the Second Lien Notes Trustee and the Debtor or the Reorganized Debtor.

Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Second Lien Notes Indenture shall continue in effect to the extent necessary to authorize the Second Lien Notes Trustee to receive and distribute to the Holders of Allowed Notes Claims distributions pursuant to this Plan on account of Allowed Notes Claims and shall terminate completely upon completion of all such distributions.

3.        Accrual of Dividends and Other Rights

For purposes of determining the accrual of dividends or other rights after the Effective Date, the Reorganized Debtor Common Stock issued under this Plan, and the New Holdings Units into which such Reorganized Debtor Common Stock shall be converted, shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed.

4.        Minimum; De Minimis Distributions

No Cash payment of less than $100.00, in the reasonable discretion of the Debtors or the Reorganized Debtor, as applicable, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

5.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Reorganized Debtor, as applicable, has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the initial distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with this Plan, and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

6.        Manner of Payment Pursuant to this Plan

Any payment in Cash to be made pursuant to this Plan shall be made at the election of the Debtors or the Reorganized Debtor, as applicable, by check or by wire transfer; provided, that all payments in Cash made to the DIP Agent or the Administrative Agent in satisfaction of the DIP Claims or Senior Debt Claims under this Plan, as applicable, shall be made by wire transfer of immediately available funds.

E.        *Compliance with Tax Requirements/Allocations*

In connection with this Plan and all distributions hereunder, to the extent applicable, the Debtors or the Reorganized Debtor, as applicable, are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  The Reorganized Debtor is authorized to require that any Holder of an Allowed Claim provide it with all forms and information required to comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit (the "Required Tax Documents") as a condition precedent to being sent a distribution.  In the event that a Holder fails to return Required Tax Documents within forty-five (45) days after a written request by the Reorganized Debtor, such Holder, its Claim, and all distributions on account of such Holder's Claim shall be treated as an undeliverable distributions and unclaimed property in accordance with Article VI.D.5 hereof.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

F.        *Claims Paid or Payable by Third Parties*

1.        Claims Paid by Third Parties; Recourse to Collateral

The Debtors or the Reorganized Debtor, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Reorganized Debtor, as applicable, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor prior to the Effective Date and the Reorganized Debtor after the Effective Date, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or

return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

      2.      <u>Claims Payable by Insurance, Third Parties; Recourse to Collateral</u>

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.      <u>Applicability of Insurance Policies</u>

Notwithstanding anything to the contrary in this Plan or Confirmation Order, Confirmation and Consummation of this Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies, including the D&O Policies.

**ARTICLE VII**

**PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.*     *Resolution of Disputed Claims*

      1.      <u>Allowance of Claims</u>

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Reorganized Debtor, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

      2.      <u>Prosecution of Objections to Claims</u>

Other than with respect to Professional Fee Claims, prior to the Effective Date, the Debtors, and, on or after the Effective Date, the Reorganized Debtor shall have the authority to File objections to such Claims, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all such Claims, regardless of whether such Claims are in a Class or otherwise, subject to the terms hereof (including Articles IV.G.3 and VI.C hereof).  From and after the Effective Date, the Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises and no further notice to or action, order, or approval of the Bankruptcy Court with respect to such settlements or compromises shall be required.

      3.      <u>Claims Estimation</u>

On and after the Effective Date, the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtor have

previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any contingent or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any provision herein to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under this Plan, including for purposes of distributions, and the Debtors or the Reorganized Debtor as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.      Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtors or the Reorganized Debtor (or the Claims Agent at, as applicable, the Debtors' or the Reorganized Debtor's direction), and any Claim that has been amended may be adjusted thereon by, as applicable, the Debtors or the Reorganized Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

5.      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Deadline.

B.      *Disallowance of Claims*

To the maximum extent provided by section 502(d) of the Bankruptcy Code, all Claims of any Entity from which property is recoverable by the Debtors or the Reorganized Debtor, as applicable, under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtor, as applicable, alleges is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtor, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

C.      *Amendments to Claims*

After the Confirmation Date, a Proof of Claim may not be filed or amended without the authorization of the Bankruptcy Court and the Claim represented by any such new or amended Proof of Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided, that such Holder may amend the Proof of Claim Filed solely to decrease, but not to increase, the amount, number, or priority of the represented Claim, unless otherwise provided by the Bankruptcy Court.

D.      *No Interest*

        Unless otherwise specifically provided for in this Plan (including Article III hereof), by applicable law (including, without limitation, section 506(b) of the Bankruptcy Code), or agreed-to by, as applicable, the Debtors or the Reorganized Debtor, interest shall not accrue or be paid on any Claim, and no Holder of any Claim shall be entitled to interest accruing on and after the Petition Date on account of any Claim.  Without limiting the foregoing, interest shall not accrue or be paid on any Claim after the Effective Date to the extent the final distribution paid on account of such Claim occurs after the Effective Date.

E.      *Second Lien Notes Trustee as Claim Holder*

        Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtor shall recognize a Proof of Claim filed by the Second Lien Notes Trustee in respect of the Notes Claims.  Accordingly, any Claim, proof of which is filed by the registered or beneficial Holder of a Claim, may be disallowed as duplicative of the Claim of the Second Lien Notes Trustee, without need for any further action or Bankruptcy Court order.

## ARTICLE VIII

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Equity Interests, and Controversies*

        Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, and except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Equity Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Equity Interests, subject to the Effective Date occurring.

B.      *Release of Liens*

        Except as otherwise provided in this Plan or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date, and concurrently with the applicable distributions made pursuant to this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors and immediately vest in the Reorganized Debtor upon the Debtors dissolution.

C.      *Subordinated Claims*

        The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination

rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Debtors or the Reorganized Debtor, as applicable, to re-classify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

D.    *Debtor Release*

AS OF THE EFFECTIVE DATE, THE DEBTORS AND THE REORGANIZED DEBTOR, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, AND THE ESTATES SHALL BE DEEMED TO FOREVER RELEASE AND WAIVE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, WHICH ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE THROUGH AND INCLUDING THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE REORGANIZED DEBTOR, THE ESTATES, THE CHAPTER 11 CASES, THE CONTRIBUTION AGREEMENT, THIS PLAN, OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS, OR THE REORGANIZED DEBTOR, WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY, OR IN ANY REPRESENTATIVE OR ANY OTHER CAPACITY AGAINST THE RELEASED PARTIES IN THEIR RESPECTIVE CAPACITIES AS SUCH; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL ANYTHING IN THIS PLAN BE CONSTRUED AS A RELEASE OF ANY ENTITY'S FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OR A RELEASE OR WAIVER OF THE DEBTORS' OR REORGANIZED DEBTOR'S RIGHT OR ABILITY TO ASSERT OR RAISE CERTAIN CLAIMS AGAINST ANY RELEASED PARTY AS A DEFENSE TO A CLAIM OR SUIT BROUGHT AGAINST THEM OR THEIR ASSETS BY ANY RELEASED PARTY; PROVIDED, FURTHER, THAT THIS RELEASE SHALL NOT APPLY TO OBLIGATIONS ARISING UNDER THIS PLAN, THE CONTRIBUTION AGREEMENT, THE BACKSTOP COMMITMENT LETTER, OR THE RESTRUCTURING SUPPORT AGREEMENT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (II) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VI) A BAR TO ANY OF THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

E.    *Third Party Release*

ON THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW AS DETERMINED BY THE BANKRUPTCY COURT, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE EFFECTIVE DATE, ALL RELEASING PARTIES, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS AND THE REORGANIZED DEBTOR UNDER THIS PLAN AND CONTRIBUTION AGREEMENT, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS EXECUTED AND DELIVERED IN CONNECTION WITH THIS PLAN AND CONTRIBUTION AGREEMENT, WILL BE DEEMED TO FOREVER RELEASE AND WAIVE ALL CLAIMS, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE OBLIGATIONS OF ANY PARTY UNDER THIS PLAN OR THE CONTRIBUTION AGREEMENT, AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR THE CONTRIBUTION AGREEMENT), INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR ANY SUCH LOSS SUCH RELEASING PARTY MAY SUFFER, HAVE SUFFERED, OR BE ALLEGED TO SUFFER AS A

RESULT OF THE DEBTORS COMMENCING THE CHAPTER 11 CASES OR AS A RESULT OF THIS PLAN OR THE CONTRIBUTION AGREEMENT TRANSACTION BEING CONSUMMATED, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE REORGANIZED DEBTOR, THE CHAPTER 11 CASES, THIS PLAN, OR THE DISCLOSURE STATEMENT AGAINST THE RELEASED PARTIES IN THEIR RESPECTIVE CAPACITIES AS SUCH.   NOTWITHSTANDING THE FOREGOING, IN NO EVENT SHALL ANYTHING IN THIS PLAN BE CONSTRUED AS A RELEASE OF ANY ENTITY'S (OTHER THAN A DEBTOR'S) FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.   FURTHER, THIS RELEASE SHALL NOT APPLY TO OBLIGATIONS ARISING UNDER THE PLAN, THE CONTRIBUTION AGREEMENT, THE BACKSTOP COMMITMENT LETTER, OR THE RESTRUCTURING SUPPORT AGREEMENT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THIS THIRD PARTY RELEASE BY RELEASING PARTIES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THIS THIRD PARTY RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (II) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (III) FAIR, EQUITABLE, AND REASONABLE; (IV) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (V) A BAR TO ANY RELEASING PARTY ASSERTING ANY CLAIM RELEASED PURSUANT TO THIS THIRD PARTY RELEASE.

F.      *Exculpation*

THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE CHAPTER 11 CASES, OR RELATED TO FORMULATING, NEGOTIATING, SOLICITING, PREPARING, DISSEMINATING, CONFIRMING, OR IMPLEMENTING THIS PLAN OR CONSUMMATING THIS PLAN, THE DISCLOSURE STATEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THIS PLAN OR ANY OTHER PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OR LIQUIDATION OF THE DEBTORS; PROVIDED, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER, OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.   WITHOUT LIMITING THE FOREGOING "EXCULPATION" PROVIDED UNDER THIS ARTICLE, THE RIGHTS OF ANY HOLDER OF A CLAIM OR EQUITY INTEREST TO ENFORCE RIGHTS ARISING UNDER THIS PLAN SHALL BE PRESERVED, INCLUDING THE RIGHT TO COMPEL PAYMENT OF DISTRIBUTIONS IN ACCORDANCE WITH THIS PLAN.

G.      *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (I) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (II) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (III) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E HEREOF; (IV) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F HEREOF; OR (V) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN

COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THIS PLAN; PROVIDED, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

H.      *Waiver of Statutory Limitations on Releases*

        EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER THIS ARTICLE) EXPRESSLY ACKNOWLEDGES THAT, ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, THEY HAVE CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542.  THE RELEASES CONTAINED IN THIS ARTICLE ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN. FOR THE AVOIDANCE OF DOUBT, THE DEBTORS, HOLDERS OF CLAIMS OR EQUITY INTERESTS, AND RELEASING PARTIES, BEING MADE AWARE OF SECTION 1542 AND SIMILAR LAWS AND COMMON LAW PRINCIPLES, HEREBY ARE DEEMED TO HAVE EXPRESSLY WAIVED ANY RIGHTS

THAT ANY OF THEM MIGHT HAVE OR ASSERT THEREUNDER, TO THE EXTENT THAT SUCH SECTION RELATES TO ANY OF THE CLAIMS RELEASED PURSUANT TO THIS ARTICLE.

I.    *Setoffs*

Except as otherwise provided in this Plan, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Reorganized Debtor, pursuant to the Bankruptcy Code (including sections 553 and 558 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim on account of any Proof of Claim or other pleading Filed with respect thereto prior to the Confirmation Hearing and the distributions to be made pursuant to this Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors' Estates may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); provided, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtor, as applicable, of any such claims, rights, and Causes of Action that the Debtors' Estates may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Debtors' Estates unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court expressly preserving such setoff; provided, that nothing in this Plan shall prejudice or be deemed to have prejudiced the Debtors' or the Reorganized Debtor's right to assert that any Holder's setoff rights were required to have been asserted by motion or pleading filed with the Bankruptcy Court prior to the Effective Date.

J.    *Discharge of the Debtors*

Pursuant to section 1141(d) of the Bankruptcy Code and effective as of the Effective Date, and except as otherwise specifically provided in the Plan:  (a) the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors, the Reorganized Debtor or any of their assets, properties or Estates, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date; (b) the Plan shall bind all holders of Claims and Equity Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt, right or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right or Equity Interest is Allowed; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan or is entitled to receive a distribution hereunder; and (d) all Entities shall be precluded from ever asserting against the Debtors, the Debtors' Estates, the Reorganized Debtor, their successors and assigns, and their assets and properties any Claims and Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.   The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

## ARTICLE IX

## CONFIRMATION AND SUBSTANTIAL CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Consummation of this Plan*

It shall be a condition to Consummation of this Plan that the following conditions have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    The Bankruptcy Court shall have entered the Disclosure Statement Order;

2.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with this Plan (without any material modification that would require re-solicitation), the Restructuring Support Agreement, and the Contribution Agreement;

3.      The Confirmation Order shall have become a Final Order;

4.      All conditions precedent to the closing of the Contribution Agreement Transaction shall have been satisfied and there shall be a simultaneous closing of the Contribution Agreement Transaction with the Consummation of the Plan;

5.      All documents and agreements necessary to implement this Plan, including the Restructuring Support Agreement: (i) shall have material compliance with the covenants in, and all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) shall have been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) shall have been effected or executed;

6.      The Escrow Accounts shall have been established and funded;

7.      The Definitive Documents shall have been executed and delivered consistent with this Plan;

8.      There shall be no material litigation restraining or materially altering the Contribution Agreement Transaction;

9.      The Rights Offering shall have closed and been funded; and

10.     All other actions necessary for the occurrence of the Effective Date shall have been taken.

On the Effective Date, this Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

B.      *Waiver of Conditions*

The Debtors may, subject to obtaining any consents required under the Restructuring Support Agreement or the Contribution Agreement, waive any of the conditions to the Effective Date set forth in Article IX.A hereof without any notice to any other parties in interest and without any further notice to, or action, order or approval of, the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate this Plan.

C.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Effective as of the date hereof, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan before the entry of the Confirmation Order, subject to the limitations set forth herein and the Restructuring Support Agreement; and (ii) after the entry of the Confirmation

Order, the Debtors or the Reorganized Debtor, as applicable, may amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan, this clause (b) being subject in all cases to the limitations set forth herein and in the Restructuring Support Agreement; provided, however, that neither the Debtors nor the Reorganized Debtor shall modify the Plan as to material terms that adversely affect the rights or duties of the Second Lien Notes Trustee without the prior written consent of the Second Lien Notes Trustee, which consent shall not be unreasonably withheld.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of this Plan*

The Debtors reserve the right to revoke or withdraw this Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors revoke or withdraw this Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then: (i) this Plan with respect to such Debtor shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan with respect to such Debtor, and any document or agreement executed pursuant to this Plan with respect to such Debtor, shall be deemed null and void; and (iii) nothing contained in this Plan with respect to such Debtor shall:   (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

D.      *Confirmation of this Plan*

The Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code. Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to amend this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and this Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.      Resolve any matters related to:   (i) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be

liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Debtors or the Reorganized Debtor amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases set forth on the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement;

8.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.F.1 hereof;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated therein;

16.     Consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' Release or Third Party Release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     Enforce all orders previously entered by the Bankruptcy Court;

22.     Hear any other matter not inconsistent with the Bankruptcy Code;

23.     Enter an order concluding or closing the Chapter 11 Cases; and

24.     Enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, the Reorganized Debtor, and any and all Holders of Claims or Equity Interests (regardless of whether such Claims or Equity Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or debt has voted on this Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors and all Holders of Claims or Equity Interests receiving distributions pursuant to this Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.     *Dissolution of Committee*

On the Effective Date, the Committee, to the extent one has been appointed in the Chapter 11 Cases, shall dissolve and the members thereof shall be compromised, settled, and released from all rights and duties from or related to the Chapter 11 Cases, except the Committee will remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.  The Debtors and the Reorganized Debtor shall have no obligation to pay any fees or expenses incurred after the Effective Date by the Committee or the Committee Members.

D.    *Reservation of Rights*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.    *Service of Documents*

Any pleading, notice, or other document required by this Plan to be served on or delivered to the following entities and shall be served via first class mail, overnight delivery, or messenger on.

(i)    If to the Debtors, to:

Milagro Oil & Gas, Inc.
1301 McKinney, Suite 500
Houston, TX 77010
Attention:    Gary Mabie
Email: gmabie@milagroexploration.com

With a copy to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, DE 19801
Attention:    M. Blake Cleary
Email: mbcleary@ycst.com

and

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002
Attention:  Robert G. Reedy; John F. Higgins; Kevin J. Poli
Email: rreedy@porterhedges.com; jhiggins@porterhedges.com; kpoli@porterhedges.com

(ii)    If to an Initial Consenting Noteholder or a transferee or assignee thereof, to the electronic mail addresses set forth below the Consenting Noteholder's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention:    Daniel I. Fisher and Charles R. Gibbs
Email: dfisher@akingump.com and cgibbs@akingump.com

(iii)    If to an Initial Secured Lender or a transferee or assignee thereof, to the electronic mail addresses set forth below the Secured Lender's signature (or as directed by any transferee

thereof), as the case may be, with copies to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention: Frederic Ragucci
Email: frederic.ragucci@srz.com

(iv)     If to an Initial Equity Holder or a transferee or assignee thereof, to the electronic mail addresses set forth below the Equity Holder's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Hogan Lovells US LLP, if to Acon
875 Third Avenue
New York, NY 10022
Attention:    Christopher R. Donoho III
Email:        chris.donoho@hoganlovells.com

(v)     If to White Oak, to:
White Oak Resources VI, LLC
12941 North Freeway, Suite 500
Houston, TX 77060
Attention:  Thomas F. Isler
Email:  tisler@whiteoakenergy.com

With a copy to:

Locke Lord LLP
600 Travis, Suite 2800
Houston, Texas 77002
Attn: Mitchell A. Tiras
Fax Number: (713) 229-2674
Telephone: (713) 226-1144

## G.     Term of Injunctions or Stays

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the later of the maximum extent permitted by law or the closing of the Chapter 11 Cases.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## H.     Entire Agreement

Except as otherwise indicated, this Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## I.     Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  The final forms of the Plan Supplement documents shall be materially consistent with those set forth in the Plan Supplement.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsels at the address above or by downloading such exhibits and documents from https://cases.primeclerk.com/milagro or the Bankruptcy

Court's website at www.deb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of this Plan that does not constitute the Plan Supplement, such part of this Plan that does not constitute the Plan Supplement shall control.

J.      *Nonseverability of Plan Provisions*

        If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors; and (iii) nonseverable and mutually dependent.

K.      *Waiver or Estoppel*

        Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

*[Signature Page Follows]*

Respectfully submitted, as of the date first set forth above,


MILAGRO HOLDINGS, LLC
on behalf of itself and all other Debtors


By:      */s/ Gary J. Mabie*
Name:    Gary J. Mabie
Title:     President & Chief Operating Officer

## EXHIBIT 1

**Contribution Agreement**

**CONTRIBUTION AGREEMENT**

Between

**MILAGRO OIL & GAS, INC.**

**and its Subsidiaries**

and

**WHITE OAK RESOURCES VI, LLC**

Dated July 15, 2015

TABLE OF CONTENTS

**Page**

1.   **DEFINED TERMS.**..................................................................................2

2.   **Contribution of Assets.** ......................................................................2

   2.1   Contribution of Assets..............................................................2
   2.2   Assets. .....................................................................................2
   2.3   Reserved Assets. .....................................................................4
   2.4   Issuance...................................................................................5
   2.5   Closing; Effective Time. ...........................................................6

3.   **PURCHASE PRICE** .............................................................................7

   3.1   Purchase Price..........................................................................7
   3.2   Treatment of Debt and Notes....................................................7
   3.3   Break-Up Fee ...........................................................................8
   3.4   Adjustments to Purchase Price. ...............................................8
   3.5   No Duplicative Effect; Methodologies .....................................12

4.   **REPRESENTATIONS AND WARRANTIES**..............................................12

   4.1   Representations and Warranties of Milagro ...........................12
   4.2   Representations and Warranties of White Oak. ......................16
   4.3   Disclaimer of Representations and Warranties; Assets Sold "As Is, Where is" ...................................................................................22

5.   **PRE-CLOSING COVENANTS AND AGREEMENTS**.................................25

   5.1   Records Review......................................................................25
   5.2   Interim Operations .................................................................26
   5.3   Preferential Rights and Consents. .........................................29
   5.4   Casualty Loss ........................................................................30
   5.5   Assumption and Rejection of Executory Contracts and Leases............30
   5.6   Confidentiality ........................................................................32
   5.7   Post-Signing Information ........................................................32
   5.8   Post-Execution Date Financial Updates.................................33

6.   **TITLE MATTERS**...............................................................................33

   6.1   Definitions ..............................................................................33
   6.2   Title Adjustments. ..................................................................36
   6.3   Special Warranty of Title. .......................................................38
   6.4   EXCLUSIVE REMEDY. ...........................................................39

7.   **ENVIRONMENTAL MATTERS**.............................................................39

   7.1   Environmental Assessment....................................................39
   7.2   INSPECTION INDEMNITY .....................................................40

7.3     Definitions .................................................................................40
7.4     Environmental Defect Adjustments .....................................41
7.5     EXCLUSIVE REMEDY ...........................................................43
7.6     NORM .....................................................................................44

8.    EMPLOYEE MATTERS.................................................................44

9.    CONDITIONS TO CLOSING .......................................................44

9.1     Milagro's Conditions.............................................................44
9.2     White Oak's Conditions ........................................................45

10.    CLOSING ...................................................................................46

10.1    Place of Closing ...................................................................46
10.2    Closing Obligations ..............................................................46

11.    OBLIGATIONS AFTER CLOSING ............................................48

11.1    Allocation of Revenues .........................................................48
11.2    Files and Records .................................................................48
11.3    Suspense Funds ...................................................................49
11.4    Recordation and Post-Closing Consents. ...........................49
11.5    Purchase Price Allocation. ...................................................49
11.6    Removal of Milagro's Name ..................................................49
11.7    Taxes .....................................................................................50
11.8    Operational Transition...........................................................52

12.    RETENTION AND ASSUMPTION OF OBLIGATIONS AND INDEMNIFICATION
        ................................................................................................52

12.1    Retention and Assumption of Obligations. ...........................52
12.2    No Survival of Representations and Warranties of Milagro; No Recourse
        ................................................................................................53
12.3    Indemnities of White Oak .....................................................54
12.4    Indemnification Procedures...................................................55

13.    TERMINATION...........................................................................56

13.1    Termination. ..........................................................................56
13.2    Liabilities Upon Termination..................................................57

14.    MISCELLANEOUS .....................................................................58

14.1    Schedules and Exhibits.........................................................58
14.2    Expenses and Taxes. ............................................................58
14.3    Notices...................................................................................58
14.4    Amendments..........................................................................60
14.5    Assignment. ...........................................................................60
14.6    Announcements......................................................................60
14.7    GOVERNING LAW; VENUE; JURY TRIAL WAIVER. ..........60
14.8    Entire Agreement. .................................................................61

14.9    Parties in Interest. ............................................................................61
14.10    WAIVER OF DAMAGES. ..................................................................61
14.11    Waivers. ...........................................................................................61
14.12    Further Assurances. ..........................................................................61
14.13    Severability. ......................................................................................62
14.14    Headings; Terminology; Defined Terms. ...........................................62
14.15    Not to be Construed Against Drafter. ................................................62
14.16    INDEMNITIES AND CONSPICUOUSNESS OF PROVISIONS. .......62
14.17    Waiver of Consumer Rights. ..............................................................63
14.18    No Partnership Created. .....................................................................63
14.19    Counterparts of Assignment. .............................................................63
14.20    Counterpart Execution. ......................................................................63
14.21    Disclosure Schedules ........................................................................64

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Leases |
| Exhibit B | Mineral Interests |
| Exhibit C | Wells |
| Exhibit D | Wells Subject to Payout |
| Exhibit E | Surface Use Agreements |
| Exhibit F | Surface Fee Lands |
| Exhibit G | Allocated Values |
| Exhibit H | Form of Assignment, Conveyance and Bill of Sale |
| Exhibit I | Form of Transition Services Agreement |
| Exhibit J | Assigned Contracts |
| Exhibit K | Form of Assumption Agreement |
| Exhibit L | Retained Contracts |
| Exhibit M | Retained Litigation |
| Exhibit N | Form of Second Amended Company Agreement |
| Exhibit O | Form of Amended and Restated Voting and Transfer Restriction Agreement |

**SCHEDULES**

| | |
|---|---|
| Schedule 1 | Defined Terms |
| Schedule 2.4 | Issuance Example |
| Schedule 3.2(a) | Paid-Off Senior Debt |
| Schedule 3.4(e) | Permitted Assignees |
| Schedule 4.1(a) | Subsidiaries |
| Schedule 4.1(f) | Actions and Proceedings |
| Schedule 4.1(g) | Compliance with Laws |
| Schedule 4.1(h) | Sales Contracts |
| Schedule 4.1(i) | Royalties |
| Schedule 4.1(j) | Taxes |
| Schedule 4.1(l) | Preferential Rights to Purchase and Consents |
| Schedule 4.1(m) | Imbalances |
| Schedule 4.1(n) | Debt |
| Schedule 4.1(o) | Affiliate Transactions |
| Schedule 4.2(f) | Bonds |
| Schedule 4.2(j) | White Oak Taxes |
| Schedule 4.2 (l) | White Oak General Disclosures |
| Schedule 4.2(l)(5) | Mortgages and Pledges of Assets |
| Schedule 4.2 (m) | White Oak Affiliate Transactions |
| Schedule 4.2 (n) | White Oak Litigation |
| Schedule 4.2 (o) | White Oak Compliance with Laws |
| Schedule 4.2 (q) | White Oak Financial Statements |
| Schedule 5.5 (a) | 365 Schedule |
| Schedule 5.5 (b) | Desired 365 Contracts |

## CONTRIBUTION AGREEMENT

This Contribution Agreement (this "**Agreement**"), dated July 15, 2015 (the "**Execution Date**"), is between **MILAGRO OIL & GAS, INC.**, a Delaware corporation, ("**MOG**"), **MILAGRO PRODUCING, LLC**, a Delaware limited liability company ("**Milagro Producing**"), **MILAGRO RESOURCES, LLC**, a Delaware limited liability company ("**Milagro Resources**"), and **MILAGRO EXPLORATION, LLC**, a Delaware limited liability company ("**Milagro Exploration**" and together with Milagro Producing and Milagro Resources, the "**Subsidiaries**" and the Subsidiaries, together with MOG, "**Milagro**"), and **WHITE OAK RESOURCES VI, LLC** ("**White Oak**").  White Oak and Milagro are sometimes individually referred to herein as a "**Party**" and collectively referred to herein as the "**Parties**."

## RECITALS

WHEREAS, White Oak was organized pursuant to the terms of the Certificate of Formation filed with the Secretary of State of the State of Delaware on December 2, 2011, and the Limited Liability Company Agreement of White Oak, dated as of December 2, 2011 (the "**Original Agreement**");

WHEREAS, the Original Agreement was amended and restated in its entirety pursuant to that certain Amended and Restated Company Agreement of White Oak, dated effective as of February 13, 2012 (as amended from time to time, the "**Amended Company Agreement**");

WHEREAS, Milagro owns certain oil and gas interests which, together with certain other assets relating thereto, are more fully described and defined herein as the Assets;

WHEREAS, concurrently with the execution of this Agreement, the Parties are party, along with the other entities named therein, to a Restructuring Support Agreement, dated as of the date hereof, pursuant to which (1) Milagro and its parent and direct and indirect subsidiaries have agreed to commence voluntary, pre-arranged reorganization cases under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to effectuate a restructuring transaction pursuant to a plan of reorganization (the "**Plan**") and a related disclosure statement of the Plan and (2) White Oak, among certain of the other parties, has agreed to take all reasonable actions necessary to facilitate the implementation and consummation of the restructuring transaction as contemplated therein;

WHEREAS, the transactions contemplated hereby will be part of the Plan and the Closing (as defined below), subject to the conditions herein, shall occur simultaneously with the effective date of the Plan, which shall occur once the order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. Section 1141 has become a Final Order that is not subject to an appeal and the time for filing an appeal has expired (unless otherwise waived upon the mutual agreement of the Parties) (the "**Final Order**");

WHEREAS, concurrently with the closing of the transactions contemplated hereby, and subject to the terms and conditions of this Agreement, the current Members (as defined in the Amended Company Agreement), White Oak and MOG desire to amend and restate the Amended Company Agreement as set forth in the Second Amended and Restated Company Agreement of White Oak dated as of the Closing Date (such agreement, including the exhibits attached thereto, the "**Second Amended Company Agreement**");

1

WHEREAS, subject to the terms and conditions of this Agreement, Milagro desires to contribute to White Oak, and White Oak desires to accept from Milagro, the Assets  free and clear of all Encumbrances, other than Permitted Encumbrances, in exchange for a Company Interest in White Oak to be issued to MOG as contemplated in this Agreement and pursuant to the Second Amended Company Agreement; and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with the contribution of the Assets.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the benefits to be derived by each Party hereunder and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, White Oak and Milagro agree as follows:

1.    **DEFINED TERMS.**

Unless otherwise expressly provided in this Agreement, each capitalized term used herein shall have the meaning given to it in **Schedule 1**.

2.    **Contribution of Assets.**

2.1    Contribution of Assets. At the Closing and subject to the terms and conditions of this Agreement, Milagro agrees to contribute, assign, transfer and convey to White Oak, and White Oak agrees to acquire and accept from Milagro, the Assets.

2.2    Assets. As used herein, the term "Assets" shall mean all right, title and interest of Milagro in and to the following (except to the extent constituting Reserved Assets):

(a)    all oil and gas leases described on **Exhibit A** (the "**Leases**"), including royalty interests, overriding royalty interests, production payments and other payments out of or measured by the value of oil and gas production from or attributable to the Leases, reversionary interests, carried interests, and all tenements, hereditaments or appurtenances belonging to the Leases;

(b)    all mineral fee interests, mineral rights and mineral servitudes in which Milagro owns an interest (the "**Mineral Interests**") including those described on **Exhibit B**, including royalty interests, production payments and other payments out of or measured by the value of oil and gas production from or attributable to the Mineral Interests;

(c)    all rights and interests in, under and derived from all unitization and pooling agreements with respect to any of the Leases, Mineral Interests and Wells (the "**Units**");

(d)    all oil and gas wells, salt water disposal wells, injection wells, and other wells and wellbores located on or used in connection with the Leases, Mineral Interests and Units, whether producing, plugged or unplugged, shut in, or permanently or temporarily abandoned, including those described on **Exhibit C** and/or **Exhibit D** (the "**Wells**");

2

(e)     all natural gas, casinghead gas, drip gasoline, natural gas liquids, condensate, products, oil, crude oil and other hydrocarbons (including produced water and carbon dioxide), whether gaseous or liquid, produced from or attributable to the Leases, Mineral Interests, Wells and Units ("**Hydrocarbons**") after the Effective Time or which are in storage or existing in stock tanks above the pipeline connection as of the Closing Date;

(f)     to the extent transferable, the permits, licenses, field office leases, servitudes, easements, rights-of-way and other surface use agreements used in connection with the use, ownership and operation of the Leases, Mineral Interests, Wells, Units and Hydrocarbons, including those set forth on **Exhibit E**, (the "**Surface Use Agreements**");

(g)     all surface fee lands in which Milagro owns an interest, including those described on **Exhibit F**, (the "**Surface Fee Lands**");

(h)     all equipment, machinery, fixtures and other personal, movable and mixed property, operational and nonoperational, known or unknown, located on or used in connection with the ownership or operation of any of the Leases, Mineral Interests, Wells, Units, Hydrocarbons, Surface Use Agreements and Surface Fee Lands, including motor vehicles, boats, buildings, pipelines, gathering systems, manifolds, well equipment, casing, tubing, pumps, motors, fixtures, machinery, compression equipment, flow lines, processing and separation facilities, pads, structures, materials and other items used in the operation thereof, and all pipe, machinery, equipment and other personal property owned by Milagro and whether located in any yards used by Milagro on or in the vicinity of any of the Assets or held by third parties for the benefit of Milagro in connection with the Assets (the "**Equipment**");

(i)     to the extent transferable, all contracts, agreements and instruments by which any of the Leases, Mineral Interests, Units, Wells, Hydrocarbons, Surface Use Agreements and Surface Fee Lands are bound or which otherwise relate thereto, but only such portions thereof to the extent applicable to the Leases, Mineral Interests, Units, Wells, Hydrocarbons, Surface Use Agreements or Surface Fee Lands, including product purchase and sale contracts, gas gathering contracts, salt water disposal agreements, processing or treating agreements, transportation agreements, surface use agreements, facilities sharing agreements, compression agreements, production handling agreements, equipment leases, pipeline lease agreements, farmouts and farmins, options, orders, unitization, pooling, spacing or consolidation agreements and operating agreements and including without limitation the contracts set forth on **Exhibit J**, but excluding (i) any contract, agreement, or instrument which is excluded by virtue of **Section 5.3(d)**, (ii) the Retained Contracts (as defined below) and (iii) any indemnities granted by Milagro to any previous assignor of any such contract, agreement or instrument (the "**Assigned Contracts**");

3

(j)    subject to **Section 3.4** and as listed on **Schedule 4.1(m)**, all rights with respect to overproduction, underproduction, overdelivery or underdelivery of hydrocarbons produced from or allocated to the Leases, Mineral Interests, Units or Wells or otherwise attributable to any Equipment or Assigned Contract, regardless of when such rights arose or whether attributable to any facility, wellhead, pipeline, plant, gathering system, transportation system or otherwise, including any imbalances under gas balancing or similar agreements, production handling agreements, processing agreements, and/or gathering or transportation agreements ("**Imbalances**"); and

(k)    all records and files in the possession of Milagro relating to the Leases, Mineral Interests, Wells, Units, Hydrocarbons, Surface Use Agreements, Surface Fee Lands, Equipment, Assigned Contracts or Imbalances, save and except for (A) records that Milagro is prohibited from disclosing or transferring under any third party agreement, (B) information entitled to legal privilege, including attorney work product and attorney-client communications (except for title opinions, which shall be included in the Records), (C) economic projections and (D) records of offers from, or negotiations with, White Oak or third parties with respect to any proposed transfer of any of the Assets and economic analyses associated therewith (the "**Records**").

2.3    Reserved Assets.    Milagro hereby reserves and excepts from the sale and conveyance of the Assets in favor of themselves, their successors and assigns the following (collectively, the "**Reserved Assets**"):

(a)    other than with respect to Imbalances, all accounts receivable arising out of, associated with, or relating to the Assets that, in accordance with GAAP, are attributable to the period prior to the Effective Time, regardless of when received, including all insurance proceeds and third party recoveries attributable to any event occurring prior to the Effective Time;

(b)    other than with respect to Imbalances, all claims and rights relating to overpayments or refunds of costs and expenses (including Taxes and Royalties) arising out of, associated with, or relating to the Assets that, in accordance with GAAP, are attributable to the period prior to the Effective Time, including the right to initiate, prosecute or participate in, at Milagro's sole cost and expense, all audits, audit claims and tax claims or proceedings relating to or including periods prior to the Effective Time, regardless of when commenced or received, arising out of or under applicable law, contracts and agreements or otherwise, and to recover all costs and expenses claimed or shown by such audits or proceedings as owing to the owner of the Assets for periods prior to the Effective Time;

(c)    all proprietary software;

4

(d)   any patent, patent application, logo, service mark, copyright, trade name, trade secrets, or trademark of or associated with, and other intellectual property of, Milagro or any Affiliate of Milagro or any business of Milagro or of any Affiliate of Milagro;

(e)   all deposits, cash, checks in process of collection, cash equivalents, and funds, including without limitation those attributable to the Assets with respect to any period of time prior to the Effective Time;

(f)   all contracts, agreements and instruments set forth on **Exhibit L** (the "**Retained Contracts**");

(g)   all rights, claims, demands and causes of action of Milagro under this Agreement;

(h)   all rights, claims (including any claim as defined in Section 101 of the Bankruptcy Code), causes, causes of action, remedies, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of Milagro, except to the extent relating directly to the Assets (other than Reserved Assets) or any Assumed Obligation with respect to any period of time arising after the Effective Time, including any such items arising under insurance policies and all guarantees, warranties, indemnities and similar rights in favor of Milagro, except to the extent relating directly to the Assets (other than Reserved Assets) or any Assumed Obligation with respect to any period of time arising after the Effective Time;

(i)   any of Milagro's rights, claims and causes of action under the Bankruptcy Code in which Milagro has rights;

(j)   all equity interests in any subsidiary, including the Subsidiaries; and

(k)   any documents withheld or not transferred pursuant to the exceptions set forth in **Section 2.2(k)**.

2.4   <u>Issuance</u>.

At Closing, in consideration of the contribution of Assets by Milagro, White Oak shall issue Company Interests to MOG (the "**Milagro Interests**") with a Capital Account equal to the Adjusted Equity Component (the "**Milagro Capital Account Balance**"), and a Sharing Ratio in White Oak proportionate to the Milagro Capital Account Balance. The Sharing Ratio applicable to the Milagro Interests shall be equal to the quotient obtained by dividing (i) the Milagro Capital Account Balance by (ii) the sum of (x) the Milagro Capital Account Balance and (y) Two Hundred Sixty Five Million and No/100 Dollars ($265,000,000.00) (1) increased by the sum of (a) the amount of cash or other working capital that is directly attributable to White Oak's acceptance of additional equity contributions from its members on or after June 19, 2015, which cash or working capital (or assets acquired by White Oak utilizing cash or such working capital, excluding the Notes) shall be reflected on White Oak's balance sheet at Closing and (b) any portion of such additional equity contributions from White Oak's members used in funding the

5

Cash Payment Cap, and (2) reduced by the outstanding borrowed money indebtedness of White Oak at the time of Closing(such value calculated in (y) above being the "**Deemed Equity Value**").   Notwithstanding the foregoing, if, between the Execution Date and the Closing, White Oak accepts additional equity contributions from its members ("**Additional Equity Contributions**"), MOG shall have the right, on or before ten (10) Business Days following receipt of written notice of White Oak's intent to accept Additional Equity Contributions, to elect to participate therein in an amount equal to MOG's Sharing Ratio as of the Closing Date.  If MOG elects to participate in any such Additional Equity Contributions, then (i) White Oak may obtain financing in an amount equal to MOG's Sharing Ratio portion, which loan agreement shall contain customary terms and conditions ("**MOG Loan**") and (ii) such MOG Loan shall accrue interest at a rate equal to the LIBOR Rate until MOG funds an amount to White Oak equal to the MOG Loan plus any accrued but unpaid interest, which amount shall be funded on or before ten (10) days following the Closing Date.  The proceeds received by White Oak from MOG shall be used to repay all amounts outstanding under the MOG Loan to the lenders of such obligation and, upon such payment, such loan shall be extinguished.  If MOG funds an amount equal to the MOG Loan plus any accrued but unpaid interest on such MOG Loan, then upon such funding, White Oak shall reflect such contribution amount (other than the accrued interest) in the Capital Account for MOG, and the Second Amended Company Agreement shall be amended to reflect the credit to such Capital Account for MOG.  In the event MOG either does not fund the MOG Loan plus any accrued but unpaid interest on such MOG Loan within ten (10) days following the Closing Date or Closing does not occur, an amount equal to the MOG Loan plus any accrued but unpaid interest on such MOG Loan may be converted to equity of White Oak, MOG shall not receive a credit to its Capital Account and/or shall not receive any Company Interests and the Company Interests of MOG, if applicable, and all members of White Oak shall be adjusted accordingly.  For the avoidance of doubt, MOG shall have no obligation to fund its Sharing Ratio portion of the Additional Equity Contributions if this Agreement is terminated or Closing otherwise does not occur.  An example of the Sharing Ratio calculations described above is set forth on **Schedule 2.4**.  The Parties hereby agree that (i) to the extent MOG receives Company Interests in exchange for the assignment, sale or transfer of the Assets, the assignment of such Assets to White Oak shall be treated as an exchange of such Assets for Milagro Interests and shall be treated as a contribution to White Oak under Section 721 of the Code, and (ii) to the extent Milagro receives cash (including any amounts for the assumption or payment of Debt) for the assignment, sale or transfer of all or a portion of the Assets to White Oak, the Parties hereby agree to treat such assignment, sale or transfer as a sale of such Assets for cash.

2.5     Closing; Effective Time.

The consummation of the transactions contemplated hereby (the "**Closing**") shall be held simultaneously with the effectiveness of the Plan and the emergence of Milagro, its parent and its direct and indirect subsidiaries, from the Chapter 11 Cases, as agreed to by the Parties and otherwise as set forth in the Plan.  The date on which the Closing occurs shall be referred to herein as the "**Closing Date**."  The Closing shall be effective as of May 1, 2015, at 12:01 a.m., at the location of the Assets (the "**Effective Time**").

3.    **PURCHASE PRICE**

3.1    Purchase Price.

The gross aggregate consideration for the Assets shall be TWO HUNDRED SEVENTEEN MILLION DOLLARS ($217,000,000) (the "**Purchase Price**"), consisting of (i) a cash payment in the amount of $120,000,000 (the "**Cash Payment Cap**"), and (ii) $97 million in the form of Company Interests (which shall not be considered the equivalent of cash), plus or minus, as applicable, the adjustments set forth in **Section 3.4(a)** (the "**Adjusted Equity Component**", and together with the Cash Payment Cap, the "**Adjusted Purchase Price**").

3.2    Treatment of Debt and Notes.

(a)    Senior Debt Payment.  At or prior to Closing, Milagro shall obtain payoff letters for all amounts of the Senior Debt owed by Milagro immediately prior to Closing (the "**Senior Debt Payoff Letters**") to TPG Specialty Lending, Inc. as administrative agent in the Milagro Senior Secured Debt, including the portion of any debtor in possession financing or refinancing of the Milagro Senior Secured Debt, as well as any other holders of Senior Secured Debt, under instruments as set forth on **Schedule 3.2(a)** ("**Senior Debt**"), and provide copies thereof, with releases in form and substance reasonably satisfactory to White Oak. The Senior Debt Payoff Letters shall indicate the backup calculations and amount required to pay off the Senior Debt at Closing.  At or prior to Closing, any financing statement terminations and Encumbrance releases shall have been filed as necessary to remove any Encumbrances (other than Permitted Encumbrances) applicable to any of the Assets with respect to the Senior Debt, or the Senior Debt Payoff Letters shall state that such financing statement terminations and Encumbrance releases shall be filed after indefeasible payment in full of the amounts set forth in the Senior Debt Payoff Letters.  At the Closing, White Oak shall pay to MOG the Cash Payment Cap; MOG shall use the Cash Payment Cap and its cash holdings to make payments to such counterparties as described above in the Senior Debt Payoff Letters, such that the full amount of all Senior Debt is provided to the applicable counterparties to the Senior Debt Payoff Letters ("**Paid-Off Senior Debt**"), and for other purposes.

(b)    Note Purchase.  Following the Execution Date, Milagro shall provide such reasonable cooperation as may be reasonably requested by White Oak in connection with, at White Oak's sole election, a purchase of any portion of the approximately Two Hundred Fifty Million and No/100 Dollars (par value) of outstanding 10.500% Senior Secured Second Lien Notes due May 11, 2016 issued by Milagro and outstanding at such time (the "**Notes**") from the holders thereof (the "**Note Purchase**"), including, without limitation, facilitating the execution and delivery of definitive documents relating to the Note Purchase and the consummation of the transactions contemplated thereby, for a price equal to 20% of the face amount of such Notes (irrespective of accrued

7

interest or penalties); provided, however, that any such Note Purchase shall be subject in all respects to the Plan, including **Section III.B.4(c)** thereof, and notwithstanding White Oak's desire to exercise the Note Purchase, the holders of the Notes shall be afforded a right of first refusal to purchase such Notes from the other holders under the same terms of the Note Purchase.  Any such election by the holders of the Notes must be made by providing written notice to White Oak at least five (5) Business Days prior to the Closing Date.  For purposes of determining the Adjusted Purchase Price pursuant to **Section 3.4**, the "**Deemed Note Payment Amount**" shall mean an amount equal to One Hundred Ninety Four Percent (194%) of all cash paid by White Oak to the holders of Notes in connection with the Note Purchase and the resulting Milagro Interests to be issued to MOG will be adjusted downward accordingly.

3.3    Break-Up Fee.  In consideration for Milagro having expended considerable time and expense in connection with the transactions contemplated by this Agreement and the negotiation and due diligence review in connection therewith, including without limitation costs and expenses to be incurred by Milagro after the Execution Date hereof, in the event (i) this Agreement is terminated pursuant to **Section 13.1(b)** and the Closing has not occurred solely because of White Oak's failure to satisfy the condition set forth in **Section 9.1(a)** other than a result of Post-Signing Information in accordance with **Section 5.7**; or (ii) this Agreement is terminated by Milagro pursuant to **Section 13.1(e)**, then White Oak shall pay MOG an amount equal to Four Million and No/100 Dollars ($4,000,000) (the "**Break-Up Fee**"), as liquidated damages (and not as a penalty).  The Parties acknowledge that the extent of damages to Milagro occasioned by the circumstances described in this **Section 3.3** would be impossible or extremely impractical to ascertain and that the Break-Up Fee is a fair and reasonable estimate of such damages under the circumstances.  The Break-Up Fee shall be paid by White Oak by wire transfer of immediately available funds to MOG upon termination of this Agreement as described herein, and shall be Milagro's sole and exclusive remedy for termination under this Agreement pursuant to **Sections 3.3(i)** or **3.3(ii)** other than any remedies that may be available to Milagro under **Section 13.2(a)**.  For purposes of clarity, failure of the Bankruptcy Court to enter into a Final Order confirming the Plan does not trigger the Break-Up Fee.

3.4    Adjustments to Purchase Price.

(a)    The amount of the Adjusted Equity Component of the Purchase Price shall be adjusted (without duplication) in accordance with **Section 3.1** as follows:

(1)    upward by an amount equal to the value of all merchantable Hydrocarbons attributable to the Assets in storage or existing in stock tanks above the pipeline connection as of the Effective Time, the value to be based upon the actual gross price received from the sale of such Hydrocarbons as of the Effective Time (provided if there has been no sale between the Effective Time and the preparation of the Preliminary Settlement Statement, then following Closing, White Oak shall endeavor to sell such

8

Hydrocarbons prior to preparation of the Final Settlement Statement and the value thereof shall be based on the actual gross price received), less amounts payable as Royalties, severance Taxes, gravity adjustments, quality bank adjustments, production payments, post-production costs (transportation, gathering, dehydration, compression, processing and costs associated with the sale of such Hydrocarbons) and other burdens upon, measured by, or payable out of such Hydrocarbons production;

(2)     upward by the amount of all Property Costs paid by or on behalf of Milagro that, in accordance with GAAP, arise out of, are associated with, or relate to the use, ownership or operation of the Assets from and after the Effective Time;

(3)     downward by the amount of all Property Costs paid by or on behalf of White Oak that, in accordance with GAAP, arise out of, are associated with, or relate to the ownership or operation of the Assets on or prior to the Effective Time;

(4)     upward by the amount of any Imbalances by which Milagro is underproduced priced at $2.50 per Mcf for gas Imbalances.

(5)     downward by the amount of any Imbalances by which Milagro is overproduced priced at $2.50 per Mcf for gas Imbalances.

(6)     upward by the amounts paid by Milagro for Cure Costs arising on or after the Effective Time, and downward by the amount of Cure Costs attributable to the period prior to the Effective Time, if any, that have not been paid by Milagro as of the Closing as contemplated by **Section 5.5(c)**;

(7)     without duplication of adjustments made in accordance with **Section 3.4(a)(1)** above, upward by Revenues received by White Oak that, in accordance with GAAP, arise out of, are associated with, or relate to the use, ownership or operation of the Assets prior to the Effective Time;

(8)     downward by Revenues received by Milagro that, in accordance with GAAP, arise out of, are associated with, or relate to the use, ownership or operation of the Assets from and after the Effective Time other than overhead charges with respect to Milagro operated Wells and Equipment for the period between the Effective Time and the Closing Date;

(9)     with respect to all Milagro operated Wells, upward by an overhead rate equal to a flat fee of $400,000 per month (and prorated as necessary), for all producing oil and gas Wells, all active utility Wells and all shut-in or inactive Wells;

9

(10)    downward by an amount equal to the sum of all adjustments to the Purchase Price (A) pursuant to **Section 5.3(b)** or **5.3(d)** in respect of Preferential Rights and consents, (B) pursuant to **Section 5.4** in respect of Casualty Loss, (C) pursuant to **Section 6.2** in respect of Title Defects and (D) pursuant to **Section 7.4** in respect of Environmental Defects;

(11)    upward by an amount equal to the sum of any and all prepaid utility charges, insurance premiums, rentals, deposits and any other prepays (excluding Taxes) that are attributable to the Assets from and after the Effective Time;

(12)    downward by the amount of the Suspense Funds in accordance with **Section 11.3**;

(13)    downward by the amount of any Deemed Note Payment Amount as set forth in **Section 3.2(b)**;

(14)    upward by an amount equal to the sum of all adjustments to the Purchase Price pursuant to **Section 6.2** in respect of Additional Interests; and

(15)    upward or downward by any other amount agreed upon in writing by Milagro and White Oak.

(b)    At least five (5) Business Days prior to Closing, Milagro shall prepare and submit to White Oak a settlement statement (the "**Preliminary Settlement Statement**") setting forth its good faith calculation of the Adjusted Purchase Price, using for such adjustments the best information then reasonably available. Prior to Closing, White Oak may notify Milagro of any objections to the Preliminary Settlement Statement.  The Parties shall use their reasonable best efforts to agree on a Preliminary Settlement Statement no later than one (1) day prior to Closing. The Adjusted Purchase Price, as provided in the Preliminary Settlement Statement, is referred to herein as the "**Preliminary Purchase Price**." If White Oak and Milagro are unable to agree upon the final Preliminary Settlement Statement, then the Preliminary Purchase Price shall be as provided in the Preliminary Settlement Statement prepared by Milagro, and any disputed amounts shall be resolved in the course of the final accounting pursuant to **Section 3.4(c)**.

(c)    No later than one hundred twenty (120) days after the Closing Date (or the first Business Day thereafter should such day fall on a non-Business Day), White Oak shall deliver to Milagro a final settlement statement (the "**Final Settlement Statement**") setting forth the calculation of the Adjusted Purchase Price.   White Oak shall make available the necessary records to permit Milagro to conduct an audit of the Final Settlement Statement during the thirty (30) day period commencing on the date the Final Settlement Statement is delivered to Milagro (the

10

"**Audit Period**").  As soon as reasonably practicable, but no later than 5:00 p.m. Houston, Texas time on the last day of the Audit Period (or the first Business Day thereafter should such day fall on a non-Business Day), Milagro may deliver to White Oak a written report containing any changes Milagro proposes to such statement (the "**Audit Report**").  The undisputed amounts (net of any amounts in dispute) will be paid to the applicable Party within two (2) Business Days from the end of the Audit Period. The Parties agree to negotiate in good faith to resolve any disputes relating to items in the Final Settlement Statement and shall meet no later than thirty (30) days after White Oak receives the Audit Report (or the first Business Day thereafter should such day fall on a non-Business Day) to attempt to agree on any adjustments to the Final Settlement Statement.  If the Parties fail to agree on final adjustments within that thirty (30) day period, either Party may, within thirty (30) days after the end of such period (or the first Business Day thereafter should such day fall on a non-Business Day), submit the disputed items to KPMG or another nationally-recognized, United States-based independent public accounting firm on which the Parties mutually agree in writing (the "**Accounting Referee**"); provided, however, that the Accounting Referee shall not have performed any material work for any Party or their respective Affiliates within three (3) years of the Execution Date. If KPMG is unable or unwilling to serve as the Accounting Referee and White Oak and Milagro are unable to agree upon the designation of a Person or entity as substitute arbitrator, then White Oak or Milagro, or any of them, may in writing request the Bankruptcy Court to appoint the substitute arbitrator; provided that such Person or entity so appointed shall be a national or regional accounting firm with no prior material relationships with Milagro or White Oak or their respective Affiliates and shall have experience in auditing companies engaged in oil and gas exploration and development activities.  Any unresolved matters covered in the Audit Report that are not submitted to the Accounting Referee within such thirty (30) day period shall be deemed waived by Milagro, which waiver shall be final and binding on the Parties and the subject matter thereof shall not be subject to further review or audit. The Parties shall direct the Accounting Referee to resolve the disputes within thirty (30) days after submission of the matters in dispute.  The Accounting Referee shall act as an expert for the limited purpose of determining the specific disputed matters submitted by either Party and may not award damages or penalties to either Party with respect to any matter.  Milagro and White Oak shall share equally the Accounting Referee's costs, fees and expenses (including attorney's fees). The Final Settlement Statement, whether as agreed between the Parties or as determined by a decision of the Accounting Referee, shall be binding on, and non-appealable by, the Parties and not subject to further review or audit.  Payment by White Oak or Milagro, as applicable, for any outstanding amounts on the Final Settlement Statement shall be made within five (5) Business Days after the date on which all disputes in respect of the Final Settlement Statement are finally resolved (whether by agreement of the Parties or pursuant to the Accounting Referee's decision), it being acknowledged and agreed that any amounts payable

11

by Milagro which are not settled in cash by wire transfer of immediately available funds within such five (5) Business Day period will be settled by adjustment to the Capital Account and Sharing Ratio of MOG as contemplated by the Second Amended Company Agreement.

(d)    For the avoidance of doubt, and without duplication of any other adjustment provided under this Agreement, if any Asset is removed from this transaction whether by agreement of the Parties or pursuant to another provision of this Agreement, the Purchase Price shall be adjusted downward by the Allocated Value of the removed Asset and the removed Asset shall be treated as a Reserved Asset (unless and until this Agreement provides otherwise).

(e)    In no event shall MOG be permitted to distribute or otherwise assign all or any part of the Company Interest issued to MOG pursuant to this **Article 3** until after the fifth (5th) Business Day following the date on which the outstanding amounts on the Final Settlement Statement have been paid or adjusted (as applicable) pursuant to **Section 3.4(c)** and the Second Amended Company Agreement.  Any distribution or assignment of such Company Interest by MOG shall only be permitted to the permitted assignees set forth on **Schedule 3.4(e)** (the "**Permitted Assignees**"), and any such distribution or assignment shall be expressly conditioned upon the execution and delivery to White Oak of a counterpart to the Second Amended Company Agreement confirming the agreement of the assignee to be bound by all of the terms and provisions of the Second Amended Company Agreement and any other conditions to assignment set forth therein.

3.5    <u>No Duplicative Effect; Methodologies.</u>  The provisions of **Section 3.4** and this **Section 3.5** shall apply in such a manner so as not to give the components and calculations duplicative effect to any item of adjustment and, except as otherwise expressly provided in this Agreement, the Parties covenant and agree that no amount shall be (or is intended to be) included, in whole or in part (either as an increase or reduction) more than once in the calculation of (including any component of) the Adjusted Purchase Price, or any other calculated amount pursuant to this Agreement if the effect of such additional inclusion (either as an increase or reduction) would be to cause such amount to be overstated or understated for purposes of such calculation.

4.    **REPRESENTATIONS AND WARRANTIES**

4.1    <u>Representations and Warranties of Milagro.</u>  Milagro represents and warrants to White Oak as follows:

(a)    Except as set forth on **Schedule 4.1(a)**, Milagro has no direct or indirect subsidiaries and does not own any securities issued by, or any equity or ownership interest in, any other Person.  Milagro is not subject to any obligation to make any investment in or to provide funds by way of loan, capital contribution or otherwise to any Person.

12

(1)     MOG is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to carry on its business and to own and operate oil and gas properties in each jurisdiction in which the Assets are located. MOG is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations promulgated pursuant thereto).

(2)     Milagro Producing is a limited liability company, duly organized, validity existing and in good standing under the laws of the State of Delaware, and is duly qualified to carry on its business and to own and operate oil and gas properties in each jurisdiction in which the Assets are located. Milagro Producing is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code).

(3)     Milagro Resources is a limited liability company, duly organized, validity existing and in good standing under the laws of the State of Delaware, and is duly qualified to carry on its business and to own and operate oil and gas properties in each jurisdiction in which the Assets are located. Milagro Resources is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code).

(4)     Milagro Exploration is a limited liability company, duly organized, validity existing and in good standing under the laws of the State of Delaware, and is duly qualified to carry on its business and to own and operate oil and gas properties in each jurisdiction in which the Assets are located. Milagro Exploration is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code).

(b)     Milagro has all requisite power and authority to carry on its business as presently conducted, to enter into this Agreement and to perform its obligations under this Agreement. The consummation of the transactions contemplated by this Agreement will not violate, be in conflict with or give rise to a right of termination, cancellation or acceleration of any obligation or result in the creation of any Encumbrance on any Asset under: (i) any provision of Milagro's Organizational Documents, (ii) any provision of any agreement or instrument to which Milagro is a party or by which Milagro is bound, or (iii) any judgment, decree, order, statute, rule or regulation applicable to Milagro or the Assets except in the cases of subsections (ii) and (iii) above, where such violation, conflict, termination, cancellation or acceleration would not materially impair Milagro's ability to consummate the transactions contemplated by this Agreement.

(c)     This Agreement has been, and, if Closing occurs, the documents to be executed and delivered by Milagro upon Closing will be, duly

13

authorized, executed and delivered on behalf of Milagro, and this Agreement constitutes, and, if Closing occurs, the documents to be executed and delivered by Milagro upon Closing will be, the legal, valid and binding obligation of Milagro, enforceable in accordance with their respective terms, subject, however, to the entry of the Final Order and to the effects of bankruptcy, insolvency, reorganization and other laws for the protection of creditors.

(d)     Milagro has incurred no liability, contingent or otherwise, for brokers' or finders fees' relating to the transactions contemplated by this Agreement for which White Oak shall have any responsibility whatsoever.

(e)     Other than the proposed restructuring transaction pursuant to the Plan and the related disclosure statement, there are no bankruptcy, reorganization or arrangement proceedings pending or, to the Knowledge of Milagro, threatened against Milagro.

(f)     Except as set forth on **Schedule 4.1(f)**, there is no suit, action or litigation before any governmental authority, and no legal, administrative or arbitration proceeding, (in each case) pending or, to Milagro's Knowledge, threatened in writing, against Milagro or the Assets.

(g)     Except as set forth on **Schedule 4.1(g)**, each of the Assets are currently owned and operated in material compliance with all applicable laws, rules and regulations.

(h)     Except as set forth on **Schedule 4.1(h)**, no Hydrocarbons marketed by Milagro and, to the Knowledge of Milagro, no Hydrocarbons marketed by others on Milagro's behalf are subject to a sales, processing, gathering, treating, or other contract (except for contracts terminable by Milagro without penalty on not more than sixty (60) days' notice).

(i)     Except as set forth on **Schedule 4.1(i)**, all Royalties that have become due and payable have been paid in full to the Persons entitled to such payments (other than Royalties that Milagro or the applicable operator is entitled under applicable law to withhold in escrow or suspense accounts).

(j)     Except as set forth in **Schedule 4.1(j)**, (i) all material returns, declarations, reports, claims for refund, or information returns or statements relating to Asset Taxes, including any schedule or attachment thereto ("**Milagro Tax Returns**") that were required to be filed by Milagro or its subsidiaries on or before the Execution Date have been duly and timely filed and the information provided on each such Milagro Tax Return is complete and accurate in all material respects; (ii) all Asset Taxes shown as due on each such Milagro Tax Return have been timely paid in full and no other Taxes are payable by Milagro or its subsidiaries with respect to items or periods covered by such Milagro Tax Returns; (iii) to Milagro's Knowledge, no penalty, interest or other

14

charge is or will become due with respect to the late filing of any such Milagro Tax Return or late payment of any such Asset Tax; (iv) there are no outstanding waivers by Milagro or any of its Affiliates that would affect the Assets or Milagro after Closing and there are no agreements regarding any extension of time with respect to an Asset Tax assessment or deficiency; (v) Milagro and its subsidiaries have withheld and paid over all Asset Taxes required to have been withheld and paid over to any governmental authority, and complied with all information reporting and backup withholding requirements, in connection with amounts paid or owing to any employee, creditor, independent contractor, or other third party; (vi) Milagro and its subsidiaries have paid all material amounts of Taxes due and owing any governmental authority in full with respect to the Assets; (vii) there are no material Asset Tax deficiencies assessed against Milagro or, to Milagro's Knowledge, audits in progress by any governmental authority; and (viii) other than Permitted Encumbrances, there are no Tax liens on or with respect to the Assets.

(k)     Milagro is not in breach of any material provision in any Lease or in default with respect to any material obligation of Milagro under the Leases and no party to any Lease or any successor to the interest of such party has filed or, to Milagro's Knowledge, has threatened in writing to file any action to terminate, cancel, rescind or procure judicial reformation of any such Lease. To Milagro's Knowledge, the Leases operated by Milagro are in full force and effect.

(l)     Except as set forth in **Schedule 4.1(l)** there are no restrictions on assignment, including Preferential Rights or requirements for consents from third parties to any assignment (in each case), required in connection with the transfer of the Assets by Milagro to White Oak or the consummation of the transactions contemplated by this Agreement.

(m)     Except as set forth in **Schedule 4.1(m)**, there are no Imbalances allocated to, affecting or burdening any of the Leases, Mineral Interests, Units or Wells or otherwise attributable to any Equipment or Assigned Contract.

(n)     **Schedule 4.1(n)** lists each item of Debt, including the Paid-Off Senior Debt, outstanding as of the Execution Date.  For purposes hereof, "**Debt**" means (i) all obligations of Milagro for borrowed money, (ii) all obligations of Milagro evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of Milagro as an account party in respect of letters of credit, surety bonds and bankers' acceptances or similar credit transactions, (iv) all obligations of Milagro issued or assumed as the deferred purchase price of property or services, including capital leases, any "earn-out" or similar payments, all conditional sale obligations of Milagro and all obligations of Milagro under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities), (v) all obligations of Milagro guaranteeing any obligations of any other Person of the type described in the

15

foregoing <u>clauses (ii)</u> through <u>(iv)</u>, (vi) all obligations secured by an Encumbrance (other than a Permitted Encumbrance) on the Assets; and (vii) all premiums, interest, fees, penalties and expenses associated with any of the foregoing <u>clauses (i)</u> through <u>(v)</u>.

(o)     Except as set forth in **Schedule 4.1(o)**, no Affiliate of Milagro has had any material business dealings with Milagro.

(p)     Milagro is and will be at Closing an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933 (the "**Securities Act**"), and will acquire its Company Interest in White Oak for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act, any applicable state blue sky laws or any other applicable securities laws.  Milagro (i) has been furnished with such information about White Oak and the Company Interest as it has requested, (ii) has made its own independent inquiry and investigation into, and based thereon has formed an independent judgment concerning, White Oak and its Company Interest therein, (iii) has adequate means of providing for its current needs and possible individual contingencies and is able to bear the economic risks of this investment and has a sufficient net worth to sustain a loss of its entire investment in White Oak in the event such loss should occur, (iv) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in White Oak and (v) understands and agrees that its Company Interest shall not be sold, pledged or otherwise transferred except in accordance with the terms of the Second Amended Company Agreement and pursuant to an applicable exemption from registration under the Securities Act and other applicable securities laws.  Milagro, upon becoming a member under the Second Amended Company Agreement at Closing, understands and acknowledges that its Company Interests have not been registered under the Securities Act, or under any state securities laws and further understands and acknowledges that Milagro's representations and warranties contained in this **Section 4.1** are being relied upon by White Oak as the basis for the exemption from the registration requirements of the Securities Act, and under all applicable state securities laws. Milagro further acknowledges that White Oak will not and has no obligation to recognize any transfer of any Company Interests to any Person unless and until the provisions of the Second Amended Company Agreement have been fully satisfied.

(q)     As of Closing, to Milagro's Knowledge, there will be no outstanding Cure Costs attributable to the period prior to the Effective Time.

To the extent that Milagro has made any representations or warranties in this **Section 4.1** in connection with matters relating to Assets operated by any Person other than Milagro, each and every such representation and warranty shall be deemed to be qualified by the phrase "to Milagro's Knowledge."

4.2     <u>Representations and Warranties of White Oak</u>.

16

White Oak represents and warrants to Milagro as follows:

(a)    White Oak is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to carry on its business and to own and operate oil and gas properties in each jurisdiction in which the Assets are located.

(b)    White Oak has all requisite power and authority to carry on its business as presently conducted, to enter into this Agreement, to purchase the Assets on the terms described in this Agreement and to perform its other obligations under this Agreement.  The consummation of the transactions contemplated by this Agreement will not violate, or be in conflict with or give rise to a right of termination, cancellation or acceleration of any obligation under: (i) any provision of White Oak's articles of incorporation or bylaws; (ii) any provision of any agreement or instrument to which White Oak is a party or by which White Oak is bound; or (iii) any judgment, decree, order, statute, rule or regulation applicable to White Oak, except in the cases of subsections (ii) and (iii) above, where such violation, conflict, termination, cancellation or acceleration would not materially impair White Oak's ability to consummate the transactions contemplated by this Agreement.

(c)    This Agreement has been, and, if Closing occurs, the documents to be executed and delivered by White Oak upon Closing will be, duly authorized, executed and delivered on behalf of White Oak, and this Agreement constitutes, and, if Closing occurs, the documents to be executed and delivered by White Oak upon Closing will be, the legal, valid and binding obligation of White Oak, enforceable in accordance with their respective terms, subject, however, to the entry of the Final Order and to the effects of bankruptcy, insolvency, reorganization and other laws for the protection of creditors.

(d)    White Oak has incurred no liability, contingent or otherwise, for brokers' or finders fees' relating to the transactions contemplated by this Agreement for which Milagro shall have any responsibility whatsoever.

(e)    There are no bankruptcy, reorganization or arrangement proceedings pending or, to the knowledge of White Oak, threatened against White Oak.

(f)    White Oak or its relevant Affiliate is now, and hereafter shall continue to be qualified, or if not presently qualified, shall be qualified at the end of the period covered by the Transition Services Agreement, to own and assume operatorship of oil, gas and mineral leases, including the Leases, in all jurisdictions where the Assets are located, and the consummation of the transactions contemplated in this Agreement will not cause White Oak to be disqualified as such an owner or operator. To the extent required by the applicable state and federal governmental bodies or agencies, White Oak or its relevant Affiliate currently has, and will continue to maintain, or shall obtain before the end of the period

17

covered by the Transition Services Agreement, those Lease bonds, area-wide bonds or any other surety bonds as set forth on **Schedule 4.2(f)** which are required by applicable state or federal regulations for the ownership and/or operation of the Leases.

(g) White Oak has outstanding Company Interests as set forth in the Amended Company Agreement.  All of the outstanding Company Interests have been duly authorized and validly issued in accordance with White Oak's certificate of formation and the Amended Company Agreement, are fully paid and non-assessable, and, as of the date hereof and as of the date of the White Oak Financial Statements, were issued and held as described therein.  Except for the Milagro Interests to be issued; there are no outstanding options, warrants or other rights to purchase, agreements or other obligations to sell, issue, or rights to convert any obligations into or exchange any securities for, Company Interests or other securities of White Oak.

(h) The Milagro Interests have been duly authorized by White Oak, and when issued and delivered to MOG in accordance with the terms of this Agreement and the Second Amended Company Agreement, will be validly issued in accordance with applicable law, fully paid and non-assessable and will be free of any and all Encumbrances and restrictions on transfer, other than restrictions on transfer under the Second Amended Company Agreement and applicable state and federal securities laws. The Milagro Interests shall have those rights, preferences, privileges and restrictions set forth in the Second Amended Company Agreement.  As of the Closing Date, all corporate action for the authorization, issuance, exchange and delivery of the Milagro Interests shall have been validly taken, and no other authorization by any of such parties is required therefor.

(i) Other than pursuant to this Agreement and the Second Amended Company Agreement, there are no contracts or agreements (including options, warrants, calls and preemptive rights) relating to the right to subscribe for or purchase any Company Interests or obligating White Oak to (i) issue, sell, pledge, dispose of or encumber any Company Interests, (ii) redeem, purchase or acquire in any manner any Company Interests or to provide funds to, or make any investment in any Person or (iii) make any dividend or distribution of any kind with respect to any Company Interests.

(j) White Oak is solvent and will not be rendered insolvent by any of transactions described hereunder. White Oak will have at Closing sufficient immediately available funds to enable it to make any payment required to be made by White Oak at Closing without encumbrance or delay and without causing White Oak to become insolvent or to declare insolvency. White Oak's assets do not and immediately following the Closing will not constitute unreasonably small capital to carry out its business as currently conducted or as proposed to be conducted after Closing. Except as set forth in **Schedule 4.2(j)**, (i) all material returns,

18

declarations, reports, claims for refund, or information returns or statements relating to Taxes, including any schedule or attachment thereto ("**White Oak Tax Returns**") that were required to be filed by White Oak on or before the Execution Date have been duly and timely filed and the information provided on each such White Oak Tax Return is complete and accurate in all material respects; (ii) all Taxes shown as due on each such White Oak Tax Return have been timely paid in full and no other Taxes are payable by White Oak with respect to items or periods covered by such White Oak Tax Returns; (iii) to White Oak's Knowledge, no penalty, interest or other charge is or will become due with respect to the late filing of any such White Oak Tax Return or late payment of any such Tax; (iv) to White Oak's Knowledge, there are no outstanding waivers by White Oak that would affect the assets of White Oak after Closing and there are no agreements regarding any extension of time with respect to a Tax assessment or deficiency; (v) White Oak has withheld and paid over all Taxes required to have been withheld and paid over to any governmental authority, and complied with all information reporting and backup withholding requirements, in connection with amounts paid or owing to any employee, creditor, independent contractor, or other third party; (vi) there are no material Tax deficiencies assessed against White Oak or, to White Oak's Knowledge, audits in progress by any governmental authority; and (vii) White Oak (including any predecessor entity) is not, and has not been at any time prior to the Execution Date, a member of an affiliated, consolidated, combined or unitary group with any other Person  and has no liability for the Taxes of any Person under Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law, including for the avoidance of doubt as a result of being a part of any unitary group), as a transferee or successor, by contract, or otherwise.

(k)     There is no suit, action or litigation before any governmental authority, and no legal, administrative or arbitration proceeding, (in each case) pending or, to White Oak's Knowledge, threatened in writing, against White Oak affecting the execution and delivery of this Agreement by White Oak or the consummation of the transactions contemplated hereby by White Oak.

(l)     Since the closing date of the White Oak Audited Financial Statements (defined below), except as set forth on **Schedule 4.2(l)**:

(1)     There has not been any Material Adverse Effect with respect to White Oak;

(2)     White Oak and its Affiliates have operated their business in the ordinary course of business in all material respects;

(3)     There has not been any material damage, destruction or loss, whether covered by insurance or not, to the assets of White Oak;

19

(4)    White Oak has not sold, transferred, or otherwise disposed of any of its material assets (other than the sale of hydrocarbons in the ordinary course of business or the sale or other disposition of disposable assets or assets that have become obsolete or unusable); and

(5)    Except as set forth on **Schedule 4.2(l)(5)**, White Oak has not mortgaged or pledged any of its assets.

(m)    Except as set forth in **Schedule 4.2(m)**, no Affiliate of White Oak has had any material business dealings with White Oak and each of the matters and transactions listed on **Schedule 4.2(m)** was incurred or engaged in, on an arm's-length basis.

(n)    Except as set forth on **Schedule 4.2(n)**, there is no suit, action or litigation before any governmental authority, and no legal, administrative or arbitration proceeding, (in each case) pending or, to White Oak's Knowledge, threatened in writing, against White Oak or its assets, except as would not individually or in the aggregate have a Material Adverse Effect. White Oak is not subject to any outstanding judgment, order, or decree of any court or governmental authority or arbitrator or any settlement agreement or consent decree.

(o)    Except as set forth on **Schedule 4.2(o)**, each of the assets of White Oak are currently owned and operated in material compliance with all applicable laws, rules and regulations.

(p)    White Oak is in material compliance with all Environmental Laws.  White Oak is in material compliance with all material permits that are required pursuant to Environmental Laws for the ownership of its assets and operation of its business. All such permits are in effect and since such permits were obtained, there has occurred no material default under any such permit.  To White Oak's Knowledge, neither the execution and delivery of this Agreement by White Oak nor the consummation by White Oak of the transactions contemplated hereby will result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to a right of termination or cancellation) of any such permit. White Oak has not received from any governmental authority or any third Person any written notice, report or other information regarding any actual or alleged material violation of Environmental Laws, or regarding any material Losses or potential material Losses (including any investigatory, remedial, or corrective obligations) arising under Environmental Laws.  White Oak has not treated, stored, disposed of, arranged for, or permitted the disposal of, transported, handled, or released any hazardous substance, onto, under or from any real property owned or operated by White Oak in a manner that has given or will give rise to material Losses, including any material Losses for response costs, corrective action costs, personal injury, property damage, natural resources damages, or attorney fees, pursuant to any Environmental Laws.  To White Oak's Knowledge,

20

White Oak has made available to Milagro true, correct and complete copies of all environmental audits, assessments, and other reports and studies in White Oak's possession or control describing the environmental conditions of its assets or that materially bear on any Loss of White Oak under any Environmental Laws. White Oak is not a party to or has not agreed to (or to White Oak's Knowledge, is subject to) any outstanding consent arrangement with any governmental authority under any Environmental Laws.

(q)     Attached hereto on **Schedule 4.2(q)** are correct and complete copies of the audited consolidated balance sheet of White Oak and its subsidiaries as of December 31, 2014 with the related consolidated statements of operations, changes in unitholders' equity, and cash flows for the year then ended (the "**White Oak Audited Financial Statements**") and the unaudited consolidated balance sheet of White Oak and its subsidiaries as of March 31, 2015 (the "**White Oak Unaudited Financial Statements**", and together with the **White Oak Audited Financial Statements,** the "**White Oak Financial Statements**"). The White Oak Financial Statements present fairly in all material respects the financial position of White Oak as of the dates indicated, and the results of its operations for the respective periods indicated. The Audited Financial Statements are in conformity with GAAP, consistently applied. The White Oak Unaudited Financial Statements are unaudited and, therefore, are subject to normal recurring year-end adjustments and the absence of footnotes.

(r)     White Oak's outstanding indebtedness as of the Execution Date is not in excess of One Hundred Twenty-Five Million Dollars ($125,000,000).

(s)     The Assets are being acquired by White Oak for investment purposes only, for White Oak's own account and not with a view to, or for resale in connection with, any distribution thereof within the meaning of the 1933 Act. White Oak is an "accredited investor" as defined in Regulation D promulgated under the 1933 Act. White Oak acknowledges that the sale of the Assets has not been registered under the 1933 Act or any state or foreign securities laws and that the Assets may not be sold, transferred, offered for sale, pledged hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws. White Oak has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Assets. White Oak has had the opportunity to examine all aspects of the Assets that White Oak has deemed relevant and has had access to all information requested by White Oak with respect to the Assets in order to make an evaluation thereof. In connection with the transactions contemplated by

21

this Agreement, White Oak has had the opportunity to ask such questions of and receive answers from the representatives of Milagro and obtain such additional information about the Assets as White Oak deems necessary for an evaluation thereof.

4.3     Disclaimer of Representations and Warranties; Assets Sold "As Is, Where is".

(a)     EXCEPT AS EXPRESSLY SET FORTH IN **SECTION 4.1** OF THIS AGREEMENT AND THE SPECIAL WARRANTY OF TITLE TO BE PROVIDED IN THE ASSIGNMENT, CONVEYANCE AND BILL OF SALE AS SET FORTH IN **SECTION 6.3** OF THIS AGREEMENT, WHITE OAK ACKNOWLEDGES THAT MILAGRO HAS NOT MADE, AND MILAGRO HEREBY EXPRESSLY DISCLAIMS AND NEGATES, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE ASSETS, INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY RELATING TO THE CONDITION OF ANY REAL OR IMMOVABLE PROPERTY, PERSONAL OR MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES CONSTITUTING PART OF THE ASSETS INCLUDING, WITHOUT LIMITATION: (i) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY; (ii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (iii) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS; (iv) ANY RIGHTS OF WHITE OAK UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE OR (v) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT OR INFRINGEMENT OF ANY OTHER INTELLECTUAL PROPERTY RIGHT.   IT IS THE EXPRESS INTENTION OF WHITE OAK AND MILAGRO THAT THE REAL OR IMMOVABLE PROPERTY, PERSONAL OR MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES SHALL BE CONVEYED TO WHITE OAK "AS IS, WHERE IS," WITH ALL FAULTS, AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR. WHITE OAK SHALL HAVE THE OPPORTUNITY PRIOR TO THE CLOSING TO MAKE INSPECTIONS WITH RESPECT TO THE REAL OR IMMOVABLE PROPERTY, PERSONAL OR MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES AS WHITE OAK DEEMS APPROPRIATE AND WHITE OAK WILL ACCEPT THE ASSETS "AS IS, WHERE IS", WITH ALL FAULTS, AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR.

(b)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT, MILAGRO MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO WHITE OAK (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN

22

PROVIDED TO WHITE OAK BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF MILAGRO OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, MILAGRO'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MILAGRO HEREBY EXPRESSLY NEGATES AND DISCLAIMS, AND WHITE OAK HEREBY WAIVES AND ACKNOWLEDGES THAT MILAGRO HAS NOT MADE, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GEOLOGICAL OR GEOPHYSICAL DATA OR INTERPRETATIONS, EXISTENCE OR THE QUALITY, QUANTITY, RECOVERABILITY OR COST OF RECOVERY OF ANY HYDROCARBON RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, THE ABILITY TO SELL OR MARKET ANY HYDROCARBONS AFTER CLOSING, OR ANY OTHER CONDITION OF THE ASSETS OR ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE ASSETS.

(c)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN **SECTION 4.1** OF THIS AGREEMENT AND THE SPECIAL WARRANTY OF TITLE SET FORTH IN **SECTION 6.3** OF THIS AGREEMENT, MILAGRO EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED AS TO (i) ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT INCLUDING, WITHOUT LIMITATION, NATURALLY OCCURRING RADIOACTIVE MATERIAL OR ASBESTOS, OR PROTECTION OF THE ENVIRONMENT OR HEALTH, (ii) ANY IMPLIED OR EXPRESS WARRANTY REGARDING TITLE TO ANY OF THE ASSETS, (iii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iv) THE PRODUCTION OR HYDROCARBONS FROM THE ASSETS, (v) THE CONDITION, QUALITY, SUITABILITY OR MARKETABILITY OF ANY HYDROCARBONS, (vi) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS, (vii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF MILAGRO OR THIRD PARTIES WITH RESPECT TO THE ASSETS AND (viii) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO WHITE OAK OR ITS OR THEIR AFFILIATES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO. ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF MILAGRO IS PROVIDED TO

110431897 v1

WHITE OAK AS A CONVENIENCE AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT WHITE OAK'S SOLE RISK.

(d)     EXCEPT AS EXPRESSLY SET FORTH IN **SECTION 4.2** OF THIS AGREEMENT, MILAGRO ACKNOWLEDGES THAT WHITE OAK HAS NOT MADE, AND WHITE OAK HEREBY EXPRESSLY DISCLAIMS AND NEGATES, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE BUSINESS AND/OR ASSETS OF WHITE OAK, INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY RELATING TO THE CONDITION OF ANY REAL OR IMMOVABLE PROPERTY, PERSONAL OR MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES CONSTITUTING PART OF THE ASSETS OF WHITE OAK INCLUDING, WITHOUT LIMITATION: (i) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY; (ii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (iii) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS; OR (Iv) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT OR INFRINGEMENT OF ANY OTHER INTELLECTUAL PROPERTY RIGHT.   IT IS THE EXPRESS INTENTION OF WHITE OAK AND MILAGRO THAT THE REAL OR IMMOVABLE PROPERTY, PERSONAL OR MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES OF WHITE OAK ARE "AS IS, WHERE IS," WITH ALL FAULTS, AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR.

(e)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT, WHITE OAK MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO MILAGRO (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO MILAGRO BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF WHITE OAK OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, WHITE OAK'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, WHITE OAK HEREBY EXPRESSLY NEGATES AND DISCLAIMS, AND MILAGRO HEREBY WAIVES AND ACKNOWLEDGES THAT WHITE OAK HAS NOT MADE, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GEOLOGICAL OR GEOPHYSICAL DATA OR INTERPRETATIONS, EXISTENCE OR THE QUALITY, QUANTITY, RECOVERABILITY OR COST OF RECOVERY OF ANY HYDROCARBON RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, THE ABILITY TO SELL OR

24

MARKET ANY HYDROCARBONS AFTER CLOSING, OR ANY OTHER CONDITION OF THE ASSETS OF WHITE OAK OR ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE ASSETS OF WHITE OAK.

(f)    EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN **SECTION 4.2.** OF THIS AGREEMENT, WHITE OAK EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED AS TO (i) ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT INCLUDING, WITHOUT LIMITATION, NATURALLY OCCURRING RADIOACTIVE MATERIAL OR ASBESTOS, OR PROTECTION OF THE ENVIRONMENT OR HEALTH, (ii) ANY IMPLIED OR EXPRESS WARRANTY REGARDING TITLE TO ANY OF THE ASSETS OF WHITE OAK, (iii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS OF WHITE OAK, (iv) THE PRODUCTION OR HYDROCARBONS FROM THE ASSETS OF WHITE OAK, (v) THE CONDITION, QUALITY, SUITABILITY OR MARKETABILITY OF ANY HYDROCARBONS, (vi) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS, (vii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF WHITE OAK OR THIRD PARTIES WITH RESPECT TO THE ASSETS OF WHITE OAK AND (viii) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO MILAGRO OR ITS OR THEIR AFFILIATES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO.  ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF WHITE OAK IS PROVIDED TO MILAGRO AS A CONVENIENCE AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT MILAGRO'S SOLE RISK.

**5.    PRE-CLOSING COVENANTS AND AGREEMENTS**

5.1    Records Review.

Upon execution of this Agreement, Milagro will promptly make the Records available to White Oak for examination during Milagro's regular business hours at Milagro's offices in Houston, Texas and/or another location reasonably designated by Milagro.  NOTWITHSTANDING THE PROVISIONS OF **SECTION 12.2**, AND SUBJECT TO **SECTION 7.2** WHICH SHALL GOVERN ENVIRONMENTAL INSPECTIONS BY WHITE OAK, WHITE OAK HEREBY AGREES TO AND SHALL DEFEND, INDEMNIFY AND HOLD ALL MILAGRO INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LOSSES ATTRIBUTABLE TO PERSONAL INJURY, DEATH OF PHYSICAL PROPERTY DAMAGE, CAUSED BY, ARISING OUT OF, ASSOCIATED

25

WITH, OR IN ANY WAY RELATED TO THE PHYSICAL ACCESS TO THE ASSETS AND MILAGRO'S OFFICES BY WHITE OAK AND ANY PERSON ACTING ON WHITE OAK'S BEHALF, INCLUDING THE EXAMINATION DESCRIBED HEREIN, OCCURRING AFTER THE EXECUTION OF THIS AGREEMENT. THE FOREGOING RELEASE AND INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LOSSES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SINGLE NEGLIGENCE, CONCURRENT NEGLIGENCE, JOINT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE) OF ANY MILAGRO INDEMNIFIED PARTY OR (ii) STRICT LIABILITY, STATUTORY LIABILITY, BREACH OF CONTRACT, BREACH OF WARRANTY OR OTHER FAULT OR RESPONSIBILITY OF ANY MILAGRO INDEMNIFIED PARTY OR ANY OTHER PERSON OR PARTY; PROVIDED, HOWEVER, THAT THE FOREGOING RELEASE AND INDEMNIFICATION SHALL NOT APPLY TO LOSSES THAT ARISE OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MILAGRO INDEMNIFIED PARTY.

5.2    Interim Operations.

(a)    During the period from the Execution Date to the Closing, except (i) as required by any Lease, Assigned Contract or instrument listed on any Schedule hereto or (ii) as required by any applicable law or any governmental authority (including by order or directive of the Bankruptcy Court, as required by the terms of any debtor in possession financing obtained by Milagro or fiduciary duty of the Board of Directors of Milagro), Milagro agrees, unless specifically waived or consented to by White Oak in writing (which consent shall not be unreasonably withheld, conditioned or delayed), as follows:

(1)    Subject to the provisions of applicable operating and other agreements, Milagro shall operate, maintain and administer the Assets in a good and workmanlike manner, consistent with its past practices.

(2)    Except for emergency action taken in the face of risk to life, property or the environment, Milagro shall submit to White Oak for prior written approval, which approval shall not be unreasonably conditioned, withheld or delayed, all requests for capital expenditures and all proposed new contracts and agreements relating to the Assets that involve individual commitments of more than Fifty Thousand Dollars ($50,000), net to Milagro's interest.

(3)    Except in the ordinary course of business, Milagro will not sell, farmout, encumber or dispose of any of the Assets that is in excess of Fifty Thousand Dollars ($50,000), net to Milagro's interest.

(4)    Except with respect to those Hydrocarbons sales, processing, gathering, treating, or other similar agreements as provided in **Section 5.2(a)(5)** below, Milagro will not enter into any material new contract affecting the Assets or modify or amend in any

26

material adverse respect any Leases or existing contract other than in the ordinary course of business.

(5)    Milagro shall not enter into any new Hydrocarbons sales, processing, gathering, treating, or other similar agreements, or otherwise modify or amend any existing Hydrocarbons sales, processing, gathering, treating, or other similar agreements, with a term of greater than sixty (60) days without the prior written approval of White Oak.

(6)    Milagro will promptly notify White Oak if Milagro receives actual written notice of any material claim, suit, action or other proceeding, or any threat thereof, of any kind relating, in whole or in part, to the Assets.

(7)    Except as contemplated by the Plan, Milagro will not issue (A) any equity interest or (B) any options, warrants, rights of conversion or other rights, agreements or commitments obligating Milagro to issue, deliver or sell any equity interest of Milagro.

(8)    Milagro will not merge or consolidate with, or purchase substantially all of the assets or business of, or equity interests in, or make an investment in, any Person or adopt a plan of complete or partial liquidation or authorize or undertake a dissolution, consolidation, restructuring, recapitalization or other reorganization.

In the event the lender to any debtor in possession financing obtained by Milagro requests or instructs Milagro to take any action that is described in this **Section 5.2(a)**, Milagro shall deliver written notice to White Oak of such request as promptly as practicable prior to Milagro's taking of any such action.

(b)    White Oak acknowledges that Milagro owns an undivided interest in certain of the Assets, and White Oak agrees that the acts or omissions of the other Working Interest or unit interest owners shall not constitute a violation of the provisions of this **Section 5.2**, nor shall any action required by a vote of Working Interest owners constitute such a violation so long as Milagro has voted its interest in a manner that complies with the provisions of this **Section 5.2**.

(c)    During the period from the Execution Date to the Closing, White Oak agrees, unless specifically consented by Milagro in writing (which consent shall not be unreasonably withheld, conditioned or delayed), as follows:

(1)    White Oak will operate its business and its assets in the ordinary course of business, in a good and workmanlike manner, consistent with its past practices, and in material compliance with all laws;

27

(2)    White Oak will use commercially reasonable efforts to preserve beneficial relationships with its customers, suppliers, agents, lessors and lessees.

(3)    White Oak will promptly notify Milagro if White Oak receives actual written notice of any material claim, suit, action or other proceeding, or any threat thereof, of any kind relating to the business or assets of White Oak.

(4)    White Oak will not subject any of its assets to any new mortgage or pledge except as set forth on **Schedule 4.2(l)(5)**, except as may be reasonably necessary to fund a portion of the Purchase Price in connection with this Agreement.

(5)    White Oak will not authorize, issue or sell (A) any equity interest of White Oak, (B) any securities containing equity features, or (C) any options, warrants, rights of conversion or other rights, agreements or commitments obligating White Oak to issue, deliver or sell any equity interest of White Oak, except as may be reasonably necessary to fund the Cash Payment Cap portion of the Purchase Price in connection with this Agreement.

(6)    White Oak will not merge or consolidate with, or purchase substantially all of the assets or business of, or equity interests in, or make an investment in, any Person or adopt a plan of complete or partial liquidation or authorize or undertake a dissolution, consolidation, merger, restructuring, recapitalization or other reorganization.

(7)    White Oak will not declare any distributions or dividends that are payable on or after the Effective Time.

(8)    White Oak will not commit to do any of the foregoing.

(d)    During the period from the Execution Date to the Closing, White Oak shall provide prompt written notice to Milagro of any of the following actions:

(1)    Except for emergency action taken in the face of risk to life, property or the environment, all requests for capital expenditures and all proposed new contracts and agreements relating that involve individual commitments of more than Two Hundred Fifty Thousand Dollars ($250,000), net to White Oak's interest.

(2)    Except in the ordinary course of business, any farmout, encumbrance or disposition of any of its assets that is in excess of Two Hundred Fifty Thousand Dollars ($250,000), net to White Oak's interest.

28

(3)     The settlement of any claim, action or proceeding that is in excess of Two Hundred Fifty Thousand Dollars ($250,000), net to White Oak's interest.

5.3     <u>Preferential Rights and Consents.</u>

(a)     Within fifteen (15) Business Days after the Execution Date, Milagro shall send (i) notices to the holders of Preferential Rights applicable to the transactions contemplated hereby and listed on **Schedule 4.1(l)** hereto, and (ii) with respect to consents to assignment applicable to the transactions contemplated hereby (other than governmental consents or approvals customarily obtained post-Closing) listed on **Schedule 4.1(l)**, requests to third parties for their consent to assignment of the affected Assets to White Oak. From and after the Execution Date, Milagro shall make all reasonable efforts to obtain all such Preferential Right waivers and third party consents; provided, that in no event shall Milagro be obligated to pay any amount or assume any additional liability in connection with obtaining such Preferential Right waivers and third party consents. For purposes of this Agreement, the term "**Preferential Rights**" shall mean any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated herein.

(b)     In the event a third party elects to exercise an applicable Preferential Right to purchase any of the Assets prior to the Closing Date (and has not, prior to the Closing, subsequently waived such Preferential Right or withdrawn its exercise thereof), the affected Assets shall be removed from this Agreement and the Purchase Price shall be reduced by the Allocated Value of such Assets. For a period of one hundred and twenty (120) days after the Closing Date, Milagro may, from time to time, notify White Oak in writing if the holder of such exercised Preferential Right has withdrawn its exercise thereof or has failed to close. Within ten (10) Business Days after White Oak's receipt of such notice, Milagro shall contribute, assign, transfer and convey to White Oak, and White Oak shall acquire and accept from Milagro, the affected Assets pursuant to the terms of this Agreement and for the Allocated Value thereof (as adjusted pursuant to **Section 3.4** through the date such Assets are transferred to White Oak).

(c)     If prior to the Closing Date any Preferential Right applicable to the transactions contemplated hereby has not been expressly waived or the period for exercise of such Preferential Right has not expired without challenge or comment from the holder of such Preferential Right, such Assets subject to the Preferential Right shall be sold to White Oak at the Closing pursuant to the provisions of this Agreement.

(d)     If prior to the Closing Date any consent to assignment applicable to the transactions contemplated hereby (other than governmental consents or

29

approvals customarily obtained post-Closing) has not been obtained, and further, failure to obtain such third party consent may result in termination of the Lease or Assigned Contract, including causing such Lease or Assigned Contract to be void or voidable (each such consent, a "**Hard Consent**"), the Assets affected by such third party Hard Consent requirement shall be held back from the Assets conveyed at Closing and the Purchase Price shall be reduced by the Allocated Value of such retained Assets subject to the outstanding consent. Any Asset so held back at the Closing will be sold to White Oak within ten (10) Business Days after such third party Hard Consents have been obtained, waived or otherwise satisfied. At such subsequent closing, Milagro shall contribute, assign, transfer and convey to White Oak, and White Oak shall acquire and accept from Milagro, such Asset pursuant to the terms of this Agreement and for the Allocated Value thereof (as adjusted pursuant to **Section 3.4** through the date such Assets are transferred to White Oak).

(e)     Except for those Hard Consents described in **Section 5.3(d)**, if any consents to the assignment of any Asset are not obtained prior to Closing, then with respect to each affected Asset, the affected Assets shall nevertheless be sold and conveyed to White Oak at the Closing.

5.4     Casualty Loss.  If, subsequent to the Execution Date and prior to the Closing, all or any portion of the Assets are (i) destroyed by fire or other casualty or (ii) are taken in condemnation or under the right of eminent domain (or proceedings for such purposes are pending or threatened) (collectively, "**Casualty Loss**"), Milagro shall, at its sole option, elect, by delivering a written notice to White Oak prior to the Closing Date, to either (A) attempt to  replace, repair or restore the Assets affected by such Casualty Loss to their prior condition, at Milagro's sole cost, as promptly as reasonably practicable (which work may extend after the Closing Date), or (B) subject to the terms of any debtor in possession financing obtained by Milagro, assign the insurance proceeds therefrom to White Oak at Closing. In the case of (B) above, Milagro shall transfer to White Oak, at Closing, without recourse against Milagro, all of the right, title, and interest of Milagro in and to any unpaid insurance or condemnation proceeds arising out of such loss, damage, destruction, or taking. Milagro agrees to maintain, or cause to be maintained, at its sole cost and expense, policies of insurance on all of the Assets in the types and in the amounts which would be reasonably maintained by a prudent operator of oil and gas properties. Except as otherwise noted in this **Section 5.4**, any funds that have been committed by Milagro for repair, restoration, or replacement as aforesaid shall be paid by Milagro for such purposes or, at Milagro's option, delivered to White Oak.  In the event any Casualty Loss is not fully compensated by the efforts of Milagro described in clause (A) above or the insurance proceeds actually assigned pursuant to clause (B) above, the Purchase Price shall be reduced in an amount equal to the insurance proceeds not actually assigned to White Oak pursuant to clause (B) above, in accordance with **Section 3.4(a)(10)**.

5.5     Assumption and Rejection of Executory Contracts and Leases.  **Schedule 5.5(a)** sets forth a draft of the executory contracts and unexpired Leases Milagro plans to file as Schedule G with the Bankruptcy Court (the "**365 Schedule**").  Within thirty (30) days after the date of this Agreement,

30

Milagro will deliver to White Oak a copy of the 365 Schedule.  If, at any time thereafter, Milagro determines that it is party to a 365 Contract that is not then set forth on the 365 Schedule, Milagro agrees to amend or supplement the 365 Schedule from time to time promptly, and to provide White Oak promptly with a copy of the revised 365 Schedule reflecting the amendments or supplements thereto.  If Milagro has not previously provided or made available to White Oak a copy of any such 365 Contract, including any amendments, waivers or other modifications thereof Milagro shall upon White Oak's request (i) provide a copy of such 365 Contract to White Oak if Milagro has a copy of such 365 Contract readily available in its files or (ii) use its commercially reasonable efforts to obtain a copy of such 365 Contract if Milagro does not have a copy of such 365 Contract readily available in its files and, upon obtaining a copy, provide a copy of such 365 Contract to White Oak.

(b)     **Schedule 5.5(b)** sets forth a complete list of the 365 Contracts listed on the 365 Schedule received from Milagro that White Oak desires to be assumed by Milagro and transferred and conveyed to White Oak as an assumed and assigned contract (collectively, and as further modified by White Oak pursuant to the provisions of this **Section 5.5(b)** (the "**Desired 365 Contracts**"), which shall include each contract that is identified as an "Operating Agreement" on the 365 Schedule and the Parties agree is an oil and gas operating agreement that relates to one or more of the Leases being acquired by White Oak under this Agreement (each such contract, an "**Operating Agreement**").  As promptly as practicable following the designation by White Oak of any 365 Contract as a Desired 365 Contract, Milagro shall take all necessary actions in order to effect the assumption and assignment of such Desired 365 Contract by Milagro in accordance with the Bankruptcy Code, effective as of the Closing. Notwithstanding the foregoing, at any time prior to five (5) calendar days before the commencement of the Confirmation Hearing (or, if any 365 Contract is first identified to White Oak by Milagro between the beginning of such five (5) calendar days and the commencement of the Confirmation Hearing, within one (1) Business Day of such identification), White Oak may designate any 365 Contract that has not been rejected as a Desired 365 Contract and upon receipt of any such notice Milagro shall use commercially reasonable efforts to effect the assumption and assignment of such 365 Contract by Milagro in accordance with the Bankruptcy Code and, if Milagro is successful in effecting such assumption and assignment as of Closing, such 365 Contract shall become a Desired 365 Contract and transferred and conveyed to White Oak as an Assigned Contract. Notwithstanding anything herein to the Contrary, White Oak may revise **Schedule 5.5(b)** by subtracting one or more Desired 365 Contracts at any time prior to five (5) calendar days before the commencement of the Confirmation Hearing; provided, however, that White Oak may not subtract from **Schedule 5.5(b)** any Desired 365

31

Contract that is an Operating Agreement as defined in this **Section 5.5(b)** which relates to any Assets being acquired by White Oak.

(c)    At or prior to the Closing, White Oak shall provide adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by Milagro and assigned to White Oak at or prior to the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement provided that White Oak shall cooperate with Milagro in providing such adequate assurance of future performance of all of the Desired 365 Contracts and Milagro acknowledges that such cooperation may require Milagro to provide information regarding White Oak and its subsidiaries, as well as a commitment of performance by White Oak and/or its subsidiaries with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts, and Milagro's obligation to assume and assign such Desired 365 Contracts is subject to the cooperation and providing of such information and commitment by White Oak. Milagro shall use its best efforts to identify all counterparties to the Desired 365 Contracts and any other parties who may assert potential claims for Cure Costs and shall comply with the provisions approved by the Bankruptcy Court to give notice of the proposed assignment of the Desired 365 Contracts and proposed Cure costs to all such identified parties.  All Cure Costs with respect to the Desired 365 Contracts, if any, will be paid by Milagro; and White Oak shall have no liability for Cure Costs other than as provided in **Section 3.4(a)(6)**.

5.6    <u>Confidentiality.</u> The Parties acknowledge that White Oak and Milagro previously executed the Confidentiality Agreement.  Notwithstanding anything to the contrary in the Confidentiality Agreement, the Parties acknowledge and understand that this Agreement will be filed with the Bankruptcy Court. The Parties agree that such disclosure shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this **Section 5.6** shall not in any way limit, to the extent required by applicable law, the disclosure of information by Milagro or its Affiliates in connection with the administration of the Plan, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

5.7    <u>Post-Signing Information.</u>

Prior to the Closing, White Oak shall have the right to amend or supplement the Schedules relating to its representations and warranties set forth in **Section 4.2** with respect to any matters first occurring subsequent to the Execution Date which, if existing as of the date hereof, would have been required to be set forth in such Schedules to make a representation or warranty true and correct ("**Post-Signing Information**").  For the avoidance of doubt, White Oak shall not have the right to amend or supplement the Schedules relating to its representations and warranties set forth in **Section 4.2** with respect to any matters occurring prior to the Execution Date.  If (i) any Post-Signing Information is added to the Schedules and (ii) the conditions set forth in **Section 9.1(a)**

32

have nonetheless been fulfilled, Milagro shall be obligated to close and Milagro shall not be entitled to make any claim of any kind or nature with respect to such Post-Signing Information pursuant to the terms of this Agreement or otherwise. If (i) any Post-Signing Information is added to the Schedules and (ii) the conditions set forth in **Section 9.1(a)** have not been fulfilled, without giving effect to the Post-Signing Information, Milagro shall be entitled to terminate this Agreement as its sole and exclusive remedy. If Milagro is entitled to terminate this Agreement as contemplated by the preceding sentence, but nonetheless elects to close the transaction, Milagro shall not be entitled to make any claim of any kind or nature with respect to such Post-Signing Information pursuant to the terms of this Agreement or otherwise.

5.8     Post-Execution Date Financial Updates. After the end of each fiscal quarter prior to the Closing Date, White Oak agrees to provide Milagro with correct and complete copies of the quarterly financial statements of White Oak and its subsidiaries provided to its lenders pursuant to White Oak's applicable credit documents. Such financial statements will be provided to Milagro within 75 days following the end of each fiscal quarter. Milagro acknowledges that such financial statements are unaudited and, therefore, are subject to normal recurring year-end adjustments. Additionally, upon the request of Milagro, and no more frequently than once per month, White Oak agrees to make its key personnel reasonably available, during normal business hours, for a conference call or in-person meeting with up to five (5) representatives of Milagro in order to discuss questions regarding such financial statements.

## 6.     **TITLE MATTERS**

6.1     Definitions.

(a)     The term "**Defensible Title**" shall mean such title held by Milagro on the Effective Time, which, except for and subject to the Permitted Encumbrances: (i) entitles Milagro to receive as to each Well or Unit not less than the Net Revenue Interest set forth on **Exhibit G** of all Hydrocarbons produced from such Well or Unit; (ii) obligates Milagro to bear costs and expenses relating to the drilling, maintenance, development, operation and plugging and abandonment of a Well or Unit in an amount not greater than the Working Interest set forth in **Exhibit G** for such Well or Unit (without at least a proportionate increase in the Net Revenue Interest which Milagro is entitled to receive from such Well or Unit); and (iii) is free and clear of Encumbrances other than Permitted Encumbrances.

(b)     "**Encumbrances**" shall mean any encumbrance, charge, equitable interest, privilege, lien, mortgage, deed of trust, production payment, option, pledge, collateral assignment, security interest, or other arrangement substantially equivalent thereto, or other defect or irregularity of any kind.

(c)     The term "**Permitted Encumbrances**" shall mean:

(1)     The terms and conditions of the Leases and other instruments of record relating to the Assets, including Royalties, production

payments, net profits interests, unitization and pooling designations and agreements, reversionary interests and similar burdens to the extent such burdens do not reduce the Net Revenue Interest for any Well or Unit below that set forth on **Exhibit G** for such Well or Unit or increase the Working Interest for any Well or Unit above that set forth on **Exhibit G** without a proportionate increase in the Net Revenue Interest for such Well or Unit;

(2)    any third party consents required for the transfer of any of the Assets and similar agreements with respect to (x) which waivers or consents are obtained prior to the Closing or (y) which are typically obtained after Closing (including any applicable approvals from any governmental authority);

(3)    Preferential Rights;

(4)    all recorded easements, rights-of-way, servitudes, licenses and permits on, over, across or in respect of any of the Assets;

(5)    rights reserved to or vested in any governmental agency to control or regulate any of the Assets in any manner, and all obligations and duties under all applicable laws, rules and orders of any such governmental agency or under any franchise, grant, license or permit issued by any such governmental agency;

(6)    materialmen's, mechanics', repairmen's, employees', contractors', operators', tax and other similar liens or charges arising in the ordinary course of business incidental to the construction, maintenance or operation of any of the Assets: (A) if they have not been filed pursuant to law; (B) if filed, that have not yet become due and payable and payment is being withheld as provided by law; or (C) if their validity is being contested in good faith in the ordinary course of business by appropriate action;

(7)    Imbalances;

(8)    liens for current period Taxes, or assessments not yet delinquent;

(9)    the terms and conditions of the Assigned Contracts, unitization, communitization, pooling agreements, joint operating agreements and production sales agreements, to the extent the same do not reduce the Net Revenue Interest for any Well or Unit below that set forth on **Exhibit G** for such Well or Unit or increase the Working Interest for any Well or Unit above that set forth on **Exhibit G** without a proportionate increase in the Net Revenue Interest for such Well or Unit;

(10)    any maintenance of uniform interest provision in an operating agreement if waived by the party or parties having the right to

34

enforce such provision or if the violation of such provision would not give rise to the unwinding of the sale of the affected Asset hereunder;

(11)  conventional rights of reassignment triggered by Milagro's (or, after the Closing, White Oak's) express indication of its intention to finally release or abandon its interest prior to expiration of the primary term or other termination of such interest; and

(12)  such other defects or irregularities of title as White Oak may have waived in writing or by which White Oak shall be deemed to have waived pursuant to the provisions of this Agreement.

(d)  The term "**Title Defect**" shall mean any encumbrance or defect in Milagro's title to a Property that renders Milagro's title to such Property to be less than Defensible Title.

(e)  The term "**Title Defect Amount**" shall mean, with respect to any Title Defect, the amount by which the Allocated Value of the Property affected by such Title Defect is reduced as a result of the existence of such Title Defect and shall be determined in accordance with the following methodology, terms and conditions:

(1)  if the Title Defect is an Encumbrance which is undisputed and liquidated in amount, then the Title Defect Amount shall be the amount necessary to be paid to remove the Title Defect from the affected Property;

(2)  if the Title Defect represents a discrepancy between the actual Net Revenue Interest for a Well or Unit and the Net Revenue Interest for such Well or Unit set forth on **Exhibit G**, then the Title Defect Amount shall be the product of the Allocated Value of such Well or Unit multiplied by a fraction, the numerator of which is the decrease in such Net Revenue Interest and the denominator of which is the Net Revenue Interest set forth on **Exhibit G**;

(3)  if the Title Defect represents an obligation, encumbrance, burden or charge upon or other defect in title to any Property of a type not described in subsections (1) or (2) above, then the Title Defect Amount shall be determined by taking into account the Allocated Value of the affected Property, the portion of such Property affected by the Title Defect, the legal effect of the Title Defect, the potential economic effect of the Title Defect over the economic life of the affected Property, and such other factors as are necessary to make a proper evaluation; and

(4)  notwithstanding anything to the contrary in this **Article 6**, the aggregate value of all Title Defect Amounts attributable to the effects of all Title Defects upon any specific Property shall not exceed the Allocated Value of such Property.

35

6.2    <u>Title Adjustments</u>.

(a)    White Oak may give Milagro written notice of any Title Defects alleged by White Oak in good faith no later than 5:00 p.m., Houston time, on the date that is ten (10) Business Days prior to the Closing Date (the "**Defect Deadline**").  To be effective, such notice shall be in writing and shall include: (i) a description of the alleged Title Defect (including identifying the Property affected thereby); (ii) White Oak's reasonable estimation of the Title Defect Amount with respect to each Title Defect, and the computations for such Title Defect Amount and (iii) documentation or other evidence reasonably supporting White Oak's assertion of each Title Defect and Title Defect Amount.  Upon receipt of such notice, Milagro shall have the right and opportunity, but not the obligation, to cure any Title Defect.

(b)    On or before the Defect Deadline, Milagro may notify White Oak in writing if Milagro determines that Milagro has (i) a lesser Working Interest in any Well or Unit (without a proportionate decrease in the corresponding Net Revenue Interest for such Well or Unit) than that shown on **Exhibit G** for such Well or Unit, or (ii) a greater Net Revenue Interest in any Well or Unit (without a proportionate increase in the corresponding Working Interest for such Well or Unit) than that shown on **Exhibit G** for such Well or Unit (collectively, such items shall be referred to as an "**Additional Interest**"). To be effective, such notice shall include: (i) a description of the alleged Additional Interest (including identifying the Properties affected thereby); (ii) Milagro's reasonable estimation of the Additional Interest Amount with respect to each Additional Interest, and the computations for such Additional Interest Amount and (iii) documentation or other evidence reasonably supporting Milagro's assertion of each Additional Interest and Additional Interest Amount.  The amount by which the Allocated Value of the Properties affected by an Additional Interest shall be increased as a result of the existence of such Additional Interest (the "**Additional Interest Amount**") shall be determined in accordance with the provisions of **Section 6.1(e)** *mutatis mutandis.*

(c)    Notwithstanding anything herein to the contrary, no single Title Defect shall be taken into account unless the applicable Title Defect Amount is determined to be more than the Individual Title Defect Threshold.  No adjustment will be made to the Purchase Price for uncured Title Defects unless the total of all Title Defect Amounts that exceed the Individual Title Defect Threshold exceeds the Aggregate Title Defect Deductible. In the event that the aggregate of all such Title Defect Amounts in excess of the Individual Title Defect Threshold exceeds the Aggregate Title Defect Deductible, the adjustment to the Purchase Price shall only be for the amount by which the total of all such Title Defect Amounts exceeds the Aggregate Title Defect Deductible.  White Oak shall be deemed to have waived all Title Defects of which Milagro has not been given notice in accordance with **Section 6.2(a)**.

(d)    Subject to **Section 6.2(c)**, in the event that any Title Defect is not waived by White Oak Milagro, at its option, shall elect to do one of the following:

(1)    reduce the Purchase Price by the associated Title Defect Amount in accordance with **Section 6.2(e)**;

(2)    remove the entirety of such affected Property from the Assets being conveyed hereby (together with all associated assets), in which event the Purchase Price shall be reduced by the Allocated Value(s) of such removed Assets; or

(3)    cure such Title Defect at Milagro's sole cost and expense within one hundred twenty (120) days after the Closing Date.

(e)    To the extent that (x) Milagro elects to reduce the Purchase Price in respect of any Title Defect pursuant to **Section 6.2(d)(1)** and/or (y) Milagro has asserted any Additional Interests pursuant to **Section 6.2(b)**: Milagro and White Oak shall attempt to agree on the associated Title Defect Amount and Additional Interest Amount prior to Closing and the Purchase Price shall be adjusted at Closing by the amount agreed by the Parties as such Title Defect Amount and Additional Interest Amount. If Milagro and White Oak are unable to agree on such amounts prior to Closing, then (1) the affected Property or Properties shall nevertheless be included in the Assets purchased by, and conveyed to, White Oak at Closing, (2) the Purchase Price shall be (i) reduced by the amount that White Oak has proposed as the Title Defect Amount with respect to such Title Defect, and/or (ii) increased by the amount that Milagro has proposed as the Additional Interest Amount with respect to such Additional Interest, and (3) the final determination of the Title Defect Amount and/or the Additional Interest Amount shall be resolved pursuant to **Section 6.2(f)**.

(f)    Prior to the Closing, White Oak and Milagro shall negotiate in good faith to agree on any Title Defect Amounts and/or Additional Interest Amounts. After written notice to the other Party prior to the Closing and if the Parties fail to agree on the existence of a Title Defect or the Title Defect Amount, either Party may submit any such Title Defect Amount or Additional Interest Amount to a single arbitrator, who shall be a title attorney with at least twenty (20) years' experience in oil and gas titles involving properties in the regional area in which the Properties affected by the Title Defect and/or the Additional Interest, as applicable, are located, as selected by mutual agreement of the Parties, and absent such agreement, by the Houston, Texas office of the American Arbitration Association (the "**Title Valuation Referee**"). The Parties shall direct the Title Valuation Referee to resolve any such dispute within thirty (30) days after its receipt of all relevant materials pertaining thereto, being in no event greater than forty-five (45) days after referral of the matter to the Title Valuation Referee. The Title Valuation Referee shall act as an expert for the limited purpose of determining the specific disputed matters submitted by either Party and may not award damages

37

or penalties to either Party with respect to any matter. Milagro and White Oak shall share equally the Title Valuation Referee's costs, fees and expenses (including attorney's fees). The determination of the Title Valuation Referee shall be made in writing, shall be binding upon and non-appealable by the Parties and shall not be subject to further review, audit or arbitration. Upon final determination of any outstanding Title Defect Amount and/or Additional Interest Amount (whether by mutual agreement of the Parties or pursuant to the Title Valuation Referee's determination), Milagro or White Oak, as applicable, shall pay to the other the difference, if any, between the final Title Defect Amount and/or the final Additional Interest Amount, as applicable and the amount by which the Purchase Price was adjusted in respect of the applicable Title Defect or Additional Interest at Closing. If neither Party submits a Title Defect Amount or Additional Interest Amount to the Title Valuation Referee within thirty (30) days from the Closing Date, then White Oak and Milagro shall be deemed to have agreed that such Title Defect Amount and/or Additional Interest Amount with respect to which the Purchase Price has been adjusted pursuant to **Section 6.2(e)** is acceptable and shall be deemed to have waived their rights with respect to such Title Defect Amount and/or Additional Interest Amount, as applicable.

(g)     If White Oak delivers a defect notice as provided in **Section 6.2(a)**, Milagro shall have until three (3) Business Days prior to the Closing Date to object to any Title Defect and/or any asserted Title Defect Amount as set forth in the Defect Notice, which objection and assertion shall be in writing (a "**Milagro Title Dispute Notice**") and shall identify (1) those Title Defects that Milagro disputes exists, (2) those Title Defect Amounts Milagro disagrees with (including any asserted Title Defect Amounts attributable to a Title Defect that Milagro does not dispute exists) and (3) those Title Defects that Milagro desires to attempt to cure. Milagro shall deliver to White Oak all internal or external engineering or other reports (and work papers related thereto reflecting information with respect to the Assets to which any Title Defect subject to an objection by Milagro relates) prepared by or for Milagro with respect to the Assets forming the basis of any dispute of any item in the Defect Notice or dollar amount or value thereof asserted by Milagro in the Milagro Title Dispute Notice. If Milagro timely delivers a Milagro Title Dispute Notice, White Oak and Milagro shall use good faith efforts to attempt to agree on the validity and amount of each Title Defect claim disputed by Milagro, giving effect to customary industry standards and practices as would be followed and accepted by a reasonable prudent operator of oil and gas properties. If White Oak and Milagro cannot agree on the validity or amount of any Title Defect claim disputed by Milagro within five (5) Business Days after Milagro's delivery of the Milagro Title Dispute Notice, either White Oak or Milagro may engage the Title Valuation Referee in accordance with **Section 6.2(f)**.

6.3     Special Warranty of Title.

In the Assignment, Conveyance and Bill of Sale to be delivered under **Section 10.2(a)**, Milagro will warrant title to the Assets unto White Oak, its successors and assigns, against all Persons claiming or to claim the same or any part thereof BY, THROUGH OR UNDER MILAGRO, BUT NOT OTHERWISE.

6.4    <u>EXCLUSIVE REMEDY</u>.    THIS **ARTICLE 6** CONSTITUTES THE SOLE AND EXCLUSIVE REMEDY AND RIGHT OF RECOVERY THAT WHITE OAK SHALL HAVE AGAINST MILAGRO WITH RESPECT TO  ANY TITLE DEFECTS TO THE ASSETS AND WHITE OAK MAY NOT CLAIM ANY FACT, CIRCUMSTANCE OR MATTER THAT WOULD CONSTITUTE A TITLE DEFECT UNDER THIS **ARTICLE 6** AS THE BASIS FOR ANY OTHER REDRESS UNDER THIS AGREEMENT.

7.    **ENVIRONMENTAL MATTERS**

7.1    <u>Environmental Assessment.</u>

Prior to Closing, White Oak shall have the right to conduct an environmental inspection of the Assets as set forth in this **Section 7.1** (the "**Assessment**").  During Milagro's regular hours of business and after providing Milagro with written notice of any such activities no less than one (1) Business Day in advance an employee of White Oak or by a reputable environmental consulting or engineering firm approved in advance in writing by Milagro, shall be permitted to enter upon the Assets, inspect the same, review all of Milagro's files and Records (other than those for which Milagro has an attorney-client privilege) relating to the Assets, and generally conduct visual, non-invasive tests, examinations, and investigations, but only to the extent that Milagro may grant such right without violating any obligations to any third party after exercising reasonable efforts to obtain their consent.  Milagro shall have the right to observe the Assessment and the Assessment shall be conducted at the sole cost and expense of White Oak, and shall be subject to the provisions of **Sections 7.1** and **7.2**.  Upon written request to White Oak, by Milagro, White Oak shall promptly provide to Milagro a copy of all results, analysis, reports and reviews prepared by White Oak with respect to each Assessment at no cost to Milagro.  If, following the conduct of any such environmental assessments, White Oak, in its reasonable discretion based on the findings and results of such environmental assessments, believes that further investigation, sampling or testing or other site assessment commonly referred to as a "Phase II" site assessment (collectively, "**Phase II Assessment**") is necessary to determine the existence and/or magnitude of an Environmental Defect or Environmental Defect Value, White Oak shall be entitled to request Milagro's consent to conduct any Phase II Assessment. White Oak shall furnish to Milagro for review and approval a proposed scope of any Phase II Assessment, including a description of the activities to be conducted and a description of the approximate locations of such activities. White Oak shall not conduct any Phase II Assessment without Milagro's prior written consent. White Oak shall advise Milagro prior to conducting any Assessment activities and Milagro shall have the right to be present during any Assessment activities and shall have the right, at its option and expense, to split samples with White Oak.  All information obtained or reviewed by White Oak in connection with an Assessment conducted pursuant to this **Section 7.1** (including Phase II Assessments) shall be maintained confidential by White Oak and shall be governed by the Confidentiality Agreement.  After completing any Assessment activities, White Oak shall, at its sole cost and expense, restore the Assets to their condition prior to the commencement of such Assessment activities, unless Milagro requests otherwise, and

39

shall promptly and properly dispose of all drill cuttings, corings, or other investigative-derived wastes generated in the course of the Assessment activities. White Oak shall maintain, and shall cause its officers, employees, representatives, consultants and advisors to maintain, all information obtained by White Oak pursuant to any Assessment or other due diligence activity as strictly confidential in perpetuity, unless disclosure of any facts discovered through such Assessment is required under any Environmental Laws.

7.2    INSPECTION INDEMNITY.

NOTWITHSTANDING THE PROVISIONS OF **SECTION 12.2**, WHITE OAK HEREBY AGREES TO AND SHALL DEFEND, INDEMNIFY AND HOLD THE MILAGRO INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LOSSES ATTRIBUTABLE TO PERSONAL INJURY, DEATH OR PHYSICAL PROPERTY DAMAGE CAUSED BY, ARISING OUT OF, ASSOCIATED WITH, OR IN ANY WAY RELATED TO THE ASSESSMENT (INCLUDING, WITHOUT LIMITATION, CLAIMS ARISING OUT OF, ASSOCIATED WITH, OR RELATED TO ANY ASSESSMENT AND/OR PHASE II ASSESSMENT), OCCURRING AFTER THE EXECUTION OF THIS AGREEMENT BY WHITE OAK OR ITS AGENTS OR REPRESENTATIVES. THE FOREGOING RELEASE AND INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LOSSES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SINGLE NEGLIGENCE, CONCURRENT NEGLIGENCE, JOINT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE) OF ANY MEMBER OF THE MILAGRO INDEMNIFIED GROUP OR (ii) STRICT LIABILITY, STATUTORY LIABILITY, BREACH OF CONTRACT, BREACH OF WARRANTY OR OTHER FAULT OR RESPONSIBILITY OF A MEMBER OF THE MILAGRO INDEMNIFIED GROUP OR ANY OTHER PERSON OR PARTY; PROVIDED, HOWEVER, THAT (A) THE FOREGOING RELEASE AND INDEMNIFICATION SHALL NOT APPLY TO LOSSES THAT ARISE OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE MILAGRO INDEMNIFIED GROUP, AND (B) NOTHING HEREIN SHALL IMPOSE UPON WHITE OAK LIABILITIES OR OBLIGATIONS WITH RESPECT TO LIABILITIES THAT ARISE FROM THE DISCOVERY OF CONDITIONS OR EVENTS AS A RESULT OF WHITE OAK'S ASSESSMENT AND DUE DILIGENCE.

7.3    Definitions.

(a)    The term "**Environmental Defect**" means any condition of the Assets that either (i) requires immediate restoration, remediation or resolution under applicable Environmental Laws, including, but not limited to, the presence of NORM, only to the extent such presence of NORM requires immediate restoration, remediation or resolution under applicable Environmental Laws; or (ii) would require immediate restoration, remediation or resolution under applicable Environmental Laws if known by a regulatory agency of competent jurisdiction.

(b)    The term "**Environmental Defect Amount**" means, with respect to an Environmental Defect, all costs and expenses reasonably required for Remediation.

40

(c)    The term "**Environmental Laws**" means all laws, statutes, ordinances, rules and regulations of any governmental authority pertaining to protection of the environment in effect as of the Effective Time and as interpreted by court decisions or administrative orders as of the Effective Time in the jurisdiction in which the applicable asset is located. Environmental Laws do not include good or desirable operating practices or standards that may be employed or adopted by other oil or gas well operators or merely recommended, but not required, by a governmental authority.

(d)    The term "**Remediation**" means, with respect to an Environmental Defect, the implementation and completion of any remedial, removal, response, construction, closure, disposal or other corrective actions required under Environmental Laws to correct or remove such Environmental Defect.

7.4    <u>Environmental Defect Adjustments.</u>

(a)    White Oak may give Milagro written notice of any Environmental Defects alleged by White Oak in good faith no later than the Defect Deadline. Such notice shall be in writing and shall include: (i) a description of each Environmental Defect (including identifying the Properties affected thereby); (ii) White Oak's reasonable estimation of the Environmental Defect Amount with respect to each Environmental Defect, and (iii) documentation or other evidence completely supporting White Oak's assertion of each Environmental Defect and Environmental Defect Amount. Upon receipt of such notice, Milagro shall have the right and the opportunity, but not the obligation, to cure any Environmental Defects.

(b)    Notwithstanding anything herein to the contrary, no single Environmental Defect shall be taken into account unless the applicable Environmental Defect Amount is determined to be more than the Individual Environmental Defect Threshold. No adjustment will be made to the Purchase Price for uncured Environmental Defects unless the total of all Environmental Defect Amounts that exceed the Individual Environmental Defect Threshold exceeds the Aggregate Environmental Defect Deductible. In the event that the aggregate of all such Environmental Defect Amounts in excess of the Individual Environmental Defect Threshold exceeds the Aggregate Environmental Defect Deductible, the adjustment to the Purchase Price shall only be for the amount by which the total of all such Environmental Defect Amounts exceeds the Aggregate Environmental Defect Deductible. White Oak shall be deemed to have waived all Environmental Defects of which Milagro has not been given notice in accordance with **Section 7.4(a)**.

(c)    Subject to **Section 7.4(b)**, in the event that any Environmental Defect is not waived by White Oak or cured to White Oak's reasonable satisfaction, Milagro, at its option, shall elect to do one of the following:

(1)    reduce the Purchase Price by the associated Environmental Defect Amount in accordance with **Section 7.4(d)**;

(2)    remove the entirety of such affected Property from the Assets being conveyed hereby (together with all associated assets), in which event the Purchase Price shall be reduced by the Allocated Value of such removed Assets; or

(3)    cure such Environmental Defect at Milagro's sole cost and expense within one hundred twenty (120) days after the Closing Date.

(d)    To the extent that the Parties agree to reduce the Purchase Price in respect of any Environmental Defect pursuant to **Section 7.4(c)(1)**, Milagro and White Oak shall attempt to agree on the associated Environmental Defect Amount prior to Closing and the Purchase Price shall be reduced at Closing by the amount agreed by the Parties as such Environmental Defect Amount. If Milagro and White Oak are unable to agree on such Environmental Defect Amount prior to Closing, then (1) the affected Property shall nevertheless be included in the Assets purchased by, and conveyed to, White Oak at Closing (2) the Purchase Price shall be reduced by the amount that White Oak has proposed as the Environmental Defect Amount with respect to such Environmental Defect and (3) the final determination of the Environmental Defect Amount shall be resolved pursuant to **Section 7.4(e)**.

(e)    From and after Closing, White Oak and Milagro shall negotiate in good faith to agree on any Environmental Defect Amounts with respect to which the Purchase Price has been reduced pursuant to **Section 7.4(c)(1)** that were not agreed upon prior to Closing. After written notice to the other Party prior to the Closing, but within thirty (30) days after the Closing Date, either Party may submit any such Environmental Defect Amount to a single arbitrator, who shall be an environmental attorney with at least twenty (20) years' experience in environmental matters involving oil and gas producing properties in the regional area in which the affected Assets are located, as selected by mutual agreement of the Parties, or absent such agreement, by the Houston, Texas office of the American Arbitration Association (the "**Environmental Valuation Referee**"). The Parties shall direct the Environmental Valuation Referee to resolve any such dispute within thirty (30) days after its receipt of all relevant materials pertaining thereto, being in no event greater than forty-five (45) days after referral of the matter to the Environmental Valuation Referee. The Environmental Valuation Referee shall act as an expert for the limited purpose of determining the specific disputed matters submitted by either Party and may not award damages or penalties to either Party with respect to any matter.  Milagro and White Oak shall share equally the Environmental Valuation Referee's costs, fees and expenses (including attorney's fees). The determination of the Environmental Valuation

42

Referee shall be made in writing, shall be binding upon and non-appealable by the Parties and shall not be subject to further review, audit or arbitration. Upon final determination of any outstanding Environmental Defect Amount (whether by mutual agreement of the Parties or pursuant to the Environmental Valuation Referee's determination), Milagro or White Oak, as applicable, shall pay to the other the difference, if any, between the final Environmental Defect Amount and the amount by which the Purchase Price was reduced in respect of the applicable Environmental Defect at Closing. If neither Party submits an Environmental Defect Amount to the Environmental Valuation Referee within thirty (30) days from the Closing Date, then White Oak and Milagro shall be deemed to have agreed that such Environmental Defect Amount with respect to which Milagro elected to reduce the Purchase Price pursuant to **Section 7.4(c)(1)** is acceptable and shall be deemed to have waived their rights with respect to such Environmental Defect Amount pursuant to this **Section 7.4(e)**.

(f)     If White Oak delivers a defect notice as provided in **Section 7.4(a)**, Milagro shall have until five (5) Business Days prior to the Closing Date to object to any Environmental Defect and/or any asserted Environmental Defect Amount as set forth in the Defect Notice, which objection and assertion shall be in writing (a "**Milagro Environmental Dispute Notice**") and shall identify (1) those Environmental Defects that Milagro disputes exists, (2) those Environmental Defect Amounts Milagro disagrees with (including any asserted Environmental Defect Amounts attributable to an Environmental Defect that Milagro does not dispute exists) and (3) those Environmental Defects that Milagro desires to attempt to cure.  If Milagro timely delivers a Milagro Environmental Dispute Notice, White Oak and Milagro shall use good faith efforts to attempt to agree on the validity and amount of each Environmental Defect claim disputed by Milagro, giving effect to customary industry standards and practices as would be followed and accepted by a reasonable prudent operator of oil and gas properties.  If White Oak and Milagro cannot agree on the validity or amount of any Environmental Defect claim disputed by Milagro within five (5) Business Days after Milagro's delivery of the Milagro Environmental Dispute Notice, either White Oak or Milagro may engage the Environmental Valuation Referee in accordance with **Section 7.4(e)**.

7.5     <u>EXCLUSIVE REMEDY.</u>

THIS **ARTICLE 7** CONSTITUTES THE SOLE AND EXCLUSIVE REMEDY AND RIGHT OF RECOVERY THAT WHITE OAK SHALL HAVE AGAINST MILAGRO WITH RESPECT TO ANY CIRCUMSTANCE WITH RESPECT TO THE ASSETS RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR PROTECTION OF THE ENVIRONMENT OR PUBLIC HEALTH AND WHITE OAK MAY NOT CLAIM ANY FACT, CIRCUMSTANCE OR MATTER THAT WOULD CONSTITUTE AN ENVIRONMENTAL DEFECT UNDER THIS **ARTICLE 7** AS THE BASIS FOR ANY OTHER REDRESS UNDER THIS AGREEMENT.

43

7.6   <u>NORM.</u>

WHITE OAK ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF OIL, GAS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER MATERIALS LOCATED ON, UNDER OR ASSOCIATED WITH THE INTERESTS.  EQUIPMENT AND SITES INCLUDED IN THE ASSETS MAY CONTAIN NORM.   NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE ASSETS MAY CONTAIN     NORM     AND     OTHER     WASTES     OR     HAZARDOUS SUBSTANCES/MATERIALS; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS SUBSTANCES/MATERIALS MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE ASSETS.   SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS SUBSTANCES/MATERIALS, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE ASSETS.  FROM AND AFTER THE CLOSING, WHITE OAK SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM AND OTHER WASTES), PRESENT AFTER THE EFFECTIVE TIME, IN A SAFE AND PRUDENT     MANNER     AND     IN     ACCORDANCE     WITH     ALL     APPLICABLE ENVIRONMENTAL LAWS.

8.   **EMPLOYEE MATTERS**

White Oak may, in its sole discretion, from and after the Execution Date, offer employment on such terms as it deems appropriate, conditioned upon the occurrence of the Closing and effective as of the Closing Date, to any of the employees of Milagro (collectively the "**Employees**") who are employed as of the Closing Date by Milagro. White Oak shall not assume any employee benefit plans of Milagro and shall have no liability for severance or other benefits (including any notice obligations and liability arising under the WARN Act) to any employees of Milagro (including any Employees) who are terminated on or prior to the Closing Date.

9.   **CONDITIONS TO CLOSING**

9.1   <u>Milagro's Conditions.</u>

The obligations of Milagro at the Closing are subject to the satisfaction at or prior to the Closing, or waiver in writing by Milagro, of the following conditions:

(a)   All representations and warranties of White Oak contained in this Agreement, to the extent qualified with respect to materiality, shall be true and correct in all respects, and to the extent not so qualified, shall be true and correct in all material respects, in each case as if such representations and warranties were made at and as of the Closing, and White Oak shall have performed and satisfied in all material

44

respects all covenants and agreements required to be performed and satisfied by it under this Agreement at or prior to the Closing; and

(b)    No suit, action or other proceeding brought by a third party shall be pending, nor shall any order have been entered by any court or governmental agency having jurisdiction over the Parties or the subject matter of this Agreement which remains in effect at the time of Closing, in either case, that restrains or prohibits or seeks to restrain or prohibit, or seeks damages in connection with, the transactions contemplated by this Agreement.

(c)    White Oak shall have delivered to Milagro the documents and other items required to be delivered by White Oak under **Section 10.2**.

(d)    The aggregate sum of (i) the Title Defect Amounts for all Title Defects timely and properly asserted by White Oak in good faith pursuant to **Section 6.2(a)** that are not cured as of Closing and (ii) the Environmental Defect Amounts for all Environmental Defects timely and properly asserted by White Oak in good faith pursuant to **Section 7.4(a)** that are not cured as of Closing does not exceed twenty percent (20%) of the unadjusted Purchase Price.

(e)    The Bankruptcy Court has entered the Final Order and the effective date of the Plan has occurred.

(f)    White Oak shall not have experienced a Material Adverse Effect.

9.2    White Oak's Conditions.

The obligations of White Oak at the Closing are subject to the satisfaction at or prior to the Closing, or waiver in writing by White Oak, of the following conditions:

(a)    All representations and warranties of Milagro contained in this Agreement, to the extent qualified with respect to materiality, shall be true and correct in all respects, and to the extent not so qualified, shall be true and correct in all material respects, in each case as if such representations and warranties were made at and as of the Closing, and Milagro shall have performed and satisfied in all material respects all covenants and agreements required to be performed and satisfied by it under this Agreement at or prior to the Closing.

(b)    No suit, action or other proceeding brought by a third party shall be pending, nor shall any order have been entered by any court or governmental agency having jurisdiction over the Parties or the subject matter of this Agreement which remains in effect at the time of Closing, in either case, that restrains or prohibits or seeks to restrain or prohibit, or seeks damages in connection with, the transactions contemplated by this Agreement.

(c)    Milagro shall have delivered to White Oak the documents and other items required to be delivered by Milagro under **Section 10.2**.

45

(d)     The aggregate sum of (i) the Title Defect Amounts for all Title Defects timely and properly asserted by White Oak in good faith pursuant to **Section 6.2(a)** that are not cured as of Closing and (ii) the Environmental Defect Amounts for all Environmental Defects timely and properly asserted by White Oak in good faith pursuant to **Section 7.4(a)** that are not cured as of Closing does not exceed twenty percent (20%) of the unadjusted Purchase Price.

(e)     Milagro shall not have experienced a Material Adverse Effect.

(f)     The Bankruptcy Court has entered the Final Order and the effective date of the Plan has occurred.

## 10.   CLOSING

10.1    Place of Closing.

The Closing shall be held at the offices of Locke Lord LLP, 600 Travis, Suite 2800, Houston, Texas, or such other place as mutually agreed upon by the Parties.

10.2    Closing Obligations.

At the Closing, the following events shall occur, each being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)     Milagro and White Oak shall execute, acknowledge and deliver an Assignment, Conveyance and Bill of Sale in sufficient counterparts to facilitate recording, substantially in the form of **Exhibit H** hereto, assigning the Assets (except for the Assigned Contracts) to White Oak;

(b)     Milagro and White Oak shall execute, acknowledge and deliver an Assumption Agreement in sufficient counterparts to facilitate recording, substantially in the form of **Exhibit K** hereto, assigning the Assigned Contracts to White Oak;

(c)     Milagro and White Oak shall execute, acknowledge and deliver such additional assignments as are required by any federal or state agency with respect to the transfer of the Assets to White Oak;

(d)     Milagro and White Oak shall execute and deliver the Preliminary Settlement Statement and White Oak shall issue the Milagro Interests in accordance with the terms hereof and the Second Amended Company Agreement;

(e)     Milagro and White Oak shall execute, acknowledge and deliver transfer orders or letters in lieu thereof prepared by Milagro and directing all purchasers of production to make payment to White Oak of proceeds attributable to production from the Assets assigned to White Oak;

(f)     For those Milagro-operated Wells for which White Oak shall take over operations, Milagro shall deliver designation or change of operator

46

forms in satisfaction of applicable governmental requirements (unless extended to the end of the period covered by the Transition Services Agreement);

(g)     Milagro and White Oak shall execute and deliver a Transition Services Agreement in the form attached as **Exhibit I** (the "**Transition Services Agreement**").

(h)     MOG, White Oak, and the current members of White Oak shall each execute, acknowledge and deliver their respective counterparts to the Second Amended Company Agreement in the form attached as **Exhibit N**.

(i)     MOG, White Oak and the current members of White Oak shall each execute, acknowledge and deliver their respective counterparts to the Amended and Restated Voting and Transfer Restriction Agreement in the form attached as **Exhibit O** by and among MOG and the current members of White Oak.

(j)     Milagro shall deliver the Senior Debt Payoff Letters.

(k)     Milagro shall deliver a Certificate of No Tax Due issued from the Texas Comptroller of Public Accounts.

(l)     White Oak shall deliver the amount of the Cash Payment Cap to MOG, and MOG shall use the Cash Payment Cap and its cash holdings to make payments to the counterparties in the Senior Debt Payoff Letters, such that the full amount of all Paid-Off Senior Debt is provided to the applicable counterparties to the Senior Debt Payoff Letters.

(m)     If, at White Oak's sole election, the Note Purchase is to be consummated at or prior to the Closing, Milagro and White Oak shall execute and deliver documentation relating thereto.

(n)     Milagro shall deliver a certificate of non-foreign status, dated as of the Closing date, duly executed by an authorized officer, that meets the requirements set forth in Treasury Regulation § 1.1445-2(b)(2).

(o)     Milagro shall deliver a certificate, dated as of the Closing Date, duly executed by an authorized officer certifying that conditions set forth in **Section 9.2(a)** have been met;

(p)     Milagro shall deliver a certificate, dated as of the Closing Date, duly executed duly executed by an authorized officer (i) attaching and certifying on behalf of Milagro those instruments authorizing the execution, delivery and performance by Milagro of this Agreement and the transactions contemplated hereby; and (ii) certifying on behalf of Milagro the incumbency of each officer of Milagro executing this Agreement or any document delivered at Closing on behalf of Milagro;

47

(q)    White Oak shall deliver a certificate, dated as of the Closing Date, duly executed by an authorized officer, certifying that conditions set forth in **Section 9.1(a)** have been met; and

(r)    White Oak shall deliver a certificate, dated as of the Closing Date, duly executed by an authorized officer (i) attaching and certifying on behalf of White Oak those instruments authorizing the execution, delivery and performance by White Oak of this Agreement and the transactions contemplated hereby; and (ii) certifying on behalf of White Oak the incumbency of each officer of White Oak executing this Agreement or any document delivered at Closing on behalf of White Oak.

## 11.    <u>OBLIGATIONS AFTER CLOSING</u>

11.1    <u>Allocation of Revenues.</u>

Milagro is entitled to all Revenues that, in accordance with GAAP, arise out of, are associated with, or relate to periods prior to the Effective Time. Subject to the Closing occurring, White Oak shall be entitled to all Revenues that, in accordance with GAAP, arise out of, are associated with, or relate to periods from and after the Effective Time. Except for amounts accounted for in connection with the Preliminary Settlement Statement or the Final Settlement Statement, if either Party receives funds to which the other Party is entitled pursuant to this **Section 11.1**, such Party shall promptly, and in no event more than thirty (30) days after receipt, deliver such funds to the other Party on an after-tax basis.

11.2    <u>Files and Records.</u>

(a)    Within thirty (30) days after the Closing Date, Milagro shall deliver originals of the Records to White Oak (other than division order files, which will be delivered within sixty (60) days following Closing). If only a portion of Milagro's interest in any Property is conveyed, copies of the original files with respect to such Property will be furnished to White Oak. If any Records are solely maintained electronically and are capable of electronic delivery, such Records will be delivered to White Oak in an electronic format determined by Milagro. Milagro, at its sole cost, shall have the right to make copies of all Records delivered to White Oak. With respect to any Asset that Milagro continues to operate after Closing pursuant to the Transition Services Agreement, Milagro may retain all Records relating to such Asset until such time as Milagro ceases to operate such Asset. White Oak and its Affiliates may be required to include statements of revenues and direct operating expenses and other financial information relating to the Assets in documents filed with the United States Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, or the Security Exchange Act of 1934, as amended, and that such financial statements may be required to be audited. In that regard, Milagro shall reasonably cooperate with White Oak, and provide White Oak reasonable access to such records (to the extent such information is available) and personnel of Milagro as White Oak may reasonably

48

request to enable White Oak, and its representatives and accountants, at White Oak's sole cost and expense, to create and audit any financial statements that White Oak deems necessary.  Notwithstanding anything to the contrary herein, Milagro shall provide White Oak and its independent accountants with reasonable access to any and all existing information, books, records, and documents in Milagro's possession that relate to the Assets (subject to any privilege or confidentiality obligations) and other data delivered to White Oak by Milagro pursuant to the provisions of this Agreement relevant to the periods being audited.

(b)    White Oak shall retain, or shall cause its assigns to retain, the Records and make them available to Milagro for review and copying at Milagro's expense for three (3) full calendar years following the Closing Date, in White Oak's office during normal business hours.

11.3    <u>Suspense Funds.</u>   All outstanding amounts for which payment has been suspended by Milagro as to any of the Assets (including, but not limited to, suspended Royalties held in the ordinary course of business as a result of title defects or changes of ownership) ("**Suspense Funds**") shall be assumed by White Oak at Closing and White Oak shall be responsible for the payment of such Suspense Funds.  Any Suspense Funds assumed by White Oak shall result in a corresponding downward adjustment in Purchase Price in accordance with **Section 3.4(a)(12)**.

11.4    <u>Recordation and Post-Closing Consents.</u>

After Closing, White Oak shall be responsible for filing and recording the documents associated with assignment of the Assets to White Oak and for all costs and fees associated therewith, including filing the assignments with appropriate federal, state and local authorities as required by law and in all applicable counties.  As soon as practicable after recording or filing, White Oak shall furnish Milagro with copies of all such recorded filings.  White Oak shall be responsible for obtaining all consents and approvals of governmental entities or authorities customarily obtained subsequent to transfer of title and all costs and fees associated therewith.

11.5    <u>Purchase Price Allocation.</u>

The allocation of Purchase Price provided for on **Exhibit G** is intended to comply with the allocation method required by Section 1060 of the Code.  White Oak and Milagro shall cooperate to comply with all substantive and procedural requirements of Section 1060 of the Code and regulations thereunder, including the filing by White Oak and Milagro of an IRS Form 8594 with their federal income tax returns for the taxable year in which Closing occurs.  White Oak and Milagro agree that each will not take for income tax purposes, or permit any Affiliate to take, any position inconsistent with the allocation of Purchase Price set forth on **Exhibit G**.

11.6    <u>Removal of Milagro's Name.</u>

As soon as practicable after Closing (and in any event within one hundred twenty (120) days after the Closing Date), White Oak shall remove from the Assets all signage

49

and other references identifying Milagro or any of its Affiliates, and shall replace such signage and other references with such appropriate and necessary signage or other references identifying White Oak as the owner thereof.

11.7    <u>Taxes.</u>

Prior to the Closing Date, Milagro shall be responsible for filing with the Tax authorities the applicable tax returns (including Milagro Tax Returns) for ad valorem, property, severance, production, sales, use and similar Taxes (excluding, for the avoidance of doubt, any income, franchise and similar Taxes ("**Income Taxes**")) based upon or measured by the ownership or operation of the Assets or the production of Hydrocarbons therefrom or the receipt of proceeds therefrom ("**Asset Taxes**") which are required to be filed on or before the Closing Date and paying the Taxes reflected on such tax returns as due and owing, provided that to the extent such Taxes relate to the periods from and after the Effective Time, such payment shall be on behalf of White Oak, and promptly following the Closing Date, White Oak shall pay to Milagro any such Taxes (determined as set forth herein).  White Oak shall be responsible for the filing with the appropriate taxing authorities the applicable tax returns for all Asset Taxes beginning on or after the Closing Date and paying the Taxes reflected on such tax returns as due and owing.  However, in the event that Milagro is required by applicable law to file a tax return with respect to such Taxes after the Closing Date which includes all or a portion of a Tax period for which White Oak is liable for such Taxes, following Milagro's request, White Oak shall promptly pay to Milagro all such Taxes allocable to the period or portion thereof beginning on or after the Effective Time, whether such Taxes arise out of the filing of an original tax return or a subsequent audit or assessment of Taxes.  Milagro shall be entitled to all Tax credits and Tax refunds which relate to any such Taxes allocable to any Tax period, or portion thereof, ending before the Effective Time.  Milagro shall be allocated and bear all Asset Taxes attributable to (i) any Tax period ending prior to the Effective Time, and (ii) the portion of any Straddle Period ending immediately prior to the date on which the Effective Time occurs.  White Oak shall be allocated and bear all Asset Taxes attributable to (A) any Tax period beginning on or after the Effective Time, and (ii) the portion of any Straddle Period beginning on the date on which the Effective Time occurs.

(a)    For purposes of determining the allocations described in **Section 11.7**, (i) Asset Taxes that are attributable to the severance or production of Hydrocarbons shall be allocated to the period in which the severance or production giving rise to such Asset Taxes occurred, (ii) Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (i)), shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred, and (iii) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending immediately prior to the date on which the Effective Time occurs and the portion of such Straddle Period beginning on the date on which the Effective Time occurs by prorating each such Asset Tax based on the number of days in the applicable Straddle Period that occur before the date on which the Effective Time occurs, on the one hand, and the number of days in such Straddle Period that

50

occur on or after the date on which the Effective Time occurs, on the other hand. For purposes of clause (iii) of the preceding sentence, the period for such Asset Taxes shall begin on the date on which ownership of the applicable Assets gives rise to liability for the particular Asset Tax and shall end on the day before the next such date.

(b)     To the extent the actual amount of an Asset Tax is not determinable at the Closing or at the time of the determination of the Final Settlement Statement pursuant to **Section 3.4(c)**, as applicable, (i) the Parties shall utilize the most recent information available in estimating the amount of such Asset Tax for purposes of such adjustment, and (ii) upon the later determination of the actual amount of such Asset Tax, timely payments will be made from one Party to the other to the extent necessary to cause each Party to bear the amount of such Asset Tax that is allocable to such Party under **Section 11.7**.

(c)     To the extent not otherwise taken into account, paid or filed under **Section 3.4(a)**, White Oak shall be responsible for payment to the applicable taxing authorities of all Asset Taxes that become due and payable on or after the Closing Date; provided that the responsibility for such Asset Taxes shall be as set forth in **Section 11.7**.

(d)     All required documentary, filing and recording fees and expenses in connection with the filing and recording of the assignments, conveyances or other instruments required to convey title to the Assets to White Oak shall be borne by White Oak. Any and all sales, use, transfer, stamp, documentary, registration or similar Taxes incurred or imposed with respect to the transactions described in this Agreement (collectively, "**Transfer Taxes**") shall be borne one-half by White Oak and one-half by Milagro.

(e)     The Parties shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of tax returns and any audit, litigation, or other proceeding with respect to Taxes relating to the Assets. Such cooperation shall include the retention and (upon another Party's request) the provision of records and information that are relevant to any such tax return or audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided under this Agreement.  The Parties agree to retain all books and records with respect to Tax matters pertinent to the Assets relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the respective Taxable periods and to abide by all record retention agreements entered into with any governmental authority.

(f)     Notwithstanding **Section 11.1** of this Agreement Milagro and White Oak shall use the closing of the books method as of the Closing Date for all Income Tax purposes.

51

11.8     Operational Transition.

The Parties acknowledge that there is no assurance given by Milagro that White Oak shall succeed Milagro as operator of any Asset where other Persons own interests in the wells located thereon.  Rights and obligations associated with operatorship of the Assets are governed by joint operating agreements or similar agreements and will be determined in accordance with the terms of such agreements.

12.     **RETENTION AND ASSUMPTION OF OBLIGATIONS AND INDEMNIFICATION**

12.1     Retention and Assumption of Obligations.

From and after Closing, except to the extent related to or the subject matter of Retained Obligations or Retained Contracts, White Oak assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) all obligations and Losses arising from, based upon, related to or associated with (i) the Assets, the operation and ownership of, or conditions first existing, arising or occurring with respect to the Assets after the Effective Time; (ii) notwithstanding the provisions set forth in clause (i) above, the Suspense Funds and the Assigned Contracts, whether arising before, on or after the Closing; (iii) notwithstanding the provisions set forth in clause (i) above, all P&A and Environmental Costs arising on or after the Effective Time; and (iv) notwithstanding the provisions set forth in clause (i) above, all Plugging and Abandonment obligations arising before, on or after the Effective Time (collectively, the "**Assumed Obligations**"). Except for the Assumed Obligations, it is expressly understood and agreed that White Oak shall not assume, be obligated to pay, perform or discharge, and Milagro shall retain, pay, perform and discharge all other obligations and Losses of Milagro, including the following (the "**Retained Obligations**"):

(a)     any fines or penalties or other assessments imposed or made by governmental authorities relating to the ownership or operation of the Assets during the period prior to the Effective Time;

(b)     any improper payment of Royalties, delay rentals or other similar Lease or Mineral Interest payments attributable to the Assets prior to the Effective Time;

(c)     any Taxes attributable to the Assets prior to the Effective Time and Income Taxes prior to the Closing Date;

(d)     any liabilities to third parties for personal injury or death attributable to the Assets prior to the Closing Date;

(e)     any accounts payable, or unpaid bills or expenses related to Property Costs arising prior to the Effective Time;

(f)     the Retained Litigation;

(g)     all obligations and liabilities to third parties related to the Assets arising on or before the Effective Time that would have otherwise been extinguished pursuant to the Chapter 11 Cases but for Milagro's failure

52

to properly notify such third parties of the filing of the Chapter 11 Cases; and

(h)     all duties, obligations and liabilities of every kind and character with respect to the Reserved Assets.

Notwithstanding anything in this Agreement to the contrary, any and all amounts paid or incurred by White Oak or owed to White Oak by Milagro in connection with the matters described in **Sections 5.5(c)**, **6.2(f)** and **12.1(f)** (including, but not limited to, attorney's fees and expenses and amounts paid in compromise or settlement of any and all such matters unless as otherwise set forth in such Section) after the Closing Date shall cause a proportionate reduction in the Company Interests of MOG (including the Capital Account and Sharing Ratio of MOG), its successors or assigns, in accordance with the terms of the Second Amended Company Agreement.   Notwithstanding the foregoing, White Oak shall not be entitled to pay or incur any amounts in connection with the matters described in **Section 12.1(f)** unless such amounts are delinquent, a claim, demand or suit has been asserted against White Oak for such delinquent amounts and White Oak has provided Milagro with prompt written notice regarding such claim, demand or suit and a reasonable opportunity to defend against (or otherwise resolve) such claim, demand or suit in a manner that Milagro deems appropriate.   No compromise or settlement of the matters set forth in either **Section 5.5(c)** or **12.1(f)** shall be permitted by Milagro, its successors or assigns, without the prior written consent of White Oak (which consent shall not be unreasonably withheld), unless such settlement or compromise includes a complete and unconditional release of White Oak of any and all claims related to or in connection with such matter.

12.2    <u>No Survival of Representations and Warranties of Milagro; No Recourse.</u>   The representations and warranties of Milagro contained in **Section 4.1** of this Agreement (other than **Section 4.1(p)** which shall survive the Closing through and including the one (1) year anniversary of the Closing Date) and in the certificate to be delivered by Milagro pursuant to **Section 10.2(o)** shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof, except for the special warranty of title and in the case of fraud or intentional misrepresentation. Each of the covenants of Milagro contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (a) performance of such covenant in accordance with this Agreement or, (b)(i) if time for performance of such covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such covenant is not specified in this Agreement, the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; provided that if a written notice of any claim with respect to any covenant to be performed after Closing is given prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

53

(b)     White Oak shall have no recourse against any Milagro Indemnified Party or any of their Affiliates or their respective lenders or creditors from and after the Closing for any liabilities relating to the Assets or this Agreement (including title and environmental matters) or Milagro's breach of any representation, warranty, covenant or other provision of this Agreement (subject, however, to Milagro's liability for its obligation to perform those covenants of Milagro the performance of which is to take place after Closing), except in the case of fraud or intentional misrepresentation.

12.3    <u>Indemnities of White Oak.</u>  The representations and warranties of White Oak set forth in **Section 4.2(a)** through **Section 4.2(d)** and **Section 4.2(h)**, shall survive the Closing through and including the one (1) year anniversary of the Closing Date.  The representations and warranties of White Oak set forth in **Section 4.2(e)** through **4.2(g)** and **Section 4.2(i)** through **4.2(s)** shall survive the Closing through and including the six (6) month anniversary of the Closing Date (the "**Survival Period**").  Each of the covenants and/or agreements of White Oak contained in this Agreement shall survive the Closing and shall remain in full force and effect through and including the Survival Period, except to the extent that performance under such covenant is to take place after expiration of the Survival Period, in which case such covenant shall survive the expiration of the Survival Period until the earlier of (a) performance of such covenant in accordance with this Agreement or, (b)(i) if time for performance of such covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such covenant is not specified in this Agreement, the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; provided that if a written notice of any claim with respect to any covenant to be performed after expiration of the Survival Period is given prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement. It is expressly agreed and understood that any indemnity obligations of White Oak under **Section 12.3(b)(2)** and **Section 12.3(b)(3)** shall not terminate with respect to any Loss as to which the Indemnified Party shall have given written notice to the Indemnifying Party in accordance with the provisions of this Agreement before the termination of the Survival Period.   It is expressly agreed and understood that any indemnity obligations of White Oak under **Section 12.3(b)(1)** shall not terminate with respect to any Loss as to which the Indemnified Party shall have given written notice to the Indemnifying Party in accordance with the provisions of this Agreement before the termination of the one (1) year anniversary of the Closing Date.

(b)     Effective as of Closing, subject to the limitations set forth in this Agreement, White Oak and its successors and assigns shall assume and be responsible for, shall pay on a current basis, and hereby agrees to defend, indemnify, hold harmless and forever release Milagro and its

Affiliates, and all of its and their respective equityholders, partners, members, directors, officers, managers, employees, agents and representatives (collectively, the "**Milagro Indemnified Parties**") from and against any and all obligations or Losses, whether or not relating to third party claims or incurred in the investigation or defense of any of the same or in asserting, preserving or enforcing any of their respective rights hereunder, arising from, based upon, related to or associated with:

(1)     any breach by White Oak of any of its representations and warranties contained in **Section 4.2(a)** through **Section 4.2(d)** and **Section 4.2(h)**;

(2)     any breach by White Oak of any of its representations and warranties contained in **Section 4.2(e)** through **4.2(g)** and **Section 4.2(i)** through **4.2(s)**; or

(3)     any breach by White Oak of any of its covenants or agreements under this Agreement.

Notwithstanding anything to the contrary in this Agreement, White Oak's indemnification obligations with respect to **Section 12.3(b)(3)** shall be limited to direct losses paid or payable by Milagro directly to third parties, and shall not include any indirect losses sustained by virtue of any equity ownership of White Oak.

(c)     Except for the indemnity obligations set forth in **Sections 5.1**, **7.2** and **12.3**, Milagro shall have no recourse against any White Oak Related Party or any of their Affiliates or their respective lenders or creditors from and after the Closing for any liabilities relating to this Agreement (including title and environmental matters) or White Oak's breach of any representation, warranty, covenant or other provision of this Agreement (subject, however, to White Oak's liability for its obligation to perform those covenants of White Oak the performance of which is to take place after Closing), except in the case of fraud or intentional misrepresentation.

12.4    <u>Indemnification Procedures</u>.  All claims for indemnification under this Agreement shall be asserted and resolved pursuant to this **Section 12.4**. Any Milagro Indemnified Party that claims indemnification hereunder is hereinafter referred to as the "**Indemnified Party**" and any person against whom such claims are asserted hereunder is hereinafter referred to as the "**Indemnifying Party**."

(b)     In the event that a Milagro Indemnified Party wishes to assert a claim for indemnity hereunder, such Milagro Indemnified Party shall with reasonable promptness, in any event within twenty (20) days of an indemnity claim arising, provide to the Indemnifying Party a written notice of the indemnity claim it wishes to assert on behalf of itself or another Indemnified Party, including the specific details of and specific

55

basis under this Agreement for its indemnity claim (a "**Claim Notice**"). To the extent that any Losses for which indemnification is sought are asserted against or sought to be collected from an Indemnified Party by a third party, such Claim Notice shall include a copy of all papers served on the applicable Indemnified Party with respect to such claim. The failure of any Milagro Indemnified Party to provide a Claim Notice as provided in this **Section 12.4(b)** shall not relieve the Indemnifying Party of its obligations under this Agreement except to the extent such failure results in insufficient time being available to permit the Indemnifying Party to effectively defend against the claim or otherwise materially prejudices the Indemnifying Party's ability to defend against the claim. The Indemnifying Party shall have thirty (30) days from the personal delivery or receipt of the Claim Notice (the "**Notice Period**") to notify the Indemnified Party (i) whether or not it disputes its liability hereunder with respect to such Losses and/or (ii) with respect to any Losses arising out of, associated with, or relating to third party claims, whether or not it desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against any such Losses. With respect to a third party claim, in the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that it desires to defend the Indemnified Party against such Losses, the Indemnifying Party shall have the right to defend all appropriate proceedings with counsel of its own choosing. If the Indemnified Party desires to participate in, but not control, any such defense or settlement it may do so at its sole cost and expense. If requested by the Indemnifying Party, the Indemnified Party agrees to cooperate with the Indemnifying Party and its counsel in contesting any Losses that the Indemnifying Party elects to contest or, if appropriate and related to the claim in question, in making any counterclaims against the third party asserting such Losses, or any cross-complaint against any third party (other than a Milagro Indemnified Party if the Indemnified Party is a Milagro Indemnified Party). Such cooperation shall include the retention and provision to the Indemnifying Party of all records and other information that are reasonably relevant to the Losses at issue. No third party claim that is the subject of indemnification hereunder may be settled or otherwise compromised without the prior written consent of the Indemnified Party unless such settlement or compromise (i) entails a full and unconditional release of the Indemnified Party without any admission or finding of fault or liability and (ii) does not impose on the Indemnified Party any material non-financial obligation or any financial obligation that is not fully paid by the Indemnifying Party. No Indemnified Party may settle or compromise any third party claim which may be the subject of indemnification hereunder without the prior consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

**13.    <u>TERMINATION</u>**

13.1    <u>Termination.</u>

This Agreement and the transactions contemplated hereby may be terminated at any time prior to Closing:

(a)    by the mutual written agreement of White Oak and Milagro;

(b)    by written notice from either White Oak or Milagro if Closing has not occurred on or before one hundred twenty (120) days after the filing date of the Chapter 11 Cases; provided the failure of Closing is not the result of the breach by such notifying Party of any terms of this Agreement;

(c)    by written notice from either Milagro or White Oak if the aggregate sum of (i) the Title Defect Amounts for all Title Defects timely and properly asserted by White Oak pursuant to **Section 6.2(a)** that are not cured as of Closing and (ii) the Environmental Defect Amounts for all Environmental Defects timely and properly asserted by White Oak pursuant to **Section 7.4(a)** that are not cured as of Closing exceeds Twenty percent (20%) of the unadjusted Purchase Price;

(d)    by written notice from either Milagro or White Oak if (i) the filing of the Chapter 11 Cases has not occurred prior to 5:00 pm, central time, on July 31, 2015, or (ii) the Restructuring Support Agreement is terminated;

(e)    by written notice from either Party if the other Party has materially breached any of its representations, warranties, covenants or agreements contained in this Agreement such that any of the conditions to Closing set forth in **Article 9** cannot be satisfied on or before one hundred twenty (120) days after the filing date of the Chapter 11 Cases; provided, however the breaching Party shall be provided written notice by the other Party of any such material breach and a reasonable opportunity to cure such breach; or

(f)    by written notice from Milagro as contemplated in **Section 5.7**.

Notwithstanding the foregoing, no Party shall be entitled to terminate this Agreement pursuant to clause (b) above if Closing has failed to occur due to a breach by such Party of its agreements or covenants contained herein.

13.2    <u>Liabilities Upon Termination.</u>

(a)    Upon termination pursuant to **Section 13.1**, and provided Closing has not occurred due to such Party's breach of any terms of this Agreement, this Agreement shall become void and of no further force or effect (except for the provisions of **Sections 4.1(d), 4.2(d), 4.3, 5.1, 7.1, 7.2, 13.2, 14.6, 14.7, 14.8, 14.10, 14.11, 14.16, 14.17 and 14.18** of this Agreement all of which shall continue in full force and effect) and Milagro shall be free immediately to enjoy all rights of ownership of the Assets and to sell, transfer, encumber or otherwise dispose of the Assets to any party without any restriction under this Agreement, except as provided in this **Article 13**. Notwithstanding the foregoing, the

57

termination of this Agreement shall not relieve any Party from liability for any willful or negligent failure to perform or observe in any material respect any of its agreements or covenants contained herein which are to be performed or observed at or prior to Closing.

(b)    In consideration for White Oak having expended considerable time and expense in connection with the transactions contemplated by this Agreement and the negotiation and due diligence review in connection therewith, including without limitation costs and expenses to be incurred by White Oak after the Execution Date hereof, in the event (i) this Agreement is terminated pursuant to **Section 13.1(b)** or **Section 13.1(d)** and (ii) Milagro closes a transaction with another Person within one (1) year of the Execution Date which results in the sale or transfer of all or a substantial portion of the business, assets or equity interests of Milagro (whether pursuant to a sale of assets or equity interests, merger, recapitalization, consolidation or other business combination), then Milagro shall pay White Oak an amount equal to $1,000,000 (the "**Alternative Transaction Fee**"), as liquidated damages (and not as a penalty). The Parties acknowledge that the extent of damages to White Oak occasioned by the circumstances described in this **Section 13.2(b)** would be impossible or extremely impractical to ascertain and that the Alternative Transaction Fee is a fair and reasonable estimate of such damages under the circumstances. The Alternative Transaction Fee shall be paid by Milagro by wire transfer of immediately available funds to White Oak concurrently with the closing of any such transaction.

## 14.    <u>MISCELLANEOUS</u>

14.1    <u>Schedules and Exhibits.</u>

All schedules (including Post-Signing Information, if any) and exhibits to this Agreement are hereby incorporated by reference herein and constitute a part of this Agreement.

14.2    <u>Expenses and Taxes.</u>

All fees, costs and expenses incurred by White Oak or Milagro in negotiating this Agreement or in consummating the transactions contemplated by this Agreement shall be paid by the Party incurring the same, including legal and accounting fees, costs and expenses.

14.3    <u>Notices.</u>

All notices and communications required or permitted under this Agreement shall be in writing and any communication or delivery hereunder shall be deemed to have been duly made when (a) personally delivered to the individual indicated below, (b) if delivered by facsimile transmission to the individual indicated below, then on the day of transmission if received during business hours or on the next Business Day after transmission if received after business hours or (c) if sent by registered or certified mail,

postage prepaid, when received. Addresses for all such notices and communication shall be as follows:

If to Milagro:

MILAGRO OIL & GAS, INC.
1301 McKinney, Suite 500
Houston, Texas 77010
Attn: Scott Winn
Fax: (212) 213-1749

With copies to (which shall not constitute notice):

Porter Hedges
1000 Main Street, 36th Floor
Houston, TX 77002
Attn: Kevin Poli
Fax: 713.226.6282


Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attn: Daniel Fisher
Fax: 202.887.4288


Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 44TH Floor
Houston, TX 77002-5200
Attn: Cody R. Carper
Fax: 713.236.0822


If to White Oak:

WHITE OAK RESOURCES VI, LLC
12941 North Freeway, Suite 550
Houston, Texas 77060
Attention: Thomas F. Isler, President
Fax Number: (281) 876-2265
Telephone: (281) 876-2025

With copies to (which shall not constitute notice):

Locke Lord LLP
600 Travis, Suite 2800
Houston, Texas 77002
Attn: Mitchell A. Tiras
Fax Number: (713) 229-2674

59

Telephone: (713) 226-1144

Any Party may, by written notice so delivered to the other Party, change the address or individual to which delivery shall thereafter be made.

14.4    <u>Amendments.</u>

This Agreement may only be amended by a written instrument executed by both Parties.

14.5    <u>Assignment.</u>

Neither Party may assign all or any portion of its rights or delegate all or any portion of its duties hereunder unless it continues to remain liable for the performance of its obligations hereunder and obtains the prior written consent of the other Party (which such consent may be granted or withheld in the sole discretion of the other Party).

14.6    <u>Announcements.</u>

Except as may be required by applicable laws or the applicable rules and regulations of any governmental agency or stock exchange, neither White Oak nor Milagro shall issue any press release or other public disclosure concerning this Agreement or the transactions contemplated hereby (including price or other terms) without the prior written consent of the other Party, which consent shall not be unreasonably withheld.

14.7    <u>GOVERNING LAW; VENUE; JURY TRIAL WAIVER.</u>

THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAW PROVISIONS; PROVIDED, HOWEVER, THAT NO LAW, THEORY, OR PUBLIC POLICY SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH, OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF DAMAGES PROVIDED IN **SECTION 14.10** HEREOF, IT BEING THE EXPRESS INTENT, UNDERSTANDING, AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY; PROVIDED, HOWEVER, THAT UPON COMMENCEMENT OF THE CHAPTER 11 CASES THE PARTIES STIPULATE AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT WITH RESPECT TO ALL DISPUTES IN ANY WAY ARISING OUT OF OR RELATING TO THIS AGREEMENT FOR SO LONG AS THE CHAPTER 11 CASES REMAIN OPEN. EXCEPT AS SET FORTH IN THE PRECEDING SENTENCE, THE PARTIES STIPULATE AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE UNITED STATES DISTRICT COURT AND THE TEXAS STATE DISTRICT COURT SITTING IN HOUSTON, HARRIS COUNTY, TEXAS WITH RESPECT TO ALL DISPUTES IN ANY WAY ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT. THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION,

PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF WHITE OAK, MILAGRO OR ANY INDEMNIFIED PARTY IN THE NEGOTIATION OR PERFORMANCE HEREOF.

14.8   Entire Agreement.

This Agreement (including the Exhibits and Schedules hereto) constitutes the entire understanding among the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and prior agreements and understandings relating to such subject matter; provided, however, that the Amended and Restated Confidentiality and Non-Circumvention Agreement, dated effective as of June 24, 2014 (the "**Confidentiality Agreement**"), between the Parties shall remain in force and effect and is not hereby superseded; provided, however, that if Closing occurs, the Confidentiality Agreement shall terminate at Closing, except insofar as it relates to information or data not included in the Assets.

14.9   Parties in Interest.

This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto, and their respective successors and assigns, and, except as expressly provided herein with respect to the Milagro Indemnified Parties and the White Oak Related Parties, nothing contained in this Agreement, express or implied, is intended to confer upon any other Person or entity any benefits, rights or remedies.

14.10   WAIVER OF DAMAGES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER (OR ANY MILAGRO INDEMNIFIED PARTY OR WHITE OAK RELATED PARTY) FOR SPECIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER SAME MAY BE CAUSED) AND EACH PARTY HEREBY WAIVES (ON BEHALF OF THEMSELVES AND ON BEHALF OF THE MILAGRO INDEMNIFIED PARTIES, WITH RESPECT TO MILAGRO, AND WHITE OAK RELATED PARTIES, WITH RESPECT TO WHITE OAK) ALL CLAIMS FOR ANY SUCH DAMAGES.

14.11   Waivers.

Any failure by a Party or Parties to comply with any of its or their obligations, agreements or conditions herein contained may be waived in writing, but not in any other manner, by the other Party or Parties to whom such compliance is owed. No waiver of, or consent to a change in, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

14.12   Further Assurances.

61

After Closing, Milagro and White Oak shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such instruments, and shall take such other action as may be necessary or advisable to carry out their obligations under this Agreement and under any document, certificate or other instrument delivered pursuant hereto.  The Parties acknowledge that all oil and gas leases owned by Milagro that are in force and effect as of the Execution Date (except to the extent constituting Reserved Assets) are intended to be transferred to White Oak at Closing.  To the extent that any such oil and gas leases are inadvertently omitted from **Exhibit A**, the Parties agree to execute an Assignment, Conveyance and Bill of Sale (substantially in the form of **Exhibit H** attached hereto) as soon as reasonably practicable after the discovery of such omission whereby Milagro will convey all right, title and interest in and to such oil and gas leases to White Oak, with special warranty of title by, through and under Milagro, but not otherwise.  Any such oil and gas leases shall be deemed to be Leases for all purposes.

14.13  Severability.

Invalidity of any provisions in this Agreement shall not affect the validity of this Agreement as a whole, and in case of such invalidity, this Agreement shall be construed as if the invalid provision had not been included herein.

14.14  Headings; Terminology; Defined Terms.

Titles and headings in this Agreement have been included solely for ease of reference and shall not be considered in interpretation or construction of this Agreement. All article, section, subsection, clause, schedule and exhibit references used in this Agreement are to articles, sections, subsections, clauses, schedules and exhibits to this Agreement unless otherwise specified. All schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.  Unless the context of this Agreement clearly requires otherwise (a) the singular shall include the plural and the plural shall include the singular wherever and as often as may be appropriate, (b) the words "includes" or "including" shall mean "includes without limitation" and "including without limitation," (c) the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear and (d) any reference to a statute, regulation, or law shall include any amendment thereof or any successor thereto.  All capitalized terms (including all terms included in ALL CAPS in any portion of this Agreement) shall have the meaning assigned thereto herein.

14.15  Not to be Construed Against Drafter.

Each Party has had an adequate opportunity to review each and every provision of this Agreement and to submit the same to legal counsel for review and advice.  Based on the foregoing, the rule of construction, if any, that a contract be construed against the drafter shall not apply to interpretation or construction of this Agreement.

14.16  INDEMNITIES AND CONSPICUOUSNESS OF PROVISIONS.

EXCEPT AS EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT, THE   RELEASE,   DEFENSE,   INDEMNIFICATION   AND   HOLD   HARMLESS

62

PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE CLAIMS, DEMANDS, SUITS, CAUSES OF ACTION, LOSSES, DAMAGES, LIABILITIES, FINES, PENALTIES AND COSTS (INCLUDING ATTORNEYS' FEES AND COSTS OF LITIGATION) IN QUESTION AROSE SOLELY OR IN PART FROM THE ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, BREACH OF DUTY (STATUTORY OR OTHERWISE), VIOLATION OF LAW, OR OTHER FAULT OF ANY INDEMNIFIED PARTY, OR FROM ANY PRE-EXISTING DEFECT. The Parties agree that provisions of this Agreement in "ALL CAPS" or "bold" type satisfy any requirement of the "express negligence rule" and other requirement at law or in equity that provisions be conspicuously marked or highlighted.

14.17   Waiver of Consumer Rights.

As partial consideration for the Parties entering into this Agreement, each Party can and does hereby waive the provisions of the Texas Deceptive Trade Practices Consumer Protection Act, Article 17.41 *et seq.*, Texas Business and Commerce Code, a law that gives consumers special rights and protection, and all other consumer protection laws of the State of Texas, or of any other state that may be applicable to this transaction, that may be waived by such Party.  It is not the intent of either Party to waive and neither Party does waive any law or provision thereof that is prohibited by law from being waived.  Each Party represents that it has had an adequate opportunity to review the preceding waiver provision, including the opportunity to submit the same to legal counsel for review and advice and after consultation with an attorney of its own selection voluntarily consents to this waiver, and understands the rights being waived herein.

14.18   No Partnership Created.

It is not the purpose or intention of this Agreement to create (and it shall not be construed as creating) a joint venture, partnership or any type of association, and neither Party is authorized to act as an agent or principal for the other Party with respect to any matter related hereto.

14.19   Counterparts of Assignment.

The Assignment, Conveyance and Bill of Sale in the form attached as **Exhibit H** is intended to assign all of the Assets being assigned pursuant to this Agreement. Certain Assets that are leased from, or require the approval to transfer by, a governmental entity are conveyed under the Assignment, Conveyance and Bill of Sale and also are described and covered by other separate assignments made by Milagro to White Oak on officially approved forms, or forms acceptable to such entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements. The interests conveyed by such separate assignments are the same, and not in addition to, the interests conveyed in the Assignment, Conveyance and Bill of Sale.

14.20   Counterpart Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

14.21   <u>Disclosure Schedules.</u> All references to Schedules and Disclosure Schedules in **Article IV** of this Agreement refer to Schedules contained in the Disclosure Schedules. The information in the Disclosure Schedules (including Post-Signing Information, if any) constitute exceptions, qualifications and/or supplements to particular representations or warranties of the applicable Party as set forth in this Agreement. The Disclosure Schedules (including the Post-Signing Information, if any) shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the ordinary course of business of, or required to be disclosed by the applicable Party. Capitalized terms used in the Disclosure Schedules and any Post-Signing Information that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement. The captions contained in the Disclosure Schedules and any Post-Signing Information are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules, any Post-Signing Information or this Agreement. The statements in each Schedule of the Disclosure Schedules (including the Post-Signing Information, if any) qualify and relate to the corresponding provisions in the sections of this Agreement to which they expressly refer and to each other provision in this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedules or any Post-Signing Information is reasonably apparent on its face.

[*Signature Page Follows*]

110431897 v1

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed as of the date first mentioned above.

**MILAGRO**

**MILAGRO OIL & GAS, INC.**

By: _____
Name: _____
Title: _____

**MILAGRO PRODUCING, LLC**

By: _____
Name: _____
Title: _____

**MILAGRO RESOURCES, LLC**

By: _____
Name: _____
Title: _____

**MILAGRO EXPLORATION, LLC**

By: _____
Name: _____
Title: _____

**WHITE OAK**

**WHITE OAK RESOURCES VI, LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed as of the date first mentioned above.

**MILAGRO**

**MILAGRO OIL & GAS, INC.**

By: _____
Name: _____
Title: _____

**MILAGRO PRODUCING, LLC**

By: _____
Name: _____
Title: _____

**MILAGRO RESOURCES, LLC**

By: _____
Name: _____
Title: _____

**MILAGRO EXPLORATION, LLC**

By: _____
Name: _____
Title: _____

**WHITE OAK**

**WHITE OAK RESOURCES VI, LLC**

By: _____
Name: _Thomas F. Isler_
Title: _President_

Schedule 1

Defined Terms

"**365 Contracts**" means all contracts that may be assumed by Milagro pursuant to Section 365 of the Bankruptcy Code.

"**365 Schedule**" has the meaning given thereto in **Section 5.5(a)**.

"**1933 Act**" means the Securities Act of 1933, as amended, and the rules and regulations as promulgated thereunder.

"**Adjusted Equity Component**" has the meaning given thereto in **Section 3.1**.

"**Adjusted Purchase Price**" has the meaning given thereto in **Section 3.1**.

"**Affiliate**" means, with respect to any individual or entity, any other individual or entity that directly or indirectly controls, is controlled by or is under common control with such individual or entity, with "control" in such context meaning the ability to direct the management or policies of an individual or entity through ownership of voting shares or other securities, pursuant to a written agreement, or otherwise.  Without limiting the foregoing, with respect to Milagro, the Subsidiaries shall be deemed Affiliates of Milagro.

"**Accounting Referee**" has the meaning given thereto in **Section 3.4(c)**.

"**Additional Equity Contributions**" has the meaning given thereto in **Section 2.4**.

"**Additional Interest**" has the meaning given thereto in **Section 6.2(b)**.

"**Additional Interest Amount**" has the meaning given thereto in **Section 6.2(b)**.

"**Aggregate Environmental Defect Deductible**" means One Million Dollars ($1,000,000).

"**Aggregate Title Defect Deductible**" means One Million Dollars ($1,000,000).

"**Allocated Value**" means, with respect to a specific Property, that portion of the Purchase Price allocated to such Asset as set forth on **Exhibit G**.

"**Alternative Transaction Fee**" has the meaning given thereto in **Section 13.2(b)**.

"**Amended Company Agreement**" has the meaning given thereto in the recitals.

"**Assessment**" has the meaning given thereto in **Section 7.1**.

"**Asset Taxes**" has the meaning given thereto in **Section 11.7**.

"**Assets**" has the meaning given thereto in **Section 2.2**.

"**Assigned Contracts**" has the meaning given thereto in **Section 2.2(i)**.

66

"**Assumed Obligations**" has the meaning given thereto in **Section 12.1**.

"**Audit Period**" has the meaning given thereto in **Section 3.4(c)**.

"**Audit Report**" has the meaning given thereto in **Section 3.4(c)**.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Bankruptcy Court**" has the meaning given thereto in the recitals.

"**Break-Up Fee**" has the meaning given thereto in **Section 3.3**.

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in Houston, Texas.

"**Capital Account**" has the meaning given thereto in the Second Amended Company Agreement.

"**Cash Payment Cap**" has the meaning given thereto in **Section 3.1**.

"**Casualty Loss**" has the meaning given thereto in **Section 5.4**.

"**Chapter 11 Cases**" has the meaning given thereto in the recitals.

"**Claim Notice**" has the meaning given thereto in **Section 12.4(b)**.

"**Closing**" has the meaning given thereto in **Section 2.5**.

"**Closing Date**" has the meaning given thereto in **Section 2.5**.

"**Code**" has the meaning given thereto in **Section 4.1(a)(1)**.

"**Company Interest**" shall have the meaning given thereto in the Second Amended Company Agreement.

"**Confidentiality Agreement**" has the meaning given thereto in **Section 14.8**.

"**Confirmation Hearing**" means the hearing to approve the transactions contemplated by this Agreement pursuant to the Plan.

"**Cure Costs**" means, with respect to any Desired 365 Contract, any and all amounts necessary to cure all defaults, if any, and to pay all losses that have resulted from defaults under such Desired 365 Contract.

"**Debt**" has the meaning given thereto in **Section 4.1(n)**.

"**Deemed Note Payment Amount**" has the meaning given thereto in **Section 3.2(b)**.

"**Deemed Equity Value**" has the meaning given thereto in **Section 2.4**.

"**Defect Deadline**" has the meaning given thereto in **Section 6.2(a)**.

"**Defensible Title**" has the meaning given thereto in **Section 6.1(a)**.

"**Desired 365 Contract**" has the meaning given thereto in **Section 5.5(b)**.

"**Effective Time**" has the meaning given thereto in **Section 2.5**.

"**Employees**" has the meaning given thereto in **Section 8**.

"**Encumbrances**" has the meaning given thereto in **Section 6.1(b)**.

"**Environmental Defect**" has the meaning given thereto in **Section 7.3(a)**.

"**Environmental Defect Amount**" has the meaning given thereto in **Section 7.3(b)**.

"**Environmental Laws**" has the meaning given thereto in **Section 7.3(c)**.

"**Environmental Valuation Referee**" has the meaning given thereto in **Section 7.4(e)**.

"**Equipment**" has the meaning given thereto in **Section 2.2(h)**.

"**Execution Date**" has the meaning given thereto in the preamble.

"**Final Order**" has the meaning given thereto in the recitals.

"**Final Settlement Statement**" has the meaning given thereto in **Section 3.4(c)**.

"**GAAP**" means generally accepted accounting principles in effect in the United States, as amended from time to time, using the accrual method of accounting.

"**Hard Consent**" has the meaning given thereto in **Section 5.3(d)**.

"**Hydrocarbons**" has the meaning given thereto in **Section 2.2(e)**.

"**Imbalances**" has the meaning given thereto in **Section 2.2(j)**.

"**Income Taxes**" has the meaning given thereto in **Section 11.7**.

"**Indemnified Party**" has the meaning given thereto in **Section 12.4(a)**.

"**Indemnifying Party**" has the meaning given thereto in **Section 12.4(a)**.

"**Individual Environmental Defect Threshold**" means Fifty Thousand Dollars ($50,000) per occurrence.

"**Individual Title Defect Threshold**" means Fifty Thousand Dollars ($50,000) per occurrence.

"**Knowledge**" means (i) with respect to Milagro, the actual knowledge of the following officers and employees of Milagro: Gary Mabie, Marshall Munsell, Carol Cooley, Bill Anderson, Bill Brown, Mike Stolte, David Lalor, Ed Wells and the knowledge that each such Person would have reasonably obtained in the performance of each such person's

68

duties as an officer or employee of Milagro, and (ii) with respect to White Oak, the actual knowledge of the following officers and employees of White Oak: Thomas F. Isler, R. M. Rayburn, Jr., Scott Nonhof, Shawn Barnhart or Joe Lauer, and the knowledge that each such Person would have reasonably obtained in the performance of each such person's duties as an officer or employee of White Oak.

"**Leases**" has the meaning given thereto in **Section 2.2(a)**.

"**LIBOR Rate**" means the rate for deposits in United States Dollars for a period of three (3) months appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service) as of the applicable date, plus five percent (5%) per annum.

"**Losses**" means all losses, damages, claims, demands, suits, causes of action, costs, expenses, charges, liabilities, fines, penalties and sanctions of every kind and character, including reasonable attorney's fees, court costs and costs of investigation.

"**Material Adverse Effect** means any violation, event, change, occurrence, development or other matter that individually or in the aggregate, has or is reasonably expected to have, a material adverse effect upon the financial condition, capitalization, assets, Losses, financial performance, business or operating results of White Oak or Milagro (as applicable) taken as a whole, except any adverse effect related to or resulting from (i) changes in general business or economic conditions in the United States or globally, (ii) national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) changes relating to oil and gas industry (including changes in the price(s) of oil, natural gas or NGLs or in the costs associated with drilling for, producing, gathering, transporting or fractionating oil or natural gas), (iv) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (v) changes in GAAP, (vi) changes in applicable laws, (vii) the taking of any action contemplated by this Agreement or the other agreements contemplated hereby or the announcement of this Agreement, the other agreements contemplated hereby or the transactions contemplated hereby or thereby, (viii) with respect to Milagro only, any adverse change in or effect on the business of Milagro that is caused by the Chapter 11 Cases or the Plan or (ix) any adverse change in or effect on the business of White Oak or Milagro (as applicable) that is caused by any delay in consummating the Closing after November 15, 2015, as a result of any violation or breach by the other Party of any covenant, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligations of such Party at the Closing.

"**Milagro**" has the meaning given thereto in the preamble.

"**Milagro Capital Account Balance**" has the meaning given thereto in **Section 2.4**.

"**Milagro Environmental Dispute Notice**" has the meaning given thereto in **Section 7.4(f)**.

69

"**Milagro Exploration**" has the meaning given thereto in the preamble.

"**Milagro Indemnified Parties**" has the meaning given thereto in **Section 12.3**.

"**Milagro Interests**" has the meaning given thereto in **Section 2.4**.

"**Milagro Producing**" has the meaning given thereto in the preamble.

"**Milagro Resources**" has the meaning given thereto in the preamble.

"**Milagro Senior Secured Debt**" or "**Senior Secured Debt**" means all obligations of Milagro for borrowed money under the Second Amended and Restated First Lien Credit Agreement, dated as of September 4, 2014 by and among Milagro Exploration and Milagro Producing, as borrowers, MOG, as guarantor, and the various financial institutions and other persons from time to time parties thereto as the lenders, and the administrative agent.

"**Milagro Tax Returns**" has the meaning given thereto in **Section 4.1(j)**.

"**Milagro Title Dispute Notice**" has the meaning given thereto in **Section 6.2(g)**.

"**Mineral Interests**" has the meaning given thereto in **Section 2.2(b)**.

"**MOG**" has the meaning given thereto in the preamble.

"**MOG Loan**" has the meaning given thereto in **Section 2.4**.

"**Net Revenue Interest**" or "**NRI**" means, with respect to any Unit or Well, the decimal interest in and to all Hydrocarbons produced and saved or sold from or allocated to such Unit or Well after giving effect to all royalties, overriding royalties, production payments, carried interests, net profits interests, reversionary interests and other burdens upon, measured by or payable out of production therefrom.

"**NORM**" means naturally occurring radioactive material.

"**Note Purchase**" has the meaning given thereto in **Section 3.2(b)**.

"**Notes**" has the meaning given thereto in **Section 3.2(b)**.

"**Notice Period**" has the meaning given thereto in **Section 12.4(b)**.

"**Operating Agreement**" has the meaning given thereto in **Section 5.5(b)**.

"**Organizational Documents**" means, with respect to any Person (other than a natural person), the certificate or articles of incorporation or organization of such Person and any limited liability company, operating or partnership agreement, by-laws or similar documents or agreement relating to the legal organization of such Person.

"**Original Agreement**" has the meaning given thereto in the recitals.

"**Paid-Off Senior Debt**" has the meaning given thereto in **Section 3.2(a)**.

"**Person**" shall mean any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or government authority (including any board, political subdivision or other body thereof).

"**Permitted Assignees**" shall mean the class of creditors set forth on **Schedule 3.4(e)**

"**Permitted Encumbrances**" has the meaning given thereto in **Section 6.1(c)**.

"**Phase II Assessment**" has the meaning given thereto in **Section 7.1**.

"**Plan**" has the meaning given thereto in the recitals.

"**Plugging and Abandonment**" and "**Plug and Abandon**" and its derivatives mean all plugging, replugging, abandonment, equipment removal, disposal or restoration associated with the Assets, including all plugging and abandonment, removal, surface restoration, site clearance and disposal of the wells, well cellars, structures and personal property located on or associated with the Assets, the removal and capping of all associated flowlines, field transmission and gathering lines, the removal of underwater obstructions, pit closures, the restoration of the surface, site clearance, and any disposal of related waste materials, including NORM and asbestos, all in accordance with applicable laws and the terms and conditions of the Leases, beneficial interests, easements and Assigned Contracts.

"**Post-Signing Information**" has the meaning given thereto in **Section 5.7**.

"**Preferential Rights**" has the meaning given thereto in **Section 5.3(a)**.

"**Preliminary Purchase Price**" has the meaning given thereto in **Section 3.4(b)**.

"**Preliminary Settlement Statement**" has the meaning given thereto in **Section 3.4(b)**.

"**Properties**" means any Lease, Well, Unit or Mineral Interest having an Allocated Value set forth on **Exhibit G**.

"**Property Costs**" means any and all costs, expenses, capital expenditures and charges that arise out of, are associated with, or relate to the use, ownership or operation of the Assets including, but not limited to, any joint interest billings, lease operating expenses, P&A and Environmental Costs, lease rental and maintenance costs, shut-in royalties, leasehold payments, Taxes, drilling expenses, workover expenses, geological, geophysical and any other exploration or development expenditures chargeable under applicable operating agreements or other agreements consistent with the standards establishes by the Council of Petroleum Accountants Societies, Inc., and amounts paid for insurance deductibles. For purposes of this Agreement, Property Costs arising out of, associated with, or relating to work performed prior to the Effective Time shall, to the extent such work was actually performed prior to the Effective Time, be deemed to arise out of the period of time prior to the Effective Time; and Property Costs arising out of, associated with, or relating to work performed from and after the Effective Time shall, to the extent such work was actually performed on and after the Effective Time, be deemed to arise out of the period of time from and after the Effective Time.

"**Purchase Price**" has the meaning given thereto in **Section 3.1**.

"**P&A and Environmental Costs**" means all costs arising out of, associated with, or relating to work in connection (i) the Plugging and Abandonment of any of the Assets or (ii) any remediation or environmental clean-up relating to any of the Assets.

"**Records**" has the meaning given thereto in **Section 2.2(k)**.

"**Remediation**" has the meaning given thereto in **Section 7.3(d)**.

"**Retained Contracts**" has the meaning given thereto in **Section 2.3(f)**.

"**Retained Litigation**" means all pending or threatened suits, arbitrations, actions or litigation against Milagro including, but not limited to, all suits, arbitrations, actions or litigation set forth on **Exhibit M**.

"**Retained Obligations**" has the meaning given thereto in **Section 12.1**.

"**Reserved Assets**" has the meaning given thereto in **Section 2.3**.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated July 15, 2015 between White Oak, Milagro and other parties thereto. "**Revenues**" means proceeds received from the sale of Hydrocarbons and all other proceeds arising out of, associated with, or relating to the ownership or operation of the Assets (net of any royalties, overriding royalties or other burdens on or payable out of production, gathering, processing and transportation costs and any production, sale or excise Taxes or similar Taxes).  For purposes of this Agreement, Revenues attributable to the sale of Hydrocarbons produced prior to the Effective Time or attributable to any service provided prior to the Effective Time shall be deemed to arise out of the period of time prior to the Effective Time and Revenues attributable to the sale of Hydrocarbons produced from and after the Effective Time or attributable to any service provided from and after the Effective Time shall be deemed to arise out of the period of time from and after the Effective Time.

"**Royalties**" means all royalties, overriding royalties, rentals, shut-in royalties, production payments and other royalties with respect to production attributable to the interests in the Leases, Mineral Interests, the Units and Wells.

"**Second Amended Company Agreement**" has the meaning given thereto in the recitals.

"**Securities Act**" has the meaning given thereto in **Section 4.1(p)**.

"**Senior Debt**" has the meaning given thereto in **Section 3.2(a)**.

"**Senior Debt Payoff Letters**" has the meaning given thereto in **Section 3.2(a)**.

"**Sharing Ratio**" has the meaning given thereto in the Second Amended Company Agreement.

72

"**Straddle Period**" means any Tax period beginning before and ending after the Effective Time.

"**Subsidiaries**" has the meaning given thereto in the preamble.

"**Surface Fee Lands**" has the meaning given thereto in **Section 2.2(g)**.

"**Surface Use Agreements**" has the meaning given thereto in **Section 2.2(f)**.

"**Survival Period**" has the meaning given thereto in **Section 12.3(a)**.

"**Suspense Funds**" has the meaning given thereto in **Section 11.3**.

"**Taxes**" means any taxes, assessments and other governmental charges imposed by any governmental authority, including net income, gross income, profits, gross receipts, license, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real property, personal property, transfer, real property transfer, value added, sales, use, environmental (including Taxes under Section 59A of the Code), customs, duties, capital stock, franchise, excise, withholding, social security (or similar), unemployment, disability, payroll, windfall profit, severance, production, estimated or other tax, including any interest, penalty or addition thereto, whether disputed or not, and any expenses incurred in connection with the determination, settlement or litigation of the Tax liability.

"**Title Defect**" has the meaning given thereto in **Section 6.1(d)**.

"**Title Defect Amount**" has the meaning given thereto in **Section 6.1(e)**.

"**Title Valuation Referee**" has the meaning given thereto in **Section 6.2(f)**.

"**Transfer Taxes**" has the meaning given thereto in **Section 11.7(d)**.

"**Transition Services Agreement**" has the meaning given thereto in **Section 10.2(g)**.

"**Units**" has the meaning given thereto in **Section 2.2(c)**.

"**Wells**" has the meaning given thereto in **Section 2.2(d)**.

"**White Oak**" has the meaning given thereto in the preamble.

"**White Oak Audited Financial Statements**" has the meaning given thereto in **Section 4.2(q)**.

"**White Oak Financial Statements**" has the meaning given thereto in **Section 4.2(q)**.

"**White Oak Related Parties**" means White Oak and its Affiliates, and all of its and their respective equityholders, partners, members, directors, officers, managers, employees, agents and representatives.

"**White Oak Tax Returns**" has the meaning given thereto in **Section 4.2(j)**.

"**White Oak Unaudited Financial Statements**" has the meaning given thereto in **Section 4.2(q)**.

"**Working Interest**" means the operating interest in a Lease or Mineral Interest that entitles the owner to conduct operations for the exploration, development, and production of Hydrocarbons, and that obligates the owner to bear his or its proportionate share of the costs and expenses of such operations.